**KASOWITZ BENSON TORRES LLP**
Daniel A. Saunders (SBN 161051)
DSaunders@kasowitz.com
Matthew S. Manacek (SBN 312834)
MManacek@kasowitz.com
1801 Century Park East, Suite 2400
Los Angeles, California  90067
Telephone:    (424) 288-7900
Facsimile:    (424) 288-7901

Edward E. McNally (*pro hac vice* forthcoming)
EMcNally@kasowitz.com
Daniel J. Fetterman (*pro hac vice* forthcoming)
DFetterman@kasowitz.com
1633 Broadway
New York, New York 10019
Telephone:    (212) 506-1715
Facsimile:    (212) 506-1800

*Attorneys for Plaintiff Ford Motor Company*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FORD MOTOR COMPANY, a Delaware Corporation<br><br>Plaintiff,<br><br>v.<br><br>KNIGHT LAW GROUP LLP; STEVE B. MIKHOV; AMY MORSE; ROGER KIRNOS; DOROTHY BECERRA; THE ALTMAN LAW GROUP; BRYAN C. ALTMAN; WIRTZ LAW APC; and RICHARD M. WIRTZ,<br><br>Defendants. | Case No.: 2:25-cv-04550<br><br>**COMPLAINT FOR:**<br><br>1. **RICO – Violation of 18 U.S.C. § 1962(c)**<br>2. **RICO Conspiracy – Violation of 18 U.S.C. § 1962(d)**<br><br>**[Jury Trial Demand]** |

Plaintiff Ford Motor Company ("Plaintiff" or "Ford") files this Complaint against defendants Knight Law Group LLP, Steve B. Mikhov, Amy Morse, Roger Kirnos, Dorothy Becerra, The Altman Law Group, Bryan C. Altman, Wirtz Law APC, and Richard Wirtz ("Defendants") for damages and other relief for Defendants' violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"). In support of these claims, Ford alleges as follows:

## INTRODUCTION

1.      This case arises out of a massive and years-long scheme by Defendants to defraud auto manufacturers, including Ford, out of money and property by falsely and fraudulently inflating their legal fees under California's Lemon Law (defined below). The scheme was carried out through a sophisticated criminal enterprise of attorneys and law firms that ingeniously spread their fraudulent billings across thousands of cases against many auto manufacturers so that their fraudulent scheme would go undetected. Indeed, but for the tremendous expense incurred by Ford to audit and detect the fraud, this criminal enterprise would have continued unabated. Ford brings this suit to end this wide-ranging and corrupt scheme to claim thousands of hours in fictitious billings for time never worked.

2.      To effectuate this scheme, Defendants submitted false and inflated fee applications and fee demands based on wholly fictitious work and time entries. The ringleader of the criminal enterprise, Steve Mikhov, and his law firm, Knight Law Group, orchestrated this scheme to take advantage of generous remedies offered by California's Lemon Law at the expense of auto manufacturers including Ford. Ford has identified hundreds of cases in which not less than $100 million of legal bills were unlawfully sought and collected. A review of fee claims in multiple cases takes one on a magical mystery tour of fictitious billings, including individual attorneys who supposedly worked more than 24 hours per day or simultaneously attended different trials or depositions in geographically distant jurisdictions.

3.      One of Mikhov's former partners, Amy Morse, billed more than 20 hours per day on at least 66 occasions, 34 of which exceeded 24 hours, including an ostensibly heroic but physically impossible 57.5-hour workday in November 2016.  Other Defendants similarly billed vast amounts of phantom legal fees.  Richard Wirtz and one of his associates, for instance, claimed to have attended two different trials in two different jurisdictions on a single day, totaling 29 hours of work.  Mikhov also billed a large number of duplicate entries that described identical tasks on the same day for numerous clients with only slight differences in wording.  Other lawyers similarly billed for the same repetitive tasks across a multitude of cases on the same day.  These unconscionable and improper practices produced a highly lucrative but fraudulent criminal enterprise built on deceiving and abusing the judicial system, duping unsuspecting clients, and stealing many millions of dollars from auto manufacturers through a pattern and practice of false pretenses carried out by means of interstate wires and U.S. mail.  These and other similar fraudulent time entries have continued to be used to make claims for legal fees, including as recently as September 2024.  Indeed, in a single email on September 6, 2024, Knight Law Group sent ten fee statements to Ford's outside counsel, seven of which contain time entries as far back as 2018.

4.      Defendants concealed their fraudulent scheme by lying and by spreading their fee claims across numerous matters involving different California courts, cases, and car company defendants.  In so doing, they hoodwinked all of the judges and lawyers who were privy only to information presented in individual cases.  However, when the Defendants' fee applications in numerous cases involving many clients are analyzed by cross-referencing different matters against different car manufacturers to track the claimed time entries for each lawyer in the criminal enterprise for each day over several years, the Defendants' massive false, fraudulent, and inflated billings are clear and unmistakable.

5.      Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, 28 U.S.C. § 1961 et seq.  As further described below, Defendants are

a group of persons constituting an association-in-fact enterprise within the meaning of the RICO statute that has the common purpose to unlawfully engage in fraudulent billing practices and has engaged in numerous predicate acts (including mail fraud and wire fraud) that constitute a pattern of racketeering.  As a result, Defendants' misconduct entitles Ford to treble damages and declaratory relief barring Defendants from attempting to collect and retain their improperly obtained fees.

## PARTIES

### Plaintiff

6.      Plaintiff Ford Motor Company is incorporated under the laws of the State of Delaware, with its principal place of business in Michigan.

### Defendants

7.      Defendant Knight Law Group LLP ("KLG") is a law firm that is, and was at all material times herein, qualified to do business in California.  KLG operates and has operated from various locations in California, including: 10250 Constellation Boulevard, Suite 2500, Los Angeles, CA 90067; 3400 Douglas Boulevard, Suite 250, Roseville, CA 95661; 1331 North California Boulevard, Suite 205, Walnut Creek, CA 94596; and 23 Corporate Plaza, Suite 150, Newport Beach, CA 92660.  During some of the relevant time period, KLG's offices on Constellation Boulevard also housed the operations of Defendant The Altman Law Group and at least two of KLG's joint venturers, The Law Offices of Michael H. Rosenstein, LC ("Rosenstein") and Hackler Daghigian Martino & Novak PC ("Hackler").  Plaintiff is informed and believes, and thereon alleges, that at all relevant times herein, KLG personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by knowingly making and allowing fraudulent entries for time not actually worked.

8.      Defendant Steve B. Mikhov ("Mikhov") is a founding partner and former managing partner of KLG who now resides in Puerto Rico.  Plaintiff is informed and believes, and thereon alleges, that at all relevant times herein, Mikhov personally and knowingly participated in the unlawful activities alleged herein, including, but not

limited to, by knowingly making and allowing fraudulent entries for time not actually worked.  He is the ringleader of Defendants' criminal enterprise to obtain fraudulent fee judgments and settlements against Ford.  Mikhov handles non-trial work, including operational tasks and marketing activities.  Mikhov routinely associates with other lawyers to provide trial services and splits inflated fee awards with these lawyers, who benefit from and knowingly participate in overbilling and the creation of false billing records.  Mikhov began his involvement in this scheme as a founding partner of O'Connor & Mikhov and later shifted his efforts to KLG.  He continues to wield considerable influence on the other lawyers and firms that are members of the criminal enterprise.

9.     Defendant Amy Morse ("Morse") is a partner at KLG who resides in the State of California.  Plaintiff is informed and believes, and thereon alleges, that at all relevant times herein, Morse personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by knowingly making and allowing fraudulent entries for time not actually worked.

10.    Defendant Roger Kirnos ("Kirnos") is a partner at KLG who resides in the State of California.  Plaintiff is informed and believes, and thereon alleges, that at all relevant times herein, Kirnos personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by knowingly making and allowing fraudulent entries for time not actually worked.

11.    Defendant Dorothy Becerra ("Becerra") is a former paralegal of KLG who resides in the State of California.  Plaintiff is informed and believes, and thereon alleges, that at all relevant times herein, Becerra personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by overseeing other paralegals participating in the fraudulent scheme, receiving and transacting checks for what she knew were fraudulently obtained fee payments, and developing the formula for KBG's split of those payments with other attorneys.

12.     Defendant The Altman Law Group ("ALG") was a law firm located at 10250 Constellation Boulevard, Suite 2500, Los Angeles, CA 90067.  ALG was qualified to do business in California.  Plaintiff is informed and believes, and thereon alleges, that ALG personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by knowingly making and allowing fraudulent entries for time not actually worked.

13.     Defendant Bryan C. Altman ("Altman"), who resides in the State of California, is a partner at Quill & Arrow LLP, and previously was the founder and member attorney of The Altman Law Group.  Plaintiff is informed and believes, and thereon alleges, that at all relevant times herein, Altman personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by knowingly making and allowing fraudulent entries for time not actually worked.

14.     Defendant Wirtz Law APC is a law firm with offices at 24370 La Jolla Village Drive, Suite 800, San Diego, CA 92122; 10866 Wilshire Boulevard, Suite 1200, Los Angeles, CA 90024; and 384 Forest Ave, Suite 17, Laguna Beach, CA 92651.  Wirtz Law APC is, and was at all material times herein, qualified to do business in California.  Plaintiff is informed and believes, and thereon alleges, that at all relevant times herein, Wirtz Law APC personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by knowingly making and allowing fraudulent entries for time not actually worked.

15.     Defendant Richard M. Wirtz ("Wirtz"), who resides in the State of California, is the founder and managing attorney of Wirtz Law APC.  Plaintiff is informed and believes, and thereon alleges, that at all relevant times herein, Wirtz personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by knowingly making and allowing fraudulent entries for time not actually worked.

**Other Lawyers and Law Firms Submitted Inflated Invoices**

16.    Mikhov and KLG also engage, coordinate, and conspire with a consortium of other Defendants, retained experts, and legal professionals, including other law firms and attorneys who are brought in as co-counsel to handle trial work on purposefully overstaffed cases.  These plaintiff lawyers, often numbering ten to fifteen lawyers for one case or set of plaintiffs, work in tandem to misrepresent the tasks completed and the amount of time spent on cases, and frequently split the proceeds of the inflated and fraudulently obtained fee awards.  KLG enters into oral agreements with these plaintiff lawyers, in which the plaintiff lawyers KLG brings on must pay KLG a referral fee, based on a formula KLG created and calls the Attorney Fee Breakdown.  On information and belief, a number of these other law firms and lawyers, including KLG's joint venturers, also submitted artificially inflated timesheets in connection with fee applications, but because the fee applications were frequently submitted by KLG, discovery is required to determine culpability for such submissions.

## JURISDICTION AND VENUE

17.    This Court has federal question jurisdiction in this matter pursuant to 28 U.S.C. § 1331.  This matter arises out of violations of the RICO Act, 18 U.S.C. §§ 1961 et seq.  Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions by Defendants giving rise to the claims occurred in this District.

## GENERAL ALLEGATIONS

### I.    BACKGROUND

#### A.    The Fraudulent Billing Scheme

18.    This action centers on Defendants' criminal scheme to win astronomical fraudulent fee awards in Lemon Law cases in federal and state courts throughout California.  Defendants' submission of fictitious billing records, among other actions, constituted multiple related acts of mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.

19.     California's "Lemon Law," the Song-Beverly Consumer Warranty Act, Civil Code §1790 *et seq.,* provides for the recovery against car manufacturers of "costs and expenses, including attorney's fees based on *actual time expended*, determined by the court to have been *reasonably incurred* by the buyer . . . ." Cal. Civ. Code § 1794(d) (emphasis added).  The party seeking the benefit of the Lemon Law's fee-shifting provisions must submit a fee application that is supported by competent evidence, including timesheets and other billing records, reflecting work actually performed on behalf of the car buyer.  The fee applicant has the burden of showing that its requested fees are reasonable.

20.     Unbeknownst to Ford or the courts, Defendants have exploited the Lemon Law by submitting fake time records in thousands of warranty claim cases asserted against Ford and other automakers, seeking compensation for work that was never performed.  Defendants participated in the fraudulent billing scheme knowingly and with the intent to deceive and defraud Ford for their benefit.  Defendants' shared objective was and is to rake in many millions of dollars of legal fees each year without regard for the actual value of the work performed.

21.     Specifically, from 2015 through the present, to further their fraudulent scheme against Ford and other auto manufacturers, Defendants have routinely submitted false and fictitious time records as part of their fee applications in Lemon Law cases, and Defendants repeatedly received funds from Ford based on those false and artificially inflated timesheets to recover larger amounts of fees and costs than those to which KLG and other Defendants were entitled.

22.     On information and belief, Defendants frequently do not maintain contemporaneous time records and instead generate purported time entries after the fact to support their fee demands, notwithstanding their representations to the contrary in court filings.

23.     Defendants failed to provide courts with truthful evidence showing the actual time expended on client work for Lemon Law cases. Thus, the court

determinations and settlements based on the evidence, including time sheets that Defendants submitted to reflect the time they reasonably incurred, are tainted and unreliable; the settlements Ford entered into and paid to Defendants based on claims for fictitious legal fees were fraudulent; and the payments Ford made to comply with such court determinations and settlements were unearned and unwarranted.

24.    In separate lawsuits, both of which settled in or around March 2022, two of KLG's joint venturers, Rosenstein and Hackler, alleged that KLG artificially inflates its invoices to recover a disproportionate share of attorneys' fees awarded by courts or obtained through settlements with car manufacturers.  Indeed, Ford's review of fee applications reveals applications that purport to show that lawyers at the Rosenstein and Hackler firms on occasion billed in excess of 24 hours in a single day.  These lawsuits also revealed complicated referral arrangements between KLG and the plaintiff lawyers it engages as trial counsel, in which trial counsel must pay KLG a referral fee.

25.    Over the past ten years, Defendants have submitted fee applications seeking payment from Ford totaling more than $100 million for work on behalf of car buyers.  The majority of the ill-gotten gains from submitting fraudulent billing records has been awarded to law firms under the control of Mikhov.  Ford believes that of these payments, not less than 50% are attributable to fraudulently inflated attorneys' fees.

26.    Defendants intended that Ford rely, and Ford did rely, on Defendants' fraudulent billings in paying false and inflated fees associated with fraudulently obtained fee judgments and settlements.

27.    Despite Ford having examined only a small sample of fee applications submitted by Defendants, it is apparent from that examination that fictitious fee applications filed by Defendants cover a gamut of made-up work and physically impossible working hours and appearances, including, but not limited to:

(a)    Numerous instances of attorneys purportedly working over 24 hours in a single day;

(b)    Attorney "appearances" simultaneously at full-day depositions and trials in different geographic locations;

(c)    Duplicative billing of the same vague task descriptions across multiple cases for comparable amounts of time; and

(d)    More than 1,200 no-date entries for clerical tasks performed by Mikhov, as well as equally suspicious dated entries.

### 1.    Defendants Repeatedly Billed Between 24 and 60 Hours Per Attorney in a Single Day

28.    Defendants electronically filed false billing records indicating that individual attorneys worked more than 24 hours a day on numerous occasions.

29.    Defendant Morse claimed to have worked more than 24 hours a day on 34 separate occasions, including an astounding 57.5-hour workday on November 30, 2016, and 31.3 hours on March 23, 2017.  Morse also claimed to have worked between 20 and 23.9 hours a day on 38 separate occasions.  During one three-month period (February-April 2017), Morse averaged 483.7 hours a month, with a high of 513.1 hours in March 2017 for an average of 16.5 hours a day in that month (including weekends).  During this time, Morse did not participate in any trials; rather, according to her billing records, she spent her time drafting and reviewing discovery and pleadings.  These obviously fraudulent and falsely inflated billing records were used, and continue to be used, to support fee awards.

30.    Kristina Stephenson-Cheang, an associate with KLG, is second only to Amy Morse in the number of 24+ hour-days she has billed.  On July 6, 2017, Stephenson-Cheang billed 34.1 hours; on July 14, 2017, Stephenson-Cheang billed 25.4 hours; on August 16, 2017, Stephenson-Cheang billed 25.6 hours; on August 21, 2017, Stephenson-Cheang billed 24.5 hours; on November 14, 2017, Stephenson-Cheang billed 28.7 hours; and on December 4, 2017, Stephenson-Cheang billed 28.6 hours.

31.    Unless the laws of time and space operate differently at KLG's offices than elsewhere in the universe, these billings are conclusive evidence of fraud.  Yet

Defendants attempted to conceal these and other fraudulent time entries by spreading them across different payor auto companies and different plaintiffs so that each individual fee application would appear innocuous in isolation.

### 2. Defendants Purportedly Appeared for a Full Day's Work at Two Different Locations in a Single Day

32.     Defendants also falsely represented that attorneys made full-day appearances in different locations on the same day.  For instance, KLG filed billing records indicating that Defendant Wirtz billed 29 hours on July 24, 2018 to attend two trials in two different jurisdictions on the same day – again a physical impossibility. Specifically, Wirtz billed 16 hours that day to prepare for and attend the *Jordan v, Ford Motor Company* trial in Alameda County Superior Court while also billing 13 hours that same day to travel to and attend the *Choi v. BMW* trial in Los Angeles County Superior Court, some 400 miles away.  By order dated June 14, 2019 in *Jordan v. Ford Motor Company,* Alameda Co. Case No. RG16820118, the Alameda County Superior Court granted an award of attorneys' fees totaling $257,615.00 that included the foregoing fees.

33.     Similarly, on July 18, 2018, Defendant Wirtz Law APC attorney Amy Smith billed 13.5 hours to prep/attend the *Choi* trial in Los Angeles and 11.2 hours on the *Jordan* trial in Alameda, while also managing to bill 0.7 hours to a third case – a total of 25.2 hours in a single day.

34.     As a third example, on April 26, 2018, Larry Castruita, whose time entries are included in fee applications filed by KLG and other firms, billed 15.25 hours in *Smith v. FCA US LLC*, Sacramento Co. Case No. 34-2016-00192381-CU-BC-GDS, to travel to and attend a settlement conference in Sacramento while also billing 5.25 hours in *Orozco v. FCA US LLC*, Los Angeles Co. Case No. BC658214, to take a deposition in Long Beach, some 400 miles away.

3.      **The Same Tasks Were Fraudulently Billed for the Same Amounts of Time Across Multiple Separate Cases**

35.     Defendants generate substantial phantom legal fees by billing for the same repetitive tasks across a multitude of cases at the same time and by billing the same work through separate law firms or timekeepers.  As an example, attached as Exhibit A is a chart of 489 task descriptions in which an attorney billed to draft a meet-and-confer letter and perform unspecified legal research.  There is no plausible reason why those two separate tasks should so frequently be combined other than to mask the time actually spent on the two tasks.  In this chart, the unspecified legal research masks the time actually billed for drafting identical or substantially similar meet-and-confer letters.  The chart is in chronological order and shows days and periods of time when many letters were drafted without any economy of scale reduction in time allotments.  Not surprisingly, these entries overlap with the 24-plus hour days described above.  For example, Amy Morse allegedly drafted/researched four letters on March 10, 2017, for which she billed 4.0 of her total 28.0 hours.

36.     Another example of such repetitive billing is the chart attached as Exhibit B of 596 fee entries submitted by Defendants for "drafting RFAs [Requests for Admission]."  As with the meet-and-confer letter entries described above, the chart demonstrates that there are no economies of scale over time and that certain timekeepers, especially Amy Morse and Kristina Stephenson-Cheang, billed to draft RFAs day after day for extended periods of time.  Overbilling for RFA drafting contributed to the 24+ hour days, including 12.9 hours of Amy Morse's 57.5 hours billed on November 30, 2016.

37.     These and similar fraudulent time entries have continued to be used to make claims for legal fees, including as recently as September 2024.

### 4.   Defendants Rely on No-Date Time Entries as Part of Their Scheme

38.   Billing records submitted by Defendants include other entries that are belied by the realities of practice.  For example, Mikhov, who on information and belief has never first-chaired a trial and does not try cases for his firm, submitted hundreds of invoices that contain fee entries with no date, an essential element when determining the reasonableness of hourly fees.  Such no-date entries exceed 1,200 hours, and the corresponding fees billed exceed $625,000.00.  Nearly all entries are a combination of (i) initial communication with client, (ii) initial evaluation of client's claims, and (iii) analysis of vehicle documents.  The entries describe identical tasks with only slight wording differences.  These and other similar suspicious time entries continue to be used to assert claims for legal fees, including as recently as September 2022.

39.   Mikhov's dated time entries are equally implausible.  For example, on July 31, 2017, Mikhov billed a total of 18.1 hours that included 84 separate entries in 59 separate cases.

### B.   Defendants Concealed and Lied About Their Fraudulent Scheme

40.   Attorneys, in California as in every state across the country, are explicitly required to conduct themselves with dignity, courtesy, and integrity as officers of the court.  An attorney seeking to practice in California is required to take an oath to that effect.  Cal. Rules of Court, R. 9.7.

41.   Defendants abused their positions of trust as members of the Bar to deceive the courts and Ford by submitting thousands of fee applications that appeared genuine on their face but are clearly false and fraudulent when viewed alongside other fee applications submitted for work on the same day.

42.   The key to Defendants' fraudulent billing scheme is submitting fee applications that do not appear fraudulent when reviewed in isolation in a particular matter.  Because there are no red flags to alert the courts or the victims to audit the daily time entries for every day over a decade across all cases for all of the Lemon Law

13

lawyers, including multiple law firms, courts have been deceived into awarding fees, and Ford has settled fee claims, in reliance on the false presumption that Defendants were complying with their ethical obligations and not perpetrating a massive and ongoing fraud on Ford, other automakers, and the courts.

43.    In May 2020, Defendant Kirnos, a partner at KLG (and also Defendant Mikhov's half-brother), admitted that he expected the court and Ford to rely on Defendants' representations regarding fees.  During an oral argument regarding KLG's fee application in an MDL action, *Mark Pedante v. Ford Motor Company et al.* (ML 18-02814-AB), Kirnos stated:  "There is a presumption attached to our billing because there is a presumption that we are going to be ethical, that we are not going to submit lies to this Court.  And we did not."  Kirnos went on to implore the Court to rely on that presumption on the basis that Defendants obviously would not violate ethical duties when they submit fee applications to the Court.  Even while making this representation, Kirnos knew that he and the other Defendants were in fact engaging in repeated and blatant violations of their ethical duties and committing criminal acts to line their own pockets.

44.    While Defendants' overbilling did not go entirely unnoticed by courts, Defendants were successful in concealing the massive scope of their fraud.  In a Lemon Law case in 2020, *In re Volkswagen "Clean Diesel" Marketing*, Sales Practice and Prod. Liab. Litig. (MDL No. 2672 CRB (JSC)), the court found that KLG, Altman Law Group, and others filed applications seeking compensation for work that was not in fact conducted on behalf of the clients involved in the fee application.  United States District Judge Charles R. Breyer ordered reduction of the requested attorneys' fees by 50-90% for certain categories of tasks.  The court stated that the plaintiff lawyers "likely overstaffed this case" and that "[o]ther courts have applied reductions when Knight Law Group's staffing practices appear to have led to inefficiency."  The court noted "the enormous number of hours attributed to these Plaintiffs' cases while they were stayed."  The court completely excluded bills for

14

vague entries and clerical tasks, as well as work performed for other plaintiffs, not involved in the fee application, whose cases actually went forward to trial. However, because the court was looking only at the fee applications in a single case, it was unable to discern the true extent of the fraud that Defendants concealed by spreading their fictitious billings across multiple clients, cases, and law firms.

### C.    Defendants Have Intensified Their Fraudulent Scheme Over Time

45.    Since 2015, the Defendants have filed over 5,000 breach of warranty cases against Ford and other car manufacturers and have filed hundreds of fee applications in connection with those cases.

46.    Defendants' fraudulent scheme has expanded over time.  In the years 2021 through 2024, KLG alone obtained fee awards from Ford totaling approximately $35 million, with a substantial portion of that sum likely resulting from false, fictitious and inflated billing records.

47.    Moreover, Ford is not the only automaker in the Defendants' crosshairs. Defendants have filed numerous cases against other automakers including GM, Fiat Chrysler Automobiles/FCA, Volkswagen/Audi, and BMW, among others.  Based on a review of only a small sample of such fee applications, Ford believes that these automakers are also victims of Defendants' scheme to defraud.

48.    There are no signs of abatement of the criminal enterprise's fraudulent scheme, despite the fact that Defendants' clients often retain small recoveries, because Defendants have pursued this fraudulent billing scheme to enrich themselves, including bankrolling their lavish vacations, opulent homes, and use of private jets.

## II.    DEFENDANTS USED INTERSTATE WIRES AND U.S. MAIL TO SUBMIT FALSE, FRAUDULENT, AND INFLATED FEE APPLICATIONS AND TO SECURE THEIR FRAUDULENTLY OBTAINED PROCEEDS

49.    Defendants used the U.S. mail and interstate wires to make fraudulent court filings, to negotiate settlements, and to receive payments pursuant to fraudulent

fee judgments and settlements based on falsified evidence, all in furtherance of their scheme to defraud Ford and other similarly situated automakers of their money.

50.    For example, by order dated July 19, 2018 and filed on July 31, 2018, in *Buck v. Ford Motor Company,* Superior Court of California, Stanislaus County, Case No. 2008745, the Court ordered Ford to pay attorneys' fees, costs, and expenses totaling $135,500.00 based on a fee application filed by KLG that included billing entries by Morse for November 30, 2016 (on which date she billed 57.5 hours) and March 23, 2017 (on which date she billed 31.3 hours).  By letter dated July 24, 2018 addressed to Mikhov and sent by FedEx, Ford enclosed a check in the amount of $135,500.00 payable to KLG.  Similarly, by judgment entered on August 31, 2018 in *Duk v. Ford Motor Company*, Superior Court of California, San Diego County, Case No. 2016-00012779, the Court ordered Ford to pay attorneys' fees, costs, and expenses totaling $101,450.78 based on a fee application filed by KLG that included billing entries by Morse for November 30, 2016 and March 23, 2017.  By letter dated October 1, 2018 addressed to Mikhov and sent by FedEx, Ford enclosed a check in the amount of $101,450.78 payable to KLG.  In addition to the fee awards in the *Buck* and *Duk* cases, Morse's fraudulent billing records were also used to support fee awards in the following cases, among others: (a) fee award in the amount of $10,675.16 in *Burgess v. Ford Motor Company*, San Bernardino Co. Case No. CIVDS1620111, paid by check dated October 9, 2018 payable to KLG and sent by FedEx; (b) fee award in the amount of $12,405.20 in *Duenas v. Ford Motor Company*, Los Angeles Co. Case No. BC638306, paid by check dated August 15, 2018 payable to KLG and the plaintiff and sent by FedEx; and (c) fee award in the amount of $15,005.00 in *Orosco v. Ford Motor Company*, Los Angeles Co. Case No. BC638222, paid by check dated October 12, 2018 payable to KLG and sent by FedEx.  Morse's fraudulent billing records were also used to support fee awards in cases involving other auto manufacturers, including, among others: (a) fee award in the amount of $106,560.55 in *Vargas v. FCA US LLC*, Orange Co. Superior Court Case No. 30-2016-00845431-CU-BC-CJC, paid by check dated July

16
COMPLAINT

26, 2018 and sent to Dorothy Becerra by FedEx; (b) fee award in the amount of $23,179.10 in *Beltran v. FCA US LLC*, Los Angeles Co. Case No. BC617905, paid by check dated September 10, 2019 and sent by FedEx.

51.     When satisfying judgments and settlements pursuant to Defendants' inflated fee applications where KLG associates with another firm, Ford will often make a single payment via check to both KLG and the other firm, and, as a common practice, KLG endorses and deposits these checks without an additional signatory from the other firm.  For instance, in *Santillo v. Ford Motor Company,* San Diego Co. Superior Court Case No. 37-2017-11591, pursuant to Notice of Ruling dated February 27, 2019, Ford submitted a payment to KLG and Rosenstein in a single check for $35,630.21, sent on March 27, 2019 by FedEx.  The check was later endorsed and deposited by KLG only without a signature from Rosenstein.

52.     Similarly, in *Beltran v. FCA US LLC*, Los Angeles Co. Superior Court Case No. BC617905, KLG received a single check for $23,179.10 on September 27, 2019, even though Defendants Wirtz Law APC and Richard Wirtz billed time on the matter.  In *Vargas v. FCA US LLC*, Orange Co. Superior Court Case No. 30-2016-00845431-CU-BC-CJC, KLG received a single check for $106,560.55 on July 26, 2018; this check was addressed to Dorothy Becerra.  Defendant Richard Wirtz billed time as of counsel *for KLG* on this case.  The above checks in the *Beltran* and *Vargas* cases were sent by FedEx.

53.     On other occasions, multiple firms receive checks in satisfaction of judgments or settlements.  For instance, in *Berroteran v. Ford Motor Company*, Los Angeles Co. Superior Court Case No. BC542525, Ford sent KLG, ALG, and their client a settlement check for $645,259.41 on February 28, 2022 by FedEx.  By this point, ALG and Ford had already reached agreement on ALG's fee claim for this case, agreeing on January 7, 2022 to pay ALG $300,000.00.  Ford mailed this check to ALG on July 20, 2022 by FedEx.  In a motion for attorneys' fees filed on May 20, 2022, KLG sought $1,226,868.45 in attorneys' fees, costs, and expenses on behalf of itself and

other attorneys.  Kirnos submitted a declaration that attached KLG's invoices, which included time entries from him, Mikhov, and Morse.  The court issued a minute order on July 14, 2022, awarding $807,127.50 in attorneys' fees only.  Ford sent KLG a check in the amount of $851,493.51 on October 21, 2022 by FedEx.

54.    Similarly, in *Coon v. Ford Motor Company*, Riverside Co. Superior Court Case No. MCC1300767, Ford sent KLG, ALG, and their client a check on March 2, 2022 for $793,924.29 by FedEx; this check was addressed to Dorothy Becerra.  The fee application—on behalf of KLG, ALG and others—was filed years prior, on February 4, 2019.  Mikhov submitted a declaration in support of that application.  KLG requested $866,754.00 (including a lodestar enhancement) and ALG requested $433,091.25 (including a lodestar enhancement).  On May 19, 2019, the court awarded KLG $543,554.00 in attorneys' fees.  Like with the *Berroteran* matter, Ford and ALG agreed on January 7, 2022 that Ford would settle ALG's fee claim for $300,000.00.  Ford mailed this check to ALG on June 16, 2022, by FedEx.  Ford mailed a check to KLG for $709,004.12 on June 16, 2022, by FedEx.

55.    In *Brown v. Ford Motor Company*, Butte Co. Superior Court Case No. 160060, KLG, ALG, and their client jointly received a check for $568,694.52, which Ford's outside counsel sent on behalf of Ford by FedEx on March 25, 2022.  Like with the *Coon* matter, the fee application in this case—on behalf of KLG, ALG, and others— was submitted years prior, on November 21, 2018.  Mikhov and Altman both submitted declarations in support of that application.  KLG sought $807,163.50 (including a lodestar enhancement) and ALG sought $398,887.50 (including a lodestar enhancement).  On January 16, 2019, the court awarded $714,233.00 in total attorneys' fees.  On June 6, 2022, Ford mailed ALG a check for $300,000.00 by FedEx, based again on its January 7, 2022 agreement with Ford.  Ford mailed a check to KLG for $843,528.13 on July 25, 2022 by FedEx.

56.    *Margeson v. Ford Motor Company*, Los Angeles Co. Superior Court Case No. BC549430, is still another example.  Like with the *Coon* and *Brown* matters, the fee

application—on behalf of KLG, ALG, and others—was submitted years prior, on December 15, 2017.  Mikhov and Altman both submitted declarations in support of that application.  KLG sought $523,494.00 in fees, and ALG sought $353,205 in fees.  On February 1, 2018, the court awarded $741,839.70 in total attorneys' fees.  Ford's outside counsel sent ALG a $500,000.00 check on July 26, 2022.  Ford's outside counsel sent KLG two checks: one for $136,744.53 on July 26, 2022, and another for $345,000.00 on September 22, 2022.  All of these checks were sent on behalf of Ford by FedEx.

57.    As another example, the fee application in *Anderson v. Ford Motor Company*, San Joaquin Co. Superior Court Case No. 39-2013-00299512-CU-BC-STK, was submitted on May 28, 2019, on behalf of KLG, Wirtz Law, and others.  Mikhov, Wirtz, and others submitted declarations in support of that application.  KLG sought $740,118.75 (including a lodestar enhancement), and Wirtz Law sought $54,348.75 (including a lodestar enhancement).   On May 10, 2022, Ford issued a check to Wirtz Law for $38,270.98, which was sent by FedEx.

58.    On information and belief, all of the above checks were sent in reliance on false, fraudulent, and inflated fee applications or billing statements, and were caused by Defendants as an essential part of their fraudulent scheme.

## III.    <u>FORD HAS SUFFERED AND CONTINUES TO SUFFER SIGNIFICANT HARM FROM THE CONSPIRACY</u>

59.    As a direct and proximate result of Defendants' pervasive fraud, Ford has paid Defendants inflated fees on fee awards totaling tens of millions of dollars.  Any uncertainty as to the amount of damages caused by the fraudulent billing scheme has been caused by Defendants' actions.  In addition to the harm suffered from payment of fraudulently induced fee awards, Ford has been further damaged by the legal fees and other costs it had to incur to detect and now attempt to stop this fraudulent criminal enterprise, as well as by harm to its reputation and goodwill resulting from Defendants' misconduct.

**A.**    **Rooting Out the Fraudulent Billing Scheme Took Thousands of Hours of Reviewing Court Records and Incurred Huge Expenses for Ford**

60.    Ford's review of fee applications in only a sampling of the cases that Defendants have filed has uncovered numerous examples of impossible and implausible time entries.  The true extent of Defendants' massive fraudulent billing scheme will only be revealed as Ford assembles additional evidence and through discovery in this matter.

61.    The evidence presented in this Complaint reflects extensive work by Ford. New evidence continues to emerge as Defendants continue to file additional fraudulent fee applications against Ford and other car manufacturers in various jurisdictions.

62.    Expensive expert services are needed to untangle the thousands of fraudulent billing entries that Defendants have filed in various jurisdictions.

63.    The work to uncover Defendants' criminal scheme is continuing and is expected to cost Ford many millions of dollars.  Such work is necessary only because of Defendants' calculated efforts to conceal their scheme by spreading their fraudulent billing entries across multiple cases, auto manufacturers, and jurisdictions.

**B.**    **Ford Has Suffered Significant Additional Harm From Defendants' Fraudulent Scheme**

64.    Ford also suffered by having to participate in a tainted litigation process. Defendants submitted false and fraudulent applications to sway courts to order unfair fee judgments that did not reflect the work actually performed on behalf of car owners.

65.    In open court and through Facebook posts, blogs, and other forums for summoning negative publicity, Defendants have presented unfair and false representations of their fee recoveries to onboard new clients, harming Ford's reputation and goodwill.

66.    Defendants' fraud has caused substantial monetary loss.  Ford paid fee judgments much larger than it would have paid absent Defendants' fraud and abuse of their trusted positions as attorneys.

67.     Although Ford's efforts to uncover the true extent of Defendants' fraud continue, on information and belief, the scheme has already cost Ford many millions of dollars in false and inflated fees.

## IV.    **THE RICO ENTERPRISE**

68.     Defendants are a group of persons constituting an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (referred to hereinafter as the "Enterprise"), because, among other reasons: (a) those involved have the common purpose to unlawfully operate an ongoing criminal enterprise engaged in fraudulent billing; (b) the Enterprise has an informal governing structure that at certain times operates as a command hierarchy led by Defendants Mikhov and KLG, different roles for members, and a governing set of rules and practices; (c) each of the Defendants participates in the operation or management of the Enterprise; (d) the Enterprise has enjoyed sufficient longevity and has been in continuous operation for over five years; and (e) the Enterprise has generally been structured to operate as a continuing unit, with membership, rank, privileges, and access constantly maintained by the members, to accomplish the goals of the fraudulent billing scheme.

69.     Defendants have associated with one another in the Enterprise for the common purposes of preparing and filing fraudulent fee applications and billing records, negotiating fraudulent settlements, splitting inflated fees, and funneling fraud proceeds into attorney distributions and extravagant purchases.

70.     At all relevant times, Defendants were financially intertwined.  KLG received checks on behalf of other plaintiff lawyers and firms associated with the Enterprise and cashed these checks without obtaining proper endorsements.

71.     At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).  Defendants are involved in business involving clients in different states, auto manufacturers engaged in interstate commerce, and the federal courts' interstate e-filing system.  Many

of the cases involved in the criminal scheme are related to multi-district litigation involving lawyers located in different states accessing the federal e-filing system.

72.    Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), namely, mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

## V.    THE PATTERN OF RACKETEERING ACTIVITY

73.    As described herein, Defendants engaged in an expansive criminal scheme to defraud Ford about Defendants' role and efforts relating to tens of thousands of cases.

74.    Defendants engaged in multiple instances of mail and wire fraud as part of their pattern of racketeering activity.

75.    The ultimate objective of Defendants' scheme or artifice to defraud was to deceive and coerce Ford into paying them unearned fee judgments and settlements totaling millions of dollars to directly benefit Defendants.

76.    In furtherance of their fraudulent scheme, and as described herein and in Exhibit C hereto, Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to, the following:

(a) electronic filing and service of court papers, served on lawyers located in various states, containing false and misleading statements intended to mislead the courts and relevant parties and to obtain Ford's money;

(b) mail service of court papers on lawyers containing false and misleading statements intended to mislead the relevant parties and to obtain Ford's money; and

(c) wires and/or mailings between and among Defendants, or between and among Defendants and Ford or its counsel, containing fraudulent billings and payments therefor.

77.    Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud Ford into paying Defendants money to which Defendants knew they were not entitled.  Defendants knowingly and intentionally prepared false billing records and then, knowingly and with the intent to deceive Ford and the relevant courts for the purpose of obtaining Ford's money, caused those false and fictitious billing records to be publicly filed.  Defendants colluded with one another to fabricate time records to inflate statutory fees and inflate settlements to further the conspiracy with the intent that those statements be believed.  The attack on Ford was intended to, and did, result in Ford paying inflated fees that benefited the Defendants, which in turn financed the criminal scheme and supported the Enterprise members' jet-setting lifestyles.

78.    In a concerted effort to thwart Ford's ability to uncover the truth about the fraudulent billing scheme, Defendants have filed or caused to be filed hundreds of false and misleading documents in various cases with different auto manufacturers.

79.    Defendants intended that courts in various jurisdictions rely on, and those courts have relied on, Defendants' false and misleading statements, trusting Defendants to comply with their ethical obligations as officers of the court.  The courts' acceptance of Defendants' fraudulent billings has resulted in numerous inflated fee awards against Ford.

80.    Accordingly, Defendants' submission of fraudulent billings and false and misleading representations in court have caused Ford to suffer substantial damages and reputational harm.

81.    The alleged predicate acts, consisting of scores of acts of mail and wire fraud, are related and continuous and were committed on behalf of an associated-in-fact

1   enterprise that has existed for the purpose of carrying out the fraudulent billing scheme
2   for nearly a decade.

### FIRST CAUSE OF ACTION

### (RICO, 18 U.S.C. § 1962(c))

### (Against All Defendants)

6   82.    Ford realleges and incorporates herein by reference each and every
7   foregoing paragraph of this Complaint.

8   83.    At all relevant times, Ford was and is a person within the meaning of 18
9   U.S.C. §§ 1961(3) and 1962(c).

10   84.    At all relevant times, each Defendant was and is a person within the
11   meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

12   85.    As detailed above, Defendants and their co-conspirators are a group of
13   persons associated together in fact for the common purpose of advancing an ongoing
14   criminal enterprise, specifically by submitting fraudulent fee applications and obtaining
15   fraudulent fee awards in federal and state courts across California against Ford and
16   other auto manufacturers.

17   86.    Defendants and their co-conspirators are an association-in-fact enterprise
18   as defined in 18 U.S.C. § 1961(4).  Each Defendant participated in the operation or
19   management of the Enterprise.

20   87.    At all times alleged herein, the Enterprise was engaged in, and its activities
21   affected, interstate commerce.

22   88.    The Enterprise is likely to continue to engage in racketeering activity in its
23   efforts to collect and protect its ill-gotten gains.

24   89.    Each Defendant conducted or participated, directly or indirectly, in the
25   conduct, management, or operation of the Enterprise's affairs through a "pattern of
26   racketeering activity" as defined in 18 U.S.C. §1961(5).

27
28

90. Ford incorporates by reference the attached Exhibit C, which identifies numerous (but not all) specific uses of interstate wire and mail communications advancing the Enterprise's scheme in violation of 18 U.S.C §§ 1341 and 1443.

91. As a direct and proximate result of the Enterprise's pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), Ford has been damaged in its business and property in an amount to be determined at trial, including but not limited to by having to pay more than $100 million due to fraudulent billing statements submitted by Defendants.

92. Pursuant to 18 U.S.C. § 1964(c), Ford is entitled to recover treble damages plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION

### Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)

### (Against All Defendants)

93. Ford realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint.

94. Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

95. Defendants knew that they were engaged in a conspiracy to commit the predicate acts of mail and wire fraud, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.

96. Each Defendant agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

97. Each Defendant knew about and agreed to facilitate the Enterprise's scheme to submit fraudulent billing statements to state and federal courts to obtain favorable decisions and recover more than they were entitled to from Ford. It was part of the conspiracy that Defendants would commit a pattern of racketeering activity in the

conduct of the affairs of the Enterprise, including but not limited to the acts of racketeering set forth above and in Exhibit C.

98.     As a direct and proximate result of Defendants' conspiracy to violate 18 U.S.C. § 1962(d) and the overt acts taken in furtherance of that conspiracy, Ford has been damaged in its business and property in an amount to be determined at trial, including but not limited to by having to pay more than $100 million due to fraudulent billing statements submitted by Defendants.

99.     Pursuant to 18 U.S.C. § 1964(c), Ford is entitled to recover treble damages plus costs and attorneys' fees from Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendants awarding the following relief:

1.     For an award of general damages in the amount to be determined at trial and estimated to be at least $100 million, which damages are to be trebled according to the RICO statute, 18 U.S.C. § 1964(c);

2.     For pre-judgment interest according to statute;

3.     For Ford's reasonable attorneys' fees and costs according to statute, 18 U.S.C. § 1964(c); and

4.     Any other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial in this action.

COMPLAINT

Dated: May 21, 2025

KASOWITZ BENSON TORRES LLP

By: /s/ *Daniel A. Saunders*

Daniel A. Saunders

*Attorneys for Plaintiff Ford Motor Company*

COMPLAINT