**KASOWITZ LLP**
Daniel A. Saunders (SBN 161051)
DSaunders@kasowitz.com
Matthew S. Manacek (SBN 312834)
MManacek@kasowitz.com
1801 Century Park East, Suite 2400
Los Angeles, California  90067
Telephone:   (424) 288-7900
Facsimile:    (424) 288-7901

Edward E. McNally (admitted *pro hac vice*)
EMcNally@kasowitz.com
Daniel J. Fetterman (admitted *pro hac vice*)
DFetterman@kasowitz.com
1633 Broadway
New York, New York 10019
Telephone:   (212) 506-1715
Facsimile:    (212) 506-1800

*Attorneys for Plaintiff Ford Motor Company*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FORD MOTOR COMPANY, a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>KNIGHT LAW GROUP LLP; STEVE B. MIKHOV; AMY MORSE; ROGER KIRNOS; DOROTHY BECERRA; THE ALTMAN LAW GROUP; BRYAN C. ALTMAN; WIRTZ LAW APC; and RICHARD M. WIRTZ,<br><br>Defendants. | Case No: 2:25-cv-04550-MWC-PVC<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>1.  **RICO – Violation of 18 U.S.C. § 1962(c)**<br>2.  **RICO Conspiracy – Violation of 18 U.S.C. § 1962(d)**<br><br>**[Jury Trial Demand]** |

Plaintiff Ford Motor Company ("Plaintiff" or "Ford") files this First Amended Complaint against defendants Knight Law Group LLP ("KLG"), Steve B. Mikhov ("Mikhov"), Amy Morse ("Morse"), Roger Kirnos ("Kirnos"), Dorothy Becerra ("Becerra"), The Altman Law Group ("ALG"), Bryan C. Altman ("Altman"), Wirtz Law APC ("Wirtz Law"), and Richard Wirtz ("Wirtz") (collectively, "Defendants") for damages and other relief for Defendants' violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO").  In support of these claims, Ford alleges as follows:

## INTRODUCTION

1.      California's Lemon Law (defined below) provides for recovery from auto manufacturers of "attorney's fees based on actual time expended."  In case after case brought under the Lemon Law over more than a decade, Los Angeles-based law firm KLG represented under oath to Ford and to state and federal courts that all of its attorneys' "time billing entries were completed contemporaneously with each dated entry or near in time to the work performed."  But these were all lies.  The truth, as KLG's representatives admitted in 2024, is that prior to 2018, KLG did not record its attorneys' time *at all*.

2.      KLG's problems stemming from having no contemporaneous time records for multiple years became more acute when Ford began refusing to settle Lemon Law cases unless KLG provided time sheets showing the attorney and other billable hours and the dates and descriptions of work performed that would support the amounts claimed in KLG's fee demands.  Faced with those requirements, KLG could have forthrightly acknowledged that it was not its practice to create and contemporaneously record attorney and paralegal hours and disclosed that fact to Ford and to the federal and state courts to which KLG attorneys owe a duty of candor.  But instead, KLG assembled a group of employees, overseen by Becerra, and specifically tasked them with creating false and fictitious billing records in thousands of cases, listing fabricated time entries that were created years after the work in question allegedly had been performed.  This

2

FIRST AMENDED COMPLAINT

outright falsification of evidence amplified a massive and years-long scheme by Defendants to defraud Ford and other auto manufacturers out of money and property by falsely and fraudulently claiming inflated attorneys' fees for time never actually worked—a scheme that continued even after KLG purportedly began keeping contemporaneous time records.

3.     The scheme was carried out through a sophisticated criminal enterprise of attorneys and law firms that ingeniously spread their fraudulent billings across thousands of cases against many auto manufacturers so that their fraudulent scheme would go undetected.  Indeed, but for the tremendous expense incurred by Ford to audit and detect the fraud, this criminal enterprise would have continued unabated.  Ford brings this suit to end this wide-ranging and corrupt scheme to claim thousands of hours in wholly fictitious billings for time never worked and created out of thin air well after the alleged work for the cases was completed.

4.     The ringleader of the criminal enterprise, Mikhov, and his law firm, KLG, orchestrated this scheme to parlay the generous remedies offered by California's Lemon Law into an opportunity to extract unearned payments for themselves from auto manufacturers including Ford.  Ford has identified hundreds of cases in which Defendants' sham billing records were unlawfully used to collect well over $100 million of legal fees that they pocketed, in addition to a percentage of payments intended for their consumer clients.  A review of fee records in multiple cases takes one on a magical mystery tour of fictitious billings, including individual attorneys who supposedly worked more than 24 hours per day or simultaneously attended different trials or depositions in widely separated jurisdictions.  The physical impossibility of such billings is a direct consequence of KLG's long-concealed fabrication of evidence and repeated perjury to the courts, and constitutes prima facie evidence of Defendants' unlawful conduct and fraud.

5.     As an example, one of Mikhov's former partners, Morse, billed more than 20 hours per day on at least 66 occasions, 34 of which *exceeded 24 hours*, including an

FIRST AMENDED COMPLAINT

ostensibly heroic but physically impossible 57.5-hour workday in November 2016. Further proof of the fraud is that Morse herself has admitted under oath that her job responsibilities at KLG from 2016 and on primarily involved administrative and supervisory duties, that an estimated 70-80% of her time was spent managing personnel and was non-billable time, and that she herself ***never*** billed or recorded ***any*** hourly time for numerous tasks that KLG time records claim she performed, specifically including communicating with clients, attending mediations, drafting case management statements, drafting and responding to meet-and-confer letters, and communicating with expert witnesses. Accepting that testimony as truthful, either Morse or someone else at KLG had to falsely create years of her "time" for hundreds or thousands of different cases.

6.      Other Defendants similarly billed vast amounts of phantom legal fees. According to the time entries of Wirtz and one of his associates, for instance, they each attended two different trials in two different jurisdictions on a single day, totaling 29 hours of work. Mikhov also billed a large number of duplicate entries that described identical tasks on the same day for numerous clients with only slight differences in wording. Other lawyers similarly billed for the same repetitive tasks across a multitude of cases on the same day. These sham billings, many or most of which were made up out of whole cloth often years after the fact, fueled a highly lucrative and fraudulent criminal enterprise that was built on deceiving and abusing the judicial system, duping unsuspecting clients who were not aware of and did not approve their lawyers' unethical and fraudulent practices, and stealing many millions of dollars from auto manufacturers through a pattern and practice of false representations that were carried out by means of interstate wires and U.S. mail. These and other similar fraudulent time entries have continued to be used to prepare false billing records and claim legal fees for fictitious time, including as recently as August 2025. For example, in a single email on September 6, 2024, KLG sent ten fee statements to Ford's outside counsel, seven of

FIRST AMENDED COMPLAINT

which reflect fraudulently created and false time records dating back as many as six or more years.

     7.    Defendants concealed their fraudulent scheme by spreading their fictitious and inflated fee records across numerous matters involving different California courts, cases, and car company defendants.  They also pressured their own clients into unconscionable contracts that—far from advancing their clients' legitimate interests—imposed draconian penalties on any clients who attempted to settle their own claims before Defendants could run up billings, or who even disclosed the terms of their representation, such as by seeking advice from independent counsel.[1]  Defendants deprived the fee application process of its legitimacy by making false statements, presenting fraudulent claims for money, and misleading all of the judges and lawyers who were privy only to selective information presented by Defendants in each individual case to prevent the detection of their false and fraudulent billing practices. Only when Defendants' fee records in thousands of separate cases involving different clients are analyzed holistically—by cross-referencing different matters against different car manufacturers to track the claimed time entries for each lawyer in the criminal enterprise for each individual <u>date</u> over several years—do Defendants' massive false, fraudulent, and inflated hours and billings become clear and unmistakable.

---

[1] This is not the only example of Defendants acting against their clients' best interests. Under California's Lemon Law, attorneys' fees recoverable pursuant to Civil Code § 1794(d) are paid by the manufacturer to the prevailing consumer's counsel, but such payments are deemed gross income to the consumer for federal and California tax purposes when made on the consumer's behalf.  *See Commissioner v. Banks*, 543 U.S. 426, 430–31 (2005); *see also* IRS Publication 525.  California conforms to this federal rule.  *See* Cal. Rev. & Tax. Code § 17071.  By fraudulently inflating time entries and lodging exaggerated fee demands, Defendants cause inflated amounts to be reported on IRS Form 1099-MISC in the name of their consumer clients. This creates unnecessary and unjust federal and state income tax liabilities for those consumers, reducing their net recovery and exposing them to IRS or California Franchise Tax Board audits. Defendants did not disclose these foreseeable tax consequences to their clients, resulting in further harm from their RICO enterprise as well as evidencing their fraudulent intent and reckless disregard for the interests of those they purport to represent.

FIRST AMENDED COMPLAINT

8.      Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, 28 U.S.C. § 1961 et seq.  As further described below, Defendants are a group of persons constituting an association-in-fact enterprise within the meaning of the RICO statute that has the common purpose to unlawfully engage in fraudulent billing practices and that has engaged in numerous predicate acts (including mail fraud and wire fraud) that constitute a pattern of racketeering.  As a result, Defendants' misconduct entitles Ford to treble damages and declaratory relief barring Defendants from attempting to collect and retain their improperly obtained fees.

## PARTIES

### Plaintiff

9.      Plaintiff Ford is incorporated under the laws of the State of Delaware, with its principal place of business in Michigan.

### Defendants

10.     Defendant KLG is a law firm that is, and was at all material times herein, qualified to do business in California.  KLG operates and has operated from various locations in California, including: 10250 Constellation Boulevard, Suite 2500, Los Angeles, CA 90067; 3400 Douglas Boulevard, Suite 250, Roseville, CA 95661; 1331 North California Boulevard, Suite 205, Walnut Creek, CA 94596; and 23 Corporate Plaza, Suite 150, Newport Beach, CA 92660.  During some of the relevant time period, KLG's offices on Constellation Boulevard also housed the operations of Defendant ALG, Law Firm 1, and Law Firm 2.  Plaintiff is informed and believes, and thereon alleges, that at all relevant times herein, KLG personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by knowingly making and/or allowing the creation of fraudulent entries for time not actually worked.

11.     Defendant Mikhov is a founding partner and former managing partner of KLG who now claims to reside in Puerto Rico.  Plaintiff is informed and believes, and thereon alleges, that at all relevant times herein, Mikhov personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by

6

knowingly making and allowing fraudulent entries for time not actually worked.  He is the ringleader of Defendants' criminal enterprise to obtain fraudulent fee judgments and settlements against Ford.  Mikhov routinely associates with other lawyers to provide trial services and splits inflated fee awards with these lawyers, bringing those lawyers into the criminal enterprise by causing them to overbill and create false billing records for the enterprise's financial benefit.  As the scheme's ringleader, he specifically instructed other members of the enterprise, including Altman and ALG, to pad their bills and inflate their fees.  Mikhov handles non-trial work, including operational tasks and marketing activities.  Mikhov began his involvement in this scheme as a founding partner of O'Connor & Mikhov and later shifted his efforts to KLG.  Despite his nominal separation from KLG and purported relocation to Puerto Rico, which was done for tax reasons—likely related to the more than $11 million in federal and state tax liens currently pending against him—he continues to manage activities at KLG and to wield considerable influence on the other lawyers and firms that are members of the criminal enterprise.  Mikhov has falsely attested, under oath, to the truth of the fraudulent billing records supporting KLG's fee applications.

12.    Defendant Morse is a partner at KLG who resides in the State of California.  Plaintiff is informed and believes, and thereon alleges, that at all relevant times herein, Morse personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by knowingly making and/or allowing the creation of fraudulent entries for time not actually worked, including in thousands of cases in which KLG did not create contemporaneous time records but fabricated them long after the cases had been completed, for the financial benefit of the enterprise.  As she has testified that she rarely recorded *any* billable time, Morse knew that the great majority of (if not all) time entries submitted to Ford and to courts under her name were inaccurate, inflated, and fictitious.

13.    Defendant Kirnos is a partner at KLG who resides in the State of California.  Plaintiff is informed and believes, and thereon alleges, that at all relevant

times herein, Kirnos personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by knowingly making and/or allowing the creation of fraudulent entries for time not actually worked, including in thousands of cases in which KLG did not create contemporaneous time records but fabricated them long after the cases had been completed, for the financial benefit of the enterprise. Kirnos has falsely attested, under oath, to the truth of the fraudulent billing records supporting KLG's fee applications.

14.    Defendant Becerra is a former paralegal of KLG who resides in the State of California.  Plaintiff is informed and believes, and thereon alleges, that at all relevant times herein, Becerra personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by overseeing the group of employees that was charged with fraudulently creating tens of thousands of false and invented time records in thousands of cases, often long after the alleged work in the cases had been completed, for the financial benefit of the enterprise; requesting, receiving, and transacting checks for what she knew were fraudulently obtained fee payments to the enterprise; and developing the formula for KLG's split of those payments with other enterprise members.

15.    Defendant ALG was a law firm located at 10250 Constellation Boulevard, Suite 2500, Los Angeles, CA 90067.  ALG was qualified to do business in California. Plaintiff is informed and believes, and thereon alleges, that ALG personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by knowingly making and/or allowing the creation of fraudulent entries for time not actually worked for the financial benefit of the enterprise.

16.    Defendant Altman, who resides in the State of California, is at present now a partner at Quill & Arrow LLP, and previously was the founder and member attorney of ALG.  Plaintiff is informed and believes, and thereon alleges, that at all relevant times herein, Altman personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by knowingly making and/or allowing the

creation of fraudulent entries for time not actually worked for the financial benefit of the enterprise.

17.     Defendant Wirtz Law is a law firm with offices at 24370 La Jolla Village Drive, Suite 800, San Diego, CA 92122; 10866 Wilshire Boulevard, Suite 1200, Los Angeles, CA 90024; and 384 Forest Ave, Suite 17, Laguna Beach, CA 92651.  Wirtz Law APC is, and was at all material times herein, qualified to do business in California.  Plaintiff is informed and believes, and thereon alleges, that at all relevant times herein, Wirtz Law APC personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by knowingly making and/or allowing the creation of fraudulent entries for time not actually worked for the financial benefit of the enterprise.

18.     Defendant Wirtz, who resides in the State of California, is the founder and managing attorney of Wirtz Law.  Plaintiff is informed and believes, and thereon alleges, that at all relevant times herein, Wirtz personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by knowingly making and/or allowing the creation of fraudulent entries for time not actually worked for the financial benefit of the enterprise.

**Additional Members of the Enterprise**

19.     Mikhov and KLG also engage, coordinate, and conspire with a consortium of other Defendants, retained experts, and legal professionals, including other law firms and attorneys who are brought in as co-counsel to handle trial work on purposefully overstaffed cases.  These plaintiff lawyers, often numbering ten to fifteen lawyers for one case or set of plaintiffs, work in tandem to misrepresent the tasks completed and the amount of time spent on cases, and regularly split the proceeds unlawfully obtained through that process based on false and fraudulent billing records.  KLG enters into oral agreements with these plaintiff lawyers, in which the plaintiff lawyers KLG brings on must pay KLG a referral fee (in violation of the California Rules of Professional Conduct), based on a formula KLG created and calls the Attorney Fee Breakdown.

20.     Attorney A is a member of Law Firm 1, located in Los Angeles, California. Attorney B is a member of Law Firm 2, located in Los Angeles, California.  Law Firm 1 and Law Firm 2 shared office space with KLG and ALG during many of the years of the enterprise's operation, and Attorney A and Attorney B worked with KLG and ALG on numerous Lemon Law cases.  Attorney A engaged in facially fraudulent billing of more than 24 hours in one day on at least five different occasions, and presumptively fraudulent billing of more than 20 hours in one day on at least 12 different occasions. Other attorneys at Law Firm 1 engaged in facially fraudulent billing of more than 24 hours in one day on at least three different occasions, and presumptively fraudulent billing of more than 20 hours in one day on at least six different occasions.  Attorney B and Law Firm 2 engaged in facially fraudulent billing of more than 24 hours in one day on at least one occasion, and presumptively fraudulent billing of more than 20 hours in one day on at least five different occasions.  On information and belief, Attorney A, Attorney B, Law Firm 1, and Law Firm 2 (collectively, the "Unnamed Enterprise Members") submitted fabricated or artificially inflated timesheets at the direction of Mikhov, KLG, and other members of the enterprise.

## JURISDICTION AND VENUE

21.     This Court has federal question jurisdiction in this matter pursuant to 28 U.S.C. § 1331.  This matter arises out of violations of the RICO Act, 18 U.S.C. §§ 1961 et seq.  Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions by Defendants giving rise to the claims occurred in this District.

## GENERAL ALLEGATIONS

I.     **BACKGROUND**

A.     **KLG's Fraudulent Billing Scheme**

22.     This action centers on Defendants' criminal scheme to extract astronomically inflated fee payments based on false and fraudulent billing records in Lemon Law cases throughout California.  Defendants' submission of fictitious billing

10

records over many years, among other actions, constituted a pattern of multiple related acts of mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.

23.     California's "Lemon Law," the Song-Beverly Consumer Warranty Act, Civil Code §1790 *et seq.,* provides for the recovery against car manufacturers of "the aggregate amount of costs and expenses, including attorney's fees based on *actual time expended*, determined by the court to have been reasonably incurred by the buyer" in connection with an action under the statute.  Cal. Civ. Code § 1794(d) (emphasis added).  Counsel for the party seeking the benefit of the Lemon Law's fee-shifting provisions in court must submit a fee application that is supported by competent evidence, including timesheets and other billing records, reflecting work actually performed on behalf of the car buyer.  The fee applicant has the burden of showing that its requested fees are reasonable.

24.     Unbeknownst to Ford or the courts, Defendants exploited the Lemon Law by submitting fake time records created in thousands of warranty claim cases asserted against Ford and other automakers, seeking millions of dollars in compensation for work that was never performed.  Defendants participated in the fraudulent billing scheme knowingly and with the intent to deceive and defraud Ford for their benefit.  In doing so, Defendants knowingly and intentionally made misrepresentations to Ford and to numerous courts about their fictitious billing records.  These misrepresentations, coupled with Defendants' knowing fraud through the submission of sham records, stripped the fee application process of its legitimacy.  This unlawful conduct concealed from the courts and Ford that Defendants sought fictitious fees based on false billing records stemming from their fraudulent billing practices—records on which courts and Ford relied because of Defendants' intentional misrepresentations and fraud—thereby harming Ford's business and property interests by causing Ford to pay more than $100 million for Defendants' sham legal fees and to expend significant resources to detect and now attempt to end this fraudulent criminal enterprise, as well as by damaging

11

Ford's reputation and goodwill. Defendants' shared objective was and is to rake in many millions of dollars of legal fees each year without regard for the actual nature, extent, or value of the work performed.

25. Specifically, from 2015 through the present, to further their fraudulent scheme against Ford and other auto manufacturers, Defendants have routinely prepared and submitted false and fraudulent time records in Lemon Law cases, to extract larger amounts of fees and costs than those to which they were entitled, and Defendants repeatedly received and accepted funds that were in effect and in actuality *stolen* from Ford based on those false and fictitious time records.

26. In or around October 2024, Ford learned that KLG's representatives had made formal statements admitting that, during much of the preceding decade, KLG had not prepared or recorded *any* contemporaneous time records. KLG's representatives admitted that KLG began keeping contemporaneous time records in 2018 and that all purported time entries prior to that date were generated after the fact—often years after the purported work in question—to support KLG's fee demands against Ford and other auto manufacturers. Before learning of those admissions in 2024, although Ford had begun investigating apparent specific instances of overbilling by KLG where 24+ hour days and other irregularities had called particular timesheets and their corresponding payments into question, Ford did not know, and had no way of discovering, that until relatively recently virtually *every* single time entry in KLG's purported time sheets, records, and fee motions was fictitious—and that virtually *every* payment based on all such time entries had been obtained by fraud, regardless of whether Ford had been able to identify any specific suspicious time entry related to such payment.

27. Faced with Ford's demand for contemporaneous time records, KLG could have forthrightly acknowledged to Ford and to the federal and state courts that were overseeing and deciding the fee motions and related requests that KLG had not maintained any such hourly time records during the years in question. KLG could also have sought the approval of Ford and the courts to utilize some alternative acceptable

12

method of calculating reasonably incurred attorneys' fees that were proportionate to the cases in question.  Instead, however, KLG and the other enterprise members chose to lie, to fabricate evidence, and to use the mails and the wires to commit fraud.

28.    KLG assembled a team of employees, overseen by Becerra, for the specific purpose of deceiving Ford, other auto manufacturers, and the courts by secretly creating purported time entries and billing records for thousands of cases and often years after the work in question allegedly had been performed.  The time records that Becerra and her team created included purported records not only for KLG attorneys, but for Altman, Wirtz, and their respective firms.  Those attorneys then knowingly used the fabricated records to support their claims for attorney's fees, repeatedly misrepresenting to Ford and to the courts that all time billing entries were completed contemporaneously with or near in time to the work performed.  Defendants accordingly failed to provide Ford and the courts with truthful evidence showing the actual time, dates, and attorneys for work on Lemon Law cases, and the payments made by Ford to comply with court determinations and settlements were based on Defendants' fabricated and untrue evidence and were tainted, unearned, and unwarranted.  In short, Defendants' systemic intentional misrepresentations, perjury, and fraud upon the courts and upon their litigation opponent, Ford, deprived the underlying fee litigations of their legitimacy and rendered them as fraudulent shams.

29.    Becerra created the fictitious and fraudulent billing records at the direction of Mikhov, Kirnos, Morse, Altman, and Wirtz, all of whom were paid portions of the money KLG obtained from Ford and other automobile manufacturers as a result of the fraud.

30.    In separate lawsuits, both of which settled in or around March 2022, Law Firm 1 and Law Firm 2 alleged that KLG artificially inflated its invoices to recover a disproportionate share of attorneys' fees awarded by courts.  These lawsuits also revealed complicated, undisclosed, and unethical referral arrangements between KLG

FIRST AMENDED COMPLAINT

and the plaintiff lawyers with which it engages as trial counsel, in which trial counsel must pay KLG a referral fee.

31.    On information and belief, when KLG received timesheets from co-counsel—including Wirtz, Wirtz Law, Altman, ALG, Attorney A, Attorney B, Law Firm 1, and Law Firm 2—it further manipulated those timesheets by fraudulently increasing the already inflated number of hours claimed by those other lawyers.

32.    Over the past ten years, Defendants have submitted fraudulent and unlawful billing records to extract fee payments from Ford totaling more than $100 million for purported legal work on behalf of car buyers.  It is now clear that the great majority of Ford's payments to KLG and its co-conspirators were attributable to fraudulent time records, many or most of them made up years after the fact.

33.    Defendants intended that Ford rely, and Ford did reasonably rely, on Defendants' fraudulent billings in paying false, inflated, and fabricated fees associated with fraudulently obtained fee awards and settlements.

34.    Ford has reviewed thousands of KLG's billing invoices and time records for the years 2013-2024, which Ford believes represent approximately 10% of all consumer warranty cases that Defendants handled during that time.  Despite Ford having had access to only this small percentage and sampling of billing records submitted by Defendants, an analysis of the records included in that sampling reveals a gamut of obviously made-up work and physically impossible working hours and appearances that stand as irrefutable evidence of Defendants' fraudulent billing practices.  The false and inflated time entries only can be discerned and detected when thousands of time entries from hundreds of timesheets across scores and scores of different cases are all entered into a spreadsheet.  Examples include, but are not limited to:

    (a)    Numerous instances of attorneys purportedly working over 24 hours in a single day;

(b)     Multiple attorney "appearances" simultaneously at full-day depositions and trials in different geographic locations;

(c)     Duplicative billing of the same vague task descriptions across multiple cases for comparable amounts of time; and

(d)     More than 1,200 no-date entries for clerical tasks performed by Mikhov, as well as equally suspicious dated entries.

## 1.     **Defendants Repeatedly Billed Between 24 and 57.5 Hours Per Attorney in a Single Day**

35.     Defendants electronically filed and submitted to Ford false and fabricated billing records purporting to reflect that individual attorneys had worked more than 24 billable hours a day on numerous occasions—a literal impossibility.  Even greater is the number of days on which individual attorneys claim to have worked 20 or more billable hours.  This raises an inference of a widespread pattern that cannot be explained away as occasional and innocent record-keeping lapses.

36.     Despite Morse having testified under oath that most of her work is administrative and supervisory and thus she only rarely bills *any* time, time entries were submitted reflecting that Morse worked more than 24 hours a day on 34 separate occasions, including an astounding 57.5-hour workday on November 30, 2016, and 31.3 hours on March 23, 2017.  Billing records also claimed that Morse worked between 20 and 23.9 hours a day on 38 separate occasions.[2]  During one three-month period (February-April 2017), Morse averaged 483.7 hours a month (with a high of 513.1

_____

[2] As noted, these figures are based on examination of only a small sample of billing records submitted by Defendants, who concealed their fraud by spreading their billings across a large number of cases and auto manufacturers.  When other billing records (including those submitted against other auto manufacturers) are obtained in discovery, Ford anticipates that the number of 20+ and 24+ hour days purportedly worked by Morse, other Defendants, and other unnamed members of the enterprise will increase exponentially.

15

hours in March 2017) for an average of 16.5 hours a day in that month (including weekends).

37.    The magnitude of Defendants' fraud grows exponentially when looking at Morse's time in year-long chunks.  In 2016, she billed an astronomical 3,106.45 hours—and that is only on the small sampling of cases for which Ford has billing invoices it can review.  In 2017, Morse was even more prolific, billing an eye-popping 3,975.40 hours—again, based only on the limited subset of cases for which Ford has billing invoices available.  Yet Morse testified that from 2016 and on she worked 60 hours per week and between 70-80% of her working time was dedicated to non-billable administrative and supervisory work.  Assuming that Morse worked 60 hours per week every week of the year, and making the most generous assumption that only 70% of her time was non-billable, she would have billed a maximum of 936 hours a year—less than 25% of the time shown on Ford's limited subset of her fraudulent time records for 2017 alone.  Ford has every reason to believe that the actual number of hours billed by Morse (and all other enterprise Defendants) to auto manufacturers across the board is significantly higher, potentially by a factor of 10.

38.    Notably, Morse did not participate in any trials during this time; rather, according to her billing records, she spent her time drafting and reviewing discovery and pleadings, even though she testified that between 0-5% of her total time worked involved drafting legal documents.  Moreover, Defendant Altman, who shared office space with KLG, has told Ford that Morse was not a "burn the midnight oil" type of lawyer and generally worked more of a 9-to-5 schedule.

39.    Not surprisingly, KLG has admitted that Morse's claimed time entries were fabricated.  In 2024, KLG's representatives confessed that, when secretly creating after-the-fact time records to submit to Ford—records that thus were fraudulent *per se*—, KLG used Morse as a "catch-all" for listing discovery tasks in the form of thousands of time entries under her name.  All or nearly all of these billing entries were false and

fraudulent, as Morse spent the vast majority of her time working on non-billable supervisory work.

40.    Other clear patterns emerge when reviewing even the limited collection of invoices available to Ford.  Morse was a billing attorney on 95% of the cases Ford has been able to review.  She was the billing attorney on 92% of the entries for "Draft Complaint"—totaling more than 450 entries and nearly 350 hours, even though she testified that between 0-5% of her total time worked was billed for drafting legal documents.  From 2016-2024, she made more than 4,600 distinct entries with the description "Communicate with Client," totaling nearly 1,150 hours, even though she testified that she never billed or recorded *any* time for client communications.  Based on the information available to Ford—including the statements of KLG's representatives and Morse's own sworn testimony—each of these entries is entirely manufactured and fraudulent.

41.    Kristina Stephenson-Cheang, an associate with KLG, is second only to Amy Morse in the number of 24+ hour-days—seven—she has billed.  On July 6, 2017, Stephenson-Cheang billed 34.1 hours; on July 14, 2017, Stephenson-Cheang billed 25.4 hours; on August 16, 2017, Stephenson-Cheang billed 25.6 hours; on August 21, 2017, Stephenson-Cheang billed 24.5 hours; on November 14, 2017, Stephenson-Cheang billed 28.7 hours; and on December 4, 2017, Stephenson-Cheang billed 28.6 hours.  As with Morse, Ford has been able to review only the small sampling of cases for which it has time entries from Stephenson-Cheang, and the true number of 24+ hour days billed in her name is undoubtedly much larger.  Stephenson-Cheang was a billing attorney on 90% of the cases Ford has been able to review.

42.    Unless the laws of time and space operate differently at KLG's offices than elsewhere in the universe, these billings are conclusive evidence of fraud.  Yet these obviously fraudulent and falsely inflated billing records were used, and continue to be used, to support Defendants' extraction of payments for fictitious fees.  Although Defendants attempted to conceal these and other fraudulent time entries by

spreading them across different payor auto companies and different plaintiffs so that each individual fee application would appear innocuous in isolation, KLG's admission that it kept **no** contemporaneous time records prior to 2018 (despite representing the contrary under oath to Ford and to the courts) means that **every one** of its billing records that included pre-2018 entries (as well as many artificially inflated records covering later periods) was fraudulent.

### 2. Defendants Purportedly Appeared for a Full Day's Work at Two Different Locations in a Single Day

43.     Further evidencing the after-the-fact fabrication of time records and other schemes to defraud Ford and the courts, Defendants also represented that attorneys made full-day appearances in different locations on the same day.  For instance, KLG filed billing records indicating that Wirtz billed an impossible 29 hours on July 24, 2018 to attend two trials in two different jurisdictions on the same day—as much of a physical impossibility as a 57.5-hour day.  Specifically, Wirtz billed 16 hours that day to prepare for and attend the *Jordan v. FCA US LLC* trial in Alameda County Superior Court while also billing 13 hours that same day to travel to and attend the *Choi v. BMW* trial in Los Angeles County Superior Court, approximately 400 miles away.

44.     Similarly, on July 18, 2018, Wirtz Law attorney Amy Smith billed 13.5 hours to prep/attend the *Choi* trial in Los Angeles and 11.2 hours on the *Jordan* trial in Alameda, while also managing to bill 0.7 hours to a third case—a total of 25.2 hours in a single day.

45.     As a third example, on April 26, 2018, an attorney with Law Firm 1, whose time entries are included in fee applications filed by KLG and other firms, billed 15.25 hours in *Smith v. FCA US LLC*, Sacramento Co. Case No. 34-2016-00192381-CU-BC-GDS, to travel to and attend a settlement conference in Sacramento while also

billing 5.25 hours in *Orozco v. FCA US LLC*, Los Angeles Co. Case No. BC658214, to take a deposition in Long Beach, approximately 400 miles away.[3]

> ### 3.   The Same Tasks Were Fraudulently Billed for the Same Amounts of Time Across Multiple Separate Cases and Timekeepers

46.    Whether as a result of after-the-fact fabrication of time and billing records or of contemporaneous padding of those records (or both), Defendants generate substantial phantom legal fees by billing for the same repetitive tasks across a multitude of cases at the same time. As an example, attached as Exhibit A is a chart of 489 task descriptions in which an attorney billed to draft a meet-and-confer letter and perform unspecified legal research. There is no plausible reason why those two separate tasks should so frequently be combined other than to mask the time actually spent on the two tasks. In this chart, the unspecified legal research masks the time actually billed for drafting identical or substantially similar meet-and-confer letters. The chart is in chronological order and shows days and periods of time when many letters were drafted without any economy of scale reduction in time allotments. Not surprisingly, these entries overlap with the 24-plus hour days described above. For example, Morse allegedly drafted/researched four letters on March 10, 2017, for which she billed 4.0 of her total 28.0 hours. This is consistent with KLG's statements that, when it created time records years after the fact for scores of cases at a time, KLG used Morse as a "catch-all" for discovery-related time entries without regard to whether she had actually performed the described work. But based on Morse's own testimony that she never

---

[3] Although the cases cited in paragraphs 41-43 involved auto manufacturers other than Ford, and thus the fraudulent billings in those cases did not harm Ford, the physical impossibilities reflected in those billings are presented here as further facial evidence of Wirtz Law's, Law Firm 1's, and the other Defendants' participation in the enterprise's pattern and practice of fabricating and padding time records, which *did* harm Ford as alleged herein. The full scope of the harm caused to Ford by the enterprise's fraudulent scheme will become clear only through discovery of records in Defendants' exclusive possession.

FIRST AMENDED COMPLAINT

drafted or responded to meet-and-confer letters after 2016, every one of these entries is fraudulent.

47.     Another example of such repetitive billing is the chart attached as Exhibit B of 596 fee entries submitted by Defendants for "drafting RFAs [Requests for Admission]."  As with the meet-and-confer letter entries described above, the chart demonstrates that there are no economies of scale over time and that certain timekeepers, especially Amy Morse and Kristina Stephenson-Cheang, billed to draft (presumably substantially identical) RFAs day after day for extended periods of time.  Overbilling for RFA drafting contributed to the 24+ hour days, including 12.9 hours of Amy Morse's 57.5 hours billed on November 30, 2016—which, again, is consistent with KLG's statements that it billed Ford for Morse's purported time on discovery tasks without regard to whether or not she had ever actually performed any such tasks.

48.     Defendants also fraudulently bill the same work through separate law firms and/or timekeepers.  For example, in *Torres v. Ford Motor Co*., Central District of California Case No. 2:18-cv-07983-SB-AS, after the case settled in 2021, both KLG and Wirtz Law provided invoices during the meet-and-confer process before filing their fee motions.  Wirtz Law's invoices reflected that Daniel Inscore of Wirtz Law incurred time for preparing for, traveling to, and attending the deposition of Ford's expert in November 2019.  KLG's invoices reflected that Deepak Devabose of KLG incurred time for those exact same tasks.  KLG's time entries showed three separate entries for a combined total of 8.5 hours, and Wirtz Law's time entries showed four separate time entries for the same work totaling 18.6 hours.  After these entries were flagged during the meet-and-confer process, Mr. Devabose's time was removed.  Mr. Inscore submitted a declaration on August 6, 2021 with Wirtz Law's reply brief that explained he "alone took that deposition" and that the court reporter incorrectly put Mr. Devabose's name in the transcript.  While this time was ultimately removed, this is further evidence that time was added to the invoices for work that was entirely made-up, whether because KLG

20

was still not keeping contemporaneous time records or because it was padding those records in the hope that Ford would not notice the same entries across multiple firms.

49.     These and similar fraudulent time entries have continued to be used to make false claims for legal fees, including as recently as August 2025.

50.     The continuity between Altman, Wirtz, their firms, and KLG runs deeper than similar fraudulent billing practices.  Defendants routinely cross-billed, meaning Wirtz, Altman, and their firms' attorneys would have time billed through KLG billing invoices.  For example, KLG billed for the time of at least six lawyers from Wirtz Law in a number of cases.  Similarly, the time of at least four Altman firm attorneys was billed directly on KLG invoices across multiple cases.  And in at least one instance, the time from a KLG attorney was reflected in billings submitted by the Altman firm.

### 4.     Defendants Rely on Undated and Form Time Entries as Part of Their Fraudulent Billing Scheme

51.     Billing records submitted by Defendants include other entries that are belied by the realities of practice.  For example, Mikhov, who on information and belief has never first-chaired a trial and did not try cases for KLG, submitted hundreds of invoices that contain fee entries with no date.  Such no-date entries exceed 1,200 hours, and the corresponding fees billed exceed $625,000.00.  Nearly all entries are a combination of (i) initial communication with client, (ii) initial evaluation of client's claims, and (iii) analysis of vehicle documents.  The entries describe identical tasks with only slight wording differences.  These and other similar time entries are fully consistent with KLG's admission to having created time records from scratch often years after the fact—time entries that KLG continued to use to assert fraudulent claims for legal fees as recently as September 2022.

52.     Mikhov's dated time entries are equally implausible and consistent with padding and/or outright fabrication.  For example, in 2016, Mikhov himself was KLG's second-highest biller, totaling 1,350.10 hours just in the smattering of cases for which

FIRST AMENDED COMPLAINT

Ford has invoices. Mikhov's time surged in 2017, when he logged 1,799.00 hours—again in only the limited subset of cases for which Ford has invoices.

53. Based on records currently available to Ford, from 2016 to 2025, Mikhov made 487 separate entries for "Initial communications with client and evaluation of clients' claims" totaling approximately 518.6 hours. Of note, 388 of these entries were for either exactly 1.0 hours (286 entries) or 0.8 hours (102 entries). Additionally, over this same time period, Mikhov made 2,002 entries (577 of which were undated) for "Communicate with Client" totaling approximately 554 hours. Mikhov also made vague entries for "analyze vehicle documentation" on all or nearly all of the matters in which Morse fraudulently billed for "Draft Complaint." Specific date logs likewise suggest fraud; on July 31, 2017, Mikhov billed a total of 18.1 hours that included 84 separate entries in 59 separate cases. These entries appear to be entirely manufactured and fraudulent, particularly in light of the recent admission that KLG kept no time records at all in 2017.

54. Mikhov was not alone in his use of "canned" and facially suspicious time entries. For example, Altman billed 0.7 or 0.8 hours on nearly every case for "Reviewed case file, documents, repair orders, discovery," regardless of the actual volume of discovery or complexity of the case.

**B. Defendants Concealed and Lied About Their Fraudulent Scheme in Furtherance of the Enterprise**

55. Attorneys, in California as in every state across the country, are explicitly required to conduct themselves with dignity, courtesy, and integrity as officers of the court. An attorney seeking to practice in California is required to take an oath to that effect. Cal. Rules of Court, R. 9.7.

56. Defendants abused their positions of trust as members of the Bar to deceive the courts and Ford by submitting thousands of fee records that appeared genuine on their face but are clearly false and fraudulent when viewed alongside other records submitted for work on the same day, as well as in light of KLG's 2024 admission to not

22

having kept any contemporaneous time records prior to 2018 and to having created such records often years after the fact—records that Defendants falsely represented to Ford and to the courts to be contemporaneous and accurate.

57.    The key to Defendants' fraudulent billing scheme is submitting time records that do not appear fraudulent when reviewed in isolation in a particular matter. Because there are no red flags to alert the courts or the victims to audit the daily time entries for every day over a decade across all cases against all automakers for all of the Lemon Law lawyers in the enterprise, including multiple law firms (even assuming courts and victims had all the information needed to do so, which they do not), courts have been deceived into awarding fees against Ford, and Ford has settled fee claims (as well as overpaid to resolve consumers' pre-litigation and post-litigation claims even before fee applications are made), based on those fraudulent fee applications.

58.    In May 2020, Kirnos, a partner at KLG (and also Mikhov's half-brother), admitted that he expected the court and Ford to rely on Defendants' representations regarding fees.  During an oral argument regarding KLG's fee application in an MDL action, *Mark Pedante v. Ford Motor Company et al.* (ML 18-02814-AB), Kirnos stated: "There is a presumption attached to our billing because there is a presumption that we are going to be ethical, that we are not going to submit lies to this Court.  And we did not."  Kirnos—whose criminal record includes a conviction for providing false statements to a police officer—went on to implore the Court to rely on that presumption on the basis that Defendants obviously would not violate their ethical duties when submitting fee applications to the Court.  Even while making these representations, Kirnos knew that he and the other Defendants were in fact engaging in repeated and blatant violations of their ethical duties and committing criminal acts to line their own pockets, including but not limited to having fabricated years of time records in countless cases—**including the *Pedante* case itself**, which predated the time when KLG claims to have begun keeping contemporaneous time records—and having falsely represented to multiple courts under oath that those records were contemporaneous, reasonable and

23

FIRST AMENDED COMPLAINT

accurate.  And in *Reynolds v. Ford Motor Company* (2020), Defendants likewise succeeded in persuading trial and appellate courts that they should not analyze the ethics of Defendants' fee agreements with their clients—including improper "double-dipping" collection of statutory and contractual contingent fee recoveries—further shielding their unlawful behavior from discovery.

59.    While certain instances of Defendants' inflated bills that might be attributable to one attorney's or firm's overzealous conduct did not go entirely unnoticed by courts in some matters on a case-by-case basis, Defendants were successful in concealing the massive (and, indeed, all-encompassing) scope of their coordinated fraud as a broader enterprise by passing it off as mere "overstaffing" and routine inefficiencies.  In a Lemon Law case in 2020, *In re Volkswagen "Clean Diesel" Marketing*, Sales Practice and Prod. Liab. Litig. (MDL No. 2672 CRB (JSC)), the court found that KLG, ALG, and others filed applications seeking compensation for work that was not in fact conducted on behalf of the clients involved in the fee application.  United States District Judge Charles R. Breyer ordered reduction of the requested attorneys' fees by 50-90% for certain categories of tasks.  The court stated that the plaintiff lawyers "likely overstaffed this case" and that "[o]ther courts have applied reductions when Knight Law Group's staffing practices appear to have led to inefficiency."  The court noted "the enormous number of hours attributed to these Plaintiffs' cases while they were stayed."  The court completely excluded bills for vague entries and clerical tasks, as well as work performed for other plaintiffs, not involved in the fee application, whose cases actually went forward to trial.  However, because the court was looking only at the fee applications in a single case and had no way of knowing that the lawyers appearing before it had secretly fabricated time records out of whole cloth years after the fact, it was unable to discern the true nature of the fraudulent enterprise that Defendants concealed by spreading their fictitious billings across multiple clients, cases, and law firms.

60.    Reflecting the ongoing and self-perpetuating nature of the criminal enterprise, Defendants use the successes they achieved through their fraudulent acts to conceal and lend a cloak of legitimacy to their further fraudulent acts.  KLG routinely touts its success in having fee motions granted by both state and federal judges, exploiting the respect those jurists had among their fellow members of the bench to avoid scrutiny of their fraudulent billings and further conceal the scheme. As just two of many examples, Mikhov and Kirnos signed declarations in August 2021 and November 2023, respectively, attaching multiple fraudulently obtained fee awards and identifying more than a dozen judges—including judges of the Central District of California and the Los Angeles Superior Court—who had approved fees for billings by Mikhov, Morse, Stephenson-Cheang and others.  *See* Exhibit D at ¶¶ 48-94; Exhibit E at ¶¶ 35-58; *see also* Exhibit F at ¶¶ 47-104; Exhibit G at ¶¶ 56-90; Exhibit H at ¶¶ 54-122; Exhibit I at ¶¶ 50-89; Exhibit J at ¶¶ 68-72.  The fee payments Defendants obtain based on their fraudulent billing records thus create a snowball effect by leading to less scrutiny of their time records, which in turn facilitates more fraud and even higher fraudulently fee payments.

61.    Further demonstrating how Defendants' fraud fed on itself to perpetuate the ongoing enterprise, Defendants' success in defrauding judges and fraudulently obtaining outsize fee payments based on false billing records led Ford and, on information and belief, other auto manufacturers to make the rational business decision to overpay in settlement of Lemon Law cases—not just for attorneys' fees, but for compensatory damages and civil penalties as well—regardless of the merits of the individual case.  The fees claimed by Defendants often far exceeded—sometimes by a factor of 10—the amount in dispute.  Outsize fee payments disincentivize auto manufacturers from proceeding to fee hearings and encourage them to pay inflated settlement values.  Even prelitigation settlement offers involving minimal attorneys'

FIRST AMENDED COMPLAINT

fees and before case facts are even developed end up artificially inflated as a direct result of Defendants' fraudulent billing records.

### C.     Defendants Intensified Their Fraudulent Scheme Over Time

62.     Since 2015, Defendants have filed over 5,000 breach of warranty cases against Ford and other car manufacturers and have filed hundreds of fee applications in connection with those cases.

63.     Defendants' fraudulent scheme has expanded over time.  In the years 2021 through 2024, KLG alone obtained fee awards from Ford totaling approximately $35 million, with a substantial portion of that sum likely resulting from false, inflated, and wholly fabricated billing records.

64.     Moreover, Ford is not the only automaker in Defendants' crosshairs. Defendants have filed numerous cases against other automakers including GM, Fiat Chrysler Automobiles/FCA, Volkswagen/Audi, and BMW, among others.  Based on a review of only a small sample of such fee applications, Ford believes that these automakers are also victims of Defendants' scheme to defraud.

65.     While Defendants have long pursued this fraudulent billing scheme to enrich themselves—including bankrolling their lavish vacations, opulent homes, and use of private jets at their clients' expense—this lawsuit is the *only* thing that has even partially caused Defendants to abate their criminal activity.  As just one example, on May 22, 2025—the day after Ford filed its complaint—KLG submitted time records reflecting time billed by Morse in *Solisperez v. Ford*, Los Angeles Superior Court Case No. 23PSCV01411.  In what appears to be an acknowledgment that such time was never actually incurred and was instead (like most of Morse's other purported "time") invented at the case's conclusion to increase Defendants' financial windfall, KLG later submitted a "supplemental" billing invoice that removed the time purportedly billed by Morse.  Since Ford filed this lawsuit, KLG has begun withdrawing requests for payment for time entries purportedly made by Morse (and other KLG attorneys) in other cases as well—against both Ford and other auto manufacturers—reflecting KLG's and its

members' and employees' ongoing efforts to cover their tracks and conceal their fraudulent conduct in furtherance of the continuing enterprise.

## II.    DEFENDANTS USED INTERSTATE WIRES AND U.S. MAIL TO DEMAND AND RECEIVE FALSE, FRAUDULENT, AND INFLATED FEE PAYMENTS

66.    Defendants used the U.S. mail and interstate wires to make fraudulent court filings, to negotiate settlements, and to receive payments pursuant to fraudulent billing records based on falsified time entries submitted in support of fee applications, all in furtherance of their scheme to defraud Ford of its money.

67.    For example, by order dated July 19, 2018 and filed on July 31, 2018, in *Buck v. Ford Motor Company,* Superior Court of California, Stanislaus County, Case No. 2008745, the Court ordered Ford to pay attorneys' fees, costs, and expenses totaling $135,500.00 based on fraudulent billing records filed by KLG that included false billing entries by Morse for March 23, 2017 (on which date she billed at least 31.3 hours).  By letter dated July 24, 2018 addressed to Mikhov and sent by FedEx, Ford enclosed a check in the amount of $135,500.00 payable to KLG.  Similarly, by judgment entered on August 31, 2018 in *Duk v. Ford Motor Company*, Superior Court of California, San Diego County, Case No. 2016-00012779, the Court ordered Ford to pay attorneys' fees, costs, and expenses totaling $101,450.78 based on fraudulent billing records filed by KLG that included billing entries by Morse for November 30, 2016 (on which date she billed at least 57.5 hours).  By letter dated October 1, 2018 addressed to Mikhov and sent by FedEx, Ford enclosed a check in the amount of $101,450.78 payable to KLG. In addition to the fee awards in the *Buck* and *Duk* cases, Morse's fraudulent billing records also were used to support fee awards in the following cases, among others: (a) fee award in the amount of $10,675.16 in *Burgess v. Ford Motor Company*, San Bernardino Co. Case No. CIVDS1620111, paid by check dated October 9, 2018 payable to KLG and sent by FedEx; (b) fee award in the amount of $12,405.20 in *Duenas v. Ford Motor Company*, Los Angeles Co. Case No. BC638306, paid by check dated

27

August 15, 2018 payable to KLG and the plaintiff and sent by FedEx; and (c) fee award in the amount of $15,005.00 in *Orosco v. Ford Motor Company*, Los Angeles Co. Case No. BC638222, paid by check dated October 12, 2018 payable to KLG and sent by FedEx.  Each of the *Buck*, *Duk*, *Burgess*, *Duenas*, and *Orosco* cases included time entries that KLG has admitted were false and fraudulent because they predated the time when KLG claims to have begun keeping contemporaneous time records.[4]

68.    When satisfying judgments and settlements pursuant to Defendants' inflated fee applications for cases in which KLG had associated with another firm, Ford often would make a single payment via check to both KLG and the other firm, and, as a common practice, KLG endorsed and deposited these checks without an additional signatory from the other firm.  For instance, in *Santillo v. Ford Motor Company,* San Diego Co. Superior Court Case No. 37-2017-11591, pursuant to a Notice of Ruling dated February 27, 2019 that was based on Defendants' submission of fraudulent billing records, Ford submitted a payment to KLG and Law Firm 2 in a single check for $35,630.21, sent on March 27, 2019 by FedEx.  The check was later endorsed and deposited by KLG only without a signature from Law Firm 2.  The *Santillo* case included time entries that KLG has admitted were false and fraudulent because they predated the time when KLG claims to have begun keeping contemporaneous time records.

69.    Similarly, in *Beltran v. FCA US LLC*, Los Angeles Co. Superior Court Case No. BC617905, KLG received a single check for $23,179.10 on September 27, 2019, even though Wirtz Law and Wirtz billed time on the matter.  In *Vargas v. FCA*

---

[4] Morse's fraudulent billing records were also used to support successful efforts to extract fee payments in cases involving other auto manufacturers, including, among others: (a) fees in the amount of $106,560.55 in *Vargas v. FCA US LLC*, Orange Co. Superior Court Case No. 30-2016-00845431-CU-BC-CJC, paid by check dated July 26, 2018 and sent to Dorothy Becerra by FedEx; and (b) fees in the amount of $23,179.10 in *Beltran v. FCA US LLC*, Los Angeles Co. Case No. BC617905, paid by check dated September 10, 2019 and sent by FedEx.

*US LLC*, Orange Co. Superior Court Case No. 30-2016-00845431-CU-BC-CJC, KLG received a single check for $106,560.55 on July 26, 2018; at KLG's direction, this check was addressed to Dorothy Becerra. Wirtz billed time as of counsel *for KLG* on this case. The above checks in the *Beltran* and *Vargas* cases were sent by FedEx as payment based on fraudulent billing records. These cases each included time entries that KLG has admitted were false and fraudulent because they predated the time when KLG claims to have begun keeping contemporaneous time records.

70.    On other occasions, multiple firms received checks for payments extracted as a result of demands based on fraudulent billing records. For instance, in *Berroteran v. Ford Motor Company*, Los Angeles Co. Superior Court Case No. BC542525, ALG and Ford agreed to settle ALG's fee claim for this case for $300,000.00 based on fraudulent billing records. Pursuant to fraudulent billing records submitted in support of a motion for attorneys' fees filed on May 20, 2022, KLG sought $1,226,868.45 in attorneys' fees, costs, and expenses on behalf of itself and other attorneys. Kirnos submitted a false declaration that attached KLG's invoices, which included time entries from him, Mikhov, and Morse. Those time entries, all of which Kirnos swore under oath "were completed contemporaneously with each dated entry or near in time to the work performed," *see* Exhibit F at ¶ 46, were in fact in large part false and fraudulent because they predated the time when KLG claims to have begun keeping contemporaneous time records and included time entries from Morse for work that she has testified she never performed. The court issued a minute order on July 14, 2022, awarding $807,127.50 in attorneys' fees only. Ford sent KLG a check in the amount of $851,493.51 on October 21, 2022 by FedEx.

71.    Similarly, the fee application in *Coon v. Ford Motor Company*, Riverside Co. Superior Court Case No. MCC1300767, was based on fraudulent billing records—from KLG, ALG and others—and filed on February 4, 2019. Mikhov submitted a false declaration in support of that application. KLG requested $866,754.00 (including a lodestar enhancement) and ALG requested $433,091.25 (including a lodestar

enhancement).  The time records attached to Mikhov's declaration, all of which Mikhov swore under oath "were completed contemporaneously with each dated entry or near in time to the work performed," *see* Exhibit G at ¶ 53, were in fact in large part false and fraudulent because they predated the time when KLG claims to have begun keeping contemporaneous time records and included time entries from Morse for work that she has testified she never performed.  On May 19, 2019, the court awarded KLG $543,554.00 in attorneys' fees.  Like with the *Berroteran* matter, Ford agreed on January 7, 2022 that it would settle ALG's fee claim for $300,000.00.  Ford mailed this check, which was based on fraudulent billing records, to ALG on June 16, 2022, by FedEx.  Ford mailed a check to KLG for $709,004.12—also based on fraudulent billing records—on June 16, 2022, by FedEx.

72.     The fee application in *Brown v. Ford Motor Company*, Butte Co. Superior Court Case No. 160060, was filed on behalf of KLG, ALG, and others on November 21, 2018, and was based on fraudulent billing records.  Mikhov and Altman both submitted false declarations in support of that application.  The time records attached to Mikhov's declaration, all of which Mikhov swore under oath "were completed contemporaneously with each dated entry or near in time to the work performed," *see* Exhibit H at ¶ 51, were in fact in large part false and fraudulent because they predated the time when KLG claims to have begun keeping contemporaneous time records and included time entries from Morse for work that she has testified she never performed.  KLG sought $807,163.50 (including a lodestar enhancement) and ALG sought $398,887.50 (including a lodestar enhancement).  On January 16, 2019, the court awarded $714,233.00 in total attorneys' fees.  On June 6, 2022, Ford mailed ALG a check for $300,000.00 by FedEx.  Ford mailed a check to KLG for $843,528.13 on July 25, 2022 by FedEx.

73.     *Margeson v. Ford Motor Company*, Los Angeles Co. Superior Court Case No. BC549430, is still another example.  Like with the *Coon* and *Brown* matters, the fee application—on behalf of KLG, ALG, and others—was submitted years prior, on

December 15, 2017, and was also based on fraudulent billing records.  Mikhov and Altman both submitted false declarations in support of that application.  KLG sought $523,494.00 in fees, and ALG sought $353,205 in fees.  The time records attached to Mikhov's declaration, all of which Mikhov swore under oath "were completed contemporaneously with each dated entry or near in time to the work performed," *see* Exhibit I at ¶ 49, were in fact in large part false and fraudulent because they predated the time when KLG claims to have begun keeping contemporaneous time records and included time entries from Morse for work that she has testified she never performed.  On February 1, 2018, the court awarded $741,839.70 in total attorneys' fees, plus prejudgment interest.  KLG had an opportunity to correct these misrepresentations in Mikhov's declaration when it filed a reply in support of its fee application on July 22, 2022, but failed to do so.  Ford's outside counsel sent ALG a $500,000.00 check on July 26, 2022.  Ford's outside counsel sent KLG two checks: one for $136,744.53 on July 26, 2022, and another for $345,000.00 on September 22, 2022.  All of these checks were sent on behalf of Ford by FedEx.

74.     As another example, the fee application in *Anderson v. Ford Motor Company*, San Joaquin Co. Superior Court Case No. 39-2013-00299512-CU-BC-STK, was submitted on May 28, 2019, on behalf of KLG, Wirtz Law, ALG, and others.  Mikhov, Wirtz, and others submitted false declarations in support of that application.  The time records attached to Mikhov's declaration, all of which Mikhov swore under oath "were completed contemporaneously with each dated entry or near in time to the work performed," *see* Exhibit J at ¶ 64, were in fact in large part false and fraudulent because they predated the time when KLG claims to have begun keeping contemporaneous time records.  KLG sought $740,118.75 (including a lodestar enhancement), Wirtz Law sought $54,348.75 (including a lodestar enhancement), and ALG sought $482,548.13.  On May 10, 2022, Ford sent a check to Wirtz Law for $38,270.98; on July 28, 2022, Ford sent a check to KLG for $813,554.48; on July 28, 2022, Ford sent a check to ALG for $225,000; and on February 9, 2023, KLG sent a

31

check to KLG for $27,664.00.  All of these checks were sent by FedEx and were based on Defendants' claim for fees supported by their fraudulent billing records.

75.    All of the above checks were sent in reliance on false, fraudulent, and inflated fee applications or billing statements, and were caused by Defendants to be mailed as an essential part of their fraudulent scheme.

## III.    FORD HAS SUFFERED AND CONTINUES TO SUFFER SIGNIFICANT HARM FROM THE ENTERPRISE'S FRAUDULENT BILLING SCHEME

76.    As a direct and proximate result of Defendants' pervasive fraudulent criminal enterprise built on sham billing records, Ford has paid Defendants more than $100 million.  Ford paid fee judgments much larger than it would have paid absent Defendants' fraudulent billing records and abuse of their trusted positions as attorneys. Any uncertainty as to the amount of damages caused by Defendants' massive fraudulent billing scheme has been caused by Defendants' actions, and the true extent of the fraud and resulting damages will only be revealed as Ford assembles additional evidence and through discovery in this matter. For example, while KLG claims it began to keep contemporaneous time records sometime in 2018, further discovery will reveal whether that claim is truthful or just another of KLG's fabrications.

77.    In addition to the harm suffered from fraudulently induced payments based on falsified billing records, Ford has been further damaged by the legal fees and other costs it had to incur to detect and now attempt to stop the fraud perpetrated by this criminal enterprise.  The evidence presented in this Complaint reflects extensive work by Ford.  New evidence continues to emerge as Defendants continue to file additional fraudulent fee billing records in support of fee demands against Ford and other car manufacturers in various jurisdictions.  Expensive expert services are needed to untangle the thousands of fraudulent billing entries that Defendants have filed in various jurisdictions.  The work to uncover Defendants' criminal enterprise is continuing and is expected to cost Ford many millions of dollars.  Such work is necessary only because of

Defendants' calculated efforts to conceal their scheme by spreading their fraudulent billing entries across multiple cases, timekeepers, auto manufacturers, and jurisdictions.

78.    Ford has been further damaged by having to participate in a sham and tainted litigation process in connection with Defendants' submission of false and fraudulent billing records in support of fee applications.  Defendants misrepresented the amount of time they actually worked, making these misrepresentations to—and thereby perpetrating a fraud on—Ford and the courts.  Defendants intentionally and knowingly concealed the fictitious nature of the time entries for which they sought to recover fees, successfully swaying courts to issue fee awards, and causing Ford to pay settlements, for work that had not actually been performed on behalf of Defendants' client car owners.  Ford did not know at the time—and could not have known—that the entire proceedings were a farce; as Defendants well knew but concealed from Ford and the courts, the entries did not reflect actual and contemporaneously billed time that may or may not be reasonable, but rather were entirely fictional entries generated without regard to whether the billed tasks were ever performed at all and often years after cases had concluded.

79.    Ford has also suffered harm to its reputation and goodwill as a result of Defendants' conduct.  In open court and through Facebook posts, blogs, and other forums for summoning negative publicity, Defendants have touted their fraudulently obtained fee payments to onboard new clients, harming Ford's reputation and goodwill.

## IV.    THE RICO ENTERPRISE

80.    Defendants and the Unnamed Enterprise Members are a group of persons constituting an associated-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (referred to hereinafter as the "Enterprise"), because, among other reasons: (a) those involved have the common purpose to unlawfully operate an ongoing criminal enterprise engaged in fraudulent billing; (b) the Enterprise has an informal governing structure that at certain times operates as a command hierarchy led by Defendants Mikhov and KLG, different roles for members, and a governing set of rules and

practices; (c) each of the Defendants participates in the operation or management of the Enterprise; (d) the Enterprise has enjoyed sufficient longevity and has been in continuous operation for over five years; and (e) the Enterprise has generally been structured to operate as a continuing unit, with membership, rank, privileges, and access constantly maintained by the members, to accomplish the goals of the fraudulent billing scheme.

81.    Defendants and the Unnamed Enterprise Members have associated with one another in the Enterprise for the common purposes of preparing and filing fraudulent billing records in support of fee demands, inflating the value of negotiated settlements, unethically splitting fraudulently obtained fees, delaying and/or depriving clients of compensation due to them or increasing their clients' tax liability to advance their own financial interests, and funneling fraud proceeds into attorney distributions and extravagant purchases.

82.    ALG, Law Firm 1, and Law Firm 2 all shared office space with KLG during many years of the Enterprise's operation.  Personnel from ALG, and on information and belief, from Law Firm 1 and Law Firm 2, attended weekly calendar meetings in KLG's offices during which Morse delegated assignments.  Mikhov oversaw the Enterprise's operations and, as noted, expressly directed Altman and ALG—and, on information and belief, other members of the Enterprise—to pad their bills and inflate their fees.

83.    At all relevant times, Defendants and the Unnamed Enterprise Members were financially intertwined.  KLG received checks on behalf of other plaintiff lawyers and firms associated with the Enterprise and cashed these checks without obtaining proper endorsements.  KLG entered into complex agreements with the non-KLG Defendants to structure the distribution of fraudulently obtained proceeds from settlements and fee applications.  KLG also advanced funds to ALG and Law Firm 2, and on information and belief, to Wirtz Law and Law Firm 1.

FIRST AMENDED COMPLAINT

84.    At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).  Defendants and the Unnamed Enterprise Members are involved in business involving clients in different states, auto manufacturers engaged in interstate commerce, and the federal courts' interstate e-filing system.  Many of the cases involved in the criminal scheme are related to multi-district litigation involving lawyers located in different states accessing the federal e-filing system.

85.    Each of the Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), namely, mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

## V.    **THE PATTERN OF RACKETEERING ACTIVITY**

86.    As described herein, Defendants engaged in an expansive criminal scheme to defraud Ford and obtain payment for fictitious fees in thousands of cases.

87.    Defendants engaged in multiple instances of mail and wire fraud as part of their pattern of racketeering activity.

88.    The ultimate objective of Defendants' scheme or artifice to defraud was to deceive and coerce Ford into paying them unearned and fraudulently obtained fee judgments and settlements totaling millions of dollars to directly benefit Defendants.

89.    In furtherance of their fraudulent scheme, and as described herein and in Exhibit C hereto, Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to, the following:

FIRST AMENDED COMPLAINT

(a) electronic filing and service of court papers, served on lawyers located in various states, containing false and misleading statements intended to mislead the courts and relevant parties and to obtain Ford's money;

(b) mail service of court papers on lawyers containing false and misleading statements intended to mislead the relevant parties and to obtain Ford's money; and

(c) wires and/or mailings between and among Defendants, or between and among Defendants and Ford or its counsel, containing fraudulent billings and payments therefor.

90.     In addition to the acts identified in Exhibit C hereto, and as alleged herein, any document transmitted or caused to be transmitted by Defendants, whether by mail or wire, that contains, incorporates, references, and/or is based on purported entries from any KLG attorney before 2018 constitutes a predicate act of racketeering under 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud) because KLG did not keep any contemporaneous time records during that time but fabricated those records at a later date.  Similarly, any document transmitted or caused to be transmitted by Defendants, whether by mail or wire, that contains, incorporates, references, and/or is based on purported post-2016 billing entries for Amy Morse for communicating with client, attending mediations, drafting case management statements, drafting or responding to meet-and-confer letters, and/or communicating with expert witnesses constitutes a predicate act of racketeering under 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud) because Morse has testified that she did not ever perform any of those tasks.  As just one example, in *Faulkner v. Ford Motor Company*, Riverside Superior Court Case No. RIC1709381 (transferred to JCCP 4856), KLG submitted a fee application on November 27, 2023 that included *both* pre-2018 purported time entries *and* purported time entries for Morse for work that she has testified she never performed.  The predicate racketeering acts falling into these two categories, which are believed to number in at least the hundreds, are too numerous to list in Exhibit C and will be further explored through discovery in this matter.  Ford

36

FIRST AMENDED COMPLAINT

reserves the right to seek leave to amend Exhibit C to include additional predicate acts as warranted by the evidence.

91.     Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud Ford into paying Defendants money to which Defendants knew they were not entitled.  Defendants knowingly and intentionally prepared false and fictitious billing records and then, knowingly and with the intent to deceive Ford and the relevant courts for the purpose of obtaining Ford's money, caused those false and fictitious billing records to be transmitted to Ford and publicly filed. Defendants colluded with one another to fabricate and pad their time records to inflate statutory fees and settlements with the intent that their false statements be believed. Defendants also colluded with one another to create billing records out of thin air for full cases, after these cases had resolved and sometimes years after the purported work performed, also with the intent that their false records be believed; indeed, when KLG submitted billing records in support of fee motions, KLG's attorneys (typically Mikhov or Kirnos) falsely represented under oath to the court and to Ford that KLG had billed its time contemporaneously.  Mikhov and Kirnos also stated repeatedly under oath that the initials "ALM" in KLG's fraudulent billing statements reflected "Ms. [Amy] Morse's billing entries"—another patently perjurious statement given KLG's admission that it used Morse as a "catch-all" for discovery tasks that she never performed and Morse's own testimony that she only rarely billed any time at all after 2016.

92.     The attack on Ford was intended to, and did, result in Ford paying inflated fees that benefited the Defendants, which in turn financed the criminal scheme and supported the Enterprise members' jet-setting lifestyles.

93.     In a concerted effort to thwart Ford's ability to uncover the truth about the fraudulent billing scheme, Defendants have filed or caused to be filed hundreds of false and misleading documents in various cases with different auto manufacturers.

94.     Defendants intended that courts in various jurisdictions rely on, and those courts have relied on, Defendants' false and misleading statements, trusting Defendants

37

to comply with their ethical obligations as officers of the court. The courts' acceptance of Defendants' fraudulent billings has resulted in numerous inflated fee awards and settlements against Ford.

95. Accordingly, Defendants' submission of fraudulent billings and false and misleading representations in court have caused Ford to suffer substantial damages and reputational harm.

96. The alleged pattern of predicate acts, consisting of scores of acts of mail and wire fraud, are related and continuous and were committed on behalf of an associated-in-fact enterprise that has existed for the purpose of carrying out the fraudulent billing scheme for more than a decade.

## FIRST CAUSE OF ACTION

### (RICO, 18 U.S.C. § 1962(c))

### (Against All Defendants)

97. Ford realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint.

98. At all relevant times, Ford was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

99. At all relevant times, each Defendant was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

100. As detailed above, Defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of advancing an ongoing criminal enterprise, by submitting fraudulent billing records to obtain fraudulent fee payments for time never actually worked in federal and state cases across California against Ford and other auto manufacturers.

101. Defendants and their co-conspirators are an association-in-fact enterprise as defined in 18 U.S.C. § 1961(4). Each Defendant participated in the operation or management of the Enterprise.

FIRST AMENDED COMPLAINT

102.   At all times alleged herein, the Enterprise was engaged in, and its activities affected, interstate commerce.

103.   The Enterprise is likely to continue to engage in racketeering activity in its efforts to collect and protect its ill-gotten gains.

104.   Each Defendant conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" as defined in 18 U.S.C. §1961(5).

105.   Ford incorporates by reference the attached Exhibit C, which identifies numerous (but not all) specific uses of interstate wire and mail communications advancing the Enterprise's scheme in violation of 18 U.S.C §§ 1341 and 1443.

106.   As a direct and proximate result of the Enterprise's pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), Ford has been damaged in its business and property in an amount to be determined at trial, including but not limited to by having to pay more than $100 million due to fraudulent billing statements submitted by Defendants.

107.   Pursuant to 18 U.S.C. § 1964(c), Ford is entitled to recover treble damages plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION

### Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)

### (Against All Defendants)

108.   Ford realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint.

109.   Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

110.   Defendants knew that they were engaged in a conspiracy to commit the predicate acts of mail and wire fraud, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.

111.   Each Defendant agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

112.   Each Defendant knew about and agreed to facilitate the Enterprise's scheme to submit fraudulent billing records to state and federal courts to obtain fraudulent fee payments for time never actually worked and to recover more than they were entitled to from Ford.  It was part of the conspiracy that Defendants would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including but not limited to the acts of racketeering set forth above and in Exhibit C.

113.   As a direct and proximate result of Defendants' conspiracy to violate 18 U.S.C. § 1962(d) and the overt acts taken in furtherance of that conspiracy, Ford has been damaged in its business and property in an amount to be determined at trial, including but not limited to by having to pay more than $100 million due to fraudulent billing statements submitted by Defendants.

114.   Pursuant to 18 U.S.C. § 1964(c), Ford is entitled to recover treble damages plus costs and attorneys' fees from Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendants awarding the following relief:

1.      For an award of general damages in the amount to be determined at trial and estimated to be not less than $100 million, which damages are to be trebled according to the RICO statute, 18 U.S.C. § 1964(c);

2.      For pre-judgment interest according to statute;

3.      For Ford's reasonable attorneys' fees and costs according to statute, 18 U.S.C. § 1964(c); and

4.      Any other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial in this action.

Dated: August 22, 2025

KASOWITZ LLP

By: /s/ *Daniel A. Saunders*

Daniel A. Saunders
Matthew S. Manacek

Edward E. McNally
Daniel J. Fetterman

*Attorneys for Plaintiff Ford Motor Company*

FIRST AMENDED COMPLAINT