1

**MILBANK LLP**
Neal K. Katyal (admitted *pro hac vice*)
nkatyal@milbank.com
1850 K Street, NW, Suite 1100
Washington, D.C. 20003
Telephone: (202) 835-7505

Matthew Laroche (admitted *pro hac vice*)
mlaroche@milbank.com
55 Hudson Yards, 34th Floor
New York, NY 10001-2163
Telephone: (212) 530-5688

*Attorneys for Defendants Knight
Law Group LLP, Steve B. Mikhov,
Amy Morse, Roger Kirnos, and
Dorothy Becerra*

[counsel caption continued on
following page]

2

3

4

5

6

7

8

9

10

11

## UNITED STATES DISTRICT COURT

12

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

14   FORD MOTOR COMPANY, a
     Delaware Corporation,

15

16               Plaintiff,

17        v.

18   KNIGHT LAW GROUP LLP; STEVE
     B. MIKHOV; AMY MORSE; ROGER
     KIRNOS; DOROTHY BECERRA; THE
19   ALTMAN LAW GROUP; BRYAN C.
     ALTMAN; WIRTZ LAW APC; and
20   RICHARD M. WIRTZ,

21               Defendants.

22

23

24

25

26

27

28

Case No. 2:25-cv-04550-MWC-PVC

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANTS KNIGHT LAW GROUP
LLP, STEVE B. MIKHOV, AMY
MORSE, ROGER KIRNOS, AND
DOROTHY BECERRA'S MOTION TO
DISMISS THE FIRST AMENDED
COMPLAINT**

Hearing
Date:       November 21, 2025
Time:       1:30 p.m.
Judge:      Hon. Michelle Williams Court
Court:      6A
Trial Date: None Set

[counsel caption continued]

**WILLIAMS & CONNOLLY LLP**
Dane H. Butswinkas (admitted *pro hac vice)*
dbutswinkas@wc.com
Zachary K. Warren (State Bar No. 288398)
zwarren@wc.com
Elizabeth R. Peled (admitted *pro hac vice)*
epeled@wc.com
Hallie Saunders (admitted *pro hac vice)*
hsaunders@wc.com
680 Maine Avenue SW
Washington, DC 20024
Telephone: (202) 434-5252

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Aaron S. Dyer (State Bar No. 161798)
aaron.dyer@pillsburylaw.com
Ronald L. Cheng (State Bar No. 138892)
ronald.cheng@pillsburylaw.com
Lisseth A. Ochoa-Chavarria (State Bar No. 317130)
lisseth.ochoachavarria@pillsburylaw.com
725 South Figueroa Street, 36th Fl.
Los Angeles, CA 90017
Telephone: (213) 488-7100

*Attorneys for Defendants Knight Law Group LLP,*
*Steve B. Mikhov, Amy Morse, Roger Kirnos, and Dorothy Becerra*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
KNIGHT LAW DEFENDANTS' MOTION TO DISMISS

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................13

SUMMARY OF ALLEGATIONS .............................................................17

    A.    The RICO Claims Are Based On Underlying Litigation Ford Lost ............17

    B.    Ford Already Litigated and Lost Its Claim that the Fee Petitions Identified in the FAC Were Inflated ..........................................................................17

    C.    The RICO Enterprise Allegations Are Deficient. .........................................18

    D.    Defendant-Specific Allegations Are Sparse and Conclusory .....................18

        1.    The Knight Law Defendants ................................................................19

        2.    The Altman Defendants ........................................................................20

        3.    The Wirtz Defendants ..........................................................................20

LEGAL STANDARD ..................................................................................21

ARGUMENT ................................................................................................22

I.    *NOERR-PENNINGTON* BARS FORD'S RICO COMPLAINT BECAUSE IT IS PREDICATED ON UNDERLYING LITIGATION ACTIVITY .........................22

    A.    *Noerr-Pennington* Immunizes Judicial Branch Petitioning .........................23

    B.    Ford Does Not, and Cannot, Plausibly Allege That the Narrow "Sham" Litigation Exception Applies to the Underlying Litigation .........................23

II.    FORD FAILS TO STATE A RICO CLAIM IN COUNT ONE ...........................25

    A.    Ford Has Not Adequately Alleged the Formation, Existence, or Ongoing Organization of a RICO Enterprise .............................................................26

        1.    Ford Has Not Alleged Members of the Purported Enterprise Associated Together for a Common Purpose .....................................26

        2.    Ford Has Not Alleged an Ongoing Organization ...............................30

        3.    Ford Has Not Alleged a Continuing Unit ...........................................32

        4.    An Enterprise Involving Only the Knight Law Defendants Fails for Lack of Distinctiveness................................................................33

    B.    Ford Has Not Adequately Alleged a Pattern of Racketeering Activity ........35

        1.    Ford's Attempt to Comply with Rule 9(b) Underscores Its Improper Collateral Attack on State Court Fee Awards....................................35

        2.    Claim Preclusion Bars Ford's RICO Claims .....................................37

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
KNIGHT LAW DEFENDANTS' MOTION TO DISMISS

3.    Issue Preclusion Bars Ford From Relitigating Defendants' Fee Petitions and Resulting Awards ........................................................ 41

C.    Ford Has Not Adequately Alleged That Any Defendant Operated or Managed a Coordinated or Organized RICO Enterprise ............................. 43

III.    FORD FAILS TO ALLEGE A RICO CLAIM AGAINST THE INDIVIDUAL DEFENDANTS ........................................................................... 47

A.    Ms. Becerra ................................................................................. 48

B.    Mr. Mikhov ................................................................................. 50

C.    Ms. Morse ................................................................................... 52

D.    Mr. Kirnos ................................................................................... 54

IV.    FORD FAILS TO PLEAD A RICO CONSPIRACY IN COUNT TWO .............. 57

CONCLUSION ........................................................................................... 57

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
KNIGHT LAW DEFENDANTS' MOTION TO DISMISS

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acres Bonusing, Inc. v. Ramsey*,
2022 WL 17170856 (N.D. Cal. Nov. 22, 2022) ...................................... 14

*Aetna Life Ins. Co. v. Young*,
2024 WL 5182638 (C.D. Cal. Sept. 25, 2024) ........................................ 22

*Anderson v. Ford Motor Co.*,
74 Cal. App. 5th 946 (2022) ............................................................ *passim*

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006) ........................................................................ 36, 52

*Apex LLC v. Korusfood.com*,
222 Cal. App. 4th 1010 (2013) .................................................................. 41

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................ 21, 30, 44, 51

*Baumer v. Pachl*,
8 F.3d 1341 (9th Cir. 1993) ............................................................ 48, 53

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................ 16, 21, 29, 57

*Berroteran v. Super. Ct.*,
12 Cal. 5th 867 (Cal. 2022)............................................................ *passim*

*Berroteran v. Super. Ct.*,
41 Cal. App. 5th 518 (2019) .................................................................... 13

*Bey v. Wilson & Assocs., PLLC*,
2016 WL 11478139 (W.D. Tenn. June 7, 2016) ..................................... 33

*Beydoun v. Rosenthal*,
2024 WL 4907214 (E.D. Mich. Sept. 30, 2024) .................................... 33

*Blantz v. Cal. Dep't of Corr. & Rehab.*,
727 F.3d 917 (9th Cir. 2013) ......................................................... *passim*

*Blue Cross & Blue Shield v. S. Coast Behav. Health LLC*,
   No. 2:24-cv-10683-MWC (C.D. Cal. June 20, 2025), Dkt. 67 ................................ 46

*Blue Cross & Blue Shield v. S. Coast Behav. Health LLC*,
   No. 2:24-cv-10683-MWC, (C.D. Cal. Mar. 31, 2025), Dkt. 45 ................................ 46

*Bowser v. Ford Motor Co.*,
   78 Cal. App. 5th 587 (2022) ................................................................. 13, 14

*Boyle v. United States*,
   556 U.S. 938 (2009) ........................................................................ *passim*

*Burdette v. Carrier Corp.*,
   158 Cal. App. 4th 1668 (2008) ............................................................ 38, 40

*Canyon Cnty. v. Syngenta Seeds, Inc.*,
   519 F.3d 969 (9th Cir. 2008) ...................................................................... 26

*Castillo v. City of Los Angeles*,
   92 Cal. App. 4th 477 (2001) ...................................................................... 43

*Cedric Kushner Promotions, Ltd. v. King*,
   533 U.S. 158 (2001) .................................................................................. 34

*Chagby v. Target Corp.*,
   2008 WL 5686105 (C.D. Cal. Oct. 27, 2008) ........................................ 29, 31

*Chagby v. Target Corp.*,
   358 F. App'x 805 (9th Cir. 2009) ................................................................ 34

*Choudhuri v. Specialized Loan Servicing*,
   2023 WL 6277327 (N.D. Cal. Sept. 26, 2023) ............................................ 36

*City of Columbia v. Omni Outdoor Advertising, Inc.*,
   499 U.S. 365 (1991) .................................................................................. 24

*Clegg v. Cult Awareness Network*,
   18 F.3d 752 (9th Cir. 1994) ........................................................................ 21

*Comm. to Protect Our Agric. Water v. Occidental Oil & Gas Corp.*,
   235 F. Supp. 3d 1132 (E.D. Cal. 2017) ................................................ 33, 46

*Cook v. Harding*,
   879 F.3d 1035 (9th Cir. 2018) .................................................................... 42

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
KNIGHT LAW DEFENDANTS' MOTION TO DISMISS

*In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*,
   2012 WL 10731957 (C.D. Cal. June 29, 2012)..........................................27, 46, 53, 55

*Crowley v. Katleman*,
   8 Cal. 4th 666 (1994) ...............................................................................................38, 39

*Delta Aliraq, Inc. v. Martin*,
   2017 WL 11615775 (C.D. Cal. Aug. 4, 2017) .................................................................39

*Dirt Hogs Inc. v. Nat. Gas Pipeline Co. of Am.*,
   2000 WL 368411 (10th Cir. Apr. 10, 2000).....................................................................35

*DKN Holdings LLC v. Faerber*,
   61 Cal. 4th 813 (2015) .....................................................................................37, 40, 41

*Doan v. Singh*,
   617 F. App'x 684 (9th Cir. 2015) ....................................................21, 28, 33, 47

*Downey Surgical Clinic, Inc. v. Ingenix, Inc.*,
   2013 WL 12114070 (C.D. Cal. Dec. 11, 2013)..........................................................44, 45

*E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961)..........................................................................................................23

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
   751 F.3d 990 (9th Cir. 2014) .................................................................................*passim*

*Edwards v. Marin Park, Inc.*,
   356 F.3d 1058 (9th Cir. 2004) ....................................................................................22, 35

*Eichman v. Fotomat Corp.*,
   147 Cal. App. 3d 1170 (1983) .........................................................................................38

*Ellis v. J.P. Morgan Chase & Co.*,
   950 F. Supp. 2d 1062 (N.D. Cal. 2013)..........................................................29, 31, 55

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014)..........................................................................................................21

*Ford Motor Warranty Cases*, 11 Cal. App. 5th 626 (2017) ...............................................13

*In re Ford Motor Warranty Cases*,
   177 Cal. 5th 1122 (2025) .................................................................................................13

*Ford Motor Warranty Cases*, 89 Cal. App. 5th 1324 (2023) ............................................13

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
KNIGHT LAW DEFENDANTS' MOTION TO DISMISS

1
2

*Fraser v. Team Health Holdings, Inc.*,
  2022 WL 971579 (N.D. Cal. Mar. 31, 2022) ........................................................ 28, 29

3
4

*Freeman v. Lasky, Haas & Cohler*,
  410 F.3d 1180 (9th Cir. 2005) ................................................................................ 23

5
6

*Furnace v. Giurbino*,
  838 F.3d 1019 (9th Cir. 2016) ................................................................................ 38

7

*In re: Gen. Motors LLC Ignition Switch Litig.*,
  2016 WL 3920353 (S.D.N.Y. July 15, 2016) .......................................................... 34

8
9

*Gomez v. Guthy-Renker*,
  2015 WL 4270042 (C.D. Cal. July 13, 2015) ................................................. *passim*

10
11

*Gonzales v. Cal. Dep't of Corr.*,
  739 F.3d 1226 (9th Cir. 2014) ................................................................................ 38

12
13

*Goren v. New Vision Int'l, Inc.*,
  156 F.3d 721 (7th Cir. 1998) .................................................................................. 50

14
15

*Graciano v. Robinson Ford Sales, Inc.*
  144 Cal.App.4th 140 (2006) ................................................................................... 41

16
17

*Hamilton v. Willms*,
  2005 WL 3797562 (E.D. Cal. Oct. 28, 2005) .......................................................... 50

18
19

*Hardwick v. Cnty. of Orange*,
  980 F.3d 733 (9th Cir. 2020) .................................................................................. 37

20
21

*Helfand v. Nat'l Union Fire Ins. Co.*,
  10 Cal. App. 4th 869 (1992) ................................................................................... 41

22

*Hill v. Opus Corp.*,
  841 F. Supp. 2d 1070 (C.D. Cal. 2011) ............................................................ 35, 36

23
24

*Holden v. Hagopian*,
  978 F.2d 1115 (9th Cir. 1992) ................................................................................ 31

25
26

*Howard v. Am. Online Inc.*,
  208 F.3d 741 (9th Cir. 2000) .......................................................................... *passim*

27
28

*Huskinson & Brown v. Wolf*,
  32 Cal. 4th 453 (2004) .................................................................... 28, 31, 39, 42

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
KNIGHT LAW DEFENDANTS' MOTION TO DISMISS

*J-M Mfg. Co. v. Simmons Hanly Conroy, LLP*,
    2025 WL 843854 (N.D. Ill. Mar. 18, 2025) ................................................. 33

*In re Jamster Mktg. Litig.*,
    2009 WL 1456632 (S.D. Cal. May 22, 2009) ................................. 29, 45, 56

*Kamal v. Cnty. of Los Angeles*,
    2018 WL 4328467 (C.D. Cal. Sept. 6, 2018) .............................................. 40

*Kearns v. Ford Motor Co.*,
    567 F.3d 1120 (9th Cir. 2009) ................................................................... 35

*Kirkeby v. JP Morgan Chase Bank, N.A.*,
    2014 WL 7205634 (S.D. Cal. Dec. 17, 2014) ............................................ 34

*Kottle v. Nw. Kidney Ctrs.*,
    146 F.3d 1056 (9th Cir. 1998) ............................................................. 24, 25

*Kougasian v. TMSL, Inc.*,
    208 F. App'x 561 (9th Cir. 2006) ............................................................... 38

*Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*,
    940 F.2d 397 (9th Cir. 1991) ..................................................................... 52

*Lucido v. Superior Court*,
    51 Cal. 3d 335 (1990) ................................................................................ 42

*Masimo Corp. v. Apple Inc.*,
    2021 WL 925885 (C.D. Cal. Jan. 6, 2021) ........................................... 30, 45

*Mazzocco v. Lehavi*,
    2015 WL 12672026 (S.D. Cal. Apr. 13, 2015) ........................................... 40

*Mikhaeilpoor v. BMW of North America, LLC*
    48 Cal.App.5th 240 (2020) ........................................................................ 41

*Mir v. Greines, Martin, Stein & Richland*,
    2015 WL 12746231 (C.D. Cal. Feb. 19, 2015) .......................................... 24

*Monterey Plaza Hotel Ltd. P'ship v. Loc. 483 of Hotel Emps. & Rest. Emps. Union*,
    215 F.3d 923 (9th Cir. 2000) ............................................................... 39, 40

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
KNIGHT LAW DEFENDANTS' MOTION TO DISMISS

*Neubronner v. Milken*,
   6 F.3d 666 (9th Cir. 1993) ............................................................. 52, 54, 56

*Odom v. Microsoft Corp.*,
   486 F.3d 541 (9th Cir. 2007) ........................................................ 21, 30, 32

*Oscar v. Univ. Students Co-Operative Ass'n*,
   965 F.2d 783 (9th Cir. 1992) ..................................................................... 21

*Parducci v. Overland Sols., Inc.*,
   399 F. Supp. 3d 969 (N.D. Cal. 2019) ........................................................ 22

*Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*,
   508 U.S. 49 (1993) .................................................................................... 24

*Quach v. Cross*,
   2004 WL 2860346 (C.D. Cal. June 10, 2004) ..................................... 13, 21

*Raining Data v. Barrenechea*,
   175 Cal. App. 4th 1363 (2009) .................................................................. 52

*Ravet v. Solomon, Ward, Seidenwurm & Smith, LLP*,
   2007 WL 2088381 (S.D. Cal. July 17, 2007) ............................................. 33

*Relevant Grp., LLC v. Nourmand*,
   116 F.4th 917 (9th Cir. 2024) .............................................................. 23, 24

*Reves v. Ernst & Young*,
   507 U.S. 170 (1993) .......................................................................... *passim*

*Reynolds v. Ford Motor Co.*,
   47 Cal. App. 5th 1105 (2020) .................................................................... 13

*Sanford v. MemberWorks, Inc.*,
   625 F.3d 550 (9th Cir. 2010) ..................................................................... 57

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*,
   806 F.2d 1393 (9th Cir. 1986) ................................................................... 36

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985) ................................................................................... 25

*Shaw v. Nissan N. Am., Inc.*,
   220 F. Supp. 3d 1046 (C.D. Cal. 2016) ................................... 26, 27, 28, 29

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
KNIGHT LAW DEFENDANTS' MOTION TO DISMISS

*Silver v. Duel*,
   2022 WL 16859646 (C.D. Cal. July 11, 2022)...............................................24

*Slack v. Int'l Union of Operating Eng'rs*,
   2014 WL 4090383 (N.D. Cal. Aug. 19, 2014) ...............................32, 44, 49

*Slater v. Blackwood*,
   15 Cal. 3d 791 (1975) ........................................................................38

*Sosa v. DIRECTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006) ..............................................................23

*Spotlight Ticket Mgmt., Inc. v. StubHub, Inc.*,
   2020 WL 4342260 (C.D. Cal. May 22, 2020) ......................................31

*Stachon v. United Consumers Club, Inc.*,
   229 F.3d 673 (7th Cir. 2000) ..............................................................34

*Sun Sav. & Loan Ass'n v. Dierdorff*,
   825 F.2d 187 (9th Cir. 1987) ..............................................................36

*Swartz v. KPMG LLP*,
   476 F.3d 756 (9th Cir. 2007) ........................................................22, 47

*In re Takata Airbag Prods. Liab. Litig.*,
   2015 WL 9987659 (S.D. Fla. Dec. 2, 2015) ........................................28

*Tatung Co. v. Hsu*,
   2015 WL 11072178 (C.D. Cal. Apr. 23, 2015) ....................................57

*Textron Inc. v. Travelers Cas. & Sur. Co.*,
   45 Cal. App. 5th 733 (2020) ...............................................................42

*Thomas v. Hous. Auth. of Cnty. of Los Angeles*,
   2006 WL 5670938 (C.D. Cal. Feb. 28, 2006) ......................................24

*Tortilla Factory, LLC v. Health-Ade LLC*,
   2018 WL 6174708 (C.D. Cal. July 13, 2018).........................48, 49, 51, 53

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs. &
   Prods. Liab. Litig. (In re Toyota UA)*,
   826 F. Supp. 2d 1180 (C.D. Cal. 2011) ........................................27, 28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
KNIGHT LAW DEFENDANTS' MOTION TO DISMISS

*United Food & Com. Workers Unions & Emp'rs Midwest Health Benefits*
    *Fund v. Walgreen Co.,*
    719 F.3d 849 (7th Cir. 2013) ........................................................ 46

*United Mine Workers of Am. v. Pennington,*
    381 U.S. 657 (1965) ...................................................................... 23

*United States v. Jimenez Recio,*
    537 U.S. 270 (2003) ...................................................................... 57

*United States v. Turkette,*
    452 U.S. 576 (1981) ............................................................... *passim*

*Vess v. Ciba-Geigy Corp. USA,*
    317 F.3d 1097 (9th Cir. 2003) ................................................. *passim*

*Vieira v. Mentor Worldwide, LLC,*
    392 F. Supp. 3d 1117 (C.D. Cal. 2019) ....................................... 29

*W. Town Bank & Tr. v. Burr Forman,*
    2020 WL 6585655 (D.S.C. Nov. 10, 2020) .................................. 33

*Wagh v. Metris Direct, Inc.,*
    348 F.3d 1102 (9th Cir. 2003) ..................................................... 21

*Walter v. Drayson,*
    538 F.3d 1244 (9th Cir. 2008) ......................................... 43, 44, 49

*Weber v. Langholz,*
    39 Cal. App. 4th 1578 (1995) ...................................................... 52

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.,*
    865 F. Supp. 2d 1002 (C.D. Cal. 2011) ................................. 45, 47

*Young v. Schultz,*
    2023 WL 3324687 (N.D. Cal. May 8, 2023) ................................ 33

*In Re ZF-TRW Airbag Control Units Prods. Liab. Litig.,*
    601 F. Supp. 3d 625 (C.D. Cal. 2022) ......................................... 57

**Statutes**

Cal. Civ. Code § 1794(d) ............................................... 14, 17, 40, 42

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
KNIGHT LAW DEFENDANTS' MOTION TO DISMISS

**PRELIMINARY STATEMENT**

This retaliatory lawsuit by Plaintiff Ford Motor Company ("Ford") amounts to an attempt to use the "thermonuclear device" of the federal RICO statute, *Quach v. Cross*, 2004 WL 2860346, at *4 (C.D. Cal. June 10, 2004), to chill and punish its litigation adversaries—law firms, lawyers, and staff who represent consumers harmed by Ford's defective vehicles and fraudulent conduct. As alleged in the First Amended Complaint ("FAC") and reflected in numerous California Supreme Court and Appellate Court opinions, Defendant Knight Law Group LLP ("Knight Law") has been at the forefront of protecting consumers by bringing successful claims against Ford under California's "Lemon Law," the Song-Beverly Consumer Warranties Act (the "Song-Beverly Act").[1]

Knight Law has successfully litigated hundreds of those cases against Ford and has obtained record-setting, multimillion-dollar jury verdicts, several of which have included punitive damages based on Ford's fraudulent concealment of defects in its trucks. Knight Law has obtained findings confirmed by appellate courts revealing that Ford "engaged in a pattern or practice of deceitful misconduct" against consumers. *Anderson v. Ford Motor Co.*, 74 Cal. App. 5th 946, 973 (2022). Knight Law exposed internal Ford correspondence reflecting Ford's extensive efforts to cover up its practices through emails showing, among other things, Ford's high-level employees and executives "strongly urge[d] that th[e] information NOT be shared" because they did "not have a definitive repair action" while continuing to sell trucks to consumers; another employee advised his colleagues to "delete these emails" or Ford "might face a class action"; and that they cannot inform the public or its dealerships because if "we advertise we have carte blanche replacement it will surely

---

[1] *See, e.g.*, *In re Ford Motor Warranty Cases*, 17 Cal. 5th 1122 (2025); *Berroteran v. Superior Court* (real party in interest Ford Motor Co.), 12 Cal. 5th 867 (Cal. 2022); *Ford Motor Warranty Cases*, 89 Cal. App. 5th 1324 (2023); *Anderson v. Ford Motor Co.,* 74 Cal. App. 5th 946 (2022); *Bowser v. Ford Motor Co.*, 78 Cal. App. 5th 587 (2022); *Berroteran v. Superior Court* (real party in interest Ford Motor Co.), 41 Cal. App. 5th 518 ( 2019); *Reynolds v. Ford Motor Co.*, 47 Cal. App. 5th 1105 (2020); *Ford Motor Warranty Cases*, 11 Cal. App. 5th 626 (2017).

get worse and we may never get beyond this." *Id.* at 956-58; *see also Bowser v. Ford Motor Co.*, 78 Cal. App. 5th 587, 593 (2022). As a result of these victories and many others against Ford, and because the Song-Beverly Act confers an award of attorneys' fees to prevailing consumers, Knight Law has litigated hundreds of fee petitions against Ford, which Ford opposed based on the same claims it raises here, and those arguments were reviewed by trial courts already. *See* FAC. ¶¶ 23, 62, 63; Cal. Civ. Code § 1794(d).

Courts are wary of RICO claims, like Ford's, asserted against litigation adversaries, like Knight Law, and deeply scrutinize such lawsuits at an early stage. RICO claims based on underlying litigation activity impermissibly chill the exercise of fundamental First Amendment rights. As one court put it, if litigation activities could serve as a basis for a RICO claim, "every unsuccessful lawsuit could spawn a retaliatory action, which would inundate the federal courts with procedurally complex RICO pleadings, engender wasteful satellite litigation, and spawn ad infinitum litigation with each party claiming that the opponent's previous action was malicious and meritless." *Acres Bonusing, Inc. v. Ramsey*, 2022 WL 17170856, at *11 (N.D. Cal. Nov. 22, 2022) (cleaned up). This lawsuit exemplifies that very danger of "wasteful satellite litigation" and "complex" pleadings dealing with matters and issues that have already been litigated over the course of ten years, according to the FAC's allegations. Such claims undermine finality and promote collateral litigation by allowing dissatisfied litigants to relitigate matters resolved in prior judicial proceedings. That is exactly what Ford is attempting to do here.

In response to Knight Law's original motion to dismiss, Ford filed the FAC in a futile effort to avoid dismissal. Like the original Complaint, the most fundamental problem with the FAC—as held in a series of Supreme Court and Ninth Circuit cases—is that the allegedly wrongful acts identified in the FAC constitute "petitioning activity" (*i.e.*, litigation activity) protected by the First Amendment and the *Noerr-Pennington* doctrine. *Noerr-Pennington* recognizes a party's right to litigate in court without fear of reprisal and requires dismissal of claims predicated on underlying litigation activity to avoid chilling the exercise of that right. *Noerr-Pennington* bars this action in its entirety, as it is premised

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
KNIGHT LAW DEFENDANTS' MOTION TO DISMISS

solely on Defendants' litigation conduct against Ford, and the FAC does not plausibly allege that the narrow "sham litigation" exception to *Noerr-Pennington* applies.

Ford's claims continue to fail on their face for multiple additional reasons.

*First*, Ford's theory—that three law firms, which sometimes jointly represented a client in consumer litigation and have a long track record of prevailing in that litigation, somehow constitute a criminal RICO enterprise—is unfounded, and if upheld, would represent an unprecedented (and dangerous) expansion of civil RICO liability.  A routine co-counsel relationship among law firms representing the same client, formed for the purpose of litigating a legitimate lawsuit, is miles away from what the RICO statute was created to combat: the infiltration of legitimate business organizations by organized crime. Courts regularly reject attempts to characterize routine commercial relationships, like the co-counsel relationships at issue here, as RICO enterprises.

*Second*, Ford needed to allege racketeering activity—*i.e.*, predicate acts of wire and mail fraud—with the particularity required by Rule 9(b), but the FAC is littered with conclusory allegations of overbilling and fraud.  Ford continues to make hyperbolic allegations about inflated fee petitions in thousands of cases, but it rarely connects specific misrepresentations with any particular payment or injury, in violation of basic pleading requirements.  The closest the FAC comes to offering particularized allegations are the 11 cases in which there was an alleged misrepresentation that resulted in a fee award paid by Ford to Knight Law.  FAC ¶¶ 67-68, 70-74.  These allegations highlight why Rule 9(b)'s particularity requirement is so critical.  By forcing Ford to replead and identify the specific cases in which alleged misrepresentations supposedly resulted in payment by Ford, the Rule exposes that Ford is simply trying to relitigate state court fee awards by filing an untimely and improper collateral attack under the guise of RICO.  Ford already challenged every one of these 11 fee petitions as inflated in state court, and thus, Ford's RICO claim is barred by the doctrines of claim and issue preclusion.

*Third*, Ford fails to plausibly allege that each Defendant participated in the management or operation of the purported RICO enterprise.  The enterprise conduct

element requires allegations that each Defendant had some degree of direction or control over the enterprise's affairs and acted in furtherance of the enterprise, rather than their own affairs. No such factual allegations are present in the FAC, which seeks to characterize, in conclusory fashion, standard co-counsel relationships as fraudulent. The allegations continue to show, at most, that lawyers sought statutory attorney fees on behalf of their own law firms and in their own commercial interests, not for any purported enterprise. Nor can it be explained how the allegedly inflated billing of one co-counsel benefitted the other co-counsel or the purported enterprise.

*Finally*, Ford fails to allege that each individual Defendant participated in the conduct of a criminal RICO enterprise or engaged in a pattern of racketeering activity. The FAC continues to engage in improper group-pleading as to all nine "Defendants" without any distinction between them and their conduct. And the FAC's few Defendant-specific allegations fall well short of the particularized factual allegations the law requires.

For these reasons, as detailed below, the Court should dismiss this ill-conceived lawsuit with prejudice. Ford already amended the Complaint once in plain recognition of the merits of the deficiencies identified in Defendants' initial motions to dismiss. Having failed to correct the identified errors, dismissal with prejudice is warranted. This is especially the case because, as set forth in Knight Law's accompanying motion to strike, most of Ford's new allegations are inadmissible and time barred.

The FAC reinforces that this suit is an obvious effort to punish Ford's litigation adversaries—it is replete with wholly irrelevant (and inaccurate) personal attacks on the Defendants. Allowing this claim to proceed would come at the serious cost of further harming the reputations of the Defendants and chilling consumers and law firms from bringing legitimate claims against Ford. Ford also seeks to embark on a fishing expedition for discovery across thousands of cases going back over a decade, which likely would require years of litigation and raise severe attorney-client privilege issues. Courts require much more than the allegations Ford has offered "before allowing a potentially massive factual controversy to proceed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558-59 (2007).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
KNIGHT LAW DEFENDANTS' MOTION TO DISMISS

## SUMMARY OF ALLEGATIONS

### A.    The RICO Claims Are Based On Underlying Litigation Ford Lost

According to the FAC, Defendants violated the federal RICO statute by representing consumers in underlying Lemon Law litigation against Ford, and receiving attorneys' fees based on purportedly "inflated" fee petitions in those cases. FAC ¶¶ 1-2. The FAC, like the original Complaint, alleges that, since 2015, Defendants have filed numerous Lemon Law cases against Ford. *Id.* ¶¶ 24-25. The FAC does not allege that those underlying cases were unjustified or that Ford's vehicles were not, in fact, defective. Rather, the FAC is predicated solely on underlying cases that Ford ***lost***.

Under the Lemon Law, only prevailing consumers are entitled to recover attorneys' fees. FAC ¶ 23; Cal. Civ. Code § 1794(d). The FAC alleges that, pursuant to that statute, Defendants have filed hundreds of fee petitions on behalf of prevailing consumers and obtained fee awards from Ford totaling millions of dollars resulting, in part, from supposedly "inflated" fee petitions. FAC ¶¶ 62-63.

### B.    Ford Already Litigated and Lost Its Claim that the Fee Petitions Identified in the FAC Were Inflated

The FAC alleges that Ford identified supposedly inflated fee petitions by examining a "limited subset of cases for which Ford has billing invoices." FAC ¶ 37. The FAC lists various categories of purportedly problematic billing entries, such as instances of attorneys working more than 24 hours in a day, attorneys appearing simultaneously in different locations, supposedly duplicative and vague billing entries, undated billing entries, certain entries of Ms. Morse after she supposedly moved to an administrative function, and billing entries not based on contemporaneous time records. *Id.* ¶¶ 1, 5, 34-54, Exs. A-B.

Though Ford claims to have "reviewed thousands of KLG's billing invoices and time records" in cases that Defendants filed fee petitions, it has named just 11 cases in which purportedly inflated entries were included in specific fee petitions resulting in awards paid by Ford to Knight Law. *See* FAC ¶¶ 34, 67-68, 70-74. More than half of those fee awards were paid in 2018 and 2019, outside the four-year limitations period. *See*

*id.* ¶¶ 67-68 (*Buck*, *Duk*, *Burgess*, *Duenas*, *Orosco*, and *Santillo* cases). Moreover, in each of those 11 cases, Ford already litigated and lost the specific issue it seeks to re-litigate here—whether the fees were inflated. *See infra* Section II.B.

### C.    The RICO Enterprise Allegations Are Deficient

The FAC claims that Defendants and certain "Unnamed Enterprise Members" (comprised of "Attorney A," "Attorney B," "Law Firm 1," and "Law Firm 2") are a "group of persons constituting an associated-in-fact enterprise." FAC ¶ 80. The conclusory enterprise allegations are not supported by factual allegations. *Id.* ¶¶ 80-85. For example, the FAC alleges that the enterprise has a "common purpose," "has an informal governing structure," "has been in continuous operation for over five years," "has generally been structured to operate as a continuing unit," and that each Defendant "participates in the operation or management of the Enterprise." *Id.* ¶ 80. As in the original Complaint, the FAC includes no well-pled factual allegations supporting those and other related assertions. Indeed, there is not a single factual allegation in the FAC reflecting that any Defendant communicated about the purported enterprise, much less acted in a coordinated manner with a unified purpose. The most Ford could muster in the FAC to address this now-reccurring deficiency is to allege that Defendant Mikhov "expressly directed Altman and ALG—and, *on information and belief*, other members of the Enterprise—to pad their bills and inflate their fees." *Id.* ¶ 82 (emphasis added). There is no allegation that this purported direction was followed or that there was any coordination related to the claimed enterprise.

### D.    Defendant-Specific Allegations Are Sparse and Conclusory

The FAC, like the original Complaint, repeatedly groups all nine Defendants together when alleging conduct. *See* FAC (making allegations against "Defendants" collectively on more than 100 occasions); *see also id.* ¶¶ 7-8, 22, 24-25, 56-57, 62-64, 66, 77-78, 80-81, 84-89, 92-96. Most of the FAC's Defendant-specific allegations have no factual support. Instead, Ford makes most allegations on information and belief, including that each Defendant "participated in the unlawful activities alleged herein." *Id.* ¶¶ 10-18.

### 1.    The Knight Law Defendants

**Knight Law.**  Ford alleges that Knight Law "assembled a group of employees" to file certain fee applications in furtherance of the enterprise.  *See, e.g.*, *id*. ¶¶ 2, 4, 10.  Ford also alleges that "at certain times" the enterprise was "led by . . . [Knight Law]" (though it never articulates how), and that Knight Law shared office space with the Altman Law Group, Law Firm 1, and Law Firm 2.  Ford also claims that "Defendants and the Unnamed Enterprise Members were financially intertwined" because Knight Law cashed checks for attorney fee awards on behalf of their co-counsel.  *Id.* ¶ 83.

**Mr. Mikhov**.  Ford claims that Mr. Mikhov is the "ringleader" of the enterprise and "continues to manage activities at [Knight Law] and to wield considerable influence" over it.  *Id*. ¶¶ 4, 11.  Ford provides no factual allegations supporting that assertion and simultaneously claims that Mr. Mikhov has separated from KLG.  *Id.* ¶ 11.  The FAC alleges that Mr. Mikhov "instructed other members of the enterprise . . . to pad their bills and inflate their fees," but does so on information and belief without factual support.  *Id.* ¶¶ 11, 20, 29, 82.  The only other allegations about Mr. Mikhov are that (i) he "submitted" "suspicious" and "implausible" time entries in unspecified cases (*id*. ¶¶ 34(d), 51-53); (ii) Ford sent letters to him enclosing fee awards on a few occasions (*id.* ¶ 67); and (iii) Mr. Mikhov submitted declarations in support of certain fee applications (*id*. ¶¶ 11, 60, 71-74).

**Ms. Morse**.  Ford claims that Ms. Morse billed more than 24 hours in a day on more than 30 occasions, that she billed repetitive time entries to discovery tasks despite having testified that she worked in a supervisory role since 2016, and that some of those entries were included in fee applications.  *Id*. ¶¶ 5, 36-40, 46, Exs. A-B.  However, the FAC suggests that Ms. Morse did not know any such time entries were included in fee petitions.  FAC ¶¶ 5, 39, 46, 91.  In fact, there are no factual allegations that Ms. Morse was ever involved in submitting or reviewing fee applications.

**Mr. Kirnos**.  In 2020, Mr. Kirnos told a court that Knight Law was "going to be ethical" and "not going to submit lies to this Court."  *Id.* ¶ 58.  Ford alleges that he made these statements knowing Defendants were "committing criminal acts," but no facts are

offered supporting his alleged knowledge, such as who informed him about what and when. *Id.* Other allegations about Mr. Kirnos include that he (i) submitted a declaration in November 2023 relying on allegedly inflated fee awards (*id.* ¶ 60); (ii) submitted a declaration with one fee application in 2022 stating that Knight Law billed time contemporaneously (*id.* ¶ 70 (*Berroteran* case)); and (iii) sent one email identified on Exhibit C. In an obvious cheap shot, they also reference a misdemeanor conviction that occurred when Mr. Kirnos was a freshman in college almost 30 years ago. *Id.* ¶ 58. But, tellingly, there is not a single allegation concerning any of his billing records. Ford fails to allege how he knowingly participated in the "ongoing" "common enterprise" at any time.

**Ms. Becerra**. The original Complaint included no factual allegations about any conduct by Ms. Becerra, a former paralegal at Knight Law, and the FAC does no better. The FAC now alleges in conclusory fashion and on information and belief that Ms. Becerra oversaw "a group of employees" that created inflated billing records "at the direction of Defendants," but it does not allege a specific instance of this occurring or that Ms. Becerra even knew the bills were inflated. *Id.* ¶¶ 2, 14, 28-29.

### 2. The Altman Defendants

There are very limited allegations about the Altman Defendants. Mr. Altman allegedly submitted a declaration in support of two fee applications in 2017 and 2018 (*id.* ¶¶ 72-73), and emailed Ford's outside counsel in 2022 (*id.* at Ex. C, Row 8), but there are no factual allegations about how any of those actions were in furtherance of a purported RICO enterprise rather than just actions undertaken by and for Mr. Altman and his firm. Ford alleges for the first time in the FAC that Knight Law and its staff inflated the Altman Group's time entries after receiving them or instructed Altman to do so but never identifies a single instance of either occurring. *Id.* ¶¶ 28-29.

### 3. The Wirtz Defendants

As with the Altman Defendants, the FAC alleges without factual support or specificity that Knight Law and its staff inflated the Wirtz Defendants' time entries after receiving them. *Id.* ¶¶ 28-29. The other allegations in the FAC are that Mr. Wirtz and one

20

1    of his associates billed time on the same day for matters in separate locations (*id*. ¶¶ 6, 43-
2    44), that some of the Wirtz Defendants' time was included in a 2019 fee motion that had
3    nothing to do with Ford (*id.* ¶ 69), and that Mr. Wirtz submitted a declaration in support of
4    a fee motion and received a check from Ford (*id.* ¶ 74).  The FAC does not allege facts
5    supporting that these actions were in furtherance of an alleged enterprise.

**LEGAL STANDARD**

7         In RICO cases, motions to dismiss perform a critical function in weeding out claims.
8    *See, e.g.*, *Oscar v. Univ. Students Co-Operative Ass'n*, 965 F.2d 783, 786 (9th Cir. 1992)
9    (RICO was not intended to "provide a federal cause of action and treble damages to every
10   tort plaintiff"); *Gomez v. Guthy-Renker*, 2015 WL 4270042, at *11 (C.D. Cal. July 13,
11   2015) ("[T]he substantive requirements for RICO liability cannot be circumvented through
12   sophistic pleading practices."); *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425
13   (2014). Given the "quasi-criminal" nature of civil RICO claims and the "stigmatizing effect
14   on those named as defendants," flawed RICO claims, such as those at issue here, should
15   be "flush[ed] out" at the early stages of litigation.  *Wagh v. Metris Direct, Inc.*, 348 F.3d
16   1102, 1108-09 (9th Cir. 2003), *overruled on other grounds by*, *Odom v. Microsoft Corp.*,
17   486 F.3d 541 (9th Cir. 2007) (en banc); *see also Quach*, 2004 WL 2860346, at *4-5.

18        Even apart from the specific commands of RICO caselaw, dismissal is appropriate
19   if the complaint fails to "state a claim to relief that is plausible on its face." *Ashcroft v.*
20   *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  The Court must only
21   "accept as true all factual allegations in the complaint." *Doan v. Singh*, 617 F. App'x 684,
22   685 (9th Cir. 2015).  The "court is not required to accept legal conclusions cast in the form
23   of factual allegations if those conclusions cannot reasonably be drawn from the facts
24   alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).
25   Moreover, when a defendant is engaging in activity that is facially legitimate, "a significant
26   level of factual specificity is required to allow a court to infer reasonably that such conduct
27   is plausibly part of a fraudulent scheme." *Eclectic Props. E., LLC v. Marcus & Millichap*
28   *Co.,* 751 F.3d 990, 998 (9th Cir. 2014).

Having attempted to state a RICO claim based on alleged mail and wire fraud, Plaintiffs face another deep barrier:  RICO claims sounding in fraud must meet Rule 9(b)'s heightened pleading standard.  *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1065-66 (9th Cir. 2004); *Aetna Life Ins. Co. v. Young*, 2024 WL 5182638, at *4 (C.D. Cal. Sept. 25, 2024).   Under Rule 9(b), a plaintiff must state with particularity the circumstances constituting fraud, including "the who, what, when, where, and how of the misconduct charged."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (cleaned up).  Group pleading is impermissible.  *Parducci v. Overland Sols., Inc.*, 399 F. Supp. 3d 969, 977-79 (N.D. Cal. 2019).  Rather, a plaintiff must differentiate its allegations to inform each defendant separately of the allegations against them.  *Id.*; *Swartz v. KPMG LLP*, 476 F.3d 756, 764-65 (9th Cir. 2007) ("Rule 9(b) does not allow a complaint to merely lump multiple defendants together but 'requires plaintiffs to differentiate their allegations when suing more than one defendant.'") (cleaned up).

## ARGUMENT

## I.    *NOERR-PENNINGTON* BARS FORD'S RICO COMPLAINT BECAUSE IT IS PREDICATED ON UNDERLYING LITIGATION ACTIVITY

Ford's RICO action—which is predicated on successful fee petitions filed by lawyers who represented prevailing consumers in Lemon Law litigation against Ford—is barred by the *Noerr-Pennington* doctrine.   The doctrine provides First Amendment immunity to judicial branch petitioning.  Indeed, the *Noerr-Pennington* doctrine provides Ford with the same protection as it hurls falsities at Defendants in the FAC.

Ford tries to latch on to the narrow exception to that broad doctrine, which allows claims predicated on underlying litigation activity when the entire underlying litigation is a sham.  Ford does not plausibly allege that the sham litigation exception applies to the underlying litigation.  Ford sold defective vehicles to consumers; the consumers prevailed in the underlying litigation against Ford; the Defendant-lawyers litigated and won the cases at issue; the prevailing consumers had a statutory right to recover attorneys' fees; they filed motions with the courts, which Ford opposed based on the same overbilling arguments

raised here; and the allegations in the FAC assert, at most, that fee petitions submitted at the very end of the respective proceedings were inflated.  The underlying litigation was neither objectively baseless nor wholly illegitimate.

## A.  *Noerr-Pennington* Immunizes Judicial Branch Petitioning

Under the *Noerr-Pennington* doctrine, persons who petition any branch of government for redress, including the judicial branch, are "generally immune from statutory liability for their petitioning conduct."  *Relevant Grp., LLC v. Nourmand*, 116 F.4th 917, 927 (9th Cir. 2024); *see E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657 (1965).  As to litigation activity, "the doctrine 'overprotects baseless petitions so as to ensure citizens enjoy the right of access to the courts without fear of prosecution.'"  *Relevant Grp.*, 116 F.4th at 927-28 (quoting *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 934 (9th Cir. 2006)); *see Relevant Grp.*, 116 F.4th at 934-35.  This broad immunity prevents disgruntled litigants like Ford from re-litigating arguments that were the subject of court proceedings, which, in this case, allegedly involve cases and motions that go back as much as a decade.

The *Noerr-Pennington* doctrine bars RICO claims, like the present one, predicated on underlying litigation activity.  *See Relevant Grp.*, 116 F.4th at 923.[2]  And it bars claims against parties in the underlying litigation as well as their lawyers.  *See Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1186 (9th Cir. 2005).

## B.  Ford Does Not, and Cannot, Plausibly Allege That the Narrow "Sham" Litigation Exception Applies to the Underlying Litigation

The broad *Noerr-Pennington* immunity provided to litigation activity is subject only to a "narrow 'sham litigation' exception."  *Sosa*, 437 F.3d at 932 n.6.  For that exception to apply, the underlying litigation must be a "sham," and the plaintiff attacking it must plausibly allege that it was.  Recognizing this principle, Ford, in response to the original

---

[2] Ford's counsel here also represented the RICO plaintiff in *Relevant* in which the Ninth Circuit held that *Noerr-Pennington* barred a RICO claim predicated on litigation activity.

1    motion to dismiss, filed the FAC inserting the word "sham" repeatedly, as if doing so could

2    cure its defective lawsuit.  *See, e.g.,* FAC ¶¶ 4, 6, 24, 28, 32, 78.  It does not.

3        "A 'sham' situation involves a defendant whose activities are not genuinely aimed

4    at procuring favorable government action at all, not one who genuinely seeks to achieve

5    his governmental result, but does so *through improper means*."  *City of Columbia v. Omni*

6    *Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991) (cleaned up).  Ford does not, and

7    cannot, allege that Defendants and their clients were uninterested in favorable judicial

8    action in the underlying litigation.  Nor can it allege that the underlying litigation was

9    "objectively baseless."  *Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508

10   U.S. 49, 51 (1993) ("We hold that litigation cannot be deprived of immunity as a sham

11   unless the litigation is objectively baseless.").  To the contrary, the FAC alleges that

12   Defendants' clients ***prevailed*** in the underlying litigations against Ford, and courts ordered

13   Ford, over Ford's objections, to pay their attorneys' fees.  *See, e.g.*, FAC ¶ 67; Section II.B

14   *infra*.  "A winning lawsuit is by definition not a sham."  *Relevant Group*, 116 F.4th at 932;

15   *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1063 (9th Cir. 1998) ("[T]he Supreme Court

16   has reminded us that a winning lawsuit is, by definition, not objectively baseless.").

17       Although Ford alleges misrepresentations to courts in the form of "inflated" fee

18   petitions, the sham litigation exception is not triggered by such allegations; a plaintiff can

19   only "overcome a 12(b)(6) motion if his allegations demonstrate" that the defendant "so

20   misrepresented the truth" in the lawsuit that "the ***entire . . . proceeding was deprived of its***

21   ***legitimacy***."  *Kottle*, 146 F.3d at 1063 (emphasis added).  The FAC, alleging only that fee

22   petitions were supposedly "inflated," falls far short of this standard and should be

23   dismissed.  *See, e.g., id.* at 1058, 1063; *Silver v. Duel*, 2022 WL 16859646, at *6 (C.D.

24   Cal. July 11, 2022) (dismissing complaint because alleged misrepresentation regarding

25   "nonpayment of rent is not the type of misrepresentation that deprives" eviction "litigation

26   of legitimacy"); *Mir v. Greines, Martin, Stein & Richland*, 2015 WL 12746231, at *7 (C.D.

27   Cal. Feb. 19, 2015), (dismissing complaint when alleged perjury could not "have deprived

28   the 'entire' state court litigation of all legitimacy"); *Thomas v. Hous. Auth. of Cnty. of Los*

1    *Angeles*, 2006 WL 5670938, at *9 n.49 (C.D. Cal. Feb. 28, 2006) (dismissing complaint;

2    stating sham litigation exception "should be limited to misrepresentations respecting the

3    substance of the claim that show that the party's litigation position had no objective basis").

4    Moreover, Ford already had its bite at the apple by litigating its allegations of inflated

5    fees in the underlying litigation. *See infra* Section II.B. Ford cannot avoid dismissal by

6    "simply recast[ing] disputed issues from the underlying litigation as 'misrepresentations'

7    by the other party." *Kottle*, 146 F.3d at 1063 (citation omitted).

8    ***

9    In sum, *Noerr-Pennington* serves a critical purpose of allowing litigants to advocate

10   without fear of collateral suit attacking their conduct. Indeed, under Ford's expansive

11   theory of RICO liability, Ford's attorneys could be sued for the positions they took

12   defending Ford in Lemon Law cases, which could be characterized as "fraudulent" when

13   they argued Ford's cars were not defective. *See, e.g.*, *Anderson*, 74 Cal. App. 5th at 973

14   (Ford "engaged in a pattern or practice of deceitful misconduct" against consumers who

15   brought Lemon Law claims). *Noerr-Pennington* ensures that litigation conduct does not

16   give rise to tit-for-tat reprisals. Because Defendants' underlying litigation conduct is

17   immune under the *Noerr-Pennington* doctrine and the FAC fails to plausibly allege that

18   the narrow sham litigation exception applies, the Court should grant the motion to dismiss.

19   **II.    FORD FAILS TO STATE A RICO CLAIM IN COUNT ONE**

20   Beyond the threshold *Noerr-Pennington* bar, Ford fails to plausibly allege a RICO

21   claim. To state a claim under 18 U.S.C. § 1962(c), Ford must plausibly allege that each

22   Defendant (i) was the member of a RICO enterprise, (ii) engaged in a pattern of

23   racketeering activity, and (iii) conducted the affairs of the enterprise. *Sedima, S.P.R.L. v.*

24   *Imrex Co.*, 473 U.S. 479, 496 (1985); *Eclectic Props.*, 751 F.3d at 997. Ford must also

25   plead that the alleged harm injured its business or property and was caused "by reason of"

26

27

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
KNIGHT LAW DEFENDANTS' MOTION TO DISMISS

the RICO violation.[3]  *See Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972 (9th Cir. 2008).  Ford has not adequately alleged these elements.

### A. Ford Has Not Adequately Alleged the Formation, Existence, or Ongoing Organization of a RICO Enterprise

The inclusion of the enterprise concept in the federal RICO statute reflects Congress's intent of preventing racketeers from establishing and investing in "wholly illegal enterprises" or "infiltrat[ing]" legitimate business organizations.  *United States v. Turkette*, 452 U.S. 576, 584, 588-91 (1981).  This description does not come close to the allegations Ford asserts to show the existence of a RICO enterprise in this matter.  To show the existence of an association-in-fact enterprise, as Ford has alleged here, Ford must plead specific facts showing that the enterprise has "(A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose."  *Eclectic Props.*, 751 F.3d at 997 (citing *Boyle v. United States*, 556 U.S. 938, 946 (2009)).  Ford's allegations fail to establish such an enterprise in this very common co-counsel scenario.

As in the original Complaint, the FAC attempts to premise a criminal RICO enterprise on allegations that three law firms occasionally served as co-counsel while jointly representing a consumer client.  There are no plausible allegations supporting the notion that three separate and distinct law firms associated together just so that they could engage in *the common criminal purpose of fraudulent billing*, or that they engaged in coordinated activity through an "ongoing organization" and were a "continuing unit," as opposed to simply multiple different co-counsel relationships to prosecute meritorious cases for different clients over time.

#### 1. Ford Has Not Alleged Members of the Purported Enterprise Associated Together for a Common Purpose

An enterprise must be "bound by common purpose."  *Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1054 (C.D. Cal. 2016); *see also Boyle*, 556 U.S. at 944 (an enterprise

---

[3] The FAC often cites conduct that purportedly resulted in allegedly inflated fee payments by *other car manufacturers*.  Harm to third parties is definitionally not a RICO injury.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
KNIGHT LAW DEFENDANTS' MOTION TO DISMISS

is "a group of persons associated together for a common purpose" (cleaned up)). "Courts have overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises." *Gomez*, 2015 WL 4270042, at *8-10 (collecting cases from the Second, Fifth, Sixth, Seventh, and Ninth Circuits); *see, e.g.*, *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 2012 WL 10731957, at *9 (C.D. Cal. June 29, 2012) ("Parties that enter commercial relationships 'for their own gain or benefit' do not constitute an 'enterprise.'" (citation omitted)). This is because RICO liability requires more than alleging a pattern of racketeering activity. If actions—even fraudulent—in furtherance of a routine business relationship are enough to allege a common purpose, then a plaintiff alleging a pattern of predicate racketeering acts involving commercial parties would automatically state a RICO claim. This in turn would transform any run-of-the-mill claim involving a business relationship into a presumptive RICO claim, which "would necessarily expand RICO beyond the scope intended by Congress." *Id.*; *see also In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs. & Prods. Liab. Litig. (In re Toyota UA)*, 826 F. Supp. 2d 1180, 1202-03 (C.D. Cal. 2011).

Against this backdrop, Ford's common purpose allegations fail. Ford alleges in conclusory fashion that Defendants "have the common purpose to unlawfully operate an ongoing criminal enterprise engaged in fraudulent billing." FAC ¶ 80; *see id.* ¶¶ 8, 81, 100 (similar). Ford's theory would require specific factual allegations showing that these three independent law firms came together *for the purpose of* committing billing improprieties, rather than to represent consumers pursuing claims against Ford for defective vehicles. But the FAC lacks factual allegations supporting the claim that Defendants "associated together for" or are "bound by" an alleged fraudulent purpose. *Boyle*, 556 U.S. at 944 (first quote); *Shaw*, 220 F. Supp. 3d at 1054 (second quote). Instead, the FAC supports that the co-counsel relationships among Defendants were created for the purpose of representing consumers with meritorious claims and winning Lemon Law cases, which is exactly what those law firms did against Ford. The "common purpose element [is] unsatisfied where the alleged enterprise reflects a routine contract for services in which the entities are

pursuing their individual economic interests and not a shared purpose." *Fraser v. Team Health Holdings, Inc.*, 2022 WL 971579, at *12 (N.D. Cal. Mar. 31, 2022)).

Ford cannot establish an enterprise with a common purpose by alleging solely that Defendants engaged in a pattern of racketeering activity—overbilling—on cases in which they served as co-counsel. FAC ¶¶ 80-81; *Gomez*, 2015 WL 4270042, at *8; *Doan v. Singh*, 617 F. App'x 684, 686 (9th Cir. 2015) ("[I]t is not clear what exactly each individual did, when they did it, or how they functioned together as a continuing unit. These bare assertions of a pattern of racketeering activity do not establish an enterprise and they do not, therefore, satisfy Plaintiffs' burden"). Nor can it do so by alleging that facially legitimate features of a co-counsel relationship, such as meetings to assign tasks between firms or referral agreements to divide fees between lawyers, are evidence of a common RICO purpose. FAC ¶¶ 82-83; *see, e.g.*, *Huskinson & Brown v. Wolf*, 32 Cal. 4th 453, 463 (2004) (California Rules of Professional Conduct permit agreements to divide fees).

Ford's defective pleading is in line with RICO cases that were dismissed on common purpose grounds. For example, in *In re Toyota UA*, the complaint alleged that Toyota Motor Corporation and its subsidiaries and manufacturers participated in an enterprise with the common purpose of selling vehicles they knew were defective. 826 F. Supp. 2d at 1199. The court dismissed the complaint because it "alleges no more than that Defendants' primary business activity—the design, manufacture, and sale or lease of Toyota vehicles—was conducted fraudulently." *Id.* at 1202-03.

Similarly, in *Shaw*, the court dismissed a complaint alleging that Nissan and its subsidiaries and supplier "participated in an enterprise bound by the common purpose of fraudulently selling defective vehicles at inflated prices." 220 F. Supp. 3d at 1057. The court contrasted the defective *Shaw* complaint with a complaint that "included 'pages of references of specific communications' showing the defendants 'acting as an enterprise' and 'engaged in a collaborative scheme to defraud.'" *Id.* (quoting *In re Takata Airbag Prods. Liab. Litig.*, 2015 WL 9987659, at *1-2 (S.D. Fla. Dec. 2, 2015)). The *Shaw*

1  plaintiffs had done nothing of the sort; they had "not given [the court] any specific facts
2  that move their allegations from the realm of the possible to the plausible." *Id.*[4]

3        Numerous other cases have dismissed RICO claims involving similar allegations.
4  *See, e.g.*, *In re Jamster Mktg. Litig.*, 2009 WL 1456632, at *6 (S.D. Cal. May 22, 2009)
5  ("Plaintiffs herein allege an overarching common purpose to engage in fraudulent conduct
6  [*i.e.*, that businesses fraudulently sold certain content], but fail to identify specific
7  allegations in support of the common purpose."); *Chagby v. Target Corp.*, 2008 WL
8  5686105, at *2 (C.D. Cal. Oct. 27, 2008) ("Plaintiff has failed to allege any common
9  purpose between Defendant and its advertising agency, fraudulent or otherwise, other than
10 through conclusory allegations or legal characteristics."); *Ellis v. J.P. Morgan Chase &
11 Co.*, 950 F. Supp. 2d 1062, 1089 (N.D. Cal. 2013) (similar).

12       The foregoing cases are squarely on point and compel dismissal.  As in those cases,
13 Ford "attempt[s] to transform Defendants' business relationships into a RICO enterprise"
14 by asserting in conclusory fashion that the enterprise had a common purpose.  *Fraser*, 2022
15 WL 971579, at *12.  Ford cannot make any factual allegations because there is no basis to
16 allege that Defendants entered into anything other than standard co-counsel relationships
17 with each other, just as each has done with numerous other law firms and lawyers.  And
18 there is a serious harm from letting lawsuits such as this one fester, potentially chilling
19 organizations like Knight Law that have ardently protected consumers from abuses by
20 Ford, not just at the trial courts, but through appellate advocacy, which has led to dozens
21 of published appellate and state Supreme Court opinions over the last seven years
22 addressing issues involving the Song-Beverly Act, the Consumer Legal Remedies Act, and
23 common law fraud.  *See, e.g.*, *supra* p.13 n.1.

24 ─────────────────
25 [4] Ford's Complaint is bereft of such specifics.  Instead, Ford repeatedly states that it would
   need to conduct a broad fishing expedition into nearly decades-old billing entries to obtain
26 the specifics it needs to support its accusations.  FAC ¶¶ 36 n.2, 45 n.3, 76, 90.  Ford has
   the process backwards.  *See Twombly*, 550 U.S. at 558-59; *Vieira v. Mentor Worldwide,
27 LLC*, 392 F. Supp. 3d 1117, 1130 (C.D. Cal. 2019) ("Plaintiffs cannot be permitted to
28 engage in discovery when they have not met the most basic pleading standards.").

### 2. Ford Has Not Alleged an Ongoing Organization

Ford also fails to plausibly allege an enterprise with "an ongoing organization, either formal or informal." *Turkette*, 452 U.S. at 583. This requires allegations that the members of the enterprise created a "vehicle for the commission of two or more predicate crimes" that is separate from themselves and the underlying racketeering acts. *Odom*, 486 F.3d at 552 (cleaned up); *see also Boyle*, 556 U.S. at 946; *Turkette*, 452 U.S. at 583. As with common purpose, this element is not met by alleging only that business entities worked together in a fraudulent manner.

But that is what Ford alleged here—even though this is its second bite at the apple. When the FAC is stripped of its hyperbole, all that is alleged is three law firms occasionally worked together and, from time to time, submitted supposedly inflated fee applications (and, indeed, those fee applications were challenged by Ford in state court already). This is hardly evidence of an ongoing organization that is separate and apart from the law firms themselves or the alleged racketeering acts.

Ford's new allegations in the FAC do not solve this problem. For example, Ford now claims that the enterprise had an "informal governing structure" because Knight Law allegedly held weekly meetings with the Altman Group, Law Firm 1, and Law Firm 2, during which Ms. Morse "delegated" unidentified "assignments," and Mr. Mikhov at some unspecified time the Altman Group to inflate their fees. FAC ¶¶ 80, 82. Those allegations are hollow, vague, and made on "information and belief," which are insufficient to state a claim. *See, e.g.*, *Blantz v. Cal. Dep't of Corr. & Rehab.*, 727 F.3d 917, 927 (9th Cir. 2013) ("A complaint will not survive a motion to dismiss if it 'tenders naked assertions devoid of further factual enhancement.'" (quoting *Iqbal*, 556 U.S. at 678)); *Masimo Corp. v. Apple Inc.*, 2021 WL 925885, at *8 (C.D. Cal. Jan. 6, 2021) ("A conclusory allegation based on information and belief remains insufficient under *Iqbal/Twombly*." (cleaned up)).

It also is entirely unremarkable that law firms serving as co-counsel may have held weekly meetings to discuss their cases. Ford needed to do much more if it wanted to show that facially legitimate business activity is evidence of a RICO enterprise. It is easy to lob

30

accusations, which is precisely why "further factual enhancement" is required. *Blantz*, 727
F.3d at 972 (cleaned up); *see also Eclectic Props.*, 751 F.3d at 997-98 ("[A] significant
level of factual specificity is required to allow a court to infer reasonably that [facially
legitimate business conduct] is plausibly part of a fraudulent scheme."); *Spotlight Ticket
Mgmt., Inc. v. StubHub, Inc.*, 2020 WL 4342260, at *4 (C.D. Cal. May 22, 2020) (same).

Ford's allegations that "Defendants were financially intertwined" also fail. FAC ¶
83. Ford alleges that Knight Law cashed checks "on behalf of other plaintiff lawyers and
firms associated with the enterprise . . . without obtaining proper endorsements," but the
alleged failure to synchronize with the other firms undermines the notion that there was a
coordinated, ongoing common enterprise. *Id.* ¶¶ 68, 81, 83. Ford also cites to referral
arrangements, but referral fees are a routine feature of co-counsel relationships and
permitted under ethical rules.[5] These are the types of ordinary business practices that
courts routinely find insufficient to state a RICO claim, and precisely the kind of allegations
that chill valuable consumer rights litigation the most. *See Chagby*, 2008 WL 5686105, at
*3 ("Simply hiring [an] advertising agency, regardless of whether such advertisements
were commissioned for fraudulent purposes, does not mean that Defendants and their
advertising agency established a vehicle to commit the predicate acts of mail or wire
fraud."); *Ellis*, 950 F. Supp. 2d at 1089 (dismissing complaint where it failed to "ascertain
the structure of the alleged enterprise" and the court could not "determine whether
Defendants have engaged in conduct of the enterprise, as opposed to their own affairs").

Ford's bare-bones allegations are not remotely satisfactory. There are no allegations
of an agreement *among the Defendant law firms* to create and maintain an ongoing
enterprise. There are no allegations of coordination and continuity. Ford alleges in one

---

[5] Ford alleges that Knight Law's referral fee arrangements violate the California Rules of
Professional Conduct, but this allegation is conclusory and has no factual support. FAC
¶ 19; *Blantz*, 727 F.3d at 927; *Holden*, 978 F.2d at 1122. Even where referral fee
arrangements have been found *not* to comply with the California Rules of Professional
Conduct, courts allow attorneys to recover the reasonable value of their services. *See, e.g.*,
*Huskinson & Brown*, 32 Cal. 4th at 463.

1  sentence that Ms. Becerra created inflated billing records "at the direction" of the other

2  individual defendants (FAC ¶ 29), but "general allegations of 'direction,' . . . unadorned

3  by any factual support are insufficient to state a claim." *Slack v. Int'l Union of Operating*

4  *Eng'rs*, 2014 WL 4090383, at *22 (N.D. Cal. Aug. 19, 2014); *see also Blantz*, 727 F.3d at

5  927. The FAC does not even identify specific communications among the three law firms

6  beyond what would be strictly necessary to engage in an ordinary co-counsel relationship

7  (*e.g.*, meetings, co-counsel agreements, referrals, and joint motions).

### 3.    Ford Has Not Alleged a Continuing Unit

9  For similar reasons, Ford also has not plausibly alleged that Defendants

10  "function[ed] as a continuing unit." *Turkette*, 452 at 583; *see also Boyle*, 556 U.S. at 946.

11  This requires allegations of an ongoing course of conduct with "longevity sufficient to

12  permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946; *see also*

13  *Odom*, 486 F.3d at 552-53. But Ford's allegations amount to three law firms at times acting

14  as co-counsel who, in some instances, purportedly submitted inflated fee applications.

15  Ford also does not allege "similar methods" of purported overbilling to support that

16  Defendants were operating as a continuing unit. *Odom*, 486 F.3d at 553. In fact, the FAC

17  alleges that (i) the Wirtz Defendants allegedly double billed two hearings (FAC ¶¶ 43-45),

18  but no such allegation is made against any other Defendants; (ii) the Altman Defendants

19  allegedly billed excessive time to initial review of transferred case files (FAC ¶ 54), but no

20  such allegation is made against other Defendants; and (iii) Knight Law allegedly billed for

21  undated entries (why that is improper is still unclear from the FAC) or exceeded 24-hour

22  days (FAC ¶¶ 1, 5, 34-54; Exs. A-B), but no such allegations are made against the other

23  law firm Defendants. Far from showing continuity, the FAC demonstrates a *lack of*

24  *coordination* among Defendants.

25  These allegations do not support the existence of a continuing unit. Rather, Ford has

26  alleged "a series of disconnected incidents, each involving a subset of the overall group of

27  defendants, with no clear indication of a unified agenda," which does not state a claim.

28

*Comm. to Protect Our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1175 (E.D. Cal. 2017); *see also Doan*, 617 F. App'x at 686 (plaintiff failed to plead an enterprise where "it is not clear what exactly each individual did, when they did it, or how they functioned together as a continuing unit"); *Young v. Schultz*, 2023 WL 3324687, at *6 (N.D. Cal. May 8, 2023) (similar).[6]

* * *

Because Ford has not plausibly alleged, despite its second opportunity to do so in the FAC, that Defendants created and maintained an ongoing organization and continuing unit to accomplish a joint common purpose, as opposed to simply working together for a short time to litigate cases, the FAC must be dismissed for failure to allege an enterprise. Allowing Ford's enterprise allegations to proceed would be an unprecedented expansion of civil RICO liability into the conduct of law firms and lawyers. Courts routinely dismiss RICO complaints against law firms in similar circumstances. *See, e.g.*, *J-M Mfg. Co. v. Simmons Hanly Conroy, LLP*, 2025 WL 843854, at *8 (N.D. Ill. Mar. 18, 2025); *W. Town Bank & Tr. v. Burr Forman*, 2020 WL 6585655, at *6 (D.S.C. Nov. 10, 2020); *Ravet v. Solomon, Ward, Seidenwurm & Smith, LLP*, 2007 WL 2088381, at *4 (S.D. Cal. July 17, 2007); *Bey v. Wilson & Assocs., PLLC*, 2016 WL 11478139, at *6 (W.D. Tenn. June 7, 2016), *R&R adopted* 2016 WL 4006118 (W.D. Tenn. July 26, 2016); *Beydoun v. Rosenthal*, 2024 WL 4907214, at *4 (E.D. Mich. Sept. 30, 2024).

### 4. An Enterprise Involving Only the Knight Law Defendants Fails for Lack of Distinctiveness

If the Court dismisses the Wirtz and Altman Defendants, as it should given the extreme paucity of factual allegations against them, then it must also dismiss the case against the Knight Law Defendants. To establish an enterprise, Ford "must allege and

---

[6] Ford claims that there was "continuity" because Knight Law occasionally included time billed by attorneys employed by the other Defendant law firms on its billing invoices. FAC ¶ 50. Ford does not identify a single case in which this occurred or allege that it harmed Ford in any way. Thus, these allegations do not support that Defendants operated as a continuing unit "to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946.

prove the existence of two distinct entities: (1) a 'person'; and (2) and 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 161 (2001).  Without the Wirtz and Altman Defendants, all that remains is Knight Law and its employees.  It is well settled that a business entity carrying out its own activities (even fraudulent ones) only through its agents and employees does not constitute an enterprise.  *In re: Gen. Motors LLC Ignition Switch Litig.*, 2016 WL 3920353, at *12 (S.D.N.Y. July 15, 2016) (collecting cases); *see also Chagby v. Target Corp.*, 358 F. App'x 805, 808 (9th Cir. 2009) ("Chagby's alternative theory that an enterprise existed between Target Corporation and its wholly-owned subsidiaries fails to meet the distinctiveness requirement of civil RICO claims."); *Kirkeby v. JP Morgan Chase Bank, N.A.*, 2014 WL 7205634, at *8 (S.D. Cal. Dec. 17, 2014) (similar).

Ford apparently recognized this fundamental problem after reviewing the Knight Law Defendants' motion to dismiss the original Complaint because it added "Unnamed Enterprise Members" in the FAC.  FAC ¶ 20.  But the FAC does not come close to stating a plausible RICO claim against the Unnamed Enterprise Members.  There is not a ***single*** non-conclusory allegation supporting that the Unnamed Enterprise Members joined the purported RICO enterprise or participated in the conduct of that enterprise.  The FAC also does not even attempt to identify any racketeering acts committed by the Unnamed Enterprise Members.  In fact, the FAC cites to only two cases from 2018 in which allegedly inflated time entries from "an attorney with Law Firm 1" were included in fee applications, but those cases did not even involve Ford.  FAC ¶ 45.

Defendants have not identified a case that survived a motion to dismiss based solely on anonymous enterprise members vaguely referenced in a complaint.[7]  Courts routinely dismiss RICO claims in these circumstances.  *See, e.g.*, *Stachon v. United Consumers Club,*

---

[7] Ford knows who these firms are because it identified them by name in the original Complaint.  Dkt. 1 ¶¶ 7, 24.  Ford also alleged that these law firms and Knight Law were engaged in adversarial litigation several years ago, which undercuts Ford's conclusory assertion that they are part of the alleged RICO enterprise.  FAC ¶ 30.

*Inc.*, 229 F.3d 673, 676 (7th Cir. 2000) ("[T]he mere fact that [the defendant], for nearly 21 years, had business dealings with a wide assortment of unnamed manufacturers, wholesalers, and members in no way establishes that they function with [the defendant] as a continuing unit or as an ongoing structured organization."); *Dirt Hogs Inc. v. Nat. Gas Pipeline Co. of Am.*, 2000 WL 368411, at *3 (10th Cir. Apr. 10, 2000) ("Such inconsistent and conclusory allegations employ a 'moving target' approach to describing an enterprise, by naming a string of participants, known and unknown, and alleging that they acted as an association in fact.").

### B.   Ford Has Not Adequately Alleged a Pattern of Racketeering Activity

The FAC attempts to satisfy the racketeering pattern element by alleging "multiple instances of mail and wire fraud." FAC ¶ 87. RICO claims predicated on alleged mail or wire fraud are subject to Rule 9(b)'s heightened pleading standard. *Edwards*, 356 F.3d at 1065-66. "Courts have been particularly sensitive to Fed. R. Civ. P. 9(b)'s pleading requirements in RICO cases in which the 'predicate acts' are mail fraud and wire fraud." *Hill v. Opus Corp.*, 841 F. Supp. 2d 1070, 1089 (C.D. Cal. 2011) (cleaned up). Rule 9(b) requires a plaintiff to particularize the "who, what, when, where, and how" of the alleged fraud, *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009), as well as "what is false or misleading about a statement, and why it is false," *Vess*, 317 F.3d at 1106 (cleaned up).

### 1.   Ford's Attempt to Comply with Rule 9(b) Underscores Its Improper Collateral Attack on State Court Fee Awards

The allegations in the FAC, like those in the original Complaint, fall into three categories: (a) allegations of false statements untethered to specific fee petitions in cases against Ford; (b) allegations of fee award payments by Ford untethered to particularized false statements; and (c) allegations of allegedly false billing entries, included in specific fee petitions, which resulted in payments Ford mailed to Knight Law. The first two categories fail to meet the requirements of Rule 9(b), and the third category illustrates why

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
KNIGHT LAW DEFENDANTS' MOTION TO DISMISS

the particularity requirement of Rule 9(b) is so important.  By forcing Ford to be more particular, Rule 9(b) makes clear that issue and claim preclusion bar this lawsuit.

a.  Ford's allegations of false statements (*i.e.*, allegedly inflated billing entries) untethered to specific fee petitions in cases against Ford, *see* FAC ¶¶ 35-54, Exs. A-B, fail to meet Rule 9(b)'s heightened pleading standard because they omit the "time" and "place" of the alleged misrepresentation "as well as the identities of the parties to the misrepresentation."  *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).  Failing to identify the parties to the alleged misrepresentation is particularly problematic in this case because Ford's allegations are based, in large part, on its purported analysis of fee petitions filed in litigation against auto manufacturers *other than Ford*.  *See, e.g.*, FAC ¶¶ 7, 43-45, Exs. A-B.  Without linking a particularized false statement to a specific fee petition that Ford itself paid, Ford cannot plausibly allege, as it must, that it suffered an injury from the alleged misrepresentation.  *See, e.g.*, *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006).  Having seen the original motion to dismiss, Ford now concedes the obvious in the FAC:  allegedly "fraudulent billings" in cases against "auto manufacturers other than Ford . . . did not harm Ford."  FAC ¶ 45 n.3.[8]

b.  Likewise inadequate under Rule 9(b) are allegations of fee award payments mailed by Ford without accompanying allegations that those awards were based on fee petitions containing inflated billing entries.  *See* FAC, Ex. C.  Absent a link between a false statement and a mailed payment, there is no fraud.  That is why complaints must identify the "specific content of the false representations," *Schreiber Distrib. Co.*, 806 F.2d at 1401, as well as "when and how each mailing (or telephone call) furthered the fraudulent scheme."  *Hill*, 841 F. Supp. 2d at 1089; *see also Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 196 (9th Cir. 1987) (complaint satisfies Rule 9(b) where, among other things, it specifies "the letters' role in the fraudulent scheme"); *Choudhuri v. Specialized Loan Servicing*, 2023 WL 6277327, at *8 (N.D. Cal. Sept. 26, 2023) (similar).

---

[8] Furthermore, many of Ford's allegations of false statements fail to particularize "what is false or misleading about a statement, and why it is false."  *Vess*, 317 F.3d at 1106.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
KNIGHT LAW DEFENDANTS' MOTION TO DISMISS

c.      The initial motion to dismiss demonstrated that, with two exceptions, the original Complaint failed to particularize allegedly false billing entries, included in specific fee petitions, which resulted in payments by Ford to Knight Law.  *See* Dkt. 65-1 at 37 (citing Dkt. 1 ¶ 50 (identifying *Buck* and *Duk*)).  The initial motion further demonstrated that RICO claims predicated on the *Buck* and *Duk* matters were barred by, among other things, the four-year statute of limitations because Ford paid those fee awards in 2018.  *See* Dkt. 65-1 at 52-54.  Recognizing that, to avoid dismissal, it had to particularize and link allegedly false billing entries, in specific fee petitions, with payments it made to Knight Law, Ford attempted such particularization and linkage with respect to nine additional matters in the FAC.  *See* FAC ¶¶ 67-68, 70-74 (identifying *Burgess*, *Duenas*, *Orosco*, *Santillo*, *Berroteran*, *Coon*, *Brown*, *Margeson*, and *Anderson* matters).

RICO claims based on these 11 matters are barred by claim and issue preclusion because in those matters Ford already litigated and lost its argument that the fees were inflated.[9]  This case demonstrates why Rule 9(b) is so important; by forcing Ford to re-plead with more particularity, the Rule has exposed Ford's lawsuit for what it is—an improper effort to relitigate fee awards by filing a collateral attack under the guise of RICO.

### 2.      Claim Preclusion Bars Ford's RICO Claims

Claim preclusion "acts to bar claims that were, or should have been, advanced in a previous suit involving the same parties."  *DKN Holdings LLC v. Faerber*, 61 Cal. 4th 813, 824 (2015).[10]  Claim preclusion arises if a second suit involves (1) the same cause of action, (2) between the same parties or their privies, (3) after a final judgment on the merits in the first suit.  *Id.*  Claim preclusion bars not only the relitigation of "claims that were conclusively determined in the first action, but also matter that was within the scope of the

---

[9] In addition, like the fee petitions in *Buck* and *Duk*, the fee petitions in *Burgess*, *Duenas*, *Orosco*, and *Santillo* involved fee applications that resulted in payments outside the four-year limitations period.  *See* FAC ¶¶ 67-68 (alleging payments by Ford in 2018 and 2019).

[10] In considering the preclusive effects of prior state-court decisions, this Court applies California preclusion law.  *Hardwick v. Cnty. of Orange*, 980 F.3d 733, 740 (9th Cir. 2020).

37

1    action, related to the subject matter, and relevant to the issues so that it could have been

2    raised." *Burdette v. Carrier Corp.*, 158 Cal. App. 4th 1668, 1674-75 (2008).

3        ***Same cause of action.***    The determination of whether two cases involve the same

4    "cause of action" does not turn on whether the same legal theory or claim is asserted in

5    each case.    *See Crowley v. Katleman*, 8 Cal. 4th 666, 681-82 (1994).    Rather, "California

6    courts employ the 'primary rights' theory to determine what constitutes the same cause of

7    action."    *Gonzales v. Cal. Dep't of Corr.*, 739 F.3d 1226, 1232 (9th Cir. 2014) (cleaned

8    up).    Under the primary rights theory, "if two actions involve the same injury to the plaintiff

9    and the same wrong by the defendant[,] then the same primary right is at stake even if in

10   the second suit the plaintiff pleads different theories of recovery, seeks different forms of

11   relief and/or adds new facts supporting recovery."    *Eichman v. Fotomat Corp.*, 147 Cal.

12   App. 3d 1170, 1174 (1983); *see also Kougasian v. TMSL, Inc.*, 208 F. App'x 561, 563 (9th

13   Cir. 2006) (similar); *Slater v. Blackwood*, 15 Cal. 3d 791, 795 (1975) (similar).

14   Accordingly, as long as two claims are "part and parcel of the same primary right," claim

15   preclusion applies even where they are "distinct claims."    *Furnace v. Giurbino*, 838 F.3d

16   1019, 1026 (9th Cir. 2016).

17       As detailed above, the FAC identifies eleven cases for which Ford attempts to link

18   an alleged misrepresentation, in a specific fee petition, with a payment by Ford.    *See* FAC

19   ¶¶ 67-68, 70-74 (identifying *Buck*, *Duk*, *Burgess*, *Duenas*, *Orosco*, *Santillo*, *Berroteran*,

20   *Coon*, *Brown*, *Margeson*, and *Anderson* matters).    But in opposing each of those state-court

21   fee petitions, Ford claimed that Defendants had engaged in overbilling.    In *Buck*, for

22   instance, Ford argued that "the invoices contain numerous examples of overcharging for

23   services, overbilling for work, charging for unrelated services, and double billing for the

24   exact same projects." Ex. 1 at 12.    In *Margeson*, Ford argued that the fee petition was

25   "drastically inflated" and "wildly overinflated"; accused Knight Law of "indulg[ing] in

26   chronically excessive, inefficient billing" based on "a cookie-cutter Complaint, [] a cookie-

27   cutter standard set of discovery, and . . . the same filings, discovery and canned motions"

28   as "thousands" of other cases; and stated that "[t]he Court should view with distrust the

1  billing entries and billing practices of Plaintiff's counsel, which is excessive, unreasonable,

2  or otherwise improper."  Ex. 2 at 33, 38, 43-44.

3       Ford made substantially the same arguments in the other cases as well.  *See* Ex. 3,

4  *Duk* Opp. at 53-59 (accusing Knight Law of "unduly inflat[ing] the fee claim," including

5  by overbilling for the preparation of "routine discovery," "form letter[s]," "template

6  motions," deposition notices, and "form documents" for motions in limine and "advancing

7  a cookie-cutter claim in a manner that bespeaks no more skill than that possessed by a

8  competent paralegal or junior associate"; alleging that certain billing entries "appear to be

9  automatic"; and contending that "the purpose of utilizing form documents is to make the

10  litigation more efficient and cost effective.  This is not reflected in the extensive billing

11  plaintiff's counsel claims."); Ex. 4 at 65-72 (*Burgess* Opp.) (similar); Ex. 5 at 83 (*Duenas*

12  Opp.) (similar); Ex. 6 at 92-94 (*Orosco* Opp.) (similar); Ex. 7 at 110 (*Brown* Opp.)

13  (similar); Ex. 8 at 130 (*Coon* Opp.) (similar); Ex. 9 at 147, 150 (*Anderson* Opp.) (similar);

14  Ex. 11 at 178 (*Santillo* Opp.) (similar, and alleging that Knight Law's claimed fees were

15  "probably impossible as long as there exist only 24 hours/day to bill"); Ex. 12 at 195

16  (*Berroteran* Opp.) ("KLG also seeks fees for duplicative work or work that was never

17  performed or useless.").

18       Ford now parrots the same claims in an attempt to avoid paying fees it considers to

19  be "falsely and fraudulently . . . inflated."  *See, e.g.*, FAC ¶ 2.  Thus, the same alleged

20  primary right—the right to be free from paying inflated attorneys' fees—is at issue in both

21  this federal action and the prior state-court cases.  *See Crowley*, 8 Cal. 4th at 681 ("[T]he

22  primary right is simply the plaintiff's right to be free from the particular injury suffered.").

23       Accordingly, Ford may not repackage its "inflated attorneys' fees" arguments as new

24  RICO claims.[11]  The Ninth Circuit has refused to allow claims "to be relitigated in the

25  RICO context" where "[t]he harm alleged is fundamentally the same injury" at issue in the

26

27  [11] Although Ford could recover greater damages on a RICO claim, "the opportunity to
recover treble damages does not affect the determination of the primary rights at stake."
28  *Delta Airaq, Inc. v. Martin*, 2017 WL 11615775, at *8  n.4 (C.D. Cal. Aug. 4, 2017).

1    earlier proceedings. *Monterey Plaza Hotel Ltd. P'ship v. Loc. 483 of Hotel Emps. & Rest.*

2    *Emps. Union*, 215 F.3d 923, 928 (9th Cir. 2000); *see also Mazzocco v. Lehavi*, 2015 WL

3    12672026, at *9 (S.D. Cal. Apr. 13, 2015) (holding that claims were precluded because the

4    "same primary right was at stake" in both actions, even though plaintiffs added a new RICO

5    theory based on predicate acts they had not yet discovered at the time of the first judgment);

6    *Kamal v. Cnty. of Los Angeles*, 2018 WL 4328467, at *11 (C.D. Cal. Sept. 6, 2018)

7    (similar), *R&R adopted,* 2018 WL 4292190 (C.D. Cal. Sept. 7, 2018).

8        It does not matter whether Ford raised the exact same allegations of overbilling in

9    prior cases. The fee petitions allegedly led to the same injury claimed here—payment of

10   excessive fees due to alleged overbilling by co-counsel law firms as part of a single alleged

11   RICO scheme. Thus, the RICO claims implicate the same primary right as the state-court

12   proceedings, irrespective of whether the allegations in this federal action exactly mirror the

13   assertions of overbilling made in state court. *See Monterey Plaza*, 215 F.3d at 927-28

14   (allegations must be "distilled down" to their essence to identify the relevant primary right,

15   and that "[s]imply pleading different acts in the same scheme does not raise more than one

16   primary right, provided the wrongful acts are all directed to the same injury"); *Kamal*, 2018

17   WL 4328467, at *11 (similar). The allegations made in this case could have been (and

18   indeed *were*) made in the prior cases, which is sufficient for claim preclusion. *See Burdette*,

19   158 Cal. App. 4th at 1674-75 (claim preclusion bars litigation of a matter that was "within

20   the scope of the [original] action, related to the subject matter, and relevant to the issues so

21   that it could have been raised," even if it was not raised in the original action).

22       ***Same parties or their privies.*** Claim preclusion applies when the two suits are

23   "between the same parties or parties in privity with them." *DKN Holdings*, 61 Cal. 4th at

24   824 (cleaned up). That requirement is easily satisfied here. Ford was a party to each of

25   the earlier state-court proceedings. Defendants were in privity with the underlying

26   plaintiffs whom they represented because Defendants' interest in the outcome of the fee

27   petitions was at least as strong as the underlying plaintiffs' interest because the statutory

28   attorneys' fees are part of the prevailing buyer's judgment. *See* Cal. Civ. Code § 1794(d)

1    (prevailing consumer "shall be allowed by the court to recover as part of the judgment"

2    their reasonable attorneys' fees). Defendants pursued this recovery based on their clients'

3    statutory entitlement, and Defendants were unquestionably bound by the courts' rulings on

4    the fee petitions, which, at times, resulted in reduced fee awards. *See Helfand v. Nat'l*

5    *Union Fire Ins. Co.*, 10 Cal. App. 4th 869, 902 (1992) ("Privity exists where the nonparty

6    has an identity of interest with, and adequate representation by, the party in the first action

7    and the nonparty should reasonably expect to be bound by the prior adjudication.").

8        ***Final judgments on the merits.*** Each of the underlying cases resulted in a final

9    judgment on the merits. An attorney's fees order is final, "because 'further judicial action

10   is not required on the matters dealt with by the order.'" *Apex LLC v. Korusfood.com*, 222

11   Cal. App. 4th 1010, 1015-1016 (2013); *see* FAC ¶¶ 67-68, 70-74; Ex. 10 at 160. Thus, the

12   third element of claim preclusion is satisfied.

### 3. Issue Preclusion Bars Ford From Relitigating Defendants' Fee Petitions and Resulting Awards

15       Issue preclusion also bars Ford from relitigating the issue of Defendants' alleged

16   overbilling. Issue preclusion applies "(1) after final adjudication (2) of an identical issue

17   (3) actually litigated and necessarily decided in the first suit and (4) asserted against one

18   who was a party in the first suit or one in privity with that party." *DKN Holdings*, 61 Cal.

19   4th at 825. The underlying cases resulted in final orders or judgments requiring that Ford

20   pay attorneys' fees. Thus, there can be no dispute that the first and fourth elements have

21   been met. Elements two and three are met as well.

22       ***Identical issue.*** The issue presented in Ford's current Complaint—whether

23   Defendants worked the hours reflected in the invoices submitted with their fee petitions—

24   is identical to an issue that was litigated in the underlying state-court proceedings. Indeed,

25   the state courts were *required* to address that issue before granting the fee petitions. *See*

26   *Graciano v. Robinson Ford Sales, Inc.* 144 Cal. App. 4th 140, 154 (2006) ("The

27   determination of what constitutes a reasonable fee generally 'begins with the "lodestar,"

28   *i.e.*, the number of hours reasonably expended multiplied by the reasonable hourly rate.'")

(citations omitted); *Mikhaeilpoor v. BMW of North America, LLC* 48 Cal.App.5th 240, 246 (2020) ("[T]he lodestar method vests the trial court with the discretion to decide which of the hours expended by the attorneys were 'reasonably spent' on the litigation.").

In the FAC, Ford alleges that Defendants "falsely and fraudulently claim[ed] inflated attorney's fees for time never actually worked."  FAC ¶ 2.  That same issue was raised in Ford's oppositions to the underlying fee petitions.  *See, e.g.*, Ex. 1 at 17 (*Buck* Opp.); Ex. 3 at 53-56 (*Duk* Opp.); Ex. 4 at 71-72 (*Burgess* Opp.); Ex. 5 at 83 (*Duenas* Opp.); Ex. 6 at 92-93 (*Orosco* Opp.); Ex. 11 at 178 (*Santillo* Opp.); Ex. 12 at 194-96 (*Berroteran* Opp.); Ex. 8 at 128-30 (*Coon* Opp.); Ex. 7 at 109-10 (*Brown* Opp.); Ex. 2 at 39-40 (*Margeson* Opp.); Ex. 9 at 147, 150 (*Anderson* Opp.).

It is immaterial whether the FAC alleges specific instances or methods of overbilling that were not alleged in the underlying fee petitions.  "An issue decided in a prior proceeding establishes collateral estoppel even if some factual matters or legal theories that could have been presented *with respect to that issue* were not presented."  *Textron Inc. v. Travelers Cas. & Sur. Co.*, 45 Cal. App. 5th 733, 747 (2020) (cleaned up).  Ford now seeks to relitigate issues that were presented and litigated in the underlying fee petitions years ago.

***"Necessarily decided" and "actually litigated."***  This issue was both "necessarily decided" and "actually litigated."  Those two requirements are "interrelated."  *Cook v. Harding*, 879 F.3d 1035, 1042 (9th Cir. 2018).  "Inasmuch as an issue was necessarily decided in a prior proceeding, it was also actually litigated."  *Id.*

California courts interpret the "necessarily decided" prong to require "'only that the issue not have been "entirely unnecessary" to the judgment in the initial proceeding.'"  *Cook,* 879 F.3d at 1042 (quoting *Lucido v. Superior Court*, 51 Cal. 3d 335, 342 (1990)).  As noted above, the state courts must have applied the lodestar analysis in deciding whether Defendants' attorneys' fees were actually and reasonably incurred in the commencement and prosecution of the underlying actions.  *See* Cal. Civ. Code § 1794(d) ("If the buyer prevails in an action under this section, the buyer shall be allowed by the court to recover

as part of the judgment a sum equal to the aggregate amount of costs and expenses, including attorney's fees based on actual time expended, determined by the court to have been reasonably incurred by the buyer in connection with the commencement and prosecution of such action.").

It is presumed that the courts complied with the analytical framework that governs awards of attorneys' fees under the statute. *See Castillo v. City of Los Angeles*, 92 Cal. App. 4th 477, 482 (2001) (holding that an issue was necessarily decided by virtue of the examiner's decision, because "if the hearing examiner were to have found that the reasons for discharge were merely a pretext for discrimination, she would not have found the discharge was appropriate"). Thus, by awarding fees, the state court judges necessarily decided that Defendants actually worked the hours reflected in their invoices.

***

In sum, claim and issue preclusion bar Ford's claims. Allowing this case to proceed would undo the finality of the state-court judgments and allow litigants such as Ford to take a second bite at the apple in a new federal action any time they are dissatisfied with a state court's unfavorable decision.

## C. Ford Has Not Adequately Alleged That Any Defendant Operated or Managed a Coordinated or Organized RICO Enterprise

Ford also has not plausibly alleged that any Defendant engaged in conduct for the purported RICO enterprise, which is a separate element than the pattern of racketeering acts. RICO enterprise conduct "requires some participation in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 176 (1993) (cleaned up). To satisfy this element, Ford must allege that each Defendant (i) had "*some* part in directing the enterprise's affairs," and (ii) "conducted or participated in the conduct of the enterprise's affairs,' not just their own affairs." *Id.* at 179, 185. This requires factual allegations showing, for example, that a defendant gave or took directions for the enterprise, occupied a position in the chain of command, or knowingly implemented decisions of upper management. *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008).

Ford has not alleged facts supporting that any Defendant participated in the operation or management of the purported enterprise's affairs, such as meetings or communications among Defendants related to the alleged scheme, or to maintain the relationship among Defendants as a standalone criminal enterprise. The FAC alleges only that the law firms and their staff performed activities that are typical of law firms jointly representing clients. This does not come close to plausibly alleging the management of a criminal enterprise.

As in the original Complaint, the FAC relies on the conclusory allegation that Defendants participated "in the conduct, management, or operation of the Enterprise's affairs through a 'pattern of racketeering activity.'" FAC ¶ 85. But Ford cannot establish RICO conduct relying solely on vague allegations of participation in the predicate racketeering acts. "[O]ne is not liable under [RICO] unless one has participated in the operation or management of the enterprise itself," which is separate and apart from the racketeering acts. *Reves*, 507 U.S. at 183; *Walter*, 538 F.3d at 1249 ("Simply performing services for the enterprise does not rise to the level of direction. . . ."); *Gomez*, 2015 WL 4270042 at *7 ("RICO liability requires more than a pattern of . . . predicate crimes.").

Ford tried, unsuccessfully, to fix this problem in the FAC by adding still more conclusory allegations devoid of factual support, this time claiming that (i) Mr. Mikhov and Knight Law directed others to inflate fees (FAC ¶¶ 20, 82); (ii) Ms. Beccera created inflated billing entries at the direction of the other individual defendants (*id.* ¶ 29); and (iii) Ms. Morse delegated assignments at weekly meetings involving "personnel" from the Altman Group, Law Firm 1, and Law Firm 2 (*id.* ¶ 82). Ford has not identified a single instance in which a Defendant "directed" anyone to do anything in furtherance of a purported enterprise, or that a Defendant actually agreed to, and did, engage in some act at that direction. The FAC's "'naked assertions devoid of further factual enhancement'" are insufficient to state a claim. *Blantz*, 727 F.3d at 927 (quoting *Iqbal*, 556 U.S. at 678); *see also Slack*, 2014 WL 4090383, at *22 ("[G]eneral allegations of 'direction,' 'counseling,' 'commanding,' 'inducing,' or 'procuring,' unadorned by any factual support are insufficient to state a claim sufficient to satisfy *Twombly* and *Iqbal*"); *Downey Surgical*

1    *Clinic, Inc. v. Ingenix, Inc.*, 2013 WL 12114070, at *6 (C.D. Cal. Dec. 11, 2013) (similar).

2    That many of these allegations were made on information and belief underscores Ford's

3    pleading failures. *See Masimo Corp.*, 2021 WL 925885, at *8 ("A conclusory allegation

4    based on information and belief remains insufficient under *Iqbal/Twombly*." (cleaned up)).

5    Moreover, Ford never alleges what "assignments" Ms. Morse allegedly "delegated,"

6    to whom they were delegated, or how this supposedly relates to the management of an

7    unlawful enterprise. Ford does not even attempt to allege why it would be at all unusual,

8    much less *part of a RICO enterprise*, for Ms. Morse to delegate tasks among co-counsel.

9    In fact, the primary benefit of entering a co-counsel relationship is to allow the delegation

10   of tasks and leverage the expertise of multiple law firms and lawyers.

11   When Ford's conclusory allegations and legal conclusions are set aside, all that

12   remains is "conduct consistent with ordinary business conduct and an ordinary business

13   purpose." *In re Jamster*, 2009 WL 1456632, at *5. Ford's allegations amount to nothing

14   more than that Defendants participated in a standard legal relationship, which fails to

15   plausibly allege the management of a standalone criminal enterprise. *See, e.g.*, *In re*

16   *WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1034-35 (C.D.

17   Cal. 2011) ("[T]he existence of a business relationship [among defendants] without more

18   does not show that [defendant] conducted the enterprise."); *Downey Surgical Clinic, Inc.*,

19   2013 WL 12114069, at *13 (no RICO enterprise where defendant was "carrying out the

20   functions it was contractually required to perform").

21   Ford's allegations reflect Defendants conducting their own affairs for their own

22   commercial interests, not those of an alleged criminal enterprise. *See Reves*, 507 U.S. at

23   185. Ford never explains how *any* of that alleged RICO activity reflects organized

24   participation in the conduct of a purported *enterprise's* affairs or benefited an *enterprise*

25   versus the individual law firms. In fact, Ford's allegations suggest—accurately—that

26   Knight Law co-counseled with a "consortium of . . . legal professionals, including other

27   law firms and attorneys" on Lemon Law cases, and that the Defendant law firms were not

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
KNIGHT LAW DEFENDANTS' MOTION TO DISMISS

always co-counsel.  FAC ¶ 19.  This undermines any suggestion that Defendants were acting in furtherance of an enterprise, rather than their own affairs.

Courts routinely dismiss complaints with similar allegations.  *See, e.g.*, *In re Countrywide*, 2012 WL 10731957, at *9 (complaint failed to allege enterprise where it alleged "no facts indicating that the various [Defendants] it identifie[d] coordinated their behavior or combined as an enterprise"); *Comm. to Protect Our Agric. Water*, 235 F. Supp. 3d at 1175 (dismissing where "plaintiffs allege only a series of disconnected incidents, each involving a subset of the overall group of defendants, with no clear indication of a unified agenda"); *United Food & Com. Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013) (similar).

Ford's allegations stand in stark contrast to those that this Court recently found sufficient to survive a motion to dismiss.  *See Blue Cross & Blue Shield v. S. Coast Behav. Health LLC*, No. 2:24-cv-10683-MWC, Dkt. 67 (C.D. Cal. June 20, 2025).  *Blue Cross* alleged a wide-ranging scheme among providers of addiction services to harm health insurers through fraudulent enrollment and billing practices.  As to each defendants' participation in the enterprise, the complaint detailed how defendants "improperly led aspects of the scheme, including finding potential targets, sending them to [another enterprise member], working with [that enterprise member] to falsify insurance applications, allowing individuals to live for free in their homes while Blue Cross paid insurance claims, and improperly accepting a split of the insurance payments." *Id.* at 18-19; *see Blue Cross*, Dkt. 45 ¶¶ 57-58, 60-67 (C.D. Cal. Mar. 31, 2025) (alleging how each defendant's actions furthered the goals of the enterprise; highlighting communications between enterprise members, at times including screenshots of those communications; and recounting frequent meetings to discuss the scheme among enterprise members).

Ford's conclusory allegations are not close to the non-conclusory allegations this Court highlighted in *Blue Cross*.  There are no specific allegations of coordination, communication, or meetings between Defendants to set up or maintain the three law firms as a purported standalone enterprise.  There are no factual allegations detailing which

Defendants led what aspects of the scheme or describing how Defendants' conduct reflects management or direction of the enterprise separate from the alleged racketeering. There are no factual allegations describing how Defendants worked together to effectuate the scheme, rather than in their own commercial self-interest as co-counsel on cases. The initial motion to dismiss put Ford on notice of these pleading deficiencies, but despite throwing much mud at the wall, the FAC still does not plausibly allege RICO conduct.

## III.    FORD FAILS TO ALLEGE A RICO CLAIM AGAINST THE INDIVIDUAL DEFENDANTS

The foregoing sections identify fundamental defects in the FAC, any one of which independently requires dismissal as to all Defendants. Those pleading failures become even more glaring when assessing Ford's allegations on an individual-by-individual basis.

To state a claim against the Individual Defendants, Ford must allege particularized facts showing that ***each*** Individual Defendant participated in the conduct of the purported enterprise through a pattern of racketeering activity. *See, e.g.*, *In re Wellpoint Litig.*, 865 F. Supp. 2d at 1035. Defendants argued in their initial motions to dismiss that the original Complaint repeatedly grouped all nine "Defendants" together—on over 100 occasions—when making allegations about their purported conduct. The FAC does the exact same thing. Group pleading fails to state a claim against any Individual Defendant as a matter of law. *Swartz*, 476 F.3d at 764-65; *see also Doan*, 617 F. App'x at 686.

The FAC's primary allegation against the Individual Knight Defendants is an almost verbatim repetition of the conclusory statement, made on information and belief, that Defendants Mikhov, Morse, and Kirnos each "knowingly . . . [made] and/or allow[ed] the creation of fraudulent entries for time not actually worked." FAC ¶¶ 11-13. Ford does not even make this allegation against Ms. Becerra and simply alleges, again on information and belief, that she oversaw "the group of employees that was charged with fraudulently creating . . . false and invented time records," without alleging that she knowingly participated in the alleged scheme or directed its affairs. FAC ¶ 14. Allegations made upon information and belief are insufficient to meet Rule 9(b)'s heightened pleading

1  standard.  *Tortilla Factory, LLC v. Health-Ade LLC*, 2018 WL 6174708, at *8 (C.D. Cal.

2  July 13, 2018).

3        Stripping Ford's FAC of impermissible group pleading, conclusory statements

4  unsupported by facts, and information and belief allegations, as the Court must, very few

5  factual allegations remain specific to the Individual Defendants.  Ford's few Defendant-

6  specific allegations do not state a claim.

7        **A.    Ms. Becerra**

8        Ms. Becerra was a career paralegal at Knight Law, and her inclusion as a named

9  Defendant in this litigation is outrageous.  The initial motion to dismiss explained that the

10 original Complaint did not allege a single factual allegation about Ms. Beccera's conduct.

11 Instead of dropping Ms. Becerra from this case, Ford doubled down in the FAC by asserting

12 spurious and conclusory allegations without factual support.  The sum total of Ford's new

13 allegations about Ms. Becerra are that she purportedly oversaw a team of employees that

14 created inflated billing records and did so at the direction of the other Individual

15 Defendants.  FAC ¶¶ 2, 28-29.  Ford's allegations against Becerra fail every RICO element.

16       *First*, Ford must allege that Ms. Becerra associated together with other members of

17 the alleged enterprise for a common purpose in furtherance of an ongoing organization.

18 *Boyle*, 556 U.S. at 944; *Turkette*, 452 U.S. at 583.  Ford has made no such allegations.  Ford

19 claims that *Knight Law* "assembled a team of employees, overseen by Becerra, for the

20 specific purpose of deceiving Ford."  FAC ¶ 28.  But that allegation, at best, points to

21 Knight Law's purported purpose.  There are no allegations that Ms. Becerra was even

22 aware of the purported enterprise, let alone that she knowingly associated with other

23 enterprise members for the common purpose of filing inflated fee statements.  *See Baumer*

24 *v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993) (dismissing RICO claim lacking allegations

25 that attorney defendant was "aware of the essential nature and scope of the enterprise").

26       *Second*, Ford must allege that Ms. Becerra was involved in directing the enterprise's

27 affairs and participated in the operation or management of the enterprise.  *Reves*, 507 U.S.

28 at 176.  There are no such allegations.  Ford alleges that Ms. Becerra "created" inflated

billing records "at the direction" of others (FAC ¶ 29), but simply claiming that someone was "directed" to do something without accompanying factual support does not plausibly state a claim. *Blantz*, 727 F.3d at 927; *Slack*, 2014 WL 4090383, at *22. Regardless, the FAC does not even allege that Ms. Becerra knew her actions were part of any purported RICO enterprise. This is not surprising because Ms. Becerra was a paralegal who had no control over the litigation filings that purportedly serve as the basis for the FAC. *See Walter*, 538 F.3d at 1249 ("performing services for the enterprise" is not enough).

*Third*, Ford must allege with particularity that Ms. Becerra engaged in a "pattern" of mail or wire fraud in furtherance of the enterprise. *See Howard v. Am. Online Inc.*, 208 F.3d 741, 748 (9th Cir. 2000). As set forth in Section II.B *supra*, there are eleven cases mentioned in which Ford attempted to link payments it mailed with allegedly false entries in specific fee petitions. The FAC does not tie Ms. Becerra to any of these eleven matters. To the contrary, Ford's factual allegations against Ms. Becerra reflect only cases involving *manufacturers other than Ford*, and reflect only the conduct of those manufacturers, *not hers*. Ford alleges that *FCA* addressed settlement checks to Ms. Becerra on two occasions. FAC ¶¶ 67 n.4, 69. This caused no RICO injury to Ford, and says nothing about what Ms. Becerra knew or did, in any event. Ford does not allege that Ms. Becerra engaged in any conduct that caused FCA to send her these checks. The fact that FCA chose to address mail to Ms. Becerra does not make her part of a RICO enterprise.

*Finally*, most of the other allegations against Ms. Becerra are in Paragraph 14 and made on information and belief, which are insufficient under Rule 9(b). *See Tortilla Factory*, 2018 WL 6174708, at *8. Ford claims that Ms. Becerra oversaw "the group of employees that was charged with fraudulently creating . . . false and invented time records . . . for the financial benefit of the enterprise, request[ed], receiv[ed] and transact[ed] checks for what she knew were fraudulently obtained fee payments, and develop[ed] the formula for [Knight Law's] split of those payments with other enterprise members." FAC ¶ 14. Again, there is not a single factual allegation that provides a basis for any of those statements: there are no allegations about how or why Ms. Becerra purportedly knew time

records were false or invented, how she allegedly knew the checks she received were fraudulent, what her role was in terms of the "split" of attorneys' fees, or how anything she did in a ministerial capacity advanced or even related to the purported RICO enterprise.

Even if its information and belief allegations were supported by particularized facts, Ford's claims still would fail. Ms. Becerra's alleged conduct—overseeing employees, receiving checks, and developing a formula to split attorneys' fees—does not plausibly allege her participation in a pattern of racketeering activity nor her management or direction of the enterprise's affairs. At most, Ford's allegations amount to Ms. Becerra, a paralegal, taking directions from others, which plainly fails to state a RICO claim. *See Hamilton v. Willms*, 2005 WL 3797562, at *8 (E.D. Cal. Oct. 28, 2005) ("[A]llegations that Defendant . . . might [have] known about certain things the alleged . . . Enterprise was doing at most suggests that Defendant . . . was aware of and may have benefitted from the alleged enterprise. Knowledge of a RICO enterprise's actions is simply not sufficient."); *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 728 (7th Cir. 1998) ("[S]imply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, is not enough to subject an individual to RICO liability under § 1962(c)[.]").

### B.     Mr. Mikhov

Ford's allegations against Mr. Mikhov are also insufficient. Ford alleges that Mr. Mikhov, Knight Law's founding partner, was the "ringleader" of the purported enterprise and that he gave "directions," submitted "suspicious" time entries, and filed several declarations that purportedly attached inflated invoices. These allegations, which are conclusory, vague, and asserted on information and belief, fail every stage of the RICO analysis. Ford did not even *attempt* to correct these defects in the FAC and, instead, chose to add inflammatory, irrelevant, and inaccurate allegations about Mr. Mikhov purportedly having federal and state tax liens. FAC ¶ 11.

*First*, Ford does not include any allegations that Mr. Mikhov associated together with other members of the alleged enterprise for a common purpose in furtherance of an ongoing organization. *Boyle*, 556 U.S. at 944; *Turkette*, 452 U.S. at 583. Ford alleges that

Mr. Mikhov "routinely associates with other lawyers to provide trial services and splits inflated fee awards with these lawyers" and that Mr. Mikhov and Knight Law "engage, coordinate, and conspire" with other Defendants and law firms to submit inflated fee applications, but those allegations are conclusory and based on information and belief, which are insufficient to state a claim. FAC ¶¶ 11 ("Plaintiff is informed and believes . . . ."), 19; *Tortilla Factory*, 2018 WL 6174708, at *8. Regardless, all Ford has alleged is the unremarkable fact that Mr. Mikhov worked with co-counsel in Lemon Law litigations. Courts have "overwhelmingly rejected attempts to characterize routine commercial relationships as RICO enterprises." *Gomez*, 2015 WL 4270042, at *8.

*Second*, Ford has not plausibly alleged that Mr. Mikhov was involved in directing the enterprise's affairs or participated in the operation and management of the enterprise. *Reves*, 507 U.S. at 176. Ford makes the conclusory assertion that Mr. Mikhov is "the ringleader of Defendants' criminal enterprise" (FAC ¶¶ 4, 11), but offers no facts to support that statement. Similarly, Ford alleges that Mr. Mikhov purportedly "instructed other members of the enterprise, including Altman and ALG, to pad their bills and inflate their fees" (FAC ¶ 11) and that the Unnamed Enterprise Members "submitted fabricated or artificially inflated timesheets at the direction of Mikhov" (FAC ¶¶ 20, 82), but again does not offer the slightest factual support for these statements. "A complaint will not survive a motion to dismiss if it 'tenders naked assertions devoid of further factual enhancement.'" *Blantz*, 727 F.3d at 927 (quoting *Iqbal*, 556 U.S. at 678). And even if those Unnamed Enterprise Members, or other named co-counsel Defendants, were fast and loose *with their own billing*, that does not make a RICO claim merely because Mr. Mikhov allegedly suggested doing so. And even if such practices occurred, there is no explanation how—or why—that would have benefited Mr. Mikhov, Knight Law, the other Knight Law Defendants, or the so-called enterprise.

*Finally*, Ford fails to allege that Mr. Mikhov participated in a pattern of racketeering activity. *See Howard*, 208 F.3d at 746. Ford alleges that Mr. Mikhov's undated billing entries, "vague" and repetitive entries, and entries from one day in 2017 are "suspicious."

FAC ¶¶ 34, 51-54.  But the FAC never links these billing entries with specific fee petitions or connects these alleged misrepresentations with any payments mailed by Ford.  By failing to link the alleged misrepresentations to specific fee petitions—let alone a fee petition that Ford actually paid—the FAC does not plausibly allege that Ford suffered any injury from these alleged misrepresentations involving Mr. Mikhov.  *See Anza*, 547 U.S. at 461.

Putting that defect aside, Ford's vague and subjective "suspicion" is not a particularized factual allegation that satisfies Rule 9(b).  *Vess,* 317 F.3d at 1106.  This is especially true because Ford challenges undated entries, which are permitted in California courts, and entries for routine litigation activities, such as "communications with client." *Eclectic Props.*, 751 F.3d at 998 ("[A] significant level of factual specificity is required to allow a court to infer reasonably that [facially legitimate] conduct is plausibly part of a fraudulent scheme[.]"); *Weber v. Langholz*, 39 Cal. App. 4th 1578, 1587 (1995); *Raining Data v. Barrenechea*, 175 Cal. App. 4th 1363, 1375 (2009) ("[A]ward of attorney fees may be based on counsel's declarations, without production of detailed time records.").

Ford also alleged that Mr. Mikhov submitted declarations in support of fee applications that purportedly attached "false and fraudulent" time records.  FAC ¶¶ 58, 71-74.  But there are no allegations that Mr. Mikhov even knew that any allegedly false billing entries were included in fee applications.  *See Neubronner v. Milken*, 6 F.3d 666, 673 (9th Cir. 1993) (dismissing fraud claim where plaintiff provided "no factual basis for his allegation . . . that [defendant] read and approved the prospectus, other than his blanket assertion that [defendant] was responsible for all offerings and sales of securities"); *Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.*, 940 F.2d 397, 404 (9th Cir. 1991) (similar).  A "blanket assertion" that Mr. Mikhov knew about fraudulent conduct is insufficient to survive a motion to dismiss.  *See Neubronner*, 6 F.3d at 673.

## C.    Ms. Morse

Ford's allegations regarding Ms. Morse, a Knight Law attorney, are likewise defective.  Ford's original Complaint did not include any allegations suggesting that Ms. Morse was the member of a RICO enterprise or conspiracy, and the FAC does no better.

*First*, the FAC does not include any allegations that Ms. Morse associated together with other members of the alleged enterprise for a common purpose in furtherance of an ongoing organization. *Boyle*, 556 U.S. at 944; *Turkette*, 452 U.S. at 583. In fact, outside of allegations made on information and belief, which are insufficient to state a claim, *Tortilla Factory*, 2018 WL 6174708, at *8, Ford does not even allege that Ms. Morse knew about the purported enterprise or ever communicated with anyone about it, *see Baumer v. Pachl*, 8 F.3d at 1346.

*Second*, Ford has not alleged that Ms. Morse engaged in any RICO enterprise conduct. *Reves*, 507 U.S. at 176. There are no factual allegations that Ms. Morse had any formal or informal position in the enterprise's structure, directed enterprise affairs, participated in the operation or management of the enterprise, or communicated or coordinated with any of the other Individual Defendants about the enterprise. *See, e.g.*, *In re Countrywide Litig.*, 2012 WL 10731957, at *9. Ford alleges in conclusory fashion that Ms. Morse directed Ms. Becerra to create inflated entries (FAC ¶ 29), but "no factual assertions support this allegation, and the[se] conclusory allegations are insufficient on their own to defeat a motion to dismiss." *Blantz*, 727 F.3d at 927. Moreover, as shown above (*supra* Section II.A.4), such *internal* communications within Knight Law do not amount to a basis for a RICO claim. Ford does not claim that Ms. Morse directed any of the named or unnamed co-counsel to do anything relating to their timesheets. Ford only claims that the Unnamed Enterprise Members submitted "fabricated" billing "at the direction of other members of the enterprise" without specifically naming Ms. Morse.

Similarly, Ford added a one-sentence allegation in the FAC that Ms. Morse "delegated assignments" during "weekly calendar meetings" involving "personnel" from the Altman Group, Law Firm 1, and Law Firm 2. FAC ¶ 82. But the FAC does not identify a single meeting, the personnel who attended those meetings, or what assignments Ms. Morse purportedly delegated or to whom. The FAC does not even allege that these purported meetings included alleged enterprise members other than Ms. Morse or that the "delegated assignments" were in furtherance of the enterprise. These allegations suggest,

at best, that Ms. Morse attended meetings with Knight Law's co-counsel to discuss joint representations of consumers harmed by Ford, which is hardly evidence of RICO conduct. Ms. Morse was also an associate at Knight Law while working on the *Buck* case, further undercutting the theory that she operated or managed the alleged enterprise during meetings with co-counsel. Ex. 1 at 18; *see Reves*, 507 U.S. at 183.

*Finally*, Ford fails to allege that Ms. Morse engaged in a pattern of racketeering activity. *See Howard*, 208 F.3d at 746. Although the FAC alleges that purportedly false billing entries attributed to Ms. Morse were included in some of the eleven fee petitions that resulted in payments mailed by Ford, *see, e.g.*, FAC ¶ 67, the FAC does not allege that Ms. Morse had any involvement in preparing, reviewing, or submitting those invoices or fee petitions, knew that billing entries attributed to her were included, or otherwise acted with an intent to defraud. In fact, several of the FAC's new allegations suggest that Ms. Morse did not know any of her purportedly inflated time entries were included in fee petitions. FAC ¶¶ 5, 39, 46, 91. Ford cannot state a claim against Mr. Morse without particularized allegations of her knowing participation in the underlying racketeering acts. *See, e.g.*, *Neubronner*, 6 F.3d at 673. There are no such allegations against her.

### D.    Mr. Kirnos

Mr. Kirnos is a partner at Knight Law. The FAC's allegations against Mr. Kirnos, like those in the original Complaint, are remarkably limited and amount to Mr. Kirnos making an argument in court, submitting one declaration supporting a fee petition, and emailing Ford's counsel. Though the purported enterprise involved inflated time entries, nowhere in Ford's FAC is there an allegation that Mr. Kirnos had any improper billing entries—of any nature. The FAC did not fix the pleading defects against Mr. Kirnos, which were identified in Defendants' initial motions to dismiss. Instead, Ford decided to fling an inflammatory, misleading, and irrelevant allegation about a misdemeanor conviction from nearly thirty years ago that has nothing to do with this case. As with the other Individual Knight Law Defendants, Ford fails to state a claim against Mr. Kirnos.

*First*, the FAC does not include a single allegation that Mr. Kirnos communicated or associated together with other members, much less intentionally coordinated with, any members of the alleged enterprise for a common purpose in furtherance of an ongoing organization. *Boyle*, 556 U.S. at 944; *Turkette*, 452 U.S. at 583. There is not a single factual allegation that Mr. Kirnos knew about the purported enterprise or when he joined it. Ford's allegations about Mr. Kirnos are that he made statements during an oral argument in one case (FAC ¶ 58), filed a declaration in another (*id.* ¶ 70), sent an email to Ford's outside counsel (Exhibit C, Row 26), and was the addressee in mail Ford chose to direct to him (*id.* Rows 16-17, 21-22), but the cases identified in those allegations do not even involve any other law firm that was part of the purported enterprise. *See Ellis,* 950 F. Supp. 2d at 1089 (dismissing RICO complaint because it "lack[ed] factual allegations that show that the unidentified enterprise members *associated together* with Defendants *for* [the] alleged common purpose").

*Second*, Ford includes no factual allegations that Mr. Kirnos engaged in enterprise conduct. *Reves*, 507 U.S. at 176. There are no allegations supporting that Mr. Kirnos participated in the operations or management of the enterprise, directed enterprise affairs, had a formal or informal role in the enterprise's chain of command, or communicated or coordinated with other purported members of the enterprise about the enterprise's affairs. The only direction of the enterprise that Ford alleges by Mr. Kirnos is an alleged instruction to Ms. Becerra (FAC ¶ 29), but this conclusory assertion is insufficient to state a claim for all the reasons discussed in the foregoing section and throughout this memorandum. There also are no allegations regarding Mr. Kirnos prior to when he joined Knight Law in 2017. *See, e.g.*, *In re Countrywide Litig.*, 2012 WL 10731957, at *9.

*Finally*, Ford's few allegations against Mr. Kirnos do not plausibly allege that he engaged in a pattern of racketeering activity. *See Howard*, 208 F.3d at 746. Ford attempts to insert him into this litigation by raising two separate and distinct situations. As noted, Ford alleges that Mr. Kirnos orally advocated in court in support of an attorney fee motion when, Ford claims without any factual support, he "knew" Defendants were submitting

inflated fee applications. But Ford includes no allegations supporting that Mr. Kirnos had any purported knowledge of Ford's version of events. FAC ¶ 58. Ford's "blanket assertion" that Mr. Kirnos knew about fraudulent conduct is insufficient to survive a motion to dismiss. *See Neubronner*, 6 F.3d at 673. Ford also alleges that Mr. Kirnos submitted a declaration in support of a single fee application containing time entries for himself, Mr. Mikhov, and Ms. Morse that, according to Ford, included time entries that are "false and fraudulent." FAC ¶ 70. But Ford has not alleged Mr. Kirnos even knew his declaration or the attached time entries were purportedly false. *See In re Jamster*, 2009 WL 1456632, at *5 (after setting aside plaintiff's legal conclusions, all that remained was "conduct consistent with ordinary business conduct and an ordinary business purpose").

Ford also alleges that Mr. Kirnos recently sent an email (as part of an ordinary meet-and-confer process) to Ford's outside counsel attaching fee statements for Ford's review and comment. FAC, Ex. C, Row 26. Ford does not identify the underlying fee statements, does not allege that they contained misstatements (or explain how their billing entries were inflated), does not allege that Mr. Kirnos knew these fee statements contained any purported misstatements, and does not even allege that Ford paid fees on these statements. *See, e.g.*, *Neubronner*, 6 F.3d at 673; *Vess*, 317 F.3d at 1103-04.

At bottom, Ford has alleged that Mr. Kirnos engaged in conduct—such as oral advocacy, filing a declaration in a court filing, and emailing opposing counsel—that amounts to the normal practice of law by an attorney at a law firm. Ford has not come close to stating a claim against him. *See Eclectic Props.*, 751 F.3d at 997-98 ("[A] significant level of factual specificity is required to allow a court to infer reasonably that [facially legitimate business activity] is plausibly part of a fraudulent scheme").

\* \* \*

For the reasons stated above, Ford has utterly failed to state a claim against any of the Individual Knight Law Defendants, and the Court should dismiss them from this lawsuit. Allowing a claim to proceed against these Defendants on such sparse and conclusory allegations would compound the harm Ford's baseless complaint has already

1  caused these people, who have been unfairly stigmatized as members of a purported

2  criminal enterprise based on nothing but the most vague and conclusory of allegations.

3  **IV.    FORD FAILS TO PLEAD A RICO CONSPIRACY IN COUNT TWO**

4          Because Ford fails to plead a substantive RICO claim, its RICO conspiracy claim

5  also fails.  "Plaintiffs cannot claim that a conspiracy to violate RICO existed if they do not

6  adequately plead a substantive violation of RICO."  *Howard*, 208 F.3d at 751; *see also*

7  *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 559 (9th Cir. 2010) (same).

8          Ford's RICO conspiracy claim also fails under Rule 9(b), which it must satisfy,

9  because the FAC does not include particularized allegations of (i) an agreement to commit

10  an unlawful act, which is the "essence of a conspiracy," or (ii) an injury caused by an

11  unlawful overt act performed in furtherance of the agreement.  *United States v. Jimenez*

12  *Recio*, 537 U.S. 270, 274 (2003); *Tatung Co. v. Hsu*, 2015 WL 11072178, at *25 (C.D. Cal.

13  Apr. 23, 2015)).  "Conclusory allegations that RICO defendants entered into an agreement

14  are insufficient."  *In Re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 601 F. Supp. 3d

15  625, 758 (C.D. Cal. 2022).

16          Yet Ford asserts in conclusory fashion that "each Defendant knew about and agreed

17  to facilitate the Enterprise's scheme."  FAC ¶ 112.  The absence of factual allegations

18  supporting any such agreement is glaring.  Nowhere does Ford allege a meeting of the

19  minds or even an implicit agreement, much less an agreement to perform an unlawful act.

20  Nor has Ford alleged any specific communications among the enterprise members that

21  would plausibly support an agreement among Defendants.  At best, Ford has made "an

22  allegation of parallel conduct and a bare assertion of conspiracy," which does "not suffice."

23  *Twombly*, 550 U.S. at 556.  Ford's conclusory conspiracy-based RICO claim does not

24  satisfy the heightened pleading standard of Rule 9(b) and must be dismissed.

25                              **<u>CONCLUSION</u>**

26          Based on the foregoing and Ford's unsuccessful attempt to cure its defective

27  allegations through the FAC, the Court should dismiss the FAC with prejudice.

28

1

2    DATED: September 12, 2025

3                                              MILBANK LLP

4

5                                              By: */s/ Neal K. Katyal*

6                                                   Attorneys for Defendants Knight Law
                                                   Group LLP, Steve B. Mikhov, Amy
7                                                   Morse, Roger Kirnos, And Dorothy
                                                   Becerra
8

9

10                                             PILLSBURY WINTHROP SHAW
                                               PITTMAN LLP
11

12                                             By: */s/ Aaron S. Dyer*

13                                                  Attorneys for Knight Law Group LLP,
                                                   Steve B. Mikhov, Amy Morse, Roger
14                                                  Kirnos, And Dorothy Becerra

15

16                                             WILLIAMS & CONNOLLY LLP

17

18                                             By: */s/ Zachary Kent Warren*

19                                                  Attorneys for Knight Law Group LLP,
                                                   Steve B. Mikhov, Amy Morse, Roger
20                                                  Kirnos, And Dorothy Becerra

21

22

23

24

25

26

27

28

## **FILER'S ATTESTATION**

Pursuant to Local Rule 5-4.3.4(a)(2)(i), I, Neal K. Katyal, attest under penalty of perjury that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.


DATED: September 12, 2025                    _/s/ Neal K. Katyal_____

## LOCAL RULE 11-6.2 CERTIFICATION

The undersigned, counsel of record for Defendants Knight Law Group LLP, Steve B. Mikhov, Amy Morse, Roger Kirnos, and Dorothy Becerra, certifies that this brief, when considered in conjunction with the concurrently filed briefs of the other Defendants, complies with the page limit set by the Court in its order dated September 10, 2025. *See* Dkt. 87.

DATED: September 12, 2025                    */s/ Neal K. Katyal*

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
KNIGHT LAW DEFENDANTS' MOTION TO DISMISS