**KASOWITZ LLP**
Daniel A. Saunders (SBN 161051)
DSaunders@kasowitz.com
Matthew S. Manacek (SBN 312834)
MManacek@kasowitz.com
1801 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (424) 288-7900
Facsimile: (424) 288-7901

Edward E. McNally (admitted *pro hac vice*)
EMcNally@kasowitz.com
Daniel J. Fetterman (admitted *pro hac vice*)
DFetterman@kasowitz.com
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1715
Facsimile: (212) 506-1800

*Attorneys for Plaintiff Ford Motor Company*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FORD MOTOR COMPANY, a Delaware Corporation,<br><br>                    Plaintiff,<br><br>   v.<br><br>KNIGHT LAW GROUP LLP; STEVE B. MIKHOV; AMY MORSE; ROGER KIRNOS; DOROTHY BECERRA; THE ALTMAN LAW GROUP; BRYAN C. ALTMAN; WIRTZ LAW APC; and RICHARD M. WIRTZ,<br><br>                    Defendants. | Case No: 2:25-cv-04550-MWC-PVC<br><br>**PLAINTIFF'S OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**<br><br>Date:       November 21, 2025<br>Time:      1:30 PM<br>Courtroom: 6A<br>Judge:   Hon. Michelle Williams Court<br><br>Trial Date: None Set |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ..................................................................................................14

FACTUAL BACKGROUND..................................................................................19

LEGAL STANDARD............................................................................................22

ARGUMENT ........................................................................................................24

I.  THE *NOERR-PENNINGTON* DOCTRINE DOES NOT APPLY ......................24

A.  Ford's Rico Claims Are Not Based on Petitioning Activity......................25

B.  Ford's RICO Claims Do Not Impose a Burden on Protected Petitioning Rights ..................................................................................................26

C.  Ford's Allegations Support Application of the Sham Exception ...............29

1.  Noerr-Pennington does not protect sham petitioning activities .......29

2.  Intentional misrepresentations deprived the litigation of its legitimacy..........................................................................................30

3.  Defendants submitted objectively baseless, false, and fraudulent billing records with an improper subjective intent ..........................36

4.  Defendants engaged in a series of improper petitions.....................38

II.  FORD ADEQUATELY PLEADS ITS RICO CLAIMS .....................................39

A.  Ford Has Adequately Alleged a RICO Enterprise......................................39

1.  Ford adequately alleges that Defendants were part of a continuing unit that functioned with a common purpose ..................................40

2.  Ford adequately alleges an ongoing organization ...........................43

3.  Ford adequately alleges a continuing unit .......................................46

4.  Even without the Altman and Wirtz Defendants, Ford's FAC would not fail for lack of distinctiveness....................................................48

B.  Ford Has Adequately Alleged a Pattern of Racketeering Activity............49

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

|  | 1. | Claim preclusion does not bar Ford's RICO claims | 52 |
|  | 2. | Issue preclusion does not bar Ford's RICO claims | 55 |
| C. | | Ford Has Adequately Alleged That Defendants Conducted or Participated in the Conduct of the Enterprise's Affairs | 59 |
| D. | | Ford Has Adequately Alleged a RICO Conspiracy | 63 |

III.   FORD ADEQUATELY ALLEGES A RICO CLAIM AGAINST ALL DEFENDANTS ................................................................................... 65

IV.   FORD SHOULD BE GRANTED LEAVE TO AMEND .................................... 83

CONCLUSION ........................................................................................................ 84

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5

*Acres Bonusing, Inc. v. Ramsey*,
   2022 WL 17170856 (N.D. Cal. Nov. 22, 2022) ................................................. 24

6

7

*Agric. Water v. Occidental Oil & Gas Corp.*,
   235 F. Supp. 3d 1132 (E.D. Cal. 2017) .............................................................. 62

8

9

*Amphastar Pharms. Inc. v. Aventis Pharma SA*,
   2012 WL 5512466 (C.D. Cal. Nov. 14, 2014) ..................................................... 8

10

11

*Anbang Grp. Holdings Co., Ltd. v. Zhou*,
   2023 WL 5615459 (N.D. Cal. Aug. 30, 2023) ................................................... 38

12

*United States ex rel. Anita Silingo v. WellPoint, Inc.*,
   904 F.3d 667 (9th Cir. 2018) ................................................... 23, 65, 74

13

14

*Anza v. Ideal Steel Supply Corp.*,
   547 U.S. 451 (2006) ............................................................................ 68, 69

15

16

*ASARCO, LLC v. Union Pac. R. Co.*,
   765 F.3d 999 (9th Cir. 2014) .................................................................. 23, 52

17

18

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ....................................................................................... 22

19

20

*B&G Foods N. Am., Inc. v. Embry*,
   29 F.4th 527 (9th Cir. 2022) ........................................................... 24, 26

21

22

*Baumer v. Pachl*,
   8 F.3d 1341 (9th Cir. 1993) ....................................................................... 71

23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................ 22, 44

24

25

*Bey v. Wilson & Assocs., PLLC*,
   2016 WL 11478139 (W.D. Tenn. June 7, 2016) ................................................ 47

26

27

*Beydoun v. Rosenthal*,
   2024 WL 4907214 (E.D. Mich. Sept. 30, 2024) ......................................... 48, 50

28

4

*Bias v. Wells Fargo & Co.*,
    942 F. Supp. 2d 915 (N.D. Cal. 2013)......................................................40, 41, 43

*Blantz v. Cal Dep't of Corr. & Rehab.*,
    727 F.3d 917 (9th Cir. 2013) ........................................................................44, 72

*Blue Cross & Blue Shield Oklahoma v. S. Coast Behav. Health LLC*,
    2025 WL 2004500 (C.D. Cal. June 20, 2025)............................................*passim*

*Boeken v. Philip Morris USA, Inc.*,
    48 Cal. 4th 788 (2010)............................................................................................52

*Borrego Cmty. Health Found. v. Inland Valley Invs., LLC*,
    2023 WL 2518844 (S.D. Cal. Mar. 13, 2023).....................................................76

*Boyle v. United States*,
    556 U.S. 938 (2009)..........................................................................................39, 46

*Burdette v. Carrier Corp.*,
    158 Cal. App. 4th 1668 (2008) ..............................................................................56

*CBC Framing, Inc. v. Flores*,
    2008 WL 11337555 (C.D. Cal. Sept. 22, 2008) ...................................................73

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001)..........................................................................................36, 49

*Chagby v. Target Corp.*,
    2008 WL 5686105 (C.D. Cal. Oct. 27, 2008) ......................................................42

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., and Prods. Liab.
Litig.*,
    295 F. Supp. 3d 927 (N.D. Cal. 2018).......................................................*passim*

*City of Sacramento v. State of California*,
    50 Cal. 3d 51 (1990) ...............................................................................................59

*Cleveland v. U.S.*,
    531 U.S. 12 (2000)...................................................................................................37

*Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*,
    911 F.2d 242 (9th Cir. 1990) .................................................................................83

*Cooper Indus., Inc. v. Aviall Servs.*,
    543 U.S. 157 (2004)..................................................................................................29

*Corley v. Rosewood Care Ctr., Inc. of Peoria,*
    388 F.3d 990 (7th Cir. 2004) ....................................................................50, 79

*In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.,*
    2012 WL 10731957 (C.D. Cal. June 29, 2012).....................................41, 42, 62

*Crowley v. Katleman,*
    8 Cal. 4th 666 (1994) ...............................................................................53

*Eclectic Props. E., LLC v. Marcus & Millichap Co.,*
    751 F.3d 990 (9th Cir. 2014) .....................................................................39

*Eichman v. Fotomat Corp.,*
    147 Cal. App. 3d 1170 (1983) ...................................................................54

*Ellis v. J.P. Morgan Chase & Co.,*
    950 F. Supp. 2d 1062 (N.D. Cal. 2013).......................................................42

*Eminence Capital, LLC v. Aspeon, Inc.,*
    316 F.3d 1048 (9th Cir. 2003) ...................................................................84

*Evans v. Celotex Corp.,*
    194 Cal. App. 3d 741 (1987) ....................................................................57

*Fleury v. Richemont N. Am., Inc.,*
    2010 WL 2671982 (N.D. Cal. July 2, 2010) ................................................59

*Flores v. Emerich & Fike,*
    2008 WL 2489900 (E.D. Cal. June 18, 2008) ..............................................83

*Franco v. Marin Cnty.,*
    579 F. Supp. 1032 (N.D. Cal. 1984), *aff'd sub nom. Franco v. State of
    Cal.*, 762 F.2d 1017 (9th Cir. 1985) ..........................................................54

*Freeman v. Lasky, Haas & Cohler,*
    410 F.3d 1180 (9th Cir. 2005) ..............................................................29, 36

*Garon v. Keleops USA, Inc.,*
    2025 WL 2522374 (N.D. Cal. Sept. 2, 2025).................................................52

*George v. Urban Settlement Servs.,*
    833 F.3d 1242 (10th Cir. 2016) .................................................................79

*Gomez v. Guthy-Renker,*
    2015 WL 4270042 (C.D. Cal. July 13, 2015) ............................................41, 43

6

*Gonzales v. Cal. Dep't of Corrs.*,
    739 F.3d 1226 (9th Cir. 2014) ................................................................... 53

*Goren v. New Vision Int'l, Inc.*,
    156 F.3d 721 (7th Cir. 1998) ..................................................................... 74

*Grimmett v. Brown*,
    75 F.3d 506 (9th Cir. 1996) ....................................................................... 83

*H.J. Inc. v. Northwestern Bell Tel. Co.*,
    429 U.S. 229 (1989)................................................................................... 80

*Hamilton v. Willms*,
    2005 WL 3797562 (E.D. Cal. Oct. 28, 2005)........................................... 73

*Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*,
    806 F.3d 162 (3d Cir. 2015) ...................................................................... 38

*Harris v. Harris*,
    935 F.3d 670 (9th Cir. 2019) ...............................................................23, 26

*Howard v. America Online, Inc.*,
    208 F.3d 741 (9th Cir. 2000) ..................................................................... 64

*Immobiliare, LLC v. Westcor Land Title Ins. Co.*,
    424 F. Supp. 3d 882 (E.D. Cal. 2019) ...........................................*passim*

*J-M Mfg. Co. v. Simmons Hanly Conroy, LLP*,
    2025 WL 843854 (N.D. Ill. Mar. 18, 2025) ............................................. 47

*In re Jamster Mktg. Litig.*,
    2009 WL 1456632 (S.D. Cal. May 22, 2009) ........................................... 42

*Just Film, Inc. v. Merchant Svcs., Inc.*,
    2012 WL 6087210 ...............................................................................51, 68, 78

*In re JUUL Labs, Inc., Mktg., Sales Pracs., and Prods. Liab. Litig.*,
    497 F. Supp. 3d 552 (N.D. Cal. 2020)...............................................60, 69, 73, 81

*In re JUUL Labs, Inc., Mktg., Sales Pracs., and Prods. Liab. Litig.*,
    533 F. Supp. 3d 858 (N.D. Cal. 2021)...................................................... 51

*JW Gaming Dev., LLC v. James*,
    2020 WL 3640004 (N.D. Cal. July 6, 2020) .......................................73, 74

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*Kearney v. Foley & Lardner, LLP*,
    590 F.3d 638 (9th Cir. 2009) ..................................................................*passim*

*Kelly v. TransGlobe Travel Bureau, Inc.*,
    60 Cal. App. 3d 195 (1976) ................................................................ 58

*Kopp v. Fair Pol. Practices Com.*,
    11 Cal. 4th 607 (1995) ....................................................................... 49

*Kottle v. Northwest Kidney Ctrs.*,
    146 F.3d 1056 (9th Cir. 1998) ...................................................... 35, 37

*Kougasian v. TMSL, Inc.*,
    208 F. App'x 561 (9th Cir. 2006) ....................................................... 55

*Le v. Hiep Pham*,
    2020 WL 3888089 (Cal. Ct. App. July 10, 2020) ............................... 54

*Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*,
    431 F.3d 353 (9th Cir. 2005) ............................................................. 35

*Lucido v. Superior Court*,
    51 Cal.3d 335 (1990) ......................................................................... 58

*Lumasense Techs., Inc. v. Advanced Eng'g Servs., LLC*,
    2021 WL 1197417 (N.D. Cal. Mar. 30, 2021) ................................... 34

*Masimo Corp. v. Apple Inc.*,
    2021 WL 925885 (C.D. Cal. Jan. 6, 2021) ........................................ 44

*Mir v. Greines, Martin, Stein & Richland*,
    2015 WL 12746231 (C.D. Cal. Feb. 19, 2015) ............................ 35, 36

*Moran v. Bromma*,
    675 F. App'x 641 (9th Cir. 2017) ....................................................... 49

*Morsberger v. ATI Holdings, LLC*,
    2024 WL 308465 (N.D. Ill. Jan. 26, 2024) ........................................ 40

*Murguia v. Langdon*,
    61 F.4th 1096 (9th Cir. 2023) ...................................................... 22, 69

*Mycogen Corp. v. Monsanto Co.*,
    28 Cal. 4th 888 (2002) ................................................................. 52, 53

8

*Newpoint Fin. Corp. v. Bermuda Monetary Auth.*,
 680 F. Supp. 3d 1151 (C.D. Cal. 2023) .................................................26, 38, 52

*Odom v. Microsoft Corp.*,
 486 F.3d 541 (9th Cir. 2007) (en banc) .......................................................*passim*

*Oki Semiconductor Co. v. Wells Fargo Bank, Nat'l Ass'n*,
 298 F.3d 768 (9th Cir. 2002) .........................................................................46, 63

*Ouwinga v. Benistar 419 Plan Servs., Inc.*,
 694 F.3d 783 (6th Cir. 2012) ...............................................................................79

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*,
 943 F.3d 1243 (9th Cir. 2019) .............................................................................69

*Parkford Owners for a Better Community v. Windeshausen*,
 81 Cal. App. 5th 216 (2022) ................................................................................53

*Pepper v. Routh Crabtree, APC*,
 219 P.3d 1017 (Alaska 2019) ..............................................................................28

*Piper v. Gooding & Co. Inc.*,
 334 F. Supp. 3d 1009 (D. Az. 2018) ....................................................................80

*Pizana v. SanMedica Int'l LLC*,
 345 F.R.D. 469 (E.D. Cal. 2022).........................................................................75

*Pyankovska v. Abid*,
 65 F.4th 1067 (9th Cir. 2023) .......................................................................27, 28

*Raining Data v. Barrenechea*,
 175 Cal. App. 4th 1363 (2009) ...........................................................................68

*Ravet v. Solomon, Ward, Seidenwurm & Smith, LLP*,
 2007 WL 2088381 (S.D. Cal. July 17, 2007)......................................................47

*Relevant Grp., LLC v. Nourmand*,
 116 F.4th 917 (9th Cir. 2024)........................................................................29, 37

*Relevant Grp., LLC v. Nourmand*,
 2023 WL 4291654 (C.D. Cal. May 24, 2023)......................................................24

*Religious Tech. Ctr. v. Wollersheim*,
 971 F.2d 364 (9th Cir. 1992) ...............................................................................80

9

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993)..........................................................................60, 67, 73, 78

*Rodriguez v. Lawrence Equipment, Inc.*,
    106 Cal. App. 5th 645 (2024) ..............................................................55

*In re Roussos*,
    2016 WL 5349717 (Bankr. C.D. Cal. Sept. 22, 2016) .........................59

*San Antonio Comm. Hosp. v. S. Cal. Dist. Council of Carpenters*,
    125 F.3d 1230 (9th Cir. 1997) .............................................................28

*Schrader Cellars, LLC v. Roach*,
    129 F.4th 1115 (9th Cir. 2025) ............................................................23

*Sever v. Alaska Pulp Corp.*,
    978 F.2d 1529 (9th Cir. 1992) .............................................................49

*Shaw v. Nissan N. Am., Inc.*,
    220 F. Supp. 3d 1046 (C.D. Cal. 2016) .........................................42, 43

*Silver v. Duel*,
    2022 WL 16859646 (C.D. Cal. July 11, 2022) ............................35, 36

*Slack v. Int'l Union of Operating Eng'rs*,
    2014 WL 4090383 (N.D. Cal. Aug. 19, 2014)......................61, 62, 72

*Slater v. Blackwood*,
    15 Cal. 3d 791 (1975) .........................................................................55

*Solano v. Playgirl, Inc.*,
    292 F.3d 1078 (9th Cir. 2002) .............................................................28

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) ...............................................................29

*Soo Park v. Thompson*,
    851 F.3d 910 (9th Cir. 2017) .........................................................44, 61

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) .......................................................*passim*

*State Comp. Ins. Fund v. Drobot*,
    2013 WL 12125748 (C.D. Cal. Nov. 20, 2013) ...........................25, 26

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*State Farm Mutual Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*,
    120 F.4th 59 (2d Cir. 2024) ................................................................25

*Straightshot Comms., Inc. v. Telekenex, Inc.*,
    2011 WL 1770935 (W.D. Wash. May 9, 2011) ..................................80

*Sussex Fin. Enterprises, Inc. v. Bayerische Hypo-Und Vereinsbank AG*,
    2010 WL 94272 (N.D. Cal. Jan. 6, 2010) ..........................................49

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) .............................................................23

*Tatung Co., Ltd. v. Hsu*,
    2015 WL 11072178 (C.D. Cal. Apr. 23, 2015) ..................................64

*Tatung Co., Ltd. v. Shu Tze Hsu*,
    217 F. Supp. 3d 1138 (C.D. Cal. 2016) .............................................77

*Taylor v. Sturgell*,
    553 U.S. 880 (2008) ...........................................................................23

*Textron, Inc. v. Travelers Cas. & Surety Co.*,
    45 Cal. App. 5th 733 (2020) ..............................................................56

*Theofel v. Farey-Jones*,
    359 F.3d 1066 (9th Cir. 2004) ....................................................*passim*

*Thomas v. Hous. Auth. of Cnty. of Los Angeles*,
    2006 WL 5670938 (C.D. Cal. Feb. 28, 2006) ...................................35

*Three Rivers Provider Network, Inc. v. Meritain Health, Inc.*,
    2008 WL 2872664 (S.D. Cal. Jul. 23, 2008) .....................................71

*Tortilla Factory, LLC v. Health-Ade LLC*,
    2018 WL 6174708 (C.D. Cal. July 13, 2018) ............................*passim*

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., and Prods. Liab. Litig.*,
    826 F. Supp. 2d 1180 (2011) .............................................................42

*United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*,
    719 F.3d 849 (7th Cir. 2013) .............................................................62

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*United States Golf Assn. v. Arroyo Software Corp.*,
    69 Cal. App. 4th 607 (1999) ................................................................. 57

*United States v. Christensen*,
    828 F.3d 763 (9th Cir. 2015) ........................................... 39, 72, 73, 79

*United States v. Feldman*,
    853 F.2d 648 (9th Cir. 1988) ................................................................. 49

*United States v. Hussain*,
    972 F.3d 1138 (9th Cir. 2020) ............................................................... 37

*United States v. Koziol*,
    993 F.3d 1160 (9th Cir. 2021) ............................................................... 24

*United States v. Kragness*,
    830 F.2d 842 (8th Cir. 1987) ................................................................. 48

*United States v. Mongol Nation*,
    693 F. App'x 637 (9th Cir. 2017) .......................................................... 48

*United States v. Raniere*,
    384 F. Supp. 3d 282 (E.D.N.Y. 2019) .................................................. 81

*United States v. Turkette*,
    452 U.S. 576 (1981) ...................................................................... 43, 46

*United States v. Vroman*,
    975 F.2d 669 (9th Cir. 1992) ................................................................. 29

*United States ex rel. USN4U, LLC v. Wolf Creek Fed. Servs., Inc.*,
    34 F.4th 507 (6th Cir. 2022) ................................................................. 50

*W. Town Bank & Tr. v. Burr Forman*,
    2020 WL 6585655 (D.S.C. Nov. 10, 2020) .......................................... 47

*Walter v. Drayson*,
    538 F.3d 1244 (9th Cir. 2008) ............................................................... 71

*Waugh Chapel South, LLC v. United Food and Commercial Workers*
    *Union Local 27*,
    728 F.3d 354 (4th Cir. 2013) ................................................................. 23

*Weber v. Langholz*,
    39 Cal. App. 4th 1578 (1995) ............................................................... 68

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
  865 F. Supp. 2d 1002 (C.D. Cal. 2011) ................................................... 76

*Williams v. Doctors Med. Ctr. of Modesto, Inc.*,
  100 Cal. App. 5th 1117 (2024) ............................................................ 56

*U.S. ex rel. Wilson v. Maxxam, Inc.*,
  2009 WL 322934 (N.D. Cal. Feb. 9, 2009) ....................................... 28, 29

*York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP, Inc.*,
  65 F.4th 1115 (9th Cir. 2023) ............................................................ 23

*In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*,
  601 F. Supp. 3d 625 (C.D. Cal. 2022) ....................................... 45, 64, 65

**Statutes**

18 U.S.C. § 1961(4) ............................................................................ 39

18 U.S.C. § 1962(c) ...................................................... 16, 18, 39, 71

Cal. Civ. Proc. Code § 391(b) ........................................................... 59

Fed. R. Civ. P. 9(b) .................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ............................................................ 23, 38

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

This case is not only about mail and wire fraud:  it is also about the integrity of the legal profession.  For the last decade-plus, Defendants have taken advantage of unique fee-shifting provisions in California's Song-Bervely Act—commonly referred to as California's Lemon Law—to extract tens to hundreds of millions of dollars in attorneys' fees for legal work they never performed.  No one is off limits from Defendants' fraud:  not the auto manufacturers their clients sue, not the lawyers who represent those manufacturers, not the courts in which they litigate, and not even Defendants' own clients.

Ford brings this RICO action to stop the bleeding from Defendants' death-by-a-thousand-cuts scheme.  Defendants took a volume approach, spreading out fabricated and fraudulent billing entries across thousands of cases in hundreds of courts throughout California.  That made the scheme nearly undetectable.  Defendants counted on claiming a few extra hundred in fees here and a few extra thousand in fees there being something that could keep them under the radar of the auto manufacturers they sue.  Defendants' strategy worked for years until Ford sensed something was off.  After dedicating millions of dollars to collecting as much fee data as it could, Ford figured out the fraud.  Although to date Ford has obtained fee data in only about 10% of Defendants' Lemon Law cases, as alleged in Ford's First Amended Complaint ("FAC") and as further detailed below, even that small subset of data reveals a staggering level of fraud.

While all of that is bad enough on its own, approximately one year ago, in October 2024, Ford learned that Defendants' fraud and deceit ran even deeper than it could have imagined.  That is because Knight Law Group ("KLG") admitted that for years of its scheme it ***never*** recorded its time, even as it repeatedly represented under oath to courts and Ford that it did.  With that disclosure, suddenly the inexplicable outcomes in Defendants' fee data—scores of 24+ hour days, attending simultaneous

trials in geographically distant locations, and the like—made more sense.  And when Ford eventually conditioned settlements on receipt of fee statements, rather than come clean that they had been lying to courts and their adversaries for years, Defendants put their fraud into overdrive, creating an operation within KLG to fabricate time records for thousands of cases—often years after they concluded, and not only for KLG attorneys but for their outside firms and lawyers they associated with to promote their scheme.  Defendant Mikhov—then KLG's managing partner and the architect of the scheme—specifically directed others who were part of the scheme to pad their hours.  To facilitate the efficiency of this operation, Defendants—and other law firms in on the scheme—worked together out of the same space, held regular meetings, entered into complex fee arrangements including advancements, and shared the proceeds of the illegal enterprise.

Defendants now bring three motions to dismiss, which Ford addresses collectively in this omnibus opposition.  Defendants repeatedly sought refuge in the imprimatur of the legal profession while they were actively defrauding Ford and the courts; they do the same now when attempting to dodge accountability for that very fraud.  But the law does not support their efforts to avoid their long-delayed day of reckoning.

*First*, the *Noerr-Pennington* doctrine—which is an affirmative defense—does not apply.  Ford bases its lawsuit on fraudulent billings that Defendants sent to Ford and payments that Defendants fraudulently induced Ford to make.  But a fraudulent billing scheme is not litigation activity, even if the stage of the fraud was a courtroom.  As such, Ford's RICO claims are not based on litigation activity, and thus Defendants cannot invoke the doctrine.  Defendants also must establish that Ford's RICO claims burden their protected petitioning rights, but they do not even attempt to do so—and for good reason.  While Ford's RICO claims may make it more difficult for Defendants to engage in fraud, that is no burden, as it should go without saying that the First Amendment does not protect fraud, and therefore does not allow attorneys to submit

fraudulent evidence in support of fee applications. Because nothing in Ford's RICO claims prevents Defendants from prosecuting Lemon Law suits or filing fee petitions if successful, no burden on their petitioning rights exists.

But even if Defendants had shown a burden, and even if the Court were to disagree with Ford and find that this lawsuit is based on petitioning activity, Defendants' *Noerr-Pennington* defense would still fail because the FAC plausibly alleges misconduct that falls within the so-called "sham" exception. Courts in the Ninth Circuit recognize three circumstances when the sham exception applies; all three apply here. Ford's FAC contains numerous allegations of Defendants' intentional misrepresentation in the fee process that deprived the fee award portion of the litigation of legitimacy—and contrary to the central premise of Defendants' argument, the legitimacy of the merits of the *entire* litigation is not the proper barometer. Ford's FAC also sufficiently pleads both that Defendants' fee petitions were objectively baseless (many if not most included time entries that were presumptively false) ***and*** that they were filed for an improper purpose (to collect money falsely billed). For similar reasons, even assuming the RICO claims were based on petitioning activities rather than fraudulent billing practices, the bad faith inherent in Defendants' submission of fraudulent evidence in support of fee applications means that Ford also has plausibly alleged that Defendants filed a series of petitions without regard to merit, thereby invoking yet another independent basis for the sham exception.

*Second*, Ford has pleaded adequately its RICO claims. As to Ford's substantive RICO claim under 18 U.S.C. 1962(c). Ford plausibly has alleged all of the elements of a RICO enterprise, including a common purpose, an ongoing organization, and a continuing unit. Ford's FAC also sufficiently alleges a pattern of racketeering activity.

***Enterprise.*** Ford plausibly alleges that Defendants share a common purpose—to profit from their fraudulent billing scheme—that extends beyond their normal and legitimate law practices. Nor is there any question, and certainly not at the pleading stage, about what Defendants' relationship ***is not***—it is not one involving routine

commercial relationships or normal business dealings. Ford also plausibly has alleged an <u>ongoing organization</u>, and Defendants' contrary arguments rely on mischaracterizations of the complaint and fact-laden challenges that are ill-suited for a motion to dismiss. Ford's allegations of a <u>continuing unit</u> are likewise plausible. Here, the focus is time-based rather than method-based, as Defendants wrongly argue. Courts routinely find enterprises spanning less than two years to constitute a continuing unit; the enterprise here lasted for at least five times that long.

Nor, contrary to Defendants' argument, does Ford's FAC raise any distinctiveness defects even in the event the Court were to dismiss the Altman and Wirtz Defendants. Defendants ignore that, while an entity cannot be both a RICO person and the enterprise, an action selecting the entity as the enterprise and naming the entity's officers and employees is valid. So at most KLG would be dismissed, but Ford's RICO claims against Mikhov, Kirnos, Becerra, and Morse would remain fully intact.

***Pattern of racketeering activity.*** Ford has plausibly alleged a pattern of racketeering activity by identifying numerous specific examples of Defendants' mail and/or wire fraud. Defendants' near-exclusive focus on claim and issue preclusion confirms as much. That focus, moreover, is misguided. Claim preclusion is designed to prevent claim splitting—when ***a plaintiff*** splits a single cause of action into two different proceedings. Claim preclusion does not apply where, as here, the *plaintiff* in the second proceeding was the *defendant* in the first, because there was never any claim to split. Here, Ford suffered no harm it could redress until Defendants defrauded it, and Ford could not have sought compensation for being defrauded in the underlying Lemon Law cases.

Nor does issue preclusion apply. Key to issue preclusion here is whether this case and the underlying Lemon Law cases involve the same issue. They do not. The crux of Ford's challenges to Defendants' fee requests in the underlying Lemon Law cases involved the *reasonableness* of the hours allegedly actually worked in an individual case; the allegations here, in contrast, concern systemic and widespread fraud

17

across hundreds if not thousands of cases involving fictitious and made-up time entries. The substantive issues are under the federal RICO statute and rely on predicate acts of mail and wire fraud. The prior proceedings were individual fee petitions, and Defendants' overarching billing practices were never (and could not have been) addressed, let alone decided by trial courts, in those individual cases. In short, both the underlying facts and the applicable substantive law are different in this case from that before the Lemon Law courts.

Even if Defendants satisfied the identical issue requirement as a matter of law so as to allow the rare dismissal of claims based on an affirmative defense, dismissal on collateral estoppel grounds would still be error. Issue preclusion does not apply where, as here, new facts have emerged since the prior judgment. Policy reasons also counsel against application of issue preclusion here, as doing so would actually harm, rather than preserve, the integrity of the judicial system by stymying its ability to cleanse itself of fraud.

***Participation in enterprise.*** Ford also plausibly alleges that each defendant participated in the conduct of the enterprise's affairs, whether directly or indirectly. Defendants' contrary arguments mainly misread the FAC or ignore that this is not a motion for summary judgment or post-trial motion. Defendants' efforts to analogize this case to others either involving bare, conclusory allegations or a plaintiff cobbling together disconnected events are unavailing.

***Conspiracy.*** Ford also adequately alleges its RICO conspiracy claim under 18 U.S.C. § 1962(d). Initially, Ford's RICO conspiracy claim is valid because its section 1962(c) claim is valid. But more than that, Defendants are wrong that Ford's FAC lacks plausible allegations of an agreement and overt act causing injury. Defendants ignore that an agreement need not be express or proved by direct evidence but can be inferred from the conspirators' actions and interdependence, and the FAC contains abundant plausible allegations of each. As to overt acts causing injury, Ford plausibly alleges far more than one overt act, as well as massive resulting injury.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*Third*, accepting Ford's well-pleaded allegations as true and making all inferences in its favor, Ford more than adequately alleges its claims against each individual defendant. Mikhov, for example, designed and oversaw the scheme, submitted false declarations, and instructed others to pad their hours. Kirnos took the baton from Mikhov and also submitted false declarations. Becerra ran point on Defendants' mission to backdate full-case invoices at scale, including in cases that had been closed for years. Morse billed 24+ hours more than 30 times and for tasks she has admitted never performing. Wirtz billed 24+ hours himself and for full-day tasks in distant locations on the same day. And Altman directed Becerra in the fabrication of fraudulent billing records and knowingly used those records to support his claims for attorney's fees, accompanied by false declarations.

For all of these reasons, and as set forth more fully below, Defendants' motions should be denied in their entirety and this case should proceed. Moreover, to the extent the Court grants any portion of any motion as to any defendant, leave to amend should be granted.

## FACTUAL BACKGROUND

Ford's First Amended Complaint ("FAC") alleges a detailed set of facts that, on this motion to dismiss, must be accepted as true and viewed in the light most favorable to Ford. Ford summarizes key facts—many of which Defendants ignore—below.

Defendants are law firms, lawyers, and law firm personnel who specialize in prosecuting cases under the California Song-Beverly Act, commonly referred to as California's Lemon Law. FAC ¶¶ 10-18. Under the Lemon Law, prevailing consumers are entitled to recover attorneys' fees "based on actual time expended, determined by the court to have been reasonably incurred by the buyer." *Id.* ¶ 23 (quoting Cal Civ. Code § 1794(d)). When their clients prevailed, Defendants—led by KLG—submitted billing records in support of fee applications purporting to document the work actually performed and time actually expended. *Id.* ¶¶ 22-25, 56-57, 66-75. But unknown to Ford, other auto manufacturers, or the courts, from 2015 onward, Defendants submitted

19

fake and fabricated time records in thousands of cases, laughing (or flying their private jets, *see id.* ¶ 65) all the way to the bank with tens or hundreds of millions of dollars fraudulently recovered for work never performed. *Id.* ¶¶ 4, 24-25.

As alleged in the FAC, KLG representatives admitted in October 2024 that until 2018, KLG did not record any of its time contemporaneously. *See* FAC ¶¶ 1, 26. So when Ford began refusing to settle Lemon Law cases unless KLG provided time sheets supporting the amounts that KLG claimed in fee demands, KLG faced an inflection point. *Id.* ¶¶ 2, 27. Consistent with its duty of candor to courts, KLG could have come clean that it was not KLG's practice to create and contemporaneously record attorney and paralegal time. Ford is here because KLG chose differently: it instead assembled a group of employees, overseen by Defendant Becerra, who was acting at the direction of Mikhov, Kirnos, Morse, Altman, and Wirtz, and specifically tasked them with creating false and fictitious billing records in thousands of cases, listing fabricated time entries that were created years after the work in question allegedly had been performed. *Id.* ¶¶ 2, 26, 28-29. KLG then defrauded Ford by passing those time sheets off as legitimate, submitting sworn declarations that the time records were accurate and were created contemporaneously with the listed tasks. *See, e.g., id.* ¶ 70 & Ex. F ¶ 46; ¶ 71 & Ex. G ¶ 53; ¶ 72 & Ex. H ¶ 51; ¶ 73 & Ex. I ¶ 49; ¶ 74 & Ex. J ¶ 64. And even as to the non-KLG Defendants—lawyers and law firms that associated with KLG to try their Lemon Law cases—KLG and its founder and managing partner, Defendant Mikhov, enlisted them in their fraudulent scheme by directing them to pad their bills and inflate their fees. *See id.* ¶¶ 11, 82.

Ford has paid Defendants more than $100 million for purported legal work on behalf of car buyers. *See id.* ¶ 32. The great majority of these payments have been based on fraudulent time records, many or most of which Defendants invented after the fact. *Id.* And what made Defendants' scheme so nefarious (and, unfortunately, successful) is that when looking at a single case in isolation, the fraud is undetectable. *Id.* ¶¶ 7, 34. It is only when thousands of time entries are consolidated and analyzed at

once does the full picture of Defendants' fraudulent scheme begin to emerge.

And that is what Ford has done. Based only on a sampling of billing invoices and time records covering only approximately 10% of Defendants' Lemon Law cases from 2013 to 2024, Ford has documented a truly disturbing number of facially fraudulent claims, including, but not limited to:

- Numerous instances of individual attorneys purportedly working more than 24 hours in a single day (¶ 34(a))
- Multiple attorney "appearances" simultaneously at full-day depositions and trials in different geographic locations (¶ 34(b))
- Duplicative billing for the same vague task descriptions across multiple cases for comparable amounts of time (¶ 34(c))
- Amy Morse billing more than 24 hours in one day on 34 separate occasions, including a 57.5-hour workday and a 31.3-hour workday (¶ 36)
- Amy Morse billing an average of 483.7 hours per month over three consecutive months (¶ 36)
- Amy Morse billing 3,106.45 hours in 2016 and 3,975.40 hours in 2017 (¶ 37)

The fraudulent nature of Defendant Morse's billing statistics is made even more clear by her sworn testimony that from 2016 on, she worked 60 hours per week and only 20-30% of that time was allocated to billable tasks (translating to at most 18 billable hours per week). *Id.* ¶ 37. Morse's sworn testimony and the admissions of KLG representatives further make clear that Morse never performed many of the tasks that she billed for and for which KLG sought and obtained reimbursement. *Id.* ¶¶ 39-40. These entries—along with other instances of double-billing, cross-billing, no-date entries, and canned entries—are fully consistent with KLG's after-the-fact and surreptitious fabrication of records to back up its fee demands. *See id.* ¶¶ 43-54.

Defendants' post-complaint conduct, after getting caught with their hands in the proverbial cookie jar, further confirms their consciousness of guilt and attempt to cover

their tracks. In numerous cases against Ford and other auto manufacturers since Ford filed this lawsuit, KLG has begun withdrawing payment requests for amounts billed by Morse and other KLG attorneys. *Id.* ¶ 65.

Defendants perpetrated their scheme to defraud by using and causing the use of the wires and U.S. mail to make fraudulent court filings, to negotiate settlements, and to receive payments pursuant to fraudulent billing records based on falsified time entries. *See id.* ¶¶ 66-75. Indeed, every document transmitted or caused to be transmitted by Defendants, whether by mail or wire, that contains, incorporates, references, and/or is based on purported time entries from any KLG attorney before 2018 or time entries by Defendant Morse for tasks that she has testified she never performed constitutes a separate act of mail or wire fraud, believed to number at least in the hundreds over the course of a decade. *Id.* ¶ 90.

## LEGAL STANDARD

To survive a motion to dismiss, a plaintiff need only establish that it has stated a claim for relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint need only "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *i.e.*, "content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This is a "context-specific task" that requires courts to "draw on judicial experience and common sense." *Id.* at 679. Courts considering motions to dismiss "must take all factual allegations as true and draw all reasonable inferences in favor of the nonmoving party." *Murguia v. Langdon*, 61 F.4th 1096, 1106 (9th Cir. 2023); *Blue Cross & Blue Shield Oklahoma v. S. Coast Behav. Health LLC*, 2025 WL 2004500, at *4 (C.D. Cal. June 20, 2025) ("In assessing the adequacy of the complaint, the court must accept all pleaded facts as true and construe them in the light most favorable to the plaintiff.").

Federal Rule of Civil Procedure 9(b) requires a plaintiff alleging fraud to "state with particularity the circumstances constituting fraud." *Id.* ("[T]he pleader must state

the false representations' time, place, and specific content.").  Even under Rule 9(b), however, "[m]alice, intent, knowledge and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  While a plaintiff must normally "differentiate their allegations when suing more than one defendant ... and inform each defendant separately of the allegations surrounding his alleged participation in the fraud," *Swartz v. KPMG LLP*, 476 F.3d 756, 764–65 (9th Cir. 2007), "a complaint need not distinguish between defendants that had the exact same role in a fraud."  *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 677-78 (9th Cir. 2018).  Further, "Rule 9(b) may be relaxed with respect to matters within the opposing party's knowledge.  In such situations, plaintiffs cannot be expected to have personal knowledge of the relevant facts."  *Immobiliare, LLC v. Westcor Land Title Ins. Co.*, 424 F. Supp. 3d 882, 890 (E.D. Cal. 2019).

The *Noerr-Pennington* doctrine, claim preclusion, and issue preclusion are affirmative defenses.  *See Schrader Cellars, LLC v. Roach*, 129 F.4th 1115, 1125 n.12 (9th Cir. 2025) (*Noerr-Pennington* doctrine); *Taylor v. Sturgell*, 553 U.S. 880, 907 (2008) (claim preclusion and issue preclusion).  "[O]rdinarily, affirmative defenses may not be raised on a motion to dismiss."  *York Cnty. on Behalf of Cnty. of York Ret. Fund v. HP, Inc.*, 65 F.4th 1115, 1125 (9th Cir. 2023).  Thus, "dismissal under Rule 12(b)(6) on the basis of an affirmative defense is proper only if the defendant shows some obvious bar to securing relief on the face of the complaint."  *ASARCO, LLC v. Union Pac. R. Co.*, 765 F.3d 999, 1004 (9th Cir. 2014) (citation modified); *see Harris v. Harris*, 935 F.3d 670, 676 (9th Cir. 2019) (similar); *Waugh Chapel South, LLC v. United Food and Commercial Workers Union Local 27*, 728 F.3d 354, 359–60 (4th Cir. 2013) (holding that court cannot dismiss claim based on *Noerr-Pennington* defense unless the defense clearly appears on the face of the complaint).

## ARGUMENT

## I.    THE *NOERR-PENNINGTON* DOCTRINE DOES NOT APPLY

Deriving from the First Amendment's guarantee of "the right of the people … to petition the Government for a redress of grievances," *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006), the *Noerr-Pennington* doctrine "is a rule of statutory construction that requires courts to construe statutes to avoid burdening conduct that implicates the protections of the Petition Clause of the First Amendment." *United States v. Koziol*, 993 F.3d 1160, 1171 (9th Cir. 2021).  Courts consider three questions when deciding whether this doctrine applies: (i) does the action impose a burden on petitioning activities; (ii) do those alleged activities forming the basis of the lawsuit constitute protected petitioning activities; and (iii) may the at-issue statute(s) be construed to avoid the burden on the protected petitioning activity.  *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 644 (9th Cir. 2009).  The doctrine does not apply unless "the answer at each step is 'yes.'"  *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 535 (9th Cir. 2022).  Moreover, the doctrine does not apply to so-called "sham petitions." *Koziol*, 993 F.3d at 1171.

Thus, to prevail on their *Noerr-Pennington* affirmative defense on a motion to dismiss, Defendants must establish each of the following (among other requirements) appears on the face of the complaint, as a matter of law: (i) Ford's RICO claims are based on petitioning activities; and (ii) those claims impose a burden on protected petitioning activity.  Defendants fail at each step.[1]  At any rate, the doctrine is

---

[1] Citing *Acres Bonusing, Inc. v. Ramsey*, 2022 WL 17170856, at *11 (N.D. Cal. Nov. 22, 2022), the Wirtz Defendants separately argue (in a footnote) that litigation activity cannot form the basis of a RICO predicate act absent allegations of wrongdoing outside the litigation, such as out-of-court activity or corruption.  *See* Wirtz Motion at 5 n.1.  The court in *Relevant Grp., LLC v. Nourmand*, 2023 WL 4291654, at *9-11 (C.D. Cal. May 24, 2023) flatly rejected that policy argument as inconsistent with Supreme Court and Ninth Circuit precedent, stating that it did "not find the argument [in *Acres Bonusing*] to be persuasive."  This Court should follow suit.  Moreover, even were this Court to follow *Acres Bonusing*, it would not support dismissal here.  Ford does not

inapplicable because the FAC plausibly alleges conduct that falls within the doctrine's sham exception.

### A.    Ford's Rico Claims Are Not Based on Petitioning Activity

Defendants ignore the three-part *Noerr-Pennington* test, instead focusing on only one prong (the second) and asserting in wholly conclusory fashion (at 23)[2] that the doctrine applies because Ford's RICO claims are "predicated on underlying litigation activity."  Defendants misconstrue (at 23) the basis for Ford's RICO claims.  At its core, Ford's action arises out of and is based on Defendants' fraudulent billing scheme—***not*** underlying litigation activity.  As the FAC alleges, this case stems from "a massive and years-long scheme by Defendants to defraud Ford and other auto manufacturers out of money and property by falsely and fraudulently claiming inflated attorneys' fees for time never actually worked."  FAC ¶ 2; *see also, e.g.*, *id.* ¶¶ 6-8, 10-18, 33, 57, 61, 66, 76, 79, 81, 89(c).  Defendants do not—and cannot—argue that those fraudulent billing practices constitute petitioning activity or are otherwise incidental to prosecuting a case.

*State Comp. Ins. Fund v. Drobot*, 2013 WL 12125748, at *5 (C.D. Cal. Nov. 20, 2013), is illustrative.  The complaint in that case alleged, in support of RICO and fraud causes of action, that the defendants—medical providers and pharmacies—"over-billed, double-billed, and defrauded" the plaintiff, a workers' compensation insurance carrier,

---

allege that the state court proceedings are predicate acts; rather, Ford's position is "that they help further the RICO violation, which consists of a pattern of racketeering activity under the mail fraud [and wire fraud] statute through other fraudulent activities alleged in the complaint.  In other words, the issue is not whether the state-court proceedings are *themselves* predicate acts, but rather that they are allegedly designed to perpetuate and monetize the RICO scheme…" *State Farm Mutual Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 98 n. 14 (2d Cir. 2024) (holding that "state litigation of the kind alleged here—involving hundreds of baseless state-court proceedings that are part of a massive fraudulent scheme—may itself further a RICO violation, which in this cased consists of alleged repeated violations of the federal mail fraud statute").

[2] Ford refers to the arguments in the KLG Defendants' motion as Defendants' arguments because the Altman and Wirtz Defendants have joined in that motion.  All motion citations are to the KLG Defendants' motion unless otherwise specified.

"out of millions, if not hundreds of millions, of dollars." *Id*. at *1. The complaint further alleged that the defendants used the United States mail and wires to submit their fraudulent bills to the plaintiff and hid their schemes by "falsifying invoices and purchase orders, submitting fraudulent bills, hiding the common ownership of the entities in the enterprise, and obstructing [the carrier's] attempt to investigate any issues." *Id*. The defendants moved to dismiss, arguing the claims were barred by the *Noerr-Pennington* doctrine because they arose from petitions to the Workers' Compensation Appeals Board for payments on liens. *Id*. at *5. The court rejected this argument and denied the motion, holding that the claims instead "center on alleged fraudulent bills Defendants sent Plaintiff." *Id*.

Although the *Drobot* court noted that the fraudulent bills were sent prior to initiation of the lien proceedings and not in contemplation of litigation, that case's logic and result should apply with equal force here. The gravamen of the FAC consists of (1) fraudulent billings that Defendants sent to Ford, and (2) payments that Defendants fraudulently induced Ford to send to them. *See, e.g.,* FAC ¶¶ 66-76 & Ex. C (Dkt. 83-3). Neither category constitutes "petitioning activity." The fact that fee litigation proceedings provided the *opportunity* for Defendants to perpetrate their fraud against Ford does not mean that the claims are *based on* litigation activity, and should not be allowed to cloak Defendants' run-of-the-mill fraud with constitutional immunity.

### B.   Ford's RICO Claims Do Not Impose a Burden on Protected Petitioning Rights

Even if Defendants could show that Ford's claims are based on underlying litigation activity, Defendants fail to argue (let alone demonstrate as a matter of law) that Ford's RICO claims *burden* activities *protected* by the Petition Clause, as required by the first *Noerr-Pennington* prong.[3] *See B&G Foods*, 29 F.4th at 535. Indeed,

---

[3] This failure alone is sufficient grounds to reject Defendants' *Noerr-Pennington* argument. *See, e.g., Harris*, 935 F.3d at 676. This failure also precludes Defendants from curing the failure with new arguments on reply. *See Newpoint Fin. Corp. v.*

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Defendants' entire argument that the *Noerr-Pennington* doctrine applies (before turning to the sham exception) is all of five sentences, with virtually no analysis and no discussion of the FAC's specific allegations.  This failure, particularly in light of Defendants' comprehensive briefing of other issues, is telling: Ford's lawsuit does nothing to prevent Defendants from prosecuting Lemon Law suits or filing fee petitions if successful in those suits.  Instead, Ford's lawsuit merely holds Defendants to their obligation "to play by the rules applicable to all litigants" when they do bring lawsuits on behalf of their clients.  *Pyankovska v. Abid*, 65 F.4th 1067, 1077 (9th Cir. 2023).

*Pyankovska* is instructive.  The plaintiff in that case sued her ex-husband and his attorney for violations of federal wiretap laws after losing a custody battle in state court based on secret recordings of the plaintiff made by her ex-husband and selectively edited and submitted to the state court by her ex-husband's attorney.  *Id.* at 1071, 1077.  The district court dismissed the complaint as to the attorney based on the *Noerr-Pennington* doctrine.  *Id.* at 1077.  The Ninth Circuit reversed, holding that the attorney's "arguments face insurmountable hurdles under step one," *i.e.* the requirement to establish that the action "imposes an unconstitutional burden on the state court litigation."  *Id.*  The court explained that attorneys appearing in court are "not at liberty to set their own rules" and that, although the attorney "was free to file and argue the custody motion—*i.e.*, to petition—[] he was not free to support that motion with illegal evidence."  *Id.*  The court thus held that requiring the attorney to face consequences for violating the law was "not a cognizable 'burden' on any conduct he was lawfully entitled to participate in" and that "filing illegally obtained evidence on a public court docket is conduct not immunized under *Noerr-Pennington*."  *Id.* at 1071, 1078.

Just as it was "hard for [the attorney in *Pyankovska*] credibly to argue that the litigation of the custody motion was 'burdened,'" *id.* at 1077, it is equally difficult for Defendants here credibly to argue—particularly on a motion to dismiss—that their

---

*Bermuda Monetary Auth.*, 680 F. Supp. 3d 1151, 1163 n.3 (C.D. Cal. 2023) (noting that "arguments raised for the first time in a reply brief are waived").

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

ability to bring lawful fee petitions is burdened by Ford's RICO claims. Defendants "were not at liberty to set their own rules" by knowingly submitting scores of false and perjurious declarations and fee records seeking reimbursement for time that Defendants knew was never worked. *Id.*; *see* FAC ¶¶ 1-2, 22-25, 56-57, 66, 90. Defendants have no "right" under the Petition Clause to falsify evidence or make false statements, *see, e.g.*, *Amphastar Pharms. Inc. v. Aventis Pharma SA*, 2012 WL 5512466, at *9-10 (C.D. Cal. Nov. 14, 2014); *U.S. ex rel. Wilson v. Maxxam, Inc.*, 2009 WL 322934, at *6-11 (N.D. Cal. Feb. 9, 2009), so holding them to account for doing so "is not a cognizable 'burden' on any conduct [they were] lawfully entitled to participate in." *Pyankovksa*, 65 F.4th at 1077; *see also Pepper v. Routh Crabtree, APC*, 219 P.3d 1017, 1018 (Alaska 2019) (applying Ninth Circuit *Noerr-Pennington* precedent and reversing dismissal of claim because lawsuit did not burden defendants' rights and instead held defendant "to account if the manner in which it allegedly undertook [petitioning] activities was unfair, deceptive, and in violation of [the law]").[4]

To put it bluntly, the "First Amendment does not protect fraud." *San Antonio Comm. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1239 (9th Cir. 1997); *see Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1089 (9th Cir. 2002) ("The First Amendment does not protect knowingly false speech."). Consistent with their alleged conduct in the underlying Lemon Law cases, Defendants seem to think that once they enter the doors of a courtroom, what follows is a free-for-all where they can defraud

---

[4] Defendants' attempt to immunize fraud under *Noerr-Pennington* is especially flimsy because, with the exception of Becerra, they are all lawyers barred in California and thus subject to the California Rules of Professional Conduct, including Rule 3.3, which details the attorney Defendants' duty of candor. Specifically, Rule 3.3(a)(1) provides that "[a] lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." And Rule 3.3(a)(3) provides that "[a] lawyer shall not offer evidence that the lawyer knows to be false." Against this backdrop, Ford's RICO claims would burden Defendants' "petitioning activities no more than [California's] rules of professional conduct or standards of practice already do so." *Pepper*, 219 P.3d at 1022-23.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

their opponents, the courts, and even their own clients with impunity. That position is "simply untenable." *Maxxam*, 2009 WL 322934, at *11.

Neither of the two cases that Defendants cite (at 23) for the proposition that the *Noerr-Pennington* doctrine bars claims based on "litigation" activity—*Relevant Grp., LLC v. Nourmand*, 116 F.4th 917 (9th Cir. 2024) and *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180 (9th Cir. 2005)—is to the contrary. These distinguishable cases never addressed whether a lawsuit based on misrepresentations to a governmental agency burdens a protected petitioning right. Cases are not authority for propositions not considered therein. *See, e.g., Cooper Indus., Inc. v. Aviall Servs.*, 543 U.S. 157, 170 (2004); *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 842 n.5 (9th Cir. 2020); *United States v. Vroman*, 975 F.2d 669, 672 (9th Cir. 1992).

### C.    Ford's Allegations Support Application of the Sham Exception

#### 1.    Noerr-Pennington does not protect sham petitioning activities

Even if Defendants could meet the *Noerr-Pennington* doctrine's prerequisites—and they cannot—dismissal would still be improper because Ford's allegations, accepted as true, adequately invoke the doctrine's sham exception. *See Kearney*, 590 F.3d at 646–48 (reversing dismissal based on *Noerr-Pennington* doctrine where complaint alleged conduct that could be subject to the doctrine's sham exception).

The Ninth Circuit has "identified three circumstances in which the sham litigation exception might apply." *Id.* at 646. These include when intentional misrepresentations deprive the litigation of its legitimacy, when the lawsuit is objectively baseless and the plaintiff's motives were unlawful, or when the plaintiff files a series of lawsuits brought pursuant to a policy of starting legal proceedings without considering the merits and for an unlawful purpose. *See Sosa*, 437 F.3d at 938. Even one of these circumstances suffices to invoke the exception. *See Kearney*, 590 F.3d at 646-68. Here, all three apply.

2.    <u>Intentional misrepresentations deprived the litigation of its legitimacy</u>

The sham exception applies "where the allegedly unlawful conduct consists of making intentional misrepresentations to the court and those misrepresentations or the party's knowing fraud upon … the court deprive the litigation of its legitimacy." *Kearney*, 590 F.3d at 647 (citation modified).  There is no denying—and certainly not at the pleading stage—that the FAC adequately alleges Defendants' intentional misrepresentations to and knowing fraud upon hundreds of courts.  *See, e.g.*, FAC ¶¶ 1-2, 4, 7, 22, 24-25, 28-29, 32, 34-35, 43, 45-46, 48, 56, 66, 78, 81, 89(a), 91, 100, 112.  As the FAC explains, "Defendants knowingly and intentionally made misrepresentations to Ford and to numerous courts about their fictitious billing records" by "submitting fake time records created in thousands of warranty claim cases" to seek "millions of dollars in compensation for work that was never performed." *Id.* ¶ 24; *see, e.g.*, *id* ¶¶ 4, 28-29, 35, 43, 47, 48.  Moreover, the FAC alleges that "KLG assembled a group of employees, overseen by Becerra, and specifically tasked them with creating false and fictitious billing records in thousands of cases, listing fabricated time entries that were created years after the work in question allegedly had been performed." *Id.* ¶ 2; *see, e.g.*, *id.* ¶¶ 1, 28, 46.  "The time records that Becerra and her team created included purported records not only for KLG attorneys, but for Altman, Wirtz, and their respective firms." *Id.* ¶ 28.  All "[t]hose attorneys then knowingly used the fabricated records to support their claims for attorney's fees, repeatedly misrepresenting to Ford and to the courts that all time billing entries were completed contemporaneously with or near in time to the work performed," thereby extracting fee payments "based on Defendants' fabricated and untrue evidence." *Id.*; *see, e.g.*, *id.* ¶¶ 1, 46.  The FAC specifies at length exactly what false and fraudulent statements Defendants made, to whom they made them, and what their unlawful misrepresentations to the courts (and Ford) consisted of.  *See, e.g., id.* ¶¶ 1-7, 22-75, 80-114.

In short, the FAC alleges Defendants "routinely prepared and submitted false and fraudulent time records in Lemon Law cases, to extract larger amounts of fees and costs than those to which they were entitled." *Id.* ¶ 25; *see, e.g.*, *id.* ¶¶ 22, 32, 56, 77, 78, 81, 89(a), 91, 100, 112. "Defendants concealed their fraudulent scheme by spreading their fictitious and inflated fee records across numerous matters involving different California courts, cases, and car company defendants." *Id.* ¶ 7. Consequently, "[t]the false and inflated time entries only can be discerned and detected when thousands of time entries from hundreds of timesheets across scores and scores of different cases are all entered into a spreadsheet." *Id.* ¶ 34. "[A]s Defendants well knew but concealed from Ford and the courts, the [time] entries did not reflect actual and contemporaneously billed time that may or may not be reasonable, but rather were entirely fictional entries generated without regard to whether the billed tasks were ever performed at all and often years after cases had concluded." *Id.* ¶ 78.

There is also no denying—particularly at the pleading stage—that the FAC adequately alleges that Defendants' knowing fraud in submitting sham billing records deprived the fee litigation of its legitimacy.

As the FAC recounts, Defendants' "sham billings, many or most of which were made up out of whole cloth often years after the fact, fueled a highly lucrative and fraudulent criminal enterprise that was built on deceiving and abusing the judicial system ... and stealing many millions of dollars from auto manufacturers through a pattern and practice of false representations." *Id.* ¶ 6. "These and other similar fraudulent time entries have continued to be used to prepare false billing records and claim legal fees for fictitious time, including as recently as August 2025." *Id.* Defendants unlawfully used their "sham billing records" in at least hundreds of cases "to collect well over $100 million of legal fees that [Defendants] pocketed." *Id.* ¶ 4. "In doing so, Defendants knowingly and intentionally made misrepresentations to Ford and to numerous courts about their fictitious billing records." *Id.* ¶ 24. "These misrepresentations, coupled with Defendants' knowing fraud through the submission of

31

sham records, stripped the fee application process of its legitimacy." *Id*. "Defendants deprived the fee application process of its legitimacy by making false statements, presenting fraudulent claims for money, and misleading all of the judges and lawyers who were privy only to selective information presented by Defendants in each individual case to prevent the detection of their false and fraudulent billing practices." *Id*. ¶ 7; *see, e.g.*, *id*. ¶¶ 25, 32, 56, 66.

"This unlawful conduct concealed from the courts and Ford that Defendants sought fictitious fees based on false billing records stemming from their fraudulent billing practices—records on which courts and Ford relied because of Defendants' intentional misrepresentations and fraud—thereby harming Ford's business and property interests by causing Ford to pay more than $100 million for Defendants' sham legal fees and to expend significant resources to detect and now attempt to end this fraudulent criminal enterprise, as well as by damaging Ford's reputation and goodwill." *Id*. ¶ 24. "The key to Defendants' fraudulent billing scheme is submitting time records that do not appear fraudulent when reviewed in isolation in a particular matter." *Id*. ¶ 57. "Because there are no red flags to alert the courts or the victims to audit the daily time entries for every day over a decade across all cases against all automakers for all of the Lemon Law lawyers in the enterprise, … courts have been deceived into awarding fees against Ford" based on the fraudulent entries. *Id*. "Defendants' systemic intentional misrepresentations, perjury, and fraud upon the courts and upon their litigation opponent, Ford, deprived the underlying fee litigations of their legitimacy and rendered them as fraudulent shams." *Id*. ¶ 28.

Additionally, "Defendants' success in defrauding judges and fraudulently obtaining outsize fee payments based on false billing records led Ford ... to make the rational business decision to overpay in settlement of Lemon Law cases—not just for attorneys' fees, but for compensatory damages and civil penalties as well—regardless of the merits of the individual case." *Id*. ¶ 61. "The fees claimed by Defendants often far exceeded—sometimes by a factor of 10—the amount in dispute. Outsize fee payments

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

disincentivize auto manufacturers from proceeding to fee hearings and encourage them to pay inflated settlement values.  Even prelitigation settlement offers involving minimal attorneys' fees and before case facts are even developed end up artificially inflated as a direct result of Defendants' fraudulent billing records."  *Id.*  "Defendants accordingly failed to provide Ford and the courts with truthful evidence," and the ensuing payments made by Ford to settle these Lemon Law cases "were based on Defendants' fabricated and untrue evidence and were tainted, unearned, and unwarranted."  *Id.* ¶ 28; *see, e.g., id.* ¶¶ 33, 57, 70, 71.

In sum, as the FAC explains, Ford has been "damaged by having to participate in a sham and tainted litigation process in connection with Defendants' submission of false and fraudulent billing records in support of fee applications.  Defendants misrepresented the amount of time they actually worked, making these misrepresentations to—and thereby perpetrating a fraud on—Ford and the courts.  Defendants intentionally and knowingly concealed the fictitious nature of the time entries for which they sought to recover fees, successfully swaying courts to issue fee awards, and causing Ford to pay settlements, for work that had not actually been performed on behalf of Defendants' client car owners."  *Id.* ¶ 78.  Ford did not know at the time—and could not have known—that the entire proceedings were a farce; as Defendants well knew but concealed from Ford and the courts, the entries did not reflect actual and contemporaneously billed time that may or may not be reasonable, but rather were entirely fictional entries generated without regard to whether the billed tasks were ever performed at all and often years after cases had concluded."  *Id.*  "Defendants intended that courts in various jurisdictions rely on, and those courts have relied on, Defendants' false and misleading statements," and "[t]he courts' acceptance of Defendants' fraudulent billings has resulted in numerous inflated fee awards and settlements against Ford."  *Id.* ¶ 94.

Courts routinely reject application of the *Noerr-Pennington* doctrine on Rule 12 motions based on misrepresentations far less jarring than those alleged here.  *See, e.g.,*

33

*Kearney*, 590 F.3d at 646-48 (reversing dismissal that had been based on *Noerr-Pennington* doctrine and holding that failure to produce important document and defendants' intentional misrepresentations to the court about the document were "precisely the sort" of misconduct that "the sham exception was created to address"); *Lumasense Techs., Inc. v. Advanced Eng'g Servs., LLC*, 2021 WL 1197417, at *1, 6 (N.D. Cal. Mar. 30, 2021) (finding that misrepresentations made by defendant to state court were sufficient at the pleading stage "to trigger the sham exception because [the plaintiff] has alleged that [the defendant] knowingly misled the state court on substantive issues related to the alleged trade secrets at issue in [the underlying] action"). Further, the Ninth Circuit has confirmed that "fail[ing] during the prior litigation to disclose damaging evidence" and thereby "induc[ing] the plaintiffs to settle" a suit for a different amount than they would have "in the absence of fraud" likewise fits within the sham exception. *Sosa*, 437 F.3d at 940 (citing *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 356-58, 364-65 (9th Cir. 2005)).

Crucially, where, as here, the allegedly unlawful petitioning activity includes specific instances of misconduct short of the entire litigation, the Ninth Circuit focuses the sham inquiry on whether those specific instances constituted a sham. *See Theofel v. Farey-Jones*, 359 F.3d 1066, 1079 (9th Cir. 2004) (holding that, where defendant alleged that a subpoena unlawfully served in prior litigation resulted in the improper disclosure of emails, the sham inquiry must focus on "the challenged discovery conduct itself" because a litigant is not immunized "for any and all" unlawful conduct in a lawsuit merely because "his lawsuit" is not a sham). Defendants wrongly focus (at 24-25) on the lawsuits as a whole in arguing that because their clients prevailed in the underlying actions, the petitions could not be shams. The FAC makes clear Ford's allegation that it was the underlying fee litigations—not the actions as a whole—that were shams in their entirety as a result of Defendants' fraud. *See, e.g.*, FAC ¶¶ 7, 24, 28, 78; *see also Sosa*, 437 F.3d at 938 (explaining that claim based on discovery misconduct may fall within sham exception where the discovery misconduct itself

34

meets the sham litigation test); *id.* at 940 (explaining that *Living Designs* reflected an application of the sham exception to fraudulent discovery that tainted a settlement); *Theofel*, 359 F.3d at 1079 (refusing to "look only to the merits of the underlying litigation" instead of the "challenged [] conduct itself" in applying sham exception).

Not surprisingly, therefore, the cases Defendants cite (at 24-25) for the mistaken proposition that the sham exception for fraud is inapplicable do not help them. In *Kottle v. Northwest Kidney Ctrs.*, 146 F.3d 1056, 1063-64 (9th Cir. 1998), the court declined to apply the sham exception because the complaint made only "vague allegations of misrepresentation" in "very general terms," without specifying "what representations [the defendant] made" or "what exactly its 'improper and/or unlawful' methods of advocacy were." Ford's FAC, on the other hand, contains highly specific allegations similar to the pleading in *Kearney*, where the court applied the sham exception based on the pleading's specificity. 590 F.3d at 647. Similarly, in *Thomas v. Hous. Auth. of Cnty. of Los Angeles*, 2006 WL 5670938, at *9 & n.49 (C.D. Cal. Feb. 28, 2006), the court refused to apply the sham exception because the complaint failed to allege knowing fraud upon, or intentional misrepresentations to, the court that deprived the action of its legitimacy—unlike the FAC at issue here. Defendants quote a stray line from *Silver v. Duel*, 2022 WL 16859646, at *6 (C.D. Cal. July 11, 2022), but ignore the thrust of the court's decision: that the plaintiff's "conclusory allegations" were "insufficient to plausibly entitle Plaintiff to benefit from the sham litigation exception to *Noerr-Bennington* [sic]." Given the extensive specifics in Ford's FAC, Defendants' reliance on *Silver* is unavailing. And the at-issue allegation in *Mir v. Greines, Martin, Stein & Richland*, 2015 WL 12746231, at *7 (C.D. Cal. Feb. 19, 2015)—that a party sought attorneys' fees despite having malpractice insurance—is worlds away from Ford's allegations here.[5] Moreover, to the extent Defendants contend that *Thomas*,

---

[5] *Mir* is particularly inapplicable because there, the plaintiff alerted the state court to, and litigated the merits of, the specific misconduct at issue in the earlier lawsuit, *see Mir*, 2015 WL 12746231, at *4, *7—something that Ford did not do, and could not

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

*Silver*, or *Mir* is inconsistent with *Theofel* (a case that neither *Silver* nor *Mir* even mentioned), clearly a district court ruling cannot overrule a Ninth Circuit decision.

Defendants (at 25) charge Ford with recasting disputed issues from the underlying Lemon Law suits as misrepresentations. Not so. While Ford may have (as is commonplace in any fee litigation) disputed the reasonableness of particular entries and specific evident inefficiencies, neither Ford nor the courts ever had reason to address the type of wholesale fraud now alleged—including, for example, that none of KLG's time entries from before 2018 was recorded contemporaneously despite sworn representations to the contrary, that all or the vast majority of Amy Morse's post-2016 time entries were completely fictitious, and that KLG manipulated the invoices of other enterprise members. *See, e.g.*, FAC ¶¶ 1-2, 5, 11-12, 14, 20, 26-29, 31, 90.

In short, as a matter of law, the FAC on its face plausibly alleges conduct that falls within the sham exception for intentional misrepresentations.

### 3. Defendants submitted objectively baseless, false, and fraudulent billing records with an improper subjective intent

Another basis for invoking the sham exception is if the petitioning activity was "objectively baseless" and done with the "subjective intent to use the legal process to achieve the evil prohibited by the statute from which exemption is claimed"—here, RICO, wire fraud, and mail fraud. *Theofel*, 359 F.3d at 1078-79 & n.6. Ford has plausibly alleged just that. RICO's "basic purpose" is protecting "the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which unlawful activity is committed." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163-64 (2001) (citation modified). Here, Ford alleges that

---

have done, here because (as the FAC alleges) Defendants successfully concealed the truth from Ford through the fake time records that they submitted, *see* FAC ¶¶ 7, 24, 28, 57, 76, 78. *See also Freeman*, 410 F.3d at 1183, 1185 (noting the distinction, for purposes of the sham petition analysis, between cases where the court in the underlying litigation is alerted to and addresses the specific misconduct at issue and cases where the misconduct is not caught in time).

Defendants rely on the imprimatur of the legal profession and their law firms to engage in illegal conduct. *See, e.g.,* FAC ¶¶ 55-61. "[T]he original impetus of behind the mail fraud statute was to protect the people from schemes to deprive them of their money or property." *Cleveland v. U.S.*, 531 U.S. 12, 18-19 (2000). Here, Ford alleges that Defendants' scheme was intentionally designed to achieve that "evil." *See, e.g.,* FAC ¶¶ 2, 6, 24, 32-33, 63. And the wire fraud statute "reflects the policy choice to free the interstate wires from fraudulent use, irrespective of the object of the fraud." *United States v. Hussain*, 972 F.3d 1138, 1143 (9th Cir. 2020). Here, Ford alleges that Defendants' conduct intentionally used the interstate wires, or caused them to be used, fraudulently. *See, e.g.,* FAC ¶¶ 66-75. Defendants' subjective intent to use the legal process to achieve these various evils can be presumed from the alleged misconduct itself. *See Theofel*, 359 F.3d at 1079 & n.6. And fee litigation based on false and manufactured evidence is by definition "objectively baseless."

Defendants, citing *Relevant Group* and *Kottle*, suggest this sham exception is inapplicable because their clients prevailed in the lawsuits against Ford. This mistaken assertion reflects a fundamentally misguided understanding of the sham exception.

*Relevant Group* and *Kottle* considered whether the entire legal and administrative actions there were objectively baseless. *See Relevant Grp.*, 116 F.4th at 931-34; *Kottle*, 146 F.3d at 1060-63. In that specific context, the courts emphasized that lawsuits or administrative proceedings are not objectively baseless if the parties invoking the *Noerr-Pennington* doctrine in the later suit had previously prevailed. *See Relevant Grp.*, 116 F.4th at 934; *Kottle*, 146 F.3d at 1060-63.

But the context here is far different. The challenged activity at issue is defendants' enterprise of submitting false and fraudulent billing records in support of their fee motions. FAC ¶¶ 66-75. If that were petitioning activity at all, it would still constitute specific misconduct defendants engaged in during the course of litigation. The inquiry into objective baselessness must focus on this specific activity in question rather than on the merits of the entire underlying litigation. *Theofel*, 359 F.3d at 1078-

37

79.  Defendants therefore cannot circumvent this inquiry by urging courts to "look only to the merits of the underlying litigation" instead.  *Id.* at 1079.  Defendants do not argue, nor could they, that filing false and fraudulent billing records is anything other than objectively baseless misconduct done with a subjectively improper purpose.  *See, e.g.*, *Anbang Grp. Holdings Co., Ltd. v. Zhou*, 2023 WL 5615459, at *1 (N.D. Cal. Aug. 30, 2023) (holding that complaint plausibly alleged objective baselessness done with a subjectively improper purpose where litigation was alleged to be "based on fraudulent deed transfers and forged arbitration awards").

### 4.    Defendants engaged in a series of improper petitions

A plaintiff may also invoke the sham exception if the at-issue conduct involves a series of petitions brought for an unlawful purpose and without regard for the petitions' merits.  *See Sosa*, 437 F.3d at 938.  Defendants do not address this basis for the sham exception and have thus waived any argument contesting its application here.  *See Newpoint Fin. Corp.*, 680 F. Supp. 3d at 1163.  But even if Defendants had challenged application of the exception on this ground, their challenge would fall short.  "In deciding whether there was such a policy of filing petitions with or without regard to merit," courts consider "allege[d] indicia of bad faith," as well as "the magnitude and nature of the collateral harm imposed on plaintiffs by defendants' petitioning activity." *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 180-81 (3d Cir. 2015).  Here, Ford alleges numerous indicia of bad faith, including, but not limited to, repeated false statements in evidence submitted in support of fee applications, FAC ¶¶ 67-74, and attempts to obtain reimbursement for work never performed, FAC ¶ 90; *see also* FAC ¶¶ 1-2, 5, 11-12, 14, 20, 26-29, 31.  And if tens of millions of dollars in fraudulently claimed and wrongfully paid legal fees do not adequately establish the collateral harm on Ford, then it is hard to see what harm would satisfy this exception.

***

In short, the *Noerr-Pennington* doctrine cannot justify the dismissal of Ford's RICO claims under Rule 12(b)(6).

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## II.    FORD ADEQUATELY PLEADS ITS RICO CLAIMS

To state a RICO claim under 18 U.S.C. § 1962(c), "a plaintiff must allege (i) conduct (ii) of an enterprise (iii) through a pattern (iv) of racketeering activity … (v) causing injury to plaintiff's business or property." *Blue Cross*, 2025 WL 2004500, at *8 (citing *Living Designs*, 431 F.3d at 361.  Ford has adequately alleged each of these elements.

### A.    Ford Has Adequately Alleged a RICO Enterprise

The RICO statute defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  This definition is "expansive" and "not very demanding." *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015); *see Boyle v. United States*, 556 U.S. 938, 944 (2009) (explaining that the definition of an associated-in-fact enterprise "has a wide reach" and that RICO statute is to be "liberally construed").  The Ninth Circuit does not require associated-in-fact enterprises to have "any particular organizational structure." *Odom v. Microsoft Corp.*, 486 F.3d 541, 551-52 (9th Cir. 2007) (en banc).  Instead, a plaintiff need only identify "a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* at 552.  Specifically, Ford must allege facts plausibly demonstrating that the enterprise has "(A) a common purpose, (B) a structure or organization, and (C) longevity necessary to accomplish the purpose." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 997 (9th Cir. 2014). Ford has done so.[6]

---

[6] The alleged enterprise members, in addition to Defendants, include two unnamed law firms and two unnamed lawyers (the "Unnamed Enterprise Members").  The Unnamed Enterprise Members, along with the Altman Defendants, shared office space with KLG. *See* FAC ¶¶ 10, 38, 82.

1.   <u>Ford adequately alleges that Defendants were part of a continuing unit that functioned with a common purpose</u>

Defendants' "no-enterprise" argument centers (at 26-27) on the invalid premise that the FAC merely alleges that various law firms "occasionally served as co-counsel while jointly representing a consumer client." This is not so. Ford repeatedly alleges that the enterprise members associated together for the common purpose of enriching themselves through a complex and coordinated scheme of fraudulent billing. *See, e.g.*, FAC ¶¶ 1-2, 10-20, 24-29, 31, 81-83. Ford alleges objective indicia of this association for a common purpose, including overlapping billing, shared office space, complicated financial arrangements including referral fees and advances, weekly meetings between the enterprise members, and more. *See, e.g.,* FAC ¶¶ 81-83; *see, e.g.*, *Morsberger v. ATI Holdings, LLC*, 2024 WL 308465, at *2 (N.D. Ill. Jan. 26, 2024) (explaining that "sharing profits (or otherwise commingling illicit proceeds) might show a common purpose under RICO") (citation modified).

"[E]vidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise may in particular cases coalesce." *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., and Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 980 (N.D. Cal. 2018) (quoting *Boyle*, 556 U.S. at 947). This is one such case. In *In re Chrysler*, the court found that "[t]he allegations that plausibly support that Defendants committed multiple acts of mail and wire fraud also support that they shared a common purpose" to engage in fraudulent conduct. *Id.* The same is true as to the multiple acts of mail and wire fraud alleged against Defendants here.

*Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915 (N.D. Cal. 2013), is also instructive. The scheme alleged in that case involved marking up fees that the defendants then collected illegally, and the alleged enterprise consisted of two Wells Fargo entities, their subsidiaries and affiliated companies, and third-party vendors and brokers. The court denied the defendants' motion to dismiss the RICO claims, finding a sufficiently alleged common purpose in "limit[ing] costs and maximiz[ing] profits

40

through concealment of marked-up fees." *Id.* at 941.  The same result is called for here, where Ford has "explicitly alleged that the enterprise members … devised a scheme to defraud [Ford] and obtain money from [it] by means of false pretenses." *Id.* (citation modified).  As in *Bias*, "[a]s alleged, this scheme to profit is a sufficient common purpose." *Id.*  And as in *Bias*, the allegations demonstrate that the KLG Defendants and the non-KLG enterprise members "each played different roles from each other to accomplish their purpose," *id.*:  the KLG Defendants brought in clients through aggressive marketing, helped litigate the case, and then handled settlements and fee motions, while the other enterprise members' roles were to win trials so KLG and the other enterprise members could lie their way to outsized fee awards—awards on which the enterprise then relied to perpetuate the cycle of fraud.  *See* FAC ¶¶ 11, 14, 19, 60.

Defendants strain (at 27) to paint this as a case merely involving "routine commercial relationships," but when viewed against the allegations in the FAC, Defendants' own cases demonstrate that this is not so.  In *Gomez v. Guthy-Renker*, 2015 WL 4270042, at *8-10 (C.D. Cal. July 13, 2015), for example, the plaintiff sought to create a RICO enterprise out of a beauty and skincare business and the various third-party credit card processing and customer service businesses with which it contracted.  But the plaintiff in *Gomez* failed to make factual allegations approaching the detail of Ford's allegations here: there were no allegations that the third-party businesses engaged in any fraudulent conduct, and the "common purpose" merely involved the services being provided.  *Id.* at *5-6.  Here, in contrast, the alleged common purpose is not providing services to Defendants' clients, but deceiving Ford and other manufacturers through a coordinated scheme of fraudulent billing.  *See, e.g., Odom*, 486 F.3d at 552 (finding allegations that defendants had common fraudulent purpose, coupled with allegations of how they furthered that purpose, "more than adequate" to satisfy pleading requirements).

Nor is this a case where the enterprise members simply "enter[ed] into commercial relationships for their own gain or benefit," as in *In re Countrywide Fin.*

*Corp. Mortgage-Backed Sec. Litig.*, 2012 WL 10731957, at *9 (C.D. Cal. June 29, 2012) (citation modified).  In that case, the alleged enterprise members "engaged in bilateral business dealings with Countrywide," the hub of the enterprise, "but in sharp competition with each other" and in some cases were "victims." *Id.* at *10-11.  This is not even close to the relationship alleged among the Defendants here, which includes sharing of office space and fees, collusion to fraudulently recover attorneys' fees for time never worked, and relying on each other's existence and participation to perpetrate their fraud by spreading their fraudulent billings across multiple law firms.  *See, e.g.*, FAC ¶¶ 3, 28, 48, 50, 80-83.

Defendants also rely (at 28-29) on *Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1055-57 (C.D. Cal. 2016), in which the court found that the bare-bones allegation that the defendants "shared a common fraudulent purpose of fraudulently selling defective vehicles" was unsupported by "any specific facts that move [the] allegations from the realm of the possible to the plausible."  But again, Ford has pleaded such specific facts here, laying out the fraudulent scheme in detail with abundant particularized examples.[7]  *See, e.g.*, FAC ¶¶ 1-2, 5, 26-29, 34-54, 66-75, 82

---

[7] Defendants' other cited cases (at 28-29) are equally distinguishable.  The plaintiff in *In re Jamster Mktg. Litig.*, 2009 WL 1456632, at *5 (S.D. Cal. May 22, 2009) only "allege[d] conduct consistent with ordinary business conduct and an ordinary business purpose" after the court stripped the complaint of its "artful[] … modifiers."  But far from "pleading by adjective," Ford makes particularized allegations sufficient "to distinguish ordinary business conduct from fraudulent conduct."  *Id.*; *see also* FAC ¶¶ 1-2, 5, 26-29, 34-54, 66-75, 82.  Unlike the plaintiffs in *Chagby v. Target Corp.*, 2008 WL 5686105, at *2-3 (C.D. Cal. Oct. 27, 2008), and *Ellis v. J.P. Morgan Chase & Co.*, 950 F. Supp. 2d 1062, 1089 (N.D. Cal. 2013), Ford has pleaded facts plausibly alleging that *all* defendants shared the common purpose of engaging in a fraudulent billing scheme and associated together for that common purpose.  *See* FAC ¶¶ 1-2, 5-8, 26-29, 35-54, 80-81, 90.  In *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., and Prods. Liab. Litig.*, 826 F. Supp. 2d 1180, 1202-03 (2011), the plaintiffs merely alleged that the defendants conducted their primary business activity fraudulently.  But here, Ford has alleged that Defendants engaged in a fraudulent billing scheme under the guise of a legitimate enterprise, which is precisely "the type[] of conduct RICO was enacted to prevent."  *Id.* at 1203.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

If the Court looks to a defective vehicle case in answering the "common purpose" question, the more apt one is *In re Chrysler,* 295 F. Supp. 3d at 980-81. There, the court rejected the same type of "routine commercial relationship" argument that the *Gomez* and *Shaw* defendants raised successfully and that Defendants rely on here. Specifically, the court contrasted *Gomez* and *Shaw* because "the specific factual allegations that were lacking in those cases are present in this one." *Id.* at 981. Like the alleged conduct in *In re Chrysler*, which involved installation of hidden fraudulent devices to cheat emissions tests, Defendants' alleged mass fabrication of fictitious and padded billing records to defraud Ford "plausibly had only a deceitful purpose" and did not occur "by accident or as part of routine business dealings." *Id.*; *see* FAC ¶¶ 1-2, 5, 26-29, 90.

At minimum, as in *Bias*, Defendants' challenge that their "actions were simply 'normal business dealings' without the existence of an enterprise or any common purpose is fact-determinative and cannot be resolved at [the pleadings stage]." *Bias*, 942 F. Supp. 2d at 942.

### 2. Ford adequately alleges an ongoing organization

"An ongoing organization is a vehicle for the commission of two or more predicate crimes." *Odom*, 486 F.3d at 552 (citation modified). The organization may be either formal or informal, and must be separate from the enterprise members and the underlying racketeering acts. *Id.*; *see United States v. Turkette*, 452 U.S. 576, 583 (1981).

In urging (at 30) that Ford does not plead an ongoing organization, Defendants again rely on mischaracterizations of Ford's FAC and factual challenges that are improper at the motion to dismiss stage. Contrary to Defendants' assertion, the FAC alleges much more than that "three law firms occasionally worked together and, from time to time, submitted supposedly inflated fee applications." What Defendants dismiss as "hyperbole" is in reality a collection of plausible, detailed, and disturbing allegations

of an enterprise engaged in massive fraud—allegations that, when accepted as true, fully support RICO liability.

Moreover, Defendants misread both the FAC and the law in contending (at 30) that Ford's new allegations are on information and belief and thus insufficient to state a claim. To begin with, the two paragraphs cited by Defendants (FAC ¶¶ 80, 82) do not support Defendants' claim: paragraph 80 says nothing about information and belief, and paragraph 82 makes clear that Ford's allegations concerning the enterprise's weekly meetings and Mikhov's direction to other enterprise members to pad their bills and inflate their fees are *not* made on information and belief as to the Altman Defendants. Moreover, Defendants' claim (at 30) that allegations made on information and belief "are insufficient to state a claim" is a misstatement of law: in the cases that Defendants cite, the allegations were rejected not simply because they were made on information and belief, but because they were wholly conclusory and lacked any underlying factual assertions, and therefore were ***alone*** insufficient to state a claim. *See Blantz v. Cal Dep't of Corr. & Rehab.*, 727 F.3d 917, 926-27 (9th Cir. 2013); *Masimo Corp. v. Apple Inc.*, 2021 WL 925885, at *8 (C.D. Cal. Jan. 6, 2021). Ford's allegations, in contrast, are supported by detailed facts that provide a plausible basis for any statements made on information and belief, which makes Ford's allegations sufficient. *See Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (explaining that *Twombly* standard "does not prevent a plaintiff from pleading facts alleged upon information and belief where … the belief is based on factual information that makes the inference of culpability plausible"); *see also Tortilla Factory, LLC v. Health-Ade LLC*, 2018 WL 6174708, at *8 (C.D. Cal. July 13, 2018) (general prohibition against alleging fraud based on information and belief has an exception for "matters that are peculiarly within the opposing party's knowledge.").

Nor should the Court give any weight to Defendants' fact-based argument (at 30) that it is "entirely unremarkable that law firms serving as co-counsel may have held weekly meetings to discuss their cases." This argument echoes one that this Court

44

recently rejected in *Blue Cross*, finding that the defendants' characterization of their meetings as "benign" presented "a question of fact not proper for a motion to dismiss." *Blue Cross*, 2025 WL 2004500, at *6. Defendants' characterization (at 31) of the allegations of their intertwined financial arrangements as reflecting only "ordinary business practices" should be rejected for the same reason.[8] And while Defendants (at 31-32) criticize as unsupported Ford's allegation that Becerra created billing records at the direction of the other individual defendants, they are silent about an equally specific and damning allegation: that Becerra oversaw a team of KLG employees whose job was to create fee invoices, including for the Wirtz and Altman Defendants, out of thin air for the specific purpose of deceiving Ford, other auto manufacturers, and the courts. *See* FAC ¶ 28.

Ultimately, Defendants' insistence that the FAC's allegations show that they organized themselves for the purpose of legitimate business activity (litigating Lemon Law Cases and winning fee awards) fails because such a purpose is not mutually exclusive of Defendants also organizing to *achieve* that legitimate purpose through fraudulent means. *See In re Chrysler*, 295 F. Supp. 3d at 980 ("Of course, Defendants also organized themselves for the more general purpose of manufacturing and selling vehicles. But that does not shield them from RICO liability."); *see also Odom*, 486 F.3d at 552 (finding adequate pleading of common purpose to increase the number of people using Microsoft's Internet service through fraudulent means); *In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 601 F. Supp. 3d 625, 741 (C.D. Cal. 2022) ("That a group of entities shares a legitimate business purpose does not shield them from RICO liability when such a purpose is pursued through illegitimate means." (citation

---

[8] Notably, Defendants' discussion of financial intertwinement (at 31) wholly ignores many of the FAC's most stark examples of financial intertwinement, including that the Altman Defendants and Unnamed Enterprise Members shared office space with KLG as lessees and the KLG often advanced funds to other enterprise members. *See* FAC ¶¶ 20, 38, 82-83.

modified)); *id.* at 742 ("Under *Odom*, [] a showing of a legitimate common purpose advanced by illegitimate means satisfies the common purpose requirement of RICO.").[9]

### 3. Ford adequately alleges a continuing unit

Ford has also plausibly alleged that Defendants "function[ed] as a continuing unit," *Turkette*, 452 U.S. at 583, *i.e.*, that their course of conduct had "longevity sufficient to permit these associates to pursue the enterprise's purpose," *Boyle*, 546 U.S. at 946. Citing two words taken wholly out of context from *Odom*, Defendants assert (at 32) that Ford must allege "similar methods" of overbilling to support the continuity requirement. But *Odom* says the exact opposite, specifically, that the "continuity requirement does not, in itself, require that every member be involved in each of the underlying acts of racketeering, or that the predicate acts be interrelated in any way. Instead, the continuity requirement focuses on whether the associates' behavior was ongoing rather than isolated activity." *Odom*, 486 F.3d at 552-53 (citation modified).[10] That there might have been slight differences in what made each member's billing fraudulent is irrelevant. *Odom* makes clear that the continuing unit requirement is a temporal one that is easily met by the allegations in the FAC that the enterprise engaged in fraudulent conduct for more than a decade. FAC ¶ 1; *see Odom*, 486 F.3d at 553

---

[9] Defendants argue (at 31) that "[t]here are no allegations of an agreement among the Defendant law firms to create and maintain an ongoing enterprise." Of course, one would not expect Defendants to draw up a written contract to engage in a criminal enterprise, nor need there be any express oral agreement to do so. For purposes of a RICO conspiracy, "[t]he illegal agreement need not be express as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." *Oki Semiconductor Co. v. Wells Fargo Bank, Nat'l Ass'n*, 298 F.3d 768, 775 (9th Cir. 2002). Moreover, the FAC plainly does include allegations of an agreement. *See, e.g.*, FAC ¶¶ 109-12.

[10] *Odom*'s reference to "similar methods" was in the context of noting the consistency of two different plaintiffs' allegations. *Odom*, 486 F.3d at 553. In no way can it be read as imposing some new requirement for the continuity element, particularly in light of the above-cited holding in the same case.

1    ("An almost two-year time span is far more than adequate to establish that [defendants]

2    functioned as a continuing unit.").

3    Defendants cite (at 33), without analysis, several cases involving unsuccessful

4    RICO complaints against law firms, implying that the RICO statute applies differently

5    when lawyers are involved or that law firms enjoy some special immunity against RICO

6    claims. Not surprisingly, no decision comes remotely close to supporting that

7    proposition, and all are distinguishable from this case.

8    • In *J-M Mfg. Co. v. Simmons Hanly Conroy, LLP*, 2025 WL 843854, at *8

9      (N.D. Ill. Mar. 18, 2025), the court dismissed a RICO claim for lack of

10     distinctiveness because the alleged enterprise involved only the law firm and

11     its employees. Here, Ford has plausibly alleged multiple non-KLG enterprise

12     members.

13    • In *W. Town Bank & Tr. v. Burr Forman*, 2020 WL 6585655, at *5-6 (D.S.C.

14     Nov. 10, 2020), the court dismissed a RICO claim because the alleged

15     predicate acts consisted of statutorily barred securities fraud and conduct that

16     did not constitute racketeering activity, both of which were "wholly unrelated"

17     to plaintiff's case and thus lacked causal connection to plaintiff's injury.

18     Here, Ford plausibly alleges racketeering activity that directly caused it injury.

19    • In *Ravet v. Solomon, Ward, Seidenwurm & Smith, LLP*, 2007 WL 2088381, at

20     *4 (S.D. Cal. July 17, 2007), the court dismissed a RICO claim because,

21     among other reasons, the plaintiff based the claim on "two separate, isolated

22     legal disputes having little relation to each other." Here, Ford alleges a highly

23     specific scheme—fraudulent billing by law firms in Lemon Law cases—that

24     played itself out in a similar manner in thousands of cases.

25    • In *Bey v. Wilson & Assocs., PLLC*, 2016 WL 11478139, at *1, *6 (W.D. Tenn.

26     June 7, 2016), *R&R adopted* 2016 WL 4006118 (W.D. Tenn. July 26, 2016),

27     the court dismissed a "hard to decipher" RICO claim "contain[ing] very few

28     factual allegations" brought by a serial litigant against three law firms because

47

it did not show any "chain of command or other evidence of hierarchy" and instead opted for "conspiracy-style accusations" insufficient to allege an organizational structure that functioned with a common purpose. Here, Ford's allegations detail—with factual support—the enterprise's hierarchy and the coordination among enterprise members.

- In *Beydoun v. Rosenthal*, 2024 WL 4907214, at *3-4 (E.D. Mich. Sept. 30, 2024), not only was the court "left to guess as to what actions amount to fraud" given the plaintiff's conclusory allegations, but the complaint failed on distinctiveness grounds *and* did not even attempt to plead the elements of an enterprise.

    4.    Even without the Altman and Wirtz Defendants, Ford's FAC would not fail for lack of distinctiveness

Although, as shown herein, Ford adequately pleads its RICO claims against the Altman and Wirtz Defendants, Defendants are wrong in claiming (at 33-35) that Ford's FAC fails for lack of distinctiveness if those defendants are dismissed. While Defendants "have not identified a case surviving a motion to dismiss based on anonymous enterprise members vaguely referenced in a complaint" (at 34), Ford has. In *United States v. Mongol Nation*, 693 F. App'x 637, 638 (9th Cir. 2017), the Ninth Circuit reversed a dismissal based on lack of distinctiveness, finding that the enterprise (the Mongols Gang) was comprised of the RICO person (Mongol Nation) and "various associates." Ford's FAC is even clearer than the indictment in *Mongol Nation*, as it identifies specific KLG lawyers, a KLG paralegal, *and* non-KLG lawyers and law firms in addition to the Unnamed Enterprise Members.[11]  And contrary to Defendants'

---

[11] In a throwaway footnote (at 34 n.7), Defendants contend that the allegation that the Unnamed Enterprise Members engaged in litigation against KLG relatively recently (*see* FAC ¶ 30) undercuts any assertion that they were part of the alleged enterprise. Not so.  *See Odom*, 486 F.3d at 553 ("That several employees engaged in the activity at different times does not defeat the continuity requirement."); *United States v. Kragness*, 830 F.2d 842, 856 (8th Cir. 1987) (noting that in an enterprise "old members may leave,

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

assertion (at 34), Ford is not required to plead all elements of its RICO claim against the non-defendant Unnamed Enterprise Members. *Cf. United States v. Feldman*, 853 F.2d 648, 656 (9th Cir. 1988) (finding it "immaterial to the proof of a separate enterprise that only [the defendant] was named as a defendant").

In any event, even if *all* non-KLG enterprise members were dismissed (which would be error as shown herein), the FAC still would not fail for lack of distinctiveness. True, the general rule is that an enterprise cannot consist of a corporation and its subsidiaries, agents, and/or employees. But all that means is ***KLG*** cannot be both a RICO person and the enterprise, so at most ***KLG*** would be dismissed, an outcome that has no bearing on Ford's claims against Mikhov, Kirnos, Becerra, and Morse. *See, e.g., Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 162-63 (2001) (finding president and sole shareholder of closely held corporation to be a RICO person and distinct from the corporation as the RICO enterprise); *Moran v. Bromma*, 675 F. App'x 641, 645 (9th Cir. 2017) ("[A] corporate officer is sufficiently distinct from the corporation for which he works such that a plaintiff can allege the officer as the RICO person and the corporation as the RICO enterprise."); *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1534 (9th Cir. 1992) (similar); *Sussex Fin. Enterprises, Inc. v. Bayerische Hypo-Und Vereinsbank AG*, 2010 WL 94272, at *4 (N.D. Cal. Jan. 6, 2010) ("[A] corporation may serve as a RICO 'enterprise' through which 'persons' violate RICO.").

## B. Ford Has Adequately Alleged a Pattern of Racketeering Activity

Ford's RICO claims are predicated on mail and wire fraud and thus are subject to Rule 9(b), under which Ford must plead with particularity "the false representations' time, place, and specific content." *Blue Cross*, 2025 WL 2004500, at *4 (citing *Odom*, 486 F.3d at 553). Rule 9(b), however, "does not require absolute particularity or a recital of the evidence and therefore the complaint need not allege a precise time frame,

---

and new members may join," but "the personnel of an enterprise may undergo alteration without loss of the enterprise's identity as an enterprise").

describe in detail a single specific transaction, identify the precise method used to carry out the fraud, or identify representative examples of false claims to support every allegation." *Id.* at *6.  Rather, Rule 9(b) is satisfied if the complaint provides "the who, what, when, where, and how" of the overall fraudulent scheme.  *Id.*

*United States ex rel. USN4U, LLC v. Wolf Creek Fed. Servs., Inc.*, 34 F.4th 507, 513-15 (6th Cir. 2022), is instructive.  In *USN4U*, the court reversed dismissal of a *qui tam* action on a number of grounds, including the plaintiff's purported failure to meet Rule 9(b)'s particularity requirement, because the plaintiff "provid[ed] examples of specific fraudulent conduct that [we]re representative samples of the scheme."  *Id.* at 514.  The plaintiff in *USN4U* did this by identifying four falsely inflated work proposals—far less specificity than that found in the FAC.[12]  *Id.*; *see, e.g.*, FAC ¶¶ 67-74; Ex. C.

Defendants argue (at 36)—in a drumbeat heard often throughout all three motions—that allegations related to fraudulent billing directed at other automakers are improper.  Not so.  In *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1004 (7th Cir. 2004), the Seventh Circuit persuasively explained that the pattern of racketeering element of RICO is distinct from the injury element, and that predicate acts directed at other victims are properly considered in determining whether the requisite pattern has been established.  Indeed, as the court explained, "one of the factors tending to show the existence of a pattern of racketeering activity is the presence of multiple victims."  *Id.*  Thus, "a plaintiff need not prove that it suffered injury from each (or more than one) predicate act constituting the pattern" because such a requirement "would conflate what must be two separate inquiries: first, was there a pattern of

---

[12] Notably, the court in *Beydoun* (cited by Defendants at 33), in dismissing the bare-bones complaint in that case for failure to meet the requirements of Rule 9(b), contrasted the complaint with the allegations of fraudulent billing in USN4U, which *did* satisfy Rule 9(b) because they "alleged specific instances with enough detail to show *how* the numbers were inflated."  *Beydoun*, 2004 WL 4907214, at *3 (original emphasis).

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

racketeering activity violating RICO, and second, was the plaintiff injured by the RICO violation?" *Id.* (citations omitted).  In other words, the "pattern" requirement can be met by including predicate acts directed at other victims, and to satisfy the separate "injury" requirement, a plaintiff "need only demonstrate injury to [itself] from **one** predicate act that is related to enough other predicate acts to constitute continuity." *Id.* (emphasis added); *see also, e.g., In re JUUL Labs, Inc., Mktg., Sales Pracs., and Prods. Liab. Litig.*, 533 F. Supp. 3d 858, 871-72 (N.D. Cal. 2021) ("Plaintiffs are not required to show that each RICO defendant … *personally* committed at least two acts of mail or wire fraud to establish a pattern of racketeering. ... [I]t is only necessary that plaintiffs allege that each defendant knowingly participated in the scheme to defraud, with the requisite intent, and that some member or members of the Enterprise commit at least two acts of mail or wire fraud") (original emphasis); *Just Film, Inc. v. Merchant Svcs., Inc.*, 2012 WL 6087210, at *12 ("[Plaintiffs] are not required to show that each individual predicate act caused them an injury, but rather that the pattern of racketeering activity did").[13]

By focusing their "pattern" argument (at 35-43) nearly exclusively on claim and issue preclusion, Defendants effectively concede that Ford's allegations that their alleged acts constitute a pattern of racketeering activity are sufficient.  Citing to Exhibit C of the FAC, Defendants argue (at 36) that Ford alleged fee award payments that it mailed but did not also allege that these payments were based on fee petitions that contained inflated billing entries.[14]  Not so.  The payments referenced in Exhibit C all

---

[13] Moreover, even if fraud directed at other auto manufacturers could not serve as predicate acts constituting a pattern, those acts are nevertheless relevant as further facial evidence that Defendants engaged in fabrication of time records and fraudulent billing, and it is a reasonable inference that if they engaged in those practices against other auto manufacturers, they also did so against Ford.  *See* FAC ¶ 45 n.3.

[14] Defendants also contend (at 36) that the allegations in paragraphs 35-54 and Exhibits A-B do not satisfy Rule 9(b).  But these allegations and exhibits are an overview to establish the existence and common purpose of the fraudulent billing enterprise; the actual alleged predicate acts of mail and wire fraud alleged are set forth in Exhibit C.

pertain to cases that were being actively litigated before KLG began recording time contemporaneously, so any fee petition corresponding to those payments would by definition be fraudulent. *See* FAC ¶ 90. And as detailed below, neither claim preclusion nor issue preclusion provides a basis for dismissing Ford's RICO claims. Certainly, no bar appears on the face of the complaint. *See ASARCO*, 765 F.3d at 1004 (dismissal on the basis of an affirmative defense such as preclusion is proper only if the defendant shows some obvious bar to securing relief on the face of the complaint), [15]

### 1.    Claim preclusion does not bar Ford's RICO claims

Claim preclusion, or res judicata, bars only "relitigation of the same cause of action in a second suit between the same parties or parties in privity with them." *Mycogen Corp. v. Monsanto Co.*, 28 Cal. 4th 888, 896 (2002). The term "cause of action," when used in the claim preclusion context, refers to "the right to obtain redress for a harm suffered, regardless of the specific remedy sought or the legal theory (common law or statutory) advanced." *Boeken v. Philip Morris USA, Inc.*, 48 Cal. 4th 788, 798 (2010). (emphasis added). The purpose of the claim preclusion doctrine is to

---

Defendants provide no authority suggesting, for example, that Rule 9(b) requires Ford to identify in its pleading, for example, every matter to which Morse billed time in her Herculean 57.5-hour day (FAC ¶ 36) or every one of Mikhov's 84 separate entries in 59 separate cases comprising his 18.1-hour day (*id.* ¶ 53). Rule 9(b) does not require that a complaint be filed in volumes.

[15] Defendants make passing references in their Motion (at 17, 37 & n.9) to certain fee applications falling outside the four-year statute of limitations. Defendants present no argument or analysis whatsoever explaining why this is so, when the fraud claims accrued as to the evidence submitted in support of those applications, how the discovery rule applies, etc. Indeed, while Defendants' initial motion included an entire section arguing that Ford's claims were barred by the statute of limitations (Dkt. 65-1 at 51-54), Defendants elected to omit that section entirely from their current Motion. Defendants' throwaway and unelaborated references to the statute of limitations should be disregarded. *See Garon v. Keleops USA, Inc*., 2025 WL 2522374, at *1 n.3 (N.D. Cal. Sept. 2, 2025) (declining to address on motion to dismiss "throwaway arguments and bare assertions made only in passing"). Nor should Defendants be permitted to expand on this waived argument in their reply. *See Newpoint Fin. Corp.*, 680 F. Supp. 3d at 1163.

"promote[] judicial economy and avoid[] piecemeal litigation by preventing a *plaintiff* from splitting a single cause of action or relitigating the same cause of action on a different legal theory or for different relief." *Parkford Owners for a Better Community v. Windeshausen*, 81 Cal. App. 5th 216, 225 (2022) (emphasis added, citation modified).

The parties agree that California courts follow the primary rights theory, under which a cause of action "is comprised of a primary right *of the plaintiff*, a corresponding primary duty of the defendant, and a wrongful act by the defendant constituting a breach of that duty." *Crowley v. Katleman*, 8 Cal. 4th 666, 681 (1994) (emphasis added). The primary rights theory "has a fairly narrow field of application" traditionally reserved for preventing claim-splitting, *id.*, and thus is "invoked when *a plaintiff* attempts to divide a primary right and enforce it in two suits," *Mycogen Corp.*, 28 Cal. 4th at 904 (emphasis added, citation modified); *see Gonzales v. Cal. Dep't of Corrs.*, 739 F.3d 1226, 1233 (9th Cir. 2014) (quoting *Boeken*, 48 Cal. 4th at 798) (a primary rights analysis applies when "two actions involving the same parties seek compensation for the same harm").

Defendants cite no case—and Ford is aware of none—in which claim preclusion has been applied in a circumstance like this one, where the *plaintiff* in the second action was the *defendant* in the first. And for good reason: any such application would conflict with the core purpose of the doctrine, to prevent claim-splitting.

The primary right at issue in the underlying Lemon Law cases was the individual consumer *plaintiffs'* right not to receive a defective vehicle. Defendants' framing (at 39) of the primary right at issue for Ford in the present action—"the right to be free from paying inflated attorneys' fees"—is unquestionably a *different* primary right, asserted by Ford in support of a cause of action for an affirmative monetary recovery never previously sought. Even if Defendants were to define the first "action" as the fee application hearing rather than the Lemon Law litigation itself, claim preclusion would still fail because Ford was still the *defendant* in that proceeding and thus definitionally had no "claim." Concerns with avoiding claim-splitting plainly do not apply when the party against whom claim preclusion is invoked had no prior claims, and Defendants'

argument, if accepted, would be an unprecedented inversion of the primary rights theory.

*Franco v. Marin Cnty.*, 579 F. Supp. 1032, 1034 (N.D. Cal. 1984), *aff'd sub nom. Franco v. State of Cal.*, 762 F.2d 1017 (9th Cir. 1985), demonstrates the flaw in Defendants' argument. In *Franco*, the court faced a claim preclusion argument under similar circumstances to those present here: a lawsuit brought by the original defendant (here, Ford) against the original plaintiff (here, Defendants who were never plaintiffs but claim to have been in privity with the original plaintiffs). Even though the later plaintiff's action "appear[ed] to present a claim based on an alleged injury to the same property interest which was the subject of the prior state court litigation," the court found California claim preclusion law "not precisely on point … because the present plaintiff was the *defendant* in the earlier action, and because the plaintiff's complaint alleges that her injury was caused by the very judicial actions which formed the substance of the state court proceedings now invoked as a bar." *Id.* (original emphasis).[16]

Defendants' own cited cases (at 38) confirm that claim preclusion has no application here. In *Eichman v. Fotomat Corp.*, 147 Cal. App. 3d 1170, 1175 (1983), the court explained that "a cause of action is based upon the nature of a plaintiff's injury" as asserted successively in prior and later litigation. Ford was not the plaintiff in

---

[16] *Franco* is not the only case that has evaluated the contours of claim preclusion in situations like this one. While unpublished, *Le v. Hiep Pham*, 2020 WL 3888089, at *12 (Cal. Ct. App. July 10, 2020), is illustrative. *Le* involved two lawsuits between the same parties arising out of a real estate dispute. The defendant filed a cross-complaint in the second action but not the first, and in response the plaintiff contended that claim preclusion barred the defendant's cross-complaint in the second action. *Id.* The court found it "difficult to understand how claim preclusion could apply in this instance," noting that "*claim preclusion* prevents relitigation of the same cause of action in the second suit between the same parties" and that the defendant in the second action "did not assert *any* claims in the first action." *Id.* (original emphases, citation modified). Accordingly, the court ruled that the claim preclusion was "inapplicable" to the defendant's cross-complaint. *Id.*

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

the Lemon Law cases, so there could be no *facts* from which its primary right could have arisen. Similarly, in *Kougasian v. TMSL, Inc.*, 208 F. App'x 561, 563 (9th Cir. 2006), the court noted the claim-splitting focus of the primary rights doctrine, under which "a plaintiff may only litigate an injury once and must bring all legal claims arising out of that injury in the same suit." Again, Ford was not plaintiff in the underlying suit and had no legal claims to bring. And in *Slater v. Blackwood*, 15 Cal. 3d 791, 795 (1975), the court pointed out that "a judgment for the *defendant* is a bar to a subsequent action by *the plaintiff* based on the same injury to the same right, even though he presents a different legal ground for relief" (emphases added, citation modified). Here, Defendants claim that they were in privity with the *plaintiffs* who received favorable judgments in the underlying Lemon Law actions. But Ford—*as a defendant*—claimed no "injury" and presented no "legal ground for relief" in those actions; indeed, Ford did not suffer an injury—and thus no cause of action accrued—until Defendants succeeded in obtaining fraudulently induced fee awards after trial or settlement. The fact that Ford raised certain *arguments* in opposing Defendants' fee petitions does not affect the primary rights at issue and does not invoke claim preclusion, and no case that Defendants cite—or of which Ford is aware—suggests otherwise.

Because Defendants cannot meet the first element of claim preclusion, the affirmative defense fails.

### 2.    Issue preclusion does not bar Ford's RICO claims

Issue preclusion, or collateral estoppel, does not bar Ford's RICO claims on the face of the complaint for two reasons: (1) Defendants do not satisfy the doctrine's elements; and (2) even if they did, policy concerns weigh against applying issue preclusion under these circumstances.

Issue preclusion "applies only (1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party." *Rodriguez v.*

*Lawrence Equipment, Inc.*, 106 Cal. App. 5th 645, 655 (2024).  As detailed below, Defendants cannot meet their burden on the "identical issue" element.

"The identical issue requirement addresses whether *identical factual allegations* are at stake in the two proceedings, not whether the ultimate issues or dispositions are the same." *Williams v. Doctors Med. Ctr. of Modesto, Inc.*, 100 Cal. App. 5th 1117, 1132 (2024) (emphasis added).  "[T]he term 'issue' as used in this connection is difficult to define, and the pleadings and proof in each case must be carefully scrutinized to determine whether a particular issue was raised even though some legal theory, argument or 'matter' relating to the issue was not expressly mentioned or asserted." *Textron, Inc. v. Travelers Cas. & Surety Co.*, 45 Cal. App. 5th 733, 747 (2020) (internal quotations and citation omitted).  Put another way, for a defendant to satisfy the identical issue requirement, "the factual predicate of the legal issue decided in the prior case must be sufficient to frame the identical legal issue in the current case." *Id.*  Courts consider several factors in determining whether the issue decided in the prior action is identical to the issue being challenged:

> Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first?  Does the new evidence or argument involve application of the same rule of law as that involved in the prior proceeding?  Could pretrial preparation and discovery relating to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second?  How closely related are the claims involved in the two proceedings?

*Burdette v. Carrier Corp.*, 158 Cal. App. 4th 1668, 1689 (2008) (citation omitted).

Here, none of these factors weigh in favor of preclusion.  As the excerpts quoted in Defendants' Motion demonstrate, the fee hearings in the underlying Lemon Law cases focused mostly on the *reasonableness* of hours allegedly worked and nominally "billed."  The Motion (at 38-39) outlines Ford's arguments in the underlying litigations of "excessive," "inflated," and "inefficient" billing that, in the respective court's

discretion, should not have been rewarded.  At one point Ford speculated that claimed hours were so high as to be "probably impossible"—but Ford did not, and at that time could not, responsibly argue that the claimed hours *were* impossible.  It was only through the investigation outlined in Ford's complaint in this action that the truth, and the concealment amounting to docket-wide fraud, came to light.  Those arguments, central to the FAC here, thus were not decided previously.  *See* Dkt. 89-3 to 89-14.

Nor does this case involve the same rule of law as the prior proceedings:  whereas the rule of law at issue in the Lemon Law cases focused on the reasonableness of Defendants' claimed fees, this RICO case involves claims of systematic and widespread fraud.  *Id*.  Further, the prior proceedings were individual post-judgment fee petitions; Defendants' overarching billing practices (including their fabrication of time records years after the fact) were not and could not have been decided by the trial courts in those individual cases.  Ford certainly never had an opportunity to conduct discovery on that issue, even if it had had reason to.  Each of the underlying proceedings dealt with the reasonableness of fees in a single isolated Lemon Law case, while this proceeding concerns systematic and widespread fraud spread across hundreds if not thousands of cases.  Thus, "both the underlying facts and the applicable substantive law are different in this case from that before the [Lemon Law courts]."  *United States Golf Assn. v. Arroyo Software Corp.*, 69 Cal. App. 4th 607, 616 (1999).

Nor do Defendants acknowledge that "[c]ollateral estoppel does not apply where there are changed conditions or new facts which did not exist at the time of the prior judgment."  *Id.*; *see Evans v. Celotex Corp.*, 194 Cal. App. 3d 741, 748 (1987) ("[C]ollateral estoppel was never intended to operate so as to prevent a re-examination of the same question between the same parties where, in the interval between the first and second actions, the facts have materially changed or new facts have occurred which may have altered the legal rights or relations of the litigants." (internal quotations and citation omitted)).  Here, the face of the FAC makes clear that such new facts have emerged since the underlying fee petitions as to which Defendants claim issue

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

preclusion were litigated.  One such key fact is KLG's admission that, contrary to Mikhov's and Kirnos's sworn declarations, KLG did not record time contemporaneously and as a result needed to make up time from scratch in hundreds of cases, some of which had been closed for years.  *See, e.g.* FAC ¶¶ 1-2, 4, 26-29; 66-75 Exs. F-J.  Another is Amy Morse's sworn deposition testimony that she did not perform tasks that KLG nonetheless included in its fee petitions.  *See* FAC ¶ 5.  In addition, Ford learned only through its comprehensive synthesis and review of thousands of time entries from hundreds of time sheets across scores of different cases billing invoices and time records that lawyers from KLG and other enterprise members had, for example, billed more than 24 hours in a day on numerous occasions, spreading their fraudulent billings against many cases specifically to avoid detection.  *See id.* ¶¶ 4-7, 34-54.  None of these facts were available to Ford at the time it challenged the reasonableness of fees sought in individual applications.  *Id.* ¶¶ 3-4, 24, 34.

Finally, even if Defendants could satisfy the elements of issue preclusion (they cannot), there are sound policy reasons to decline to apply the doctrine in this case. Issue preclusion "is not an inflexible, universally applicable principle.  Rather, policy considerations may limit its use where the limitation on relitigation underpinnings of the doctrine are outweighed by other factors."  *Kelly v. TransGlobe Travel Bureau, Inc.*, 60 Cal. App. 3d 195, 202 (1976); *accord Union Pac. R.R. Co. v. Santa Fe Pac. Pipelines, Inc.*, 231 Cal. App. 4th 134, 186 (2014).  Such factors include preserving the integrity of the judicial system, promoting judicial economy, and protecting litigants from harassment by vexatious litigation.  *Lucido v. Superior Court*, 51 Cal.3d 335, 342-43 (1990) (explaining that "[e]ven assuming all the threshold requirements [of collateral estoppel] are satisfied," courts should "look[] to the public policies underlying the doctrine before concluding that collateral estoppel should be applied in a particular setting").

The California Supreme Court has recognized that the consequences of errors in an original adjudication may "transcend those which would apply to mere private

parties," in which cases issue preclusion should not bar relitigation. *City of Sacramento v. State of California*, 50 Cal. 3d 51, 64-65 (1990); *accord Kopp v. Fair Pol. Practices Com.*, 11 Cal. 4th 607, 622 (1995). "Where there is doubt about the application of issue preclusion, it should not apply." *Union Pac. R.R. Co.*, 231 Cal. App. 4th at 186.

Here, the integrity of the judicial system would be gravely ***harmed*** were the Court to agree with Defendants because that judicial system would lose the "ability to cleanse itself of fraud." *In re Roussos*, 2016 WL 5349717, at *14 (Bankr. C.D. Cal. Sept. 22, 2016). Defendants' fraudulent practices should not be insulated from review in the context of this RICO action, where the never previously litigated claim concerns a fraudulent scheme operated across multiple firms in hundreds or thousands of cases. The consequences of allowing such behavior to go unchecked implicate the transcendent interests of consumers, courts, and litigants throughout the state. Nor does applying issue preclusion provide any judicial economy benefit for the simple reason that Ford was never a plaintiff in the underlying Lemon Law cases and thus never had the opportunity to challenge Defendants' conduct as actionable fraud, precluding any risk of repetitive litigation. And applying issue preclusion cannot help protect Defendants from harassment by vexatious litigation because this is Ford's first action and it is not meritless. *See Fleury v. Richemont N. Am., Inc.*, 2010 WL 2671982, at *5 (N.D. Cal. July 2, 2010) (vexatious litigant "is one who abuses the judicial process by filing meritless and repetitive lawsuits"); *see also* Cal. Civ. Proc. Code § 391(b) (defining vexatious litigant).

For all of these reasons, Defendants have failed to establish the affirmative defense of issue preclusion as a matter of law.

### C. Ford Has Adequately Alleged That Defendants Conducted or Participated in the Conduct of the Enterprise's Affairs

Ford sufficiently alleges that the Defendants each participated, directly or indirectly, in the conduct of the alleged enterprise's affairs. "The word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for

59

the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (original emphasis). To meet its burden, Ford need only "plausibly allege that each [Defendant] acted, directly or indirectly" in the conduct of the enterprise—not that each participated in each predicate act. *See In re JUUL Labs, Inc., Mktg., Sales Pracs., and Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 594 (N.D. Cal. 2020).

Defendants argue (at 44) that Ford has not alleged facts supporting that any defendant participated in the operation or management of the enterprise's affairs, and characterize the FAC's allegation of such participation in paragraph 85 as "conclusory." But Defendants, in homing in on one allegation serving to summarize what has come before, ignores the preceding 84 paragraphs that provide the very supporting facts that Defendants claim are missing. Specific allegations as to each defendant are discussed in detail in the Section III *infra*, but it is worth noting here as a general matter that Defendants' challenges to the "factual support" for Ford's allegations—here and throughout its Motion—are woefully misguided. Defendants argue (at 44), for example, that the allegation that Becerra created inflated billing entries at the direction of other defendants and that Morse delegated assignments at weekly meetings with other defendants are "conclusory allegations devoid of factual support." But those allegations *are* part of the factual support for the allegations of Becerra's and Morse's roles in the enterprise. This is not a trial at which Ford must prove its allegations by a preponderance of the evidence (or any other standard): it is a motion to dismiss at the pleading stage, and the FAC's non-conclusory factual allegations—allegations such as Becerra overseeing a team tasked with creating fictitious billing entries and Morse directing other enterprise members in connection with the cases that served as the enterprise's vehicle for fraud—must be accepted as true and construed in the light most favorable to Ford. *Blue Cross*, 2025 WL 2004500, at *4.

Defendants' attempt (at 45) to again discredit the allegations in the FAC made on information and belief—and to demand that Ford have detailed knowledge at this stage of internal meetings and discussions between enterprise members—is meritless. Ford alleges the facts it needs to at this stage, and allegations on information and belief are fully appropriate as to "matters that are peculiarly within the opposing party's knowledge." *Tortilla Factory*, 2018 WL 6174708, at \*8; *see Immobiliare*, 424 F. Supp. 3d at 890 (Rule 9(b) may be relaxed with respect to facts of which plaintiff cannot be expected to have personal knowledge). [17] Ford is also entitled to plead allegations on information and belief where, as in the case of the massive fraud at issue here, "the belief is based on factual information that makes the inference of culpability plausible." *Soo Park*, 851 F.3d at 928.

As discussed in Section II.A.2, *supra*, Defendants' attempt (at 45) to characterize their activities as "ordinary business conduct" and "a standard legal relationship" must be rejected at this stage, where all inferences are to be drawn in Ford's favor. In any event, Defendants cannot seriously contend that allegations that KLG and the other Defendants "work in tandem to misrepresent the tasks completed and the amount of time spent on cases, and regularly split the proceeds unlawfully obtained through that process based on false and fraudulent billing records" and that Mikhov instructed lawyers at other firms to "pad their bills and inflate their fees" reflect a "standard legal relationship," FAC ¶ 11, 19, 82. Nor are the allegations in this case remotely comparable to those in *Slack v. Int'l Union of Operating Eng'rs*, 2014 WL 4090383, at \*21-22 (N.D. Cal. Aug. 19, 2014), which involved one generalized allegation—

---

[17] For example, Defendants argue (at 45) that Ford fails to plead Morse's direction of the enterprise because the FAC does not allege what assignments she delegated or to whom. Not only can Ford not be expected to know precisely what went on inside KLG's conference room during those weekly meetings, but that allegation in paragraph 82 of the FAC must be read in conjunction with the following paragraph and other paragraphs of the complaint, which allege how the enterprise members were financially intertwined and worked together to purposefully overstaff cases, misrepresent the work performed, and split the unlawfully obtained proceeds. *See, e.g.*, FAC ¶¶ 19, 83.

"unadorned by any factual support"—that extortion occurred "at the direction of" particular defendants in a situation where the facts the plaintiff did allege (and had first-hand knowledge of) were, on their face, not extortionate.  2014 WL 4090383, at *21-22.

For these reasons, Defendants' attempt (at 46) to analogize the FAC to the allegations in various inapposite cases fails.  *In re Countrywide*, 2012 WL 10731957, at *10-11, as previously discussed, involved alleged enterprise members who were "in sharp competition with each other" and in some cases were "victims" of the alleged scheme.  That is not the case here, where the allegations plainly demonstrate clear alignments of interests and coordinated fulfillment of the enterprise's fraudulent objectives.  *See, e.g.*, FAC ¶¶ 28-31, 81-83.  Similarly, in *Comm. to Protect our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1175 (E.D. Cal. 2017), plaintiffs attempted to bring RICO claims alleging underground water contamination against state officials and various competing oil companies and trade associations but "fail[ed] to allege facts indicating that all the named defendants acted with the same purpose in mind" and instead ""allege[d] only a series of disconnected incidents, each involving a subset of the overall group of defendants, with no clear indication of a unified agenda."  *See also United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013) (dismissing RICO action against pharmacy and drug manufacturer, finding that "the activities the complaint describes are entirely consistent with Walgreens and Par each going about its own business, with Par manufacturing generic drugs and marketing its products to pharmacies, and Walgreens purchasing drugs and filling prescriptions.").  That is far from the case here, where the FAC plausibly describes a group of law firms and individuals working cooperatively in tandem toward a mutually beneficial, profitable, and fraudulent goal.  *See, e.g.*, FAC ¶¶ 3, 11, 19, 24, 28-29, 50, 80-83.

Finally, while Defendants attempt to draw what they view as a "stark contrast" between the FAC and *Blue Cross*, that contrast is illusory.  Just as the plaintiffs in *Blue Cross* were able to allege that certain defendants "improperly led aspects of the scheme,

including finding potential targets, sending them to [another enterprise member], working with [that enterprise member] to falsify insurance applications," 2025 WL 2004500, at *11, Ford amply "identif[ies] each defendant's role in the alleged scheme," *id*. at *4, and their participation with one another in directing the affairs of the enterprise. *See, e.g.*, FAC ¶¶ 11, 20, 82 (Mikhov and KLG instructing Altman, ALG, and other defendants and enterprise members to pad bills or submit fraudulent time sheets), 28-29 (KLG team led by Becerra creating fraudulent billing records at direction of Mikhov, Kirnos, Morse, Altman, and Wirtz), 70-75 (money fraudulently obtained through false declarations submitted by Mikhov, Kirnos, Altman, and Wirtz). To the extent (if any) that additional information about the enterprise's inner workings is missing, Ford cannot be expected to know at this stage every detail of the direction of the enterprise taking place behind the closed doors of KLG's Los Angeles office. *See Immobiliare*, 424 F. Supp. 3d at 890 ("In such situations, plaintiffs cannot be expected to have personal knowledge of the relevant facts.").

### D.    Ford Has Adequately Alleged a RICO Conspiracy

Defendants' challenge to Ford's RICO conspiracy claim based on Ford's alleged failure to plead the underlying substantive RICO claim fails for the reasons detailed above. *See Blue Cross*, 2025 WL 2004500, at *9 ("Because the Court does not dismiss the RICO claim as noted above, the Court does not dismiss the conspiracy claim.").

Defendants additionally contend (at 57) that Ford's conspiracy claim fails to satisfy Rule 9(b) because it lacks particularized allegations of an agreement or an injury caused by an unlawful overt act. Ford's narrow focus on the elemental allegation that "each Defendant knew about and agreed to facilitate the Enterprise's scheme," FAC ¶ 112, again ignores the 111 paragraphs that preceded it. "The illegal agreement" required for conspiracy under RICO "need not be express, as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." *Oki*, 298 F.3d at 775. The agreement need not even be to engage in a substantive violation of RICO; it is sufficient if "the defendants agreed to commit, or

63

participated in, a violation of two predicate offenses." *Howard v. America Online, Inc.*, 208 F.3d 741, 751 (9th Cir. 2000).  Moreover, each defendant need not have personally committed a predicate act, or even an overt act in furtherance of the conspiracy; all that is required is that they be "aware of the essential nature and scope of the enterprise and intend[] to participate in it." *Tatung Co., Ltd. v. Hsu*, 2015 WL 11072178, at *25 (C.D. Cal. Apr. 23, 2015).

In *In re ZF-TRW* (cited by Defendants), an MDL involving a number of auto manufacturers and parts suppliers, the court dismissed the RICO conspiracy claim against some but not all defendants.  601 F. Supp. 3d at 758-59.  As to the dismissed defendants, the court found that the complaint "[did] not sufficiently identify those defendants who allegedly entered into an agreement whose purpose was to pursue unlawful ends, or intended to participate in the alleged RICO enterprises," but rather merely "group[ed] Defendants by vehicle manufacturer." *Id*.  As to the non-dismissed defendants, however, the court found sufficient the allegations that "there was agreement, coordination and interdependence among [them]," that they "agreed to conduct and participate, directly and indirectly, in the affairs of the [] Enterprise through a pattern of racketeering activity," that they did knowingly conduct or participate in those affairs through a pattern of racketeering activity, that they shared information among themselves, and that they depended on each others' concealment of the object of the conspiracy. *Id.* at 759.  The court further noted that the complaint alleged that each of the non-dismissed defendants committed at least one predicate act of racketeering activity, from which the court found "it can be inferred that they were aware of the essential nature and scope of the enterprise and intended to participate in it." *Id.* at 759-60 (citation omitted).

Here, as with the non-dismissed defendants in *In re ZF-TRW*, the Defendants' illegal agreement "can be inferred from the words, actions, or interdependence of activities and persons involved."  601 F. Supp. 3d at 760 (quoting *Oki*, 298 F.3d at 775). And as with the non-dismissed defendants in *In re ZF-TRW*, the FAC plausibly alleges

that each defendant committed at least one predicate act of racketeering activity.  In short, the FAC much more closely resembles the *In re ZF-TRW* complaint as to the non-dismissed defendants in that case than it does as to the dismissed defendants, and the same allegations of agreement and coordination discussed herein that support the common purpose and participation elements of the substantive RICO claim against all Defendants more than satisfy the pleading requirements for the conspiracy claim.  *See, e.g.*, FAC ¶¶ 19, 80-83.

## III.   FORD ADEQUATELY ALLEGES A RICO CLAIM AGAINST ALL DEFENDANTS

Defendants incorrectly state (at 47) that because Ford often groups Defendants together, the FAC constitutes impermissible group pleading that fails as a matter of law. In the Ninth Circuit, however, "[t]here is no flaw in a pleading where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *Silingo*, 904 F.3d at 677.  In a case like this one, which contains elements of "a wheel conspiracy, [] any parallel actions of the 'spokes' can be addressed by collective allegations." *Id*. at 678.  And as previously discussed, Defendants' reliance (at 47-48) on *Tortilla Factory*, 2018 WL 6174708, at *8 for the categorical proposition that "[a]llegations made upon information and belief are insufficient to meet Rule 9(b)'s heightened pleading standard" is flawed; as *Tortilla Factory* itself recognizes, this rule does not apply to "matters"—like the specific inner workings of the alleged enterprise— "that are peculiarly within the opposing party's knowledge." *Id.*; *see also Immobiliare*, 424 F. Supp. 3d at 890 ("Rule 9(b) may be relaxed with respect to matters within the opposing party's knowledge.  In such situations, plaintiffs cannot be expected to have personal knowledge of the relevant facts.").

As detailed below, Ford plausibly pleads its RICO claims against each Defendant.[18]

***Mikhov.*** Defendants contend (at 50-51) that Ford fails to state a claim against Mikhov because it does not allege Mikhov "associated together with other members of the alleged enterprise for a common purpose in furtherance of an ongoing organization," and that Ford's allegations of associating and splitting fee awards with non-KLG attorneys are insufficient because they "are conclusory," insufficient to the extent they are "upon information and belief," and reflect "routine commercial relationships" rather than a RICO enterprise. Defendants are wrong.

Ford sufficiently alleges that Mikhov associates with—and in indeed, leads and oversees—the other members of the enterprise for the common purpose of carrying out a highly lucrative fraudulent billing scheme. *See, e.g.*, FAC ¶¶ 11, 80, 82. As ringleader of the enterprise, Mikhov "routinely associates with other lawyers" whom he causes and instructs to "overbill and create false billing records." FAC ¶ 11; *see In re Chrysler*, 295 F. Supp. 3d at 982 (finding enterprise allegations sufficient where plaintiffs "identif[ied] specific roles for each Defendant within the scheme, alleging that the FCA Defendants oversaw the scheme under the guidance of" the CEO). Far from "routine commercial relationships," Mikhov and KLG's alleged business plan in working with other firms is to maximize the returns on their collective fraud by "work[ing] in tandem to misrepresent the tasks completed and the amount of time spent on cases, and regularly split[ting] the proceeds unlawfully obtained through that process based on false and fraudulent billing records." FAC ¶ 19. Moreover, Mikhov brings those outside lawyers into the criminal enterprise "by causing them to overbill and create false billing records for the enterprise's financial benefit."[19] *Id.* ¶ 11.

---

[18] Section III of the KLG Defendants' Motion (at 47-57) addresses only the individual KLG defendants and raises no argument as to the allegations against KLG itself. Accordingly, as to KLG, Ford incorporates all of its generally applicable RICO arguments set forth in Section II, *supra*.

[19] The enterprise members further rely on trial lawyers such as the Altman Defendants

Even more specifically, Ford alleges that Mikhov himself directed the creation of false billing records by KLG staff and associated attorneys (some of whom worked out of the same office space), FAC ¶¶ 11, 20, 29, 82, represented the truth of those records in declarations to courts, *id.* ¶¶ 60, 71-72, 91, and himself submitted hundreds of suspect time entries reflecting his own purported work, *id.* ¶¶ 51-54, 70, 74. As alleged, these records were directed to be sent to courts and Ford—on countless occasions—for the purposes of inducing Ford to transmit fees not due to Defendants. *See, e.g.*, FAC ¶¶ 6, 35, 43, 45, 66-75.

The same allegations sufficiently allege that Mikhov played "*some* part in directing the enterprise's affairs." *Reves*, 507 U.S. at 179 (original emphasis). Here again, Defendants' challenges to the "factual support" for Ford's allegations of Mikhov's role—for Mikhov and for other defendants—are simply untenable. Defendants argue (at 51), for example, that the allegation that Mikhov is "the ringleader of Defendants' criminal enterprise" FAC ¶¶ 4, 11) is unsupported by any alleged facts. Bizarrely, Defendants go on in the very next sentence to cite some of the many specific factual allegations in the FAC that support that statement, including that Mikhov "instructed other members of the enterprise, including Altman and ALG, to pad their bills and inflate their fees" (FAC ¶ 11) and that the Unnamed Enterprise Members "submitted fabricated or artificially inflated timesheets at the direction of Mikhov" (FAC ¶¶ 20, 82)—only to then argue that *those* allegations do not have factual support. But those statements *are* the factual support for the allegations of Mikhov's role in the enterprise. Contrary to Defendants' apparent belief, pleading—even of RICO claims— is not an endless funhouse mirror where each statement must have factual support, and that factual support must have factual support, and *that* factual support must have

---

and the Wirtz Defendants to successfully try their cases—a prerequisite to being able to submit fraudulent fee invoices—and then rely on those successes to bring in more business and cloak their fraud in a false sheen of legitimacy. *See* FAC ¶¶ 11, 19, 60.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

factual support, *ad infinitum*.  To be sure, no case cited by Defendants remotely supports such a proposition.

Ford also sufficiently alleges that Mikhov "participated in a pattern of racketeering activity." MTD at 51-52.  Defendants nitpick at allegations related to Mikhov's numerous improper billing entries, while ignoring the highly improper nature of those entries when examined together, FAC ¶¶ 51-54,[20] and that all of the indisputably fraudulent entries created by KLG, including but not limited to his own, were created on his watch and at his direction, *id.* ¶¶ 20, 29.

Defendants claim (at 51-52) that Ford fails to plausibly allege it suffered injury from Mikhov's fraudulent billing entries because those entries are not explicitly "link[ed]" to allegations of specific fee petitions or payments by Ford.  Ford, however, is "not required to show that each individual predicate act caused [it] an injury, but rather that the pattern of racketeering activity did." *Just Film, Inc v. Merchant Svcs., Inc.*, 2012 WL 6087210, at *12 (N.D. Cal. Dec. 6, 2012).  Defendants rely on *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006), but ignore that courts regularly cabin *Anza*'s insistence on a strict proximate cause showing to its peculiar fact pattern (plaintiff's competitor unlawfully committing tax fraud upon the government, which also allowed it to lure away plaintiff's customers), in which the Supreme Court held the proximate cause requirement had "particular resonance" because it "involve[d] economic competitors" and "layering of intervening independent factors that could have

_____

[20] Defendants attempt (at 52) to support their contention that Mikhov's suspicious time entries are proper under California law with citations to *Weber v. Langholz*, 39 Cal. App. 4th 1578 (1995) and *Raining Data v. Barrenechea*, 175 Cal. App. 4th 1363 (2009).  *Weber*, an appeal from a grant of summary judgment, merely found that the absence of substantiation of hours was not objectionable enough to "reweigh the evidence" considered by the trial court, in part because the attorney's declaration was made "under penalty of perjury." *Webe*r, 39 Cal. App. 4th at 1587.  But here, Ford has alleged that Mikhov routinely submits false declarations under penalty of perjury, and Ford is entitled to all favorable inferences therefrom.  *See* FAC ¶¶ 71-74.  *Barrenechea* is similarly inapposite because the plaintiffs "did not offer any evidence to challenge any statement in [] counsel's declarations." *Barrenechea*, 175 Cal. App. 4th at 1375.

68

caused [the] injury." *In re Chrysler*, 295 F. Supp. 3d at 966-67 (*quoting Anza*, 547 U.S. at 460). *Anza* has been further clarified as applying only to bar claims "where the RICO conduct alleged most directly impacted the government." *In re JUUL Labs*, 497 F. Supp. 3d at 618. Putting Defendants' misleading citation aside, "proximate cause is a flexible concept that does not lend itself to a black-letter rule that will dictate the result in every case," and courts find a RICO plaintiff's harm to be "the direct result of the defendants' fraud [where] [i]t was a foreseeable and natural consequence of the defendants' scheme." *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1250 (9th Cir. 2019) (citation modified).

Finally, Defendants claim (at 52) that Ford alleges Mikhov submitted sworn declarations in support of false fee applications but not that he knew they contained any false billing entries. This rather desperate argument is easily dispensed with, as the FAC clearly alleges that Mikhov—the founder and managing partner of KLG, who would unquestionably have known whether KLG attorneys, ***including himself***, contemporaneously recorded their time—repeatedly "falsely attested, under oath" that KLG's time entries "were completed contemporaneously with each dated entry or near in time to the work performed" when in fact the entries predated the time when KLG claims to have begun keeping contemporaneous time records. *See, e.g.*, FAC ¶¶ 1, 11, 26, 71-74. The FAC further alleges that Mikhov specifically instructed other members of the enterprise to pad their bills and inflate their fees. *See id.* ¶¶ 11, 20, 82. Ford is entitled at this stage to every inference in its favor, *Murguia*, 61 F.4th at 1106, and to the extent Mikhov's knowledge of the falsity of his sworn declarations is not directly alleged (it is), it certainly requires no substantial inference to get there.

***Kirnos.*** Defendants make (at 54-55) nearly identical arguments with respect to Kirnos as they do for his half-brother Mikhov, including that Ford does not sufficiently allege that Kirnos knowingly associated and "communicated" with the other members of the enterprise, that he engaged in enterprise conduct, or that he engaged in a pattern

of racketeering activity. These arguments fail as to Kirnos, just as they do as to Mikhov.

Ford adequately alleges that Kirnos (much like Mikhov) had a leading role in KLG and the enterprise, including by knowingly directing the creation of fraudulent records by staff members at KLG and repeatedly committing fraud by falsely attesting under oath that the fabricated records were contemporaneously prepared and accurately reflected the time worked on each case.[21] *See* FAC ¶¶ 13, 29, 58, 60, 70, 91. It is unnecessary for Ford to allege that Kirnos—who identified himself as the Managing Partner of KLG, see Dkt. 83.5 ¶ 1, Dkt. 83.6 ¶ 1, an undisputably supervisory position in the enterprise—"communicated" with other members of the enterprise; Ford's allegations that Kirnos was a partner in KLG who knowingly participated in and directed the creation of fraudulent billing records and falsely swore to their truth and accuracy in declarations intended to defraud Ford are more than sufficient to show a knowing association with the enterprise with the common purpose of carrying out the fraud. *See Blue Cross*, 2025 WL 2004500, at *10 ("A complaint need not provide every detail of every interaction with every individual related to an alleged scheme.").

Finally, Ford's allegations of Kirnos' engagement in racketeering activity are more than sufficient. As with Mikhov, Defendants attempt to argue (at 55-56) that the FAC lacks "factual support" that Kirnos "'knew' Defendants were submitting inflated fee applications." MTD at 55-56. But also as with Mikhov, Ford is entitled to the inference that Kirnos—who as KLG's managing partner would unquestionably have known whether its attorneys (***including himself***) contemporaneously recorded their time—knew when he declared under oath that the time records were contemporaneously prepared that in truth they were fabricated years after the fact. Defendants seek (at 56)

---

[21] The exhibits to KLG's motion corroborate this allegation, as they reflect Kirnos stating under oath that he "personally reviewed" the fraudulent billing entries to ensure their accuracy and that they were "completed contemporaneously with each dated entry or near in time to the work performed"—statements that KLG's own representatives have admitted to were false. See Dkt. 83.5 ¶ 34; Dkt. 83.6 ¶ 46; FAC ¶¶ 1, 26.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

to immunize Kirnos' enterprise conduct because he also performed functions that are performed by non-criminal lawyers. But as Ford has already explained, Defendants' heavy emphasis on "facially legitimate business activity" as a talisman to avoid RICO liability is deeply flawed, particularly at the motion to dismiss stage.

**Becerra.** As with the other individual defendants, Defendants argue (at 48-49) that Ford fails to allege that Becerra associated with other members of the enterprise, participated in the operation and management of the enterprise, and engaged in a pattern of racketeering activity.

Ford alleges in the FAC that, after KLG was required to begin providing back-up for its fee requests in the form of actual fee statements showing actual hours worked, Becerra—whom Defendants describe (at 48) as "a career paralegal"—was appointed by KLG to oversee a team creating false and fictitious billing records across thousands of litigations that had long concluded. *See* FAC ¶¶ 2, 14, 28-29. This alone is enough to establish Becerra's knowing association with the enterprise and participation in its operation and management, and illustrates why *Baumer v. Pachl*, 8 F.3d 1341 (9th Cir. 1993) is inapposite. There, RICO allegations were made against an outside attorney who was retained by a limited partnership six years after the partnership's alleged scheme began, who "at no time held any formal position in the limited partnership," and whose only involvement was the preparation of two letters and a partnership agreement and assistance in one Chapter 7 proceeding. *Id*. at 1344. Ford's allegations, in contrast, plausibly establish that Becerra held a position in the "chain of command" "knowingly implement[ed] decisions of upper management," and was "indispensable to achievement of the enterprise's goal," *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008), as she is alleged to have overseen the creation of thousands of fake invoices—the lifeblood of the fraudulent scheme. *See Three Rivers Provider Network, Inc. v. Meritain Health, Inc.*, 2008 WL 2872664, at *5 (S.D. Cal. Jul. 23, 2008) (denying motion to dismiss § 1962(c) claim where complaint alleged that defendants participated

in the operation or management of the enterprise by "creating or supervising the creation of [] fraudulent [Explanation of Benefits forms]").[22]

  While Defendants argue (at 49) that Becerra did not "[know] her actions were part of any purported RICO enterprise" because, as a paralegal, she had "no control over the litigation filings that purportedly serve as the basis for the FAC," the "litigation filings" are in fact not "the basis for the FAC":  the fabricated billing records—***which Becerra herself is alleged to have fabricated***—are.  Becerra is also alleged to have played a key role at the other end of the scheme by receiving and transacting the fraudulently induced payments.  *See* FAC ¶¶ 14, 67 n.4, 69.  Moreover, a defendant need not play a role in, or even be aware of, every aspect of the scheme—or know the identities and roles of all the other members—in order to be a member of an enterprise.  *See Christensen*, 828 F.3d at 780 (a defendant merely needs know the "general nature of the enterprise and know that the enterprise extended beyond his individual role").

  The same allegations also sufficiently plead Becerra's involvement in a pattern of mail and wire fraud.  Defendants claim (at 49) that the FAC does not tie Becerra to any of the eleven cases it mentions in which the FAC links mailed payments with false entries in fee petitions—each of which constitutes a predicate act of mail fraud (and one of which involved a check mailed directly to Becerra, *see* FAC Ex. C, Item 9).  Defendants are wrong.  The FAC alleges that each of those eleven cases involved time records that were false and fraudulent because they predated the time when KLG claims to have begun keeping contemporaneous time records.  *See* FAC ¶¶ 67-68, 70-74;

---

[22] Defendants' reliance (at 49) on *Blantz* and *Slack* is especially inapt with respect to Becerra, who, as alleged, was directly involved in, and exercised supervisory authority over others providing services in furtherance of, the fraudulent scheme.  *See Blantz*, 727 F.3d at 927 (complaint lacked any specific factual allegations regarding the defendant's involvement, and there were no factual assertions to support the conclusory allegation that she "directed" the other defendants); *Slack*, 2014 WL 4090383, at *22 (generalized allegation that extortion occurred "at the direction of" particular defendants found insufficient where "unadorned by any factual support," particularly where the facts plaintiff did allege were, on their face, not extortionate).

Motion at 38.  And the FAC alleges that those false and fraudulent pre-2018 time records were fabricated by Becerra and a KLG team overseen by her.  FAC ¶¶ 2, 14, 28-29.  These allegations directly link Becerra to at least every predicate racketeering acts involving those eleven cases.  And it is certainly a plausible—indeed, obvious—inference that Becerra, when tasked with creating fraudulent billing records for thousands of Lemon Law cases, knew that those fraudulent records would be used to claim fees.  *See CBC Framing, Inc. v. Flores*, 2008 WL 11337555, at *11 (C.D. Cal. Sept. 22, 2008) (finding plaintiff adequately alleged defendants engaged in RICO conspiracy even where the "alleged predicate acts of mail and/or wire fraud do not involve each of the Defendants in each instance" because the facts alleged showed that "Defendant would have or should have known, and indeed should have expected, that the alleged acts of mail or wire fraud would occur, and thus each Defendant could plausibly be liable for each predicate act alleged").

Finally, Defendants emphasize (at 50) that because Becerra was "a paralegal, taking directions from others," Ford "plainly fails to state a RICO claim" against her. Whatever Becerra's job title, the law is clear that RICO liability attaches to "foot soldiers" as well as "generals," so long as they were inside the "chain of command," *JW Gaming Dev., LLC v. James*, 2020 WL 3640004, at *3-4 (N.D. Cal. July 6, 2020), and does not "require a participant to exercise significant control over or within an enterprise," *In re JUUL Labs*, 497 F. Supp. 3d at 594; *see Reves*, 507 U.S. at 184 ("An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management."); *Christensen*, 828 F.3d at 781 (explaining that "the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise" (citation omitted)).[23]

---

[23] *Hamilton v. Willms*, 2005 WL 3797562, at *8 (E.D. Cal. Oct. 28, 2005), cited by Defendants (at 50), is a summary judgment decision in which the *evidence* showed that the relevant RICO defendant merely "might have provided secretarial services" and

***Morse.***  Defendants contend (at 53) that—despite Morse billing more than 24 hours on at least 34 different days and other temporal impossibilities and irregularities, *see, e.g.*, FAC ¶¶ 5, 12, 36, 40, 46, 47, 53, 67—Ford fails to allege that Morse associated with the members of the fraudulent billing enterprise for a common purpose, or even (other than on information and belief) that she "knew about the purported enterprise or ever communicated with anyone about it."[24]  Defendants ignore that knowledge need only be "pleaded generally," with "sufficient factual matter from which a defendant's knowledge of a fraud might reasonably be inferred." *Silingo*, 904 F.3d at 679-80.  Moreover, the FAC need not "provide every detail of every interaction," *Blue Cross*, 2025 WL 2004500, at *10, and matters "peculiarly within the opposing party's knowledge" may be pleaded on information and belief, *Tortilla Factory*, 2018 WL 6174708, at *8.  The specific allegations of Morse's facially fraudulent billing entries are more than sufficient to allege her knowing association with others in the fraudulent billing enterprise.  *See* FAC ¶¶ 5, 12, 36-40, 46-47.

Defendants' argument (at 53-54) that Ford does not allege that Morse participated in the operation or management of the enterprise also fails.  As discussed above, RICO liability "reach[es] all involved in the scheme of organized crime, whether they are generals or foot soldiers." *JW Gaming Dev.*, 2020 WL 3640004, at *3 (*quoting Tatung Co., Ltd. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1153 (C.D. Cal. 2016)).  Contrary to Defendants' characterization, the allegation that Morse directed Becerra to create

---

"knew very little about the details" of any purported racketeering activity.  KLG also cites *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 728 (7th Cir. 1998) for the proposition that "simply performing services for an enterprise" is insufficient, but that case involved allegations against a doctor external to the alleged enterprise who, unlike Becerra here, did not "participate[] in the operation and management of the enterprise itself."  Neither case helps Becerra.

[24] Again, Defendants cite no authority for their purported "communications" requirement; Ford could not possibly be expected at this juncture to have access to internal communications among enterprise members.  Nor is there any authority for Defendants' assertion (at 53) that "internal communications within Knight Law do not amount to a basis for a RICO claim."

74

fraudulent billing entries (FAC ¶ 47) is not "conclusory," but is a specific factual allegation.  Ford also alleges that Morse presided over and delegated assignments during meetings among KLG and outside enterprise members (FAC ¶ 82[25]); although Ford cannot be expected to know at this juncture what was discussed in those closed-door meetings, *see Immobiliare*, 424 F. Supp. 3d at 890, this allegation at minimum raises a strong inference that Morse had a position of authority and direction of the enterprise in light of the other allegations that KLG worked with the outside enterprise members to purposefully overstaff cases and misrepresent the tasks completed through fraudulent billing records.  *See, e.g.*, FAC ¶ 19.

Ford also plausibly alleges that Morse knowingly engaged in a pattern of racketeering activity, *i.e.*, in creating her own fraudulent billing entries and directing the creation of fraudulent bills generally.  Defendants again ignore that, under Rule 9(b), "intent, knowledge, and other conditions of a person's mind may be averred generally" and can be inferred from "the existence of a scheme which was reasonably calculated to deceive." *Carey v. J.A.K.'s Puppies, Inc.*, 763 F. Supp. 3d 952, 982-83 (C.D. Cal. 2025) (citation modified); *see Pizana v. SanMedica Int'l LLC*, 345 F.R.D. 469, 488-89 (E.D. Cal. 2022) ("[T]he intent to defraud may be inferred from a defendant's statements and conduct.   In the absence of direct evidence of intent, the party asserting fraud must first allege and ultimately prove the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension, and then, by examining the scheme itself the court may infer a defendant's specific intent to defraud.") (citation modified).

 Defendants' argument regarding Morse as to all elements boils down to the contention (at 54) that Morse must be dismissed because "several" of the allegations

---

[25] Defendants' statement (at 53) that "[t]he FAC does not even allege that these purported meetings included alleged enterprise members other than Ms. Morse" is false. *See* FAC ¶ 82 ("Personnel from ALG, and on information and belief, from Law Firm 1 and Law Firm 2, attended weekly calendar meetings in KLG's offices during which Morse delegated assignments.").

against her can be interpreted consistently with Morse not knowing that her inflated time entries were included in fee petitions.  It is true that either Morse knowingly made or directed the creation of the facially fraudulent time entries in her name, or she was somehow duped by others at KLG into having her name used in fraudulent evidence submitted in support of fee applications without her knowledge.  And if Morse or another KLG witness wants to testify at trial that the latter is true and that Morse's tens of thousands of time entries over the span of several years are false and were created by KLG without her knowledge, Ford would welcome that testimony.  For now, however, Morse's state of mind presents a quintessential question of fact that cannot be resolved on a motion to dismiss; all that matters is whether the allegations plausibly show her knowing participation and involvement in the fraudulent billing enterprise, and they unquestionably do.

*Wirtz Defendants.*  Contrary to the arguments presented in Wirtz Defendants' separate motion (most of which are rehashes of KLG's arguments, the above responses to which Ford incorporates here), Ford plausibly alleges that Richard Wirtz and Wirtz Law APC participated in the conduct of the enterprise and engaged in a pattern of racketeering activity.  The FAC alleges that Wirtz, along with other enterprise members, directed Becerra to create fictitious and fraudulent billing records for cases handled by the enterprise; that Becerra and her team did in fact create fraudulent billing records for the Wirtz Defendants; and that Wirtz received a share of the money that KLG obtained from Ford as a result of the fraudulent scheme.  FAC ¶¶ 28-29.  Contrary to the Wirtz Defendants' claim (at 6-7), these are factual and not conclusory allegations.[26]  The FAC

---

[26] This is even more clear when comparing the FAC's allegations against those in the cases that the Wirtz Defendants cite.  In *Borrego Cmty. Health Found. v. Inland Valley Invs., LLC,* 2023 WL 2518844, at *5 (S.D. Cal. Mar. 13, 2023), the complaint alleged only that the defendants collectively "worked with [the plaintiff's former CEO] to devise management and operations decisions at [the plaintiff]," with no differentiation between the defendants and no allegations of what each defendant did.  In *In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1034-35 (C.D. Cal. 2011), the complaint alleged only that the defendants were "involved in decision

further alleges that the Wirtz Defendants inflated the number of hours they claimed on their timesheets (*id.* ¶ 31) and supports the inference that Wirtz Law worked in tandem witih KLG to fraudulently bill the same tasks across multiple firms (*id.* ¶ 48). According every favorable inference to Ford, and in light of the fact (unacknowledged by the Wirtz Defendants, as by the KLG Defendants) that Rule 9(b) requirements are relaxed and pleading on information and belief is allowed for matters that are peculiarly within the opposing party's knowledge, *see Immobiliare*, 424 F. Supp. 3d at 890; *Tortilla Factory*, 2018 WL 6174708, at *8, these allegations are sufficient to plead that the Wirtz Defendants participated in the operation and management of the enterprise and engaged in a pattern of racketeering activity.

Nor does it matter that the majority of the allegations in the FAC are directed at enterprise members other than the Wirtz Defendants. *See* Wirtz Motion at 6. As discussed above, even "foot soldiers" who "have some part in directing the affairs of the enterprise" but are not the "primary decision-makers in the enterprise" may be held liable under RICO. *Tatung Co., Ltd. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1153 (C.D. Cal. 2016) (citation modified). Similarly, it is immaterial that the FAC does not allege that the Wirtz Defendants submitted a fee petition with a KLG attorney's pre-2018 time or with a billing entry for Morse (*see* Wirtz Motion at 9) as those are merely *examples* of some of the most obvious evidence of fraudulent billing by the enterprise and hardly constitute an exclusive list.

The Wirtz Defendants also err (at 3) in focusing on the fact that the examples of their facially fraudulent billings—including days of more than 24 hours and attending simultaneous full-day trials in distant jurisdictions, FAC ¶¶ 43-44—involved auto manufacturers other than Ford. As Ford notes in a footnote of its FAC (which is

making," without any further detail about what decisions were made and who made them, and the court found that allegation standing alone too general to satisfy pleading requirements. Here, in contrast, Ford sufficiently alleges that the Wirtz Defendants, together with other named enterprise members, directed Becerra to create the fraudulent billing records that were used to defraud Ford. *See, e.g.,* FAC ¶¶ 28-29.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

intended to reference paragraphs 43-45, rather than 41-43), those examples are provided as further facial evidence that the Wirtz Defendants—like the KLG Defendants—engaged in fabrication of time records and fraudulent billing.[27]  FAC ¶ 45 n.3.  That evidence, in turn, supports the reasonable inference that if the Wirtz Defendants engaged in those practices against other auto manufacturers, they also did so against Ford—particularly when coupled with Ford's allegations of the long association between Wirtz Law and KLG in connection with Lemon Law cases involving fraudulent billing and that Wirtz directed Becerra to create fraudulent billing records on his and his firm's behalf.  *See* FAC ¶¶ 28-29.

Relying on *Reves*, 507 U.S. at 185, the Wirtz Defendants argue (at 7) that Ford's allegations "do not indicate" that they directed "the enterprise's affairs," as opposed to "their *own* affairs," and that their occasional submission of their own fee applications "is *inconsistent* with enterprise conduct."  The enterprise's affairs and the Wirtz Defendants' affairs, however, are not mutually exclusive, and the fact that the Wirtz Defendants' actions might have served their own interests in no way means that they did not also serve those of the enterprise.  In fact, what the *Reves* Court said was RICO liability does not lie where the defendants conducted or participated in the conduct of "***just*** their own affairs," 507 U.S. at 185 (emphasis added); the Wirtz Defendants omit the word "just" from their quotation.  Here, regardless of whether Wirtz Law submitted its own application or a joint application with other enterprise members in any particular Lemon Law case, the FAC alleges that they coordinate with KLG and direct its staff in the creation of fraudulent billing records and that their co-counsel relationship is in service of "systemic intentional misrepresentations, perjury, and fraud" which in the aggregate allowed the massive scheme to have its desired effect.  FAC ¶¶ 28-29.

The Wirtz Defendants also argue (at 7-8) that their alleged involvement in a limited number of cases does not support the inference that they played a role in

---

[27] Notably, the Wirtz Defendants do not even attempt to proffer a potentially innocent explanation for these obvious examples of fraud.

directing the affairs of a RICO enterprise that involved thousands of cases. This unsupported argument finds no footing in the law. *See, e.g., Christensen*, 828 F.3d at 780 (defendant need only "know the general nature of the enterprise and know that the enterprise extends beyond his individual role"); *Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 791-93 (6th Cir. 2012) (directing the enterprise's affairs "can be accomplished either by making decisions on behalf of the enterprise *or by knowingly carrying them out*" (original emphasis); *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1252 (10th Cir. 2016) (explaining that "a plaintiff can easily satisfy *Reves'* operation and management test by showing that an enterprise member played some part—*even a bit part*—in conducting the enterprise's affairs") (emphasis added).[28]

And in any event, those four examples are just that: examples. Ford only has access to a "small percentage and sampling of billing records submitted by Defendants," FAC ¶ 34, and given the already clear incidents of fraudulent conduct in furtherance of the criminal enterprise, the Wirtz Defendant's regular coordination with KLG and ALG, and the failure of the Wirtz Defendants to cease their coordination with the other members of the enterprise upon inquiry notice of the fraud (*e.g.*, FAC ¶ 48), Ford has plausibly alleged the Wirtz Defendants' participation in the alleged enterprise.

For reasons previously discussed (*see* Section II.B, *supra*), the Wirtz Defendants' argument (at 9) that the FAC does not plead two predicate acts against them fails. In addition to predicate act #10 on Exhibit C, Ford also alleges that Wirtz Law attorneys on at least two occasions billed more than 24 hours in a single day to simultaneously attend trials in geographically distant locations. *See* FAC ¶¶ 43-44. For purposes of establishing a pattern of racketeering activity, it is of no moment that these cases involved non-Ford automakers. *See Corley,* 388 F.3d at 1004 (explaining that pattern

---

[28] This authority also defeats the Wirtz Defendants' argument (at 1-2) that the FAC does not support the inference that they agreed to a scheme involving more than $100 million in unlawful billing.

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

and injury elements are distinct and that "a plaintiff need not demonstrate injury to himself from each and every predicate act making up the RICO claim").

The Wirtz Defendants' challenge (at 10-11) to Ford's pleading of the continuity element is also meritless. Contrary to the Wirtz Defendants' characterization, their alleged racketeering activity in furtherance of the enterprise is not limited to "two instances of alleged overbilling six days apart in July 2018." Rather, the FAC clearly alleges that the Wirtz Defendants continued to be associated with KLG—and with cases in which fraudulent time entries were submitted to Ford, to be corrected by Wirtz Law only after Ford flagged them in the meet-and-confer process—three years later, in 2021. See FAC ¶ 48. Moreover, the conduct alleged in the FAC is not focused on achieving an objective in connection with a single event or point in time, but "by its nature projects into the future with a threat of repetition," thereby satisfying the continuity requirement. *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366 (9th Cir. 1992); *see also, e.g.*, *H.J. Inc. v. Northwestern Bell Tel. Co.*, 429 U.S. 229, 242-43 (1989) (continuity "may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business"); *Piper v. Gooding & Co. Inc.*, 334 F. Supp. 3d 1009, 1020 (D. Az. 2018) ("Open ended continuity … requires either (1) a threat of future criminal conduct; or (2) conduct that constitutes the enterprise's regular way of doing business."); *Straightshot Comms., Inc. v. Telekenex, Inc.*, 2011 WL 1770935, at *5 (W.D. Wash. May 9, 2011) ("A plaintiff can establish open-ended continuity where there is an ongoing scheme, multiple victims, or a risk of continuing illegal activity.").

Finally, the Wirtz Defendants' argument (at 12-13) regarding the sufficiency of allegations of an "agreement" for purposes of the RICO conspiracy claim is generally addressed in Section II.D, *supra*. The Wirtz Defendants' argument that the FAC is deficient for failing to identify "interactions" between them and KLG that involved fraud with particularity, or between them and the Altman Defendants, Law Firm 1, and Law Firm 2 at all, lacks merit. The Wirtz Defendants cite no authority that requires

80

"interactions" among conspirators to involve fraud pleaded with particularity, or, indeed, "interactions" with other conspirators at all.  And as to the Altman Defendants, Law Firm 1, and Law Firm 2, "[a]lleged RICO conspirators need not conspire directly with every other co-conspirator, so long as every co-conspirator has agreed to participate in the affairs of the same enterprise."  *United States v. Raniere*, 384 F. Supp. 3d 282, 304 (E.D.N.Y. 2019).

*Altman Defendants.*  As with the other defendants, Ford plausibly alleges that the Altman Defendants participated in the conduct of the enterprise, engaged in a pattern of racketeering activity, and committed at least two predicate acts.  The Altman Defendants' contrary arguments all fail.

As previously discussed, Ford need only "plausibly allege that each defendant acted, directly or indirectly," in the conduct of the enterprise.  *In re JUUL Labs*, 497 F. Supp. 3d at 594.  And it does so with respect to the Altman Defendants.  The FAC alleges that Altman was instructed by his officemate and enterprise leader Mikhov to pad his bills and inflate his fees, that he directed Becerra in the fabrication of fictitious and fraudulent billing records, that Becerra did create those false time records for the Altman Defendants, and that the Altman Defendants—along with the other attorney defendants—knowingly used those fabricated records to support their claims for attorney's fees.  *See* FAC ¶¶ 11, 28-29, 82.  While the small percentage of billing records Ford was able to review in preparing its complaint did not reflect the same temporal impossibilities reflected in KLG and Wirtz attorneys, they did show "'canned' and facially suspicious time entries," including the same .07 and .08 hours on nearly every case for the same task—"Reviewed case file, documents, repair orders, discovery." *Id.* ¶ 54.  Given the common-sense disparities in the volume and complexity of each case and its related "case file" and discovery, the consistent and boilerplate nature of these entries—particularly when viewed in light of the other allegations regarding the Altman Defendants and the enterprise as a whole—fully supports an inference that they were created non-contemporaneously and as part of the wholesale

fabrication of billing records.  The FAC further alleges that Altman submitted false declarations in support of these fraudulent billing records.  *Id.* ¶¶ 72-73.

Contrary to the Altman Defendants' unsupported[29] assertion (at 6), Ford *has* alleged misconduct in connection with the billing records submitted in support of fee applications, including that the supporting time records were fabricated by KLG often years after the fact.  *See* FAC ¶¶ 28-29, 54.  The Altman Defendants' focus on the underlying courts' "line-by-line analysis" is misguided because it ignores the markedly different context in which the cases arose.  The at-issue fee petitions were never evaluated for fraud, nor could Ford have made such an allegation at that time; rather, courts merely looked to the reasonableness of the fees, making the reasonable assumption that the attorneys appearing before them were not fabricating evidence and committing perjury.  The Altman Defendants' preclusion argument (at 11-12) fails for the same reason, as well as for those set forth in Section II.B.2, *supra*.

For reasons previously discussed, the Altman Defendants' arguments (at 7-8) about whether certain alleged conduct is indicative of the existence of an enterprise or instead reflects "legitimate business practices" are factual disputes that are not appropriate for resolution at this stage—if they are even directed at allegations that purport to identify misconduct.  *See Blue Cross*, 2025 WL 2004500, at *6 (defendants' argument that meetings alleged in complaint were "benign" was "a dispute of fact inappropriate for this motion to dismiss").  Moreover, these arguments fail because they are directed at background allegations.  For example, Ford does not contend that the Altman Defendants' sublease of office space from KLG was "fraudulent"; rather, like the weekly meetings, cross-billing, advancements of funds, and other allegations of interconnectedness, they serve to demonstrate associations between the defendants that plausibly support the existence of an enterprise.  *See* FAC ¶¶ 10, 50, 82-83.  Contrary to

---

[29] Aside from reciting the elements of RICO and making other general rule statements, the Altman Defendants' motion does not cite a single case.

the Altman Defendants' apparent view, Ford need not at the pleading stage preclude all other possible interpretations of the alleged conduct.

Equally unavailing is the Altman Defendants' contention (at 8) that a fee settlement between Ford and the Altman Defendants "contradicts" Ford's allegations of a common purpose. The Altman Defendants fail to explain why settling certain of their fee claims with Ford would have any bearing on whether they shared with the other defendants a common purpose of fraudulently inflating those claims to line their pockets. *See, e.g., Odom*, 486 F.3d at 552 (finding that complaint adequately alleged that defendants had a common purpose of conducting their business activity through fraudulent means).

Finally, the Altman Defendants' statute of limitations arguments (at 10-11) fail. The Altman Defendants ignore that the Ninth Circuit follows the separate accrual rule, under which each new and independent injury triggers the accrual of a new cause of action when the plaintiff knows or should know of that injury. *See Grimmett v. Brown*, 75 F.3d 506, 511-12 (9th Cir. 1996). Here, regardless of when the underlying litigations took place, Ford suffered "injury" when it paid settlements to the Altman Defendants pursuant to their fraudulently inflated fees on numerous occasions in 2022—well within the four-year statute of limitations. See FAC ¶¶ 70-73, Ex. C Nos. 12-13, 15, 18, 20. And earlier acts, even if outside the limitations period, can still form part of the pattern of racketeering activity. *See Flores v. Emerich & Fike*, 2008 WL 2489900, at *26 (E.D. Cal. June 18, 2008) ("An act may serve as a predicate act if it falls within ten years of another predicate act even if the act does not fall within the statute of limitations.")

## IV.     FORD SHOULD BE GRANTED LEAVE TO AMEND

Even if the Court grants any of Defendants' motions in whole or in part, the Court should nonetheless grant Ford leave to amend. The Ninth Circuit has "held that in dismissals for failure to state a claim, a district court should grant leave to amend unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242,

247 (9th Cir. 1990).  "Leave shall be freely given when justice so requires.  This policy is to be applied with extreme liberality."  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).

Here, although Ford previously amended its complaint once, it did so without the benefit of any guidance from the Court as to what the Court viewed as deficiencies (if any) in its pleading.  Given the importance of this case to Ford, the amount of loss suffered, and the serious nature of the conduct alleged (as well as the ongoing threat it poses to the fair administration of justice), leave to further amend in an attempt to address any failures the Court finds to exist should be granted.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied in their entirety or, to the extent any motion is granted, Ford should be given leave to amend.

Dated: September 26, 2025

KASOWITZ LLP

By: /s/ *Daniel A. Saunders*

Daniel A. Saunders
Matthew S. Manacek

Edward E. McNally
Daniel J. Fetterman

*Attorneys for Plaintiff*
*Ford Motor Company*

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S MOTION TO DISMISS