1

**KASOWITZ LLP**
Daniel A. Saunders (SBN 161051)
DSaunders@kasowitz.com
Matthew S. Manacek (SBN 312834)
MManacek@kasowitz.com
1801 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (424) 288-7900
Facsimile: (424) 288-7901

Edward E. McNally (admitted *pro hac vice*)
EMcNally@kasowitz.com
Daniel J. Fetterman (admitted *pro hac vice*)
DFetterman@kasowitz.com
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1715
Facsimile: (212) 506-1800

*Attorneys for Plaintiff Ford Motor Company*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FORD MOTOR COMPANY, a Delaware Corporation,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>STEVE B. MIKHOV; ROGER KIRNOS; and AMY MORSE,<br><br>　　　　　　Defendants. | Case No: 2:25-cv-04550-MWC-PVC<br><br>**SECOND AMENDED COMPLAINT FOR:**<br><br>1.　**RICO – Violation of 18 U.S.C. § 1962(c)**<br>2.　**RICO Conspiracy – Violation of 18 U.S.C. § 1962(d)**<br><br>**[Jury Trial Demand]** |

Plaintiff Ford Motor Company ("Plaintiff" or "Ford") files this Second Amended Complaint against defendants Steve B. Mikhov ("Mikhov"), Amy Morse ("Morse"), and Roger Kirnos ("Kirnos") (collectively, "Defendants") for damages and other relief for Defendants' violations of the Racketeering Influenced and Corrupt Organizations Act ("RICO"). In support of these claims, Ford alleges as follows:

## INTRODUCTION

1.      In 1913, Ford's founder, Henry Ford, revolutionized the automobile industry by introducing a moving assembly line, which enabled Ford to efficiently manufacture automobiles, create jobs for middle-class Americans, and make the automobile accessible to all. A century later, Defendants—all licensed attorneys with legal and ethical duties of truthfulness and candor to the courts and to their clients—adopted the principles of the moving assembly line to devise and operationalize a fraudulent  scheme to create false billing records after the conclusion of their client's case, built around Knight Law Group LLP's ("KLG") fee motion department (the "Fee Motion Department") that employed "drafters," "reviewers," and "finalizers" to defraud Ford and other auto manufacturers into paying tens of millions of dollars in legal fees for make-believe work.

2.      Defendants picked the perfect industry to deploy their fraud. KLG primarily represents plaintiffs in lawsuits arising out of California's Lemon Law (defined below). Once a lawsuit under this law concludes, if it is resolved in the plaintiffs' favor, their attorneys may seek fees for "actual time expended." In case after case over more than a decade, KLG's (nominally) former managing partner Steve Mikhov and current managing partner Roger Kirnos defrauded Ford and other auto manufacturers to pay for legal services that were never rendered and induced Ford and other auto manufacturers to settle fee claims that they falsely claimed were for reasonable attorneys' fees based on actual time expended.

3.     To further their fraud, Mikhov and Kirnos also lied under oath to federal and state courts throughout California about the time sheets created by KLG's Fee Motion Department operated under Defendants' supervision.  The lies included the oft-repeated statement that KLG's attorneys' "time billing entries were completed contemporaneously with each dated entry or near in time to the work performed."  Instead, the  extremely limited preliminary discovery in this matter—which Defendants fought tooth-and-nail to block—has revealed the truth: that while some KLG attorneys may have recorded their time, most of the billing entries were created after the fact and under Defendants' direction by KLG's dedicated Fee Motion Department, the primary function of which was to fabricate billing records to fraudulently obtain funds from Ford and other auto manufacturers.  At the direction of Defendants, members of the Fee Motion Department would, on a regular basis, arbitrarily enter time entries for particular attorney tasks prior to the filing of fee applications.  In that way, the Department—an assembly line of fraud—churned out countless billing statements stuffed with fraudulent entries and generating tens if not hundreds of millions of dollars of fictitious and ill-gotten attorney's fees for Defendants at Ford's expense.  For example, by comparing the small percentage (approximately 11-12%) of KLG' fee applications that Ford has in its possession with prior deposition testimony of KLG witnesses recently produced in discovery, Ford has already identified at least 8,963 specific fraudulent time entries in 1,152 separate cases totaling $865,301 in fees attributable to Defendant Morse alone for work she has admitted under oath she never performed.

4.     And this is only the tip of the iceberg.  The scheme was carried out through a sophisticated criminal enterprise that ingeniously spread KLG's fraudulent billings across thousands of cases against many auto manufacturers so that Defendants' fraudulent scheme would go undetected.  Indeed, but for the tremendous expense incurred by Ford to audit and detect the fraud, this criminal enterprise would have continued unabated.  The exercise of creating fictional time sheets was not in the service

3

of any clients' interests.  It occurred *after* the clients' own cases were fully resolved upon the conclusion of the settlement or trial that determined those rights.  Defendants typically required their clients to sign engagement letters under which the clients would pay a contingency fee and under which the clients *relinquished all interests in later statutory fee recoveries*.  The real party in interest with respect to collecting payments from Ford was therefore not the clients, but rather the enterprise that existed for that purpose.  Ford brings this suit to end this wide-ranging and corrupt scheme to defraud Ford and the courts by claiming thousands of hours in wholly fictitious billings for time never worked and created well after the alleged work for the cases was completed.

5.      To be clear, while Defendants have attempted to downplay their illegal conduct by mischaracterizing this case as being about "padding" of time entries (itself a fraud and disgrace to the profession) or run-of-the-mill "mistakes," that is decidedly not what is alleged here.  This is not a "padding" or "inflating" case.  Rather, this is a case about an organized, deliberate, and pervasive scheme across thousands of cases to defraud Ford, other auto manufacturers, the courts, and even KLG's own clients through the fabrication of entirely fictitious time entries to overstate the amount of work performed.

6.      The ringleader of the criminal enterprise, Mikhov, and his partners at KLG orchestrated this scheme to parlay the generous fee-shifting provided for by California's Lemon Law into an opportunity to extract unearned payments for themselves from Ford and other auto manufacturers.  Ford has identified hundreds of instances in which Defendants' sham billing records were unlawfully used to collect well over $100 million of legal fees that Defendants pocketed.  A review of fee records in multiple matters takes one on a magical mystery tour of fictitious billings created after their clients' cases have resolved in full, including individual attorneys who claimed to have worked more than 24 hours per day or simultaneously attended different trials or depositions in widely separated jurisdictions.  The physical impossibility of such

4

billings is a direct consequence of Defendants' long-concealed fabrication of evidence, repeated lies to Ford, and perjury to the courts amounting to obstruction of justice, and constitutes prima facie evidence of Defendants' unlawful conduct and fraud.

7.     As an example, one of Mikhov's former partners, Morse, billed more than 24 hours in a day more than 34 times, while topping 20 hours per day on at least 66 occasions.  Those indefensible claims included an ostensibly heroic but physically impossible 57.5-hour workday in November 2016.  And this is based only on the small sampling of KLG's billing records in Ford's possession; when the full universe of those records are produced, Morse's 57.5-hour day could well become 500 hours or more.

8.     Further proof of the fraud is that Morse herself has admitted under oath that her job responsibilities at KLG from 2016 on primarily involved administrative and supervisory duties, that most of her time was spent managing personnel and was non-billable, and that she herself did not bill or record hourly time for numerous tasks that KLG time records claim she performed, such as drafting discovery, drafting motions, and communicating with clients.  And again, this is based only on the small percentage of KLG's billing records that Ford has obtained.  When that percentage is taken as a representative sample, the scale of the fraud contained in the remaining approximately 88% of KLG billing records is likely to be substantially larger.

9.     As another example, Mikhov billed a large number of duplicate entries that described identical tasks on the same day for numerous clients with only slight differences in wording—a circumstance that is highly unlikely to occur in the real-world practice of law, but is fully consistent with the large-scale fabrication of time entries across a multitude of cases.

10.     These sham billings, many or most of which were made up out of whole cloth often years after the fact, fueled a highly lucrative and fraudulent criminal enterprise that was built on deceiving and defrauding Ford and other automobile manufacturers out of millions of dollars, abusing the judicial system, and duping

unsuspecting clients who were not aware of and did not approve their lawyers' unethical and fraudulent practices. The net result of this fraudulent scheme was stealing many millions of dollars from auto manufacturers through a pattern and practice of false representations that were carried out by means of interstate wires and U.S. mail. These and other similar fraudulent time entries have continued to be used to wrongly obtain settlement payments from Ford, including as recently as August 2025. For example, in a single email on September 6, 2024, KLG sent ten fee statements to Ford's outside counsel, seven of which reflect fraudulently created and false time records dating back as many as six or more years. Notably, these fee statements were sent to Ford prior to the commencement of any fee litigation regarding the statements.

11.    Defendants concealed their fraudulent scheme by spreading their fictitious billing records across numerous matters involving different California courts, cases, and auto manufacturer defendants. They also pressured their own clients into unconscionable contracts that—far from advancing their clients' legitimate interests— imposed draconian penalties on any clients who attempted to settle their own claims before Defendants could run up billings or even disclosed the terms of their representation, such as by seeking advice from independent counsel. Defendants undertook this scheme not to plead and prove their clients' right to statutory damages, but rather as part of a separate, post-settlement or post-trial process that was entirely limited to their *own* interests in collecting fees pursuant to private contracts with KLG's clients, who signed away any right to or interest in a fee award rendered in their name.

12.    Defendants defrauded Ford and other manufacturers out of millions of dollars based on fraudulent billing records and misrepresentations about fees supposedly incurred. Defendants' material fraudulent misrepresentations were transmitted in the form of settlement demands for unearned fee amounts for services that were not truly rendered. Defendants also perpetuated their scheme in part by making false and knowingly fraudulent representations to the courts, committing obstruction of justice

6

SECOND AMENDED COMPLAINT

through perjury, submitting and relying on fabricated evidence, presenting fraudulent claims for money, and misleading all of the judges and lawyers who were privy only to selective information presented by Defendants in each individual case to prevent the detection of their false and fraudulent billing practices—all of which deprived the fee application process of any legitimacy. Although under normal circumstances Defendants may have been entitled to some legal fees, these proceedings lacked *any* legitimacy because Defendants' settlement demands and fee applications were holistically fraudulent. Defendants did not merely supplement legitimate billing records with additional hours; rather, the billing entries were inherently fraudulent, submitted by Defendants with the false representations that billing entries were completed contemporaneously, when they were invented after the fact through the systematic operation of KLG's Fee Motion Department.

13. Defendants' misconduct is exposed by cross-referencing fee records from different matters, before different judges, against different car manufacturers to track the claimed time entries for each lawyer in the criminal enterprise for each individual date over several years. Only then does Defendants' massive fraud involving false and fraudulent hours and billings become clear and unmistakable.

14. Defendants' scheme also misuses the structure of Lemon Law litigation. Fee petition proceedings are not part of the merits of the underlying lawsuit in which the alleged grievance of the plaintiff is redressed; instead, fee motions are not made or considered by the court until the substantive Lemon Law claim has been resolved either through settlement or trial, at which point the Lemon Law plaintiff's vehicle is repurchased, the plaintiff is otherwise compensated, and KLG takes its contingent percentage of the client's recovery. Then, the case is typically dismissed with the court retaining ancillary jurisdiction only for post-settlement or post-trial issues, including a statutory entitlement to payment of attorney's fees based on actual time expended. That distinct jurisdictional grant allows a court to consider attorney's fees even when the

SECOND AMENDED COMPLAINT

underlying case is resolved.  The fee proceeding is totally separate from the merits of

the underlying Lemon Law litigation: the issue presented is different; the legal standard

is different; the parties in interest are different; and the evidence is different.  Nor do fee

proceedings affect the finality of the merits ruling or settlement.

15.    As applicable to this case, many months—sometimes as much as a year or

more—after the merits of Lemon Law cases were finalized and the plaintiffs'

grievances redressed, KLG would make a demand for fees to Ford and other

manufacturers directly, threatening that unless Ford paid the claimed fees without KLG

having to provide time records or any other proof of their claimed fees, KLG would file

a fee motion and seek more than its original demand using a substantial multiplier.  In

some cases, Ford would settle the fee claims based on KLG's fraudulent demands,

meaning there was no court action on those demands.  KLG's fraudulent demands were

material to Ford's settlement decisions.  If Ford refused to pay without receiving time

records, then KLG would file a fee motion, starting a new proceeding before the court

claiming statutory entitlement to fees.  Because discovery had long been closed, Ford

would be unable to obtain discovery regarding the bases for the fee application.  KLG

would then charge Ford for its time associated with the fee hearing—often spanning

multiple days of (alleged) attorney labor to prepare and attend.

16.    Ford had no ability at the time of KLG's fraudulent fee demands or the

judicial proceedings that sometimes followed those demands to discover the fraud in

each of thousands of cases and every reason to accede to Defendants' demands,

particularly as that fraud only becomes apparent when time sheets across those cases

and other cases against other auto manufacturers are aggregated and compared.

17.    Defendants' conduct violates the Racketeer Influenced and Corrupt

Organizations Act, 28 U.S.C. § 1961 et seq.  As further described below, Defendants are

a group of persons associated with an enterprise within the meaning of the RICO statute

who have the common purpose to unlawfully engage in fraudulent billing practices and

8

have engaged in numerous predicate acts (including mail fraud, wire fraud, and obstruction of justice) that constitute a pattern of racketeering. As a result, Defendants' misconduct entitles Ford to treble damages and declaratory relief barring Defendants from attempting to collect and retain their improperly obtained fees.

18.     Defendants' conduct cannot reasonably be described as zealous advocacy or a legitimate exercise of KLG's, Defendants', or KLG's clients' First Amendment rights to petition the government. Instead, Defendants sought to fraudulently induce payments directly from Ford and, if necessary, to unduly influence the courts through criminal and fraudulent conduct in proceedings that did not involve redress of the underlying Lemon Law grievance, but were separate proceedings that involved a claim for payment. Indeed, Defendants, despite being officers of the court, routinely corrupted the integrity of the judicial process by intentionally operating a fraud on every court in which they appeared bearing their fraudulent fee statements and perjured declarations. This fraud and perjury—hidden as it was by being spread over numerous cases—fully impaired the ability of each court to fairly adjudicate each individual fee motion before it and deprived those proceedings of legitimacy.

## PARTIES

### Plaintiff

19.     Plaintiff Ford is incorporated under the laws of the State of Delaware, with its principal place of business in Michigan.

### Defendants

20.     Defendant Mikhov is a founding partner and former managing partner of KLG who now claims to reside in Puerto Rico. Plaintiff is informed and believes, and thereon alleges, that at all relevant times herein, Mikhov personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by knowingly making and allowing fraudulent entries for time not actually worked, making fraudulent extra-judicial fee demands of Ford, and obstructing justice through the

9

knowing submission of fraudulent extra-judicial demands, fraudulent evidence and false declarations attesting to the accuracy and contemporaneous creation of KLG's billing records. His scheme—undertaken on behalf of Defendants and not on behalf of KLG's clients—was all too successful. He is the ringleader of Defendants' criminal association to obtain fraudulent settlements from, and fee judgments against, Ford that are not authorized by statute. Mikhov routinely associates with other lawyers at KLG to carry out the scheme. As the scheme's ringleader, he was responsible for creating KLG's Fee Motion Department as a formal system to create fictitious time entries in Lemon Law cases for work never performed or contemporaneously billed. While at KLG, Mikhov performed very little billable work himself but rather handled marketing activities, client intake, and approval of settlements. Mikhov began his involvement in this scheme as a founding partner of O'Connor & Mikhov and later shifted his efforts to KLG. Despite his nominal separation from KLG and purported relocation to Puerto Rico, apparently to avoid both federal and California income taxes, Mikhov continues to manage KLG and to wield considerable influence on the other lawyers that are members of the criminal enterprise. From approximately four years ago to the present, Mikhov has made statements claiming that he has separated from KLG and purportedly moved to Puerto Rico. He has been removed from KLG's website, removed from pending cases, and he has changed his affiliation with the California State Bar from KLG to instead affiliate with a Puerto Rico company that he founded, Rusk LLC. Rusk LLC is not a law firm nor is it in the business of practicing law in California. Instead, it purports to be a management consulting company for hire, helping KLG "adapt its business strategy in the face of ever-expanding challenges" and "reforming company culture or looking to streamline internal processes." Nonetheless, despite Mikhov having publicly purported to separate himself from KLG and from California litigation matters four years ago, he has maintained his role working with the other Defendants to oversee and direct the enterprise's operations and its fraudulent fee-related scheme, and

10

continued to profit from the enterprise's fraudulent activities. The specifics of what amounts and how he receives money from the enterprise are peculiarly within the knowledge of defendants and will be more fully uncovered in discovery.

21.    Defendant Morse is a partner at KLG who supervises KLG's litigation department and who resides in the State of California.  Plaintiff is informed and believes, and thereon alleges, that at all relevant times herein, Morse personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by knowingly making and/or allowing the creation of fraudulent entries for time not actually worked including in thousands of cases in which KLG did not create contemporaneous time records but fabricated them long after the cases had been completed, for the financial benefit of the enterprise.  As she has testified that she rarely if ever performed many of the billable tasks recorded in her name, Morse knew that the great majority of time entries submitted to Ford and to courts under her name were fictitious.

22.    Defendant Kirnos is a partner at KLG who resides in the State of California.  Plaintiff is informed and believes, and thereon alleges, that at all relevant times herein, Kirnos personally and knowingly participated in the unlawful activities alleged herein, including, but not limited to, by knowingly making and/or allowing the creation of fraudulent entries for time not actually worked and by obstructing justice through the knowing submission of fraudulent extra-judicial demands, fraudulent evidence and false declarations attesting to the accuracy and contemporaneous creation of KLG's billing records.

**Additional Members of the Enterprise**

23.    KLG constitutes an enterprise within the meaning of the RICO statute. Mikhov, Kirnos, Morse, and other attorneys and employees at KLG work in tandem to conduct the operations of the enterprise, including by creating fictitious time sheets that misrepresent the tasks completed and the amount of time spent on cases, and regularly

split the proceeds unlawfully obtained by relying on these false and fraudulent billing records to obtain fee awards. Defendants oversee a Fee Motion Department, made up of ten or more employees at any one time, whose primary task is to create fictitious billing records to support fee applications. At the direction of Defendants, members of the Fee Motion Department create time records in which they falsely add fictitious tasks, assign the amounts to be billed to the fictitious task, and choose a billing attorney to whom the fictitious task is to be attributed. These fictitious billing records are then used to support fraudulent and perjurious fee demands and applications.

## JURISDICTION AND VENUE

24.     This Court has federal question jurisdiction in this matter pursuant to 28 U.S.C. § 1331. This matter arises out of violations of the RICO Act, 18 U.S.C. §§ 1961 et seq. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions by Defendants giving rise to the claims occurred in this District.

## GENERAL ALLEGATIONS

### I.     BACKGROUND FACTS

#### A.     Defendants' Fraudulent Billing Scheme

25.     This action centers on Defendants' criminal scheme to extract unearned fee payments from Ford based on false and fraudulent billing records in Lemon Law cases throughout California. Defendants' fraudulent demands for payment from Ford and their submission of fictitious billing records over many years, among other actions, constituted a pattern of multiple related acts of mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and obstruction and impediment of justice in violation of 18 U.S.C. § 1503.

26.     California's "Lemon Law," the Song-Beverly Consumer Warranty Act, Civil Code §1790 *et seq.,* provides car manufacturers must pay "the aggregate amount of costs and expenses, including attorney's fees based on *actual time expended,*

determined by the court to have been reasonably incurred by the buyer" in connection with an action under the statute. Cal. Civ. Code § 1794(d) (emphasis added). Fees are determined after the conclusion of the underlying Lemon Law litigation. If the parties do not reach a settlement, counsel for the party seeking the benefit of the Lemon Law's fee-shifting provisions in court must submit a fee application that is supported by competent evidence, including timesheets and other billing records, reflecting work actually performed on behalf of the car buyer. The fee applicant has the burden of showing that its requested fees are reasonable.

27. Unbeknownst to Ford or the courts, Defendants exploited the Lemon Law by creating fake time records in thousands of warranty claim cases that they demanded Ford and other automakers pay after resolution of a consumer's underlying claims, seeking millions of dollars in compensation for work Defendants had not performed. Defendants' fee petitions were not based on "actual time expended" in each case, as required by California law. Defendants also leveraged these fake time records to make fraudulent demands for payment from Ford and extract settlements that were based on material fraudulent representations.

28. Defendants participated in the fraudulent billing scheme knowingly and with the intent to deceive and defraud Ford for their benefit. In doing so, Defendants knowingly and intentionally made misrepresentations—in extra-judicial communications as well as in sworn, perjurious declarations—to Ford and to numerous courts about their fictitious billing records. When these misrepresentations were made in court, through the submission of sham records about the legal work performed, they impeded the administration of justice, defrauded Plaintiff, and stripped the statutory fee recovery procedure of its legitimacy. This unlawful conduct concealed from Ford and the courts that Defendants sought fictitious fees based on false billing records stemming from their fraudulent billing practices. Defendants' intentional misrepresentations and fraud resulted in unwarranted fee payments that harmed Ford's business and property

13

interests by causing Ford to pay more than $100 million for Defendants' sham legal fees and to expend significant resources to detect and now attempt to end this fraudulent criminal enterprise, as well as by damaging Ford's reputation and goodwill. Defendants' shared objective was and is to rake in many millions of dollars of legal fees each year without regard for the actual nature, extent, or value of the work performed for consumer clients.

29.    Defendants' billing fraud went to the central issue of the fee petition proceedings—how much Ford owed pursuant to the fee-shifting provision in California's Lemon Law—and affected the outcome of those proceedings.

30.    Specifically, from 2015 through the present, to further their fraudulent scheme against Ford and other auto manufacturers, Defendants have routinely made fraudulent demands for payment from Ford for services that were not truly rendered. Defendants have prepared and submitted false and fraudulent time records to Ford and to courts in Lemon Law cases to extract exorbitant amounts of fees and costs regardless of whether Defendants even performed the work reflected in those records.  Defendants also fraudulently extracted substantial settlements from Ford based on the fraudulent benchmarks set in other cases based on false time records.  In so doing, Defendants repeatedly received and accepted funds that were in effect and in actuality *stolen* from Ford based on those false and fictitious time records.

31.    As a result of its limited preliminary discovery in this action, Ford has learned that KLG members and employees have testified that KLG attorneys frequently did not record time contemporaneously.  Rather, Defendants oversaw a process by which the purported time entries included in KLG's fee motions were generated by non-lawyer members of a dedicated Fee Motion Department after the fact—often years after the purported work in question—to support KLG's fee demands against Ford and other auto manufacturers.  Although Ford had earlier begun investigating apparent specific instances of overbilling by KLG where 24+ hour days and other irregularities had called

SECOND AMENDED COMPLAINT

particular timesheets and their corresponding payments into question, and although Ford was informed in or around October 2024 that KLG attorneys did not regularly begin keeping contemporaneous records until 2018, Ford—at the time it originally received KLG's time records and made fraudulently induced payments to KLG—did not know and had no way of discovering that KLG's purported time sheets, records, and fee motions were fictitious and that virtually *every* payment based on all such time entries had been obtained by fraud, regardless of whether Ford had been able to contemporaneously identify any specific suspicious time entry related to such payment.

32.     In sworn testimony given in unrelated litigation, Defendants and KLG employees gave a small window into Defendants' multi-step fraud—the full scope of which is still to be uncovered.  Testimony from each Defendant confirmed that KLG attorneys did not consistently record their time contemporaneously or ensure that the time entries ultimately attributed to them reflected time they actually worked. Testimony also indicates that, rather than record their time accurately and contemporaneously, Defendants relied on the Fee Motion Department to generate false billing records to fraudulently recover unearned fees from Plaintiff and other car manufacturers.  Portions of the deposition transcripts referred to herein are contained in Exhibit K.

33.     Kirnos, who testified that his duties as partner included "supervising and addressing matters involving settlement of cases [and] fee motion[s]," claimed he did not know whether attorneys at the firm contemporaneously entered their time.  When asked in 2021 whether KLG attorneys "all enter their own time in a billing program," Kirnos responded: "I can't speak for what other attorneys do.  My understanding is that we have a billing program, and they're supposed to, and I have seen results.  So I know that they do on a general level[.]"

34.     Morse testified that "a lot of what [she did was] on the administrative end of things, and [] would not be billed to a case," but as will be detailed *infra*, KLG billing

records indicate that she billed unnatural and sometimes impossible amounts on individual KLG cases.  The discrepancies regarding Ms. Morse's billing were further highlighted through the testimony of Elin Howard, detailed below.

35.    Mikhov testified that he would only record his time spent working on cases "from time to time" and in a "hodgepodge" fashion, and that he would "recreate" "what [time he could] remember" sometimes a month or two after he would have done the purported task.  Once he had done that, Mikhov testified that he would give a paper with this time to Kirnos or Guadalupe Lopez, a non-lawyer KLG employee who reported to Mikhov and Kirnos and worked in the Fee Motion Department, to enter into fee motions.  Mikhov also testified that "the fee motion department . . . ha[d] authority to enter time for various tasks for [Mikhov] absent [Mikhov] handing them a written sheet or Mr. Kirnos handing them a written sheet" with purported time entries.

36.    In sworn deposition testimony, KLG employee Elin Howard described how the Fee Motion Department operated during the time period from 2017 through the deposition in March 2021.  Howard, like other members of the Fee Motion Department—who were divided by role into "drafters," "reviewers," and "finalizers"—was tasked with "prepar[ing] to file the motion for attorney's fees and costs after a case has settled," and to that end would "review attorney time billing."  Members of the team would review attorney tasks that KLG attorneys had input into KLG's billing software to compile an invoice in a new, separate document for filing a fee petition.  Howard testified that where information on time spent as stored in KLG's billing software was, in the opinion of the Fee Motion Department, lacking, team members were authorized to "input an attorney task and identify a particular set of hours for that attorney."  "[*O]n a regular basis*" (and for "[m]ore than 50 percent" of case files she handled), Howard would determine the amount she estimated an attorney might conceivably have spent on a particular task and would then input that imagined amount into a spreadsheet that would be submitted in support of KLG's fee petitions.  In doing so, Howard and the rest

of her team initially relied on "guidelines" provided by to them to determine the amounts to be added for specified "tasks," but Howard eventually began to "rely on [her] experience" and "history with the company" to "set a certain amount of time" for a particular task.  Under this system, Howard testified that she would, for example, regularly input one hour for "Initial communication with client," nine-tenths of an hour for "Analyze vehicle documentation," and half an hour for "Draft Complaint."  Howard admitted that she would make these entries without confirming their accuracy with the lawyers whose time she was supposedly entering.

37.    The Fee Motion Department's practices were specifically authorized by Mikhov and Kirnos.  As stated above, in sworn deposition testimony, Mikhov was asked: "[I]n the fee motion department, do they have authority to enter time for various tasks for you absent you handing them a written sheet [of tasks performed] or Mr. Kirnos handing them a written sheet?"  Mikhov answered unequivocally: "Yes."  Similarly, Kirnos testified that his responsibilities at KLG included supervising the preparation of fee motions.

38.    Mikhov and Kirnos then knowingly used the fabricated records to support their claims for attorney's fees and repeatedly misrepresented to Ford and to the courts —including in sworn, perjurious declarations—that all time billing entries were completed contemporaneously with or near in time to the work performed.  Because the fee application process was predicated on billing records created after the fact according to the fraudulent practices of the Fee Motion Department, the entire fee petition process was tainted by Mikhov's and Kirnos's false representations to the courts that their claims were based on reliable contemporaneous records.  Defendants failed to properly substantiate their claims for fees, or to provide Ford and the courts with truthful evidence showing the actual time, dates, and attorneys for work on Lemon Law cases. The payments made by Ford to settle fee demands or to comply with court determinations were therefore based on Defendants' fabricated and untrue evidence and

17

were tainted, unearned, and unwarranted.  In short, Defendants' systemic misrepresentations, corrupt and intentional obstruction and impeding of the due administration of justice, and fraud upon Ford and the courts deprived the underlying fee litigations of their legitimacy and rendered them as fraudulent shams.  The scope and scale of Defendants' fraud constitutes the type of misrepresentation that deprives the fee proceedings of their legitimacy.

39.    The Fee Motion Department created the fictitious and fraudulent billing records at the direction of Mikhov, Kirnos, Morse, and others, all of whom were paid portions of the money KLG obtained from Ford and other automobile manufacturers as a result of the fraud.

40.    Over the past ten years, Defendants have submitted and relied on fraudulent and unlawful billing records and perjured declarations to extract fee payments from Ford totaling more than $100 million for purported legal work on behalf of car buyers.  It is now clear that the great majority of Ford's payments to KLG, in which Defendants shared, were attributable to fraudulent time records (*i.e.*, records not based on time actually expended, as required by California law), many or most of them made up years after the fact.

41.    Defendants intended that Ford rely, and Ford did reasonably rely, on Defendants' fraudulent billings in paying false and fabricated fees associated with fraudulently obtained fee awards and settlements.

42.    Ford has reviewed thousands of KLG's billing invoices and time records for the years 2013-2024, which Ford believes represent approximately 11-12% of all consumer warranty cases that Defendants handled during that time.  Despite Ford having had access to only this small percentage and sampling of billing records submitted by Defendants, an analysis of the records included in that sampling reveals a gamut of obviously made-up work and physically impossible working hours and appearances that stand as irrefutable evidence of Defendants' fraudulent billing

practices.  The false and fictitious time entries can be discerned and detected only when thousands of time entries from hundreds of timesheets across scores and scores of different cases are all aggregated.  Examples include, but are not limited to:

(a)    Numerous instances of attorneys purportedly working over 24 hours in a single day;

(b)    Individual attorneys entering "appearances" simultaneously at full-day depositions and trials in different geographic locations;

(c)    Duplicative billing of the same vague task descriptions across multiple cases for comparable amounts of time; and

(d)    More than 1,200 no-date entries for clerical tasks performed by Mikhov, as well as equally suspicious dated entries.

1.    **Defendants Repeatedly Billed Between 24 and 57.5 Hours Per Attorney in a Single Day, Including for Tasks Never Performed by That Billing Attorney.**

43.    Defendants electronically filed and submitted to Ford false and fabricated billing records purporting to reflect tasks that were not actually performed by the attorney for whom that time was claimed.

44.    For instance, Defendant Morse has testified under oath that since becoming a "supervising attorney" at KLG in 2016, she has not "propounded written discovery," "drafted or prepared any motions," or had any "direct communications with clients." She also testified that she could not recall the "last time. . . [she] communicated with opposing counsel," which she did "not very often."  Morse also testified that in her supervisory role she spent very little time drafting any legal documents. Yet, billing statements attached to sworn declarations filed by KLG include many hundreds of entries for Morse that purport to attribute to her time for performing these very tasks during this period, including frequent entries for communicating with clients and

opposing counsel and hundreds of entries claiming to have drafted written discovery and complaints.

45.    Notably, the inconsistency between Morse's testimony and KLG's fee applications cannot fully be attributed to the fraud that took place in KLG's Fee Motion Department.  Howard, a member of the Fee Motion Department, testified that, prior to inputting the arbitrary time values, she reviewed attorney billing statements that reflected that Morse performed these tasks—including "preparing complaints" and "drafting discovery"—as recently as 2020 and 2021, notwithstanding Morse's own testimony that she has not performed these tasks since 2016.

46.    KLG's billing records reflect that individual attorneys, including Kirnos and Morse, worked more than 24 billable hours a day on numerous occasions—a literal impossibility.  Even greater is the number of days on which individual attorneys claim to have worked 20 or more billable hours.  This constitutes further evidence of a widespread billing fraud that cannot be explained away as occasional and innocent record-keeping lapses, or even non-innocent but minor "padding."

47.    Despite Morse having testified under oath that most of her work is administrative and supervisory and thus she only rarely bills *any* time, time entries were submitted representing that Morse worked more than 24 hours a day on 34 separate occasions, including an astounding 57.5-hour workday on November 30, 2016, and 31.3 hours on March 23, 2017.  Billing records also claimed that Morse worked between 20 and 23.9 hours a day on 38 separate occasions.  During one three-month period (February-April 2017), Morse averaged 483.7 hours a month (with a high of 513.1 hours in March 2017) for an average of 16.5 hours a day in that month (including weekends).

48.    The magnitude of Defendants' fraud grows exponentially when looking at Morse's time on an annual basis.  In 2016, Morse purported to bill an astronomical 3,106.45 hours—and that is based only on the small sampling of cases for which Ford

has billing invoices it can review.  In 2017, Morse was even more prolific, billing an eye-popping 3,975.40 hours—again, based only on the limited subset of cases for which Ford has billing invoices available.  Yet Morse testified that from 2016 and on she worked 60 hours per week and between 70-80% of her working time was dedicated to non-billable administrative and supervisory work.  Assuming that Morse worked 60 hours per week every week of the year, and making the most generous assumption that only 50% of her time was non-billable, she would have billed a maximum of 936 hours a year—less than 25% of the time shown on Ford's limited subset of her fraudulent time records for 2017 alone.

49.    As mentioned above, these figures are based on examination of only the small sampling of billing records—an estimated 11-12% of KLG-filed cases—currently in Ford's possession, and Defendants concealed their fraud by spreading their billings across a large number of cases and auto manufacturers.  When the other 88-89% of billing records (including those submitted against other auto manufacturers) are obtained in discovery, Ford reasonably anticipates that the number of 20+ and 24+ hour days purportedly worked by Morse, other Defendants, and potentially other as-yet unidentified or unnamed persons associated with the  enterprise will increase exponentially, possibly by a factor of 10 or more.

50.    Other clear patterns emerge when reviewing even the limited collection of invoices available to Ford.  Morse was a billing attorney on 95% of the cases that Ford has been able to review.  She was the billing attorney on 92% of the entries for "Draft Complaint"—totaling more than 450 entries and nearly 350 hours, even though she testified that between 0-5% of her total time worked was billed for drafting legal documents.  From 2016-2024, she made more than 4,600 distinct entries with the description "Communicate with Client," totaling nearly 1,150 hours, even though she testified that she never communicated with clients during this period.  Based on the information available to Ford—including the statements of KLG's representatives and

SECOND AMENDED COMPLAINT

Morse's own sworn testimony—each of these entries is entirely manufactured and fraudulent.

51.     Kristina Stephenson-Cheang, an associate with KLG, is second only to Amy Morse in the number of 24+ hour-days—seven—she has purportedly billed.  On July 6, 2017, Stephenson-Cheang billed 34.1 hours; on July 14, 2017, she billed 25.4 hours; on August 16, 2017, she billed 25.6 hours; on August 21, 2017, she billed 24.5 hours; on November 14, 2017, she billed 28.7 hours; and on December 4, 2017, she billed 28.6 hours.  As with Morse, Ford has been able to review only the small sampling of cases for which it has time entries from Stephenson-Cheang, and the true number of 24+ hour days billed in her name is undoubtedly much larger.  Stephenson-Cheang was a billing attorney on 90% of the cases that Ford has been able to review.

52.     Unless the laws of time and space operate differently at KLG's offices than elsewhere in the universe, these billings are conclusive evidence of fraud.  Yet these obviously fraudulent billing records were used, and continue to be used, to support Defendants' extraction of payments for fictitious fees.  Although Defendants attempted to conceal these and other fraudulent time entries by spreading them across different payor automobile manufacturers and different plaintiffs so that each individual fee application would appear innocuous in isolation, the sworn deposition testimony confirming the pervasive use of fraudulent billing statements created by KLG's Fee Motion Department leads to the reasonable inference that ***every one*** of KLG's billing records is presumptively fraudulent.  These fraudulent billing records were used not only to wrongly obtain fee awards in court, but also as leverage to wrongly extract high and unwarranted settlement payments from Ford.

### 2.     The Same Tasks Were Fraudulently Billed for the Same Amounts of Time Across Multiple Separate Cases and Timekeepers

53.    Consistent with the admitted after-the-fact fabrication of time and billing records, Defendants generate substantial phantom legal fees by billing for the same repetitive tasks across a multitude of cases at the same time.  As an example, attached as Exhibit A is a chart of 489 task descriptions in which an attorney billed to draft a meet-and-confer letter and perform unspecified legal research.  There is no plausible reason why those two separate tasks should so frequently be combined other than to mask the time actually spent on the two tasks.  In this chart, the unspecified legal research masks the time actually billed for drafting identical or substantially similar meet-and-confer letters.  The chart is in chronological order and shows days and periods of time when many letters were drafted without any economy of scale reduction in time allotments.  Not surprisingly, these entries overlap with the 24-plus hour days described above.  For example, Morse allegedly drafted/researched four letters on March 10, 2017, for which she billed 4.0 of her total 28.0 hours.  This is consistent with Howard's testimony regarding both (1) Morse's time entries including discovery tasks after she ceased performing them, and (2) KLG's Fee Motion Department creating time records years after the fact irrespective of actual time spent or even of whether the work had actually been performed.

54.    Another example of such repetitive billing is the chart attached as Exhibit B of 596 fee entries submitted by Defendants for "drafting RFAs [Requests for Admission]."  As with the meet-and-confer letter entries described above, the chart demonstrates that there are no economies of scale over time and that certain timekeepers, especially Amy Morse and Kristina Stephenson-Cheang, billed to draft (presumably substantially identical) RFAs day after day for extended periods of time.  Overbilling for RFA drafting contributed to the 24+ hour days, including 12.9 hours of Amy Morse's 57.5 hours billed on November 30, 2016—which, again, is consistent with sworn testimony establishing that KLG billed Ford for Morse's

SECOND AMENDED COMPLAINT

purported time on discovery tasks without regard to whether or not she had ever actually performed any such tasks.

55.    These and similar fraudulent time entries have continued to be used to make false claims for legal fees and to wrongly obtain settlement payments from Ford, including as recently as August 2025.

### 3.    Defendants Rely on Undated and Form Time Entries as Part of Their Fraudulent Billing Scheme

56.    Billing records submitted by Defendants include other entries that are belied by the realities of practice.  For example, Mikhov, who on information and belief has never first-chaired a trial and did not try cases for KLG, submitted hundreds of invoices that contain fee entries with no date.  Such no-date entries exceed 1,200 hours, and the corresponding fees billed exceed $625,000.00.  Nearly all entries are a combination of (i) initial communication with client, (ii) initial evaluation of client's claims, and (iii) analysis of vehicle documents.  The entries describe identical tasks with only slight wording differences.  These and other similar time entries are fully consistent with deposition testimony establishing that KLG created time records from scratch often years after the fact—time entries that KLG continued to use to assert fraudulent claims for legal fees as recently as August 2025.  Indeed, Howard testified that when creating billing statements, she would "insert a set time period" for Mikhov's "client intake" tasks without ascertaining how much time Mikhov had actually spent on that task or whether he performed that task at all.  This was consistent with the practices Mikhov had authorized for the Fee Motion Department.

57.    Mikhov's dated time entries are equally implausible and consistent only with outright fabrication.  For example, in 2016, Mikhov himself was KLG's second-highest biller, totaling 1,350.10 hours just in the estimated 11-12% of cases for which Ford has invoices.  Mikhov's time surged in 2017, when he logged 1,799.00 hours—again in only the estimated 11-12% of cases for which Ford has invoices.

58.    Based on records currently available to Ford, from 2016 to 2025, Mikhov has 487 separate time entries for "Initial communications with client and evaluation of clients' claims" totaling approximately 518.6 hours.  Of note, 388 of these entries were for either exactly 1.0 hours (286 entries) or 0.8 hours (102 entries).  Additionally, over this same time period, Mikhov made 2,002 entries (577 of which were undated) for "Communicate with Client" totaling approximately 554 hours.  Mikhov also made vague entries for "analyze vehicle documentation" on all or nearly all of the matters in which Morse fraudulently billed for "Draft Complaint."  Specific date logs likewise suggest fraud; on July 31, 2017, Mikhov billed a total of 18.1 hours that included 84 separate entries in 59 separate cases.  These entries appear to be entirely manufactured and fraudulent, particularly in light of deposition testimony that, at Mikhov's direction, KLG's Fee Motion Department would create fictitious time entries for Mikhov using fictitious time values.

**B.    Defendants Concealed and Lied About Their Fraudulent Scheme in Furtherance of the Enterprise**

59.    Attorneys, in California as in every state across the country, are explicitly required to conduct themselves with dignity, courtesy, and integrity as officers of the court.  An attorney seeking to practice in California is required to take an oath to that effect.  Cal. Rules of Court, R. 9.7. The same or similar requirements apply in federal courts.

60.    Defendants abused their positions of trust as members of the Bar to deceive Ford and the courts, including by submitting thousands of billing records that appeared plausible in isolation but are clearly false and fraudulent.  The fraudulent nature of these records is apparent when viewed alongside other records submitted for work on the same day.  Deposition testimony establishes that KLG created such records often years after the fact and without regard for work actually performed, despite Defendants' false

representations to Ford and to the courts that the time records were both contemporaneous and accurate.

61.     Defendants likewise defrauded Ford and other car manufacturers in the settlement process.  Defendants' fraudulent scheme led Ford and, on information and belief, other auto manufacturers to overpay in settlement of Lemon Law fee disputes—not just for attorney's fees, but for compensatory damages and civil penalties as well—regardless of the merits of the individual case.  The fees claimed by Defendants often far exceeded—sometimes by a factor of 10—the amount in dispute in the underlying Lemon Law case.  Outsize fee payments disincentivize auto manufacturers from proceeding to fee hearings—where auto manufacturers end up paying both sides to fight over how much more to pay—and induce them to pay inflated settlement values. Defendants' fraudulent billing records thus result in the artificial and fraudulent inflation of prelitigation settlement offers, including by altering the perceived risk calculus of fee litigation.

62.     The key to Defendants' fraudulent billing scheme is creating time records that do not appear fraudulent when reviewed in isolation in a particular matter.  Because there are no red flags to alert the courts or the victims of this fraud to audit the daily time entries for every day over a decade across all cases against all automakers for all of the Lemon Law lawyers in the enterprise (even assuming courts and victims had all the information needed to do so, which they do not), two circumstances have resulted: First, courts have been deceived into awarding fees against Ford during the fee-petition process that occurs as a separate and distinct process from any underlying merits litigation, and, second, Ford has  been defrauded into settling fee claims based on these fraudulent billing records  and resolving consumers' pre-litigation and post-litigation claims even before fee applications are made.

63.     In May 2020, Kirnos admitted, as he has on numerous other occasions that he expected the court and Ford to rely on Defendants' representations regarding fees.

SECOND AMENDED COMPLAINT

During an oral argument regarding KLG's fee application in an MDL action, *Mark Pedante v. Ford Motor Company et al.* (ML 18-02814-AB), Kirnos stated: "There is a presumption attached to our billing because there is a presumption that we are going to be ethical, that we are not going to submit lies to this Court. And we did not." Kirnos went on to implore the Court to rely on that presumption on the basis that Defendants obviously would not violate their ethical duties when submitting fee applications to the Court. Even while making these representations, Kirnos knew that he and the other Defendants were in fact engaging in repeated and blatant violations of their ethical duties and committing criminal acts to line their own pockets, including but not limited to having directed and overseen the fabrication years of time records in countless cases—**including the *Pedante* case itself**—and having falsely represented to multiple courts under oath that those records were contemporaneous, reasonable and accurate.

64.    While certain instances of Defendants' inflated bills did not go entirely unnoticed by courts in some matters on a case-by-case basis, Defendants were successful in concealing the massive (and, indeed, all-encompassing) scope of their coordinated fraud as a broader enterprise by passing it off as mere "overstaffing" and routine inefficiencies. For example, in a Lemon Law fee proceeding in 2020, *In re Volkswagen "Clean Diesel"Marketing*, *Sales Practice and Prod. Liab. Litig.* (MDL No. 2672 CRB (JSC)), the court found that KLG and other firms filed applications seeking compensation for work that was not in fact conducted on behalf of the clients involved in the fee application. United States District Judge Charles R. Breyer noted "the enormous number of hours attributed to these Plaintiffs' cases while they were stayed." The court completely excluded bills for vague entries and clerical tasks, as well as work performed for other plaintiffs, not involved in the fee application, whose cases actually went forward to trial. However, because the court was looking only at the fee applications in a single case and had no way of knowing that the lawyers appearing before it had secretly fabricated time records out of

whole cloth years after the fact, it was unable to discern the true nature of the fraudulent enterprise that Defendants concealed by spreading their fictitious billings across multiple clients, cases, and law firms.

65.    Reflecting the ongoing and self-perpetuating nature of the criminal enterprise, Defendants use the successes they achieve through their fraudulent acts to conceal and lend a cloak of legitimacy to their further fraudulent acts.  In declarations submitted to federal and state courts, Mikhov and Kirnos routinely tout their success in having fee motions granted by both federal and state judges, exploiting the respect those jurists have for their fellow members of the bench to avoid scrutiny of their fraudulent billings and further conceal the scheme.  As just two of many examples, Mikhov and Kirnos signed declarations in August 2021 and November 2023, respectively, attaching multiple fraudulently obtained fee awards and identifying more than a dozen judges—including judges of the Central District of California and the Los Angeles Superior Court—who had approved fees for billings by Mikhov, Morse, Stephenson-Cheang and others.  *See* Exhibit D at ¶¶ 48-94; Exhibit E at ¶¶ 35-58; *see also* Exhibit F at ¶¶ 47-104; Exhibit G at ¶¶ 56-90; Exhibit H at ¶¶ 54-122; Exhibit I at ¶¶ 50-89; Exhibit J at ¶¶ 68-72; Exhibit L at ¶¶ 41-51; Exhibit M at ¶¶ 174-128; Exhibit O at ¶¶ 51-76.  The fee payments Defendants obtain based on their fraudulent billing records thus create a snowball effect by leading to less scrutiny of their time records, which in turn facilitates more fraud and even higher fraudulent fee payments and settlements not "based on" time actually expended in each case.  Defendants' scheme thus harmed Ford in transactions far beyond those specific to the individual cases in which the fee claims were made.

### C.    Defendants Intensified Their Fraudulent Scheme Over Time

66.    Since 2015, Defendants have filed over 10,000 breach of warranty cases against Ford and other car manufacturers and have filed hundreds of fee applications in connection with those cases.

67.    Defendants' fraudulent scheme has expanded over time.  In the years 2021 through 2024, KLG obtained fee awards from Ford totaling approximately $35 million, with a substantial portion of that sum likely resulting from false and wholly fabricated billing records.

68.    Moreover, Ford is not the only automaker in Defendants' crosshairs. Defendants have filed thousands of cases against other automakers including GM, Fiat Chrysler Automobiles/FCA, Volkswagen/Audi, and BMW, among others.  Based on a review of only a small sample of such fee applications, Ford believes that these automakers are also victims of Defendants' scheme to defraud.

69.    Defendants have long pursued this fraudulent billing scheme to enrich themselves, and their conduct since the filing of this lawsuit demonstrates consciousness of guilt.  As just one example, on May 22, 2025—the day after Ford filed its complaint—KLG submitted time records reflecting time billed by Morse in *Solisperez v. Ford*, Los Angeles Superior Court Case No. 23PSCV01411.  In what appears to be an acknowledgment that such time was never actually incurred and was instead (like most of Morse's other purported "time") invented at the case's conclusion to increase Defendants' financial windfall, KLG later, after reviewing the initial complaint in this action, submitted a "supplemental" billing invoice that removed the time purportedly billed by Morse.  Since Ford filed this lawsuit, KLG has begun withdrawing requests for payment for time entries purportedly made by Morse (and other KLG attorneys) in other cases as well—against both Ford and other auto manufacturers—reflecting KLG's and its members and employees' ongoing efforts to

cover their tracks and conceal their fraudulent conduct in furtherance of the continuing enterprise.

**D.** **Defendants Corruptly Obstructed And Impeded The Administration Of Justice By Submitting Fabricated Evidence And Sworn Declarations Falsely Attesting To The Truth Of KLG's Fraudulent Fee Motions**

70.     As noted, the fee application process is separate from and subsequent to the underlying Lemon Law litigation.  The submission of sworn declarations by counsel in support of a fee request is central to the resolution of the narrowly focused separate fee application proceeding.  In submitting sworn declarations in support of KLG's fee motions, Defendants Mikhov and Kirnos repeatedly perjured themselves in violation of 18 U.S.C. § 1621 and thereby obstructed and impeded the administration of justice in violation of 18 U.S.C. § 1503.  Section 1503 prohibits anyone from "corruptly . . . influenc[ing], obstruct[ing], or imped[ing], or endeavor[ing] to influence, obstruct, or impede, the due administration of justice."  Acts of perjury committed in federal courts, including those violating 18 U.S.C. § 1621, are indictable under 18 U.S.C. § 1503.

71.     For instance, as part of cases comprising *In Re Ford Motor Co. DPS6 Powershift Transmission Products Liability Litigation*, No. 2:18-ml-02814 (C.D. Cal.) (the "DPS6 Cases"), KLG submitted multiple perjurious declarations.  In one of those cases, *Pedante*, Mikhov submitted a sworn declaration attaching timesheets and attesting that "[a]ll time billing entries were completed contemporaneously with each dated entry or near in time to the work performed" and that he "personally reviewed the billing entries to ensure that they appropriately reflect the time expended."  Exhibit L at ¶ 40.  However, in *Pedante*, Defendants submitted numerous time entries for Amy Morse beginning in July 2017 reflecting "Communication with Client" and "Draft Complaint," notwithstanding her testimony that she did not perform those tasks during this period. *See id*.  Moreover, the application included entries for Mikhov himself,

including an entry reflecting one hour for "Initial communication with Client; Analyze Vehicle documentation"—exactly the amount of time Elin Howard testified she would input for Mikhov arbitrarily and fictitiously, without receiving any actual time entry from him. *Id.* Aside from these specific examples, the application included other non-contemporaneous time records that were supplemented or entirely created by KLG's Fee Motion Department. Pursuant to a Court order entered in reliance on Mikhov's perjurious declaration and fraudulent billing records, Ford paid KLG $49,987.01.

72. In *Fort v. Ford Motor Company*, No. 2:17-cv-06631 (C.D. Cal.), and *Bagwell v. Ford Motor Company*, No. 2:17-cv-06632 (C.D. Cal.), Mikhov submitted a sworn declaration attaching timesheets and attesting that "[a]ll time billing entries were completed contemporaneously with each dated entry or near in time to the work performed" and that he "personally reviewed the billing entries to ensure that they appropriately reflect the time expended." Exhibit M at ¶ 73. However, in *Fort/Bagwell*, Defendants submitted numerous time entries for Amy Morse beginning in July 2017 reflecting "Communication with Client," "Draft Complaint," and "Draft NOD [Notice of Deposition]," notwithstanding her testimony that she did not perform those tasks during this period. *See id.* Moreover, the application included entries for Mikhov himself, including an entry reflecting one hour (for each plaintiff) for "Initial communication with Clients and evaluation of Clients' claims"—exactly the amount of time Elin Howard testified she would input for Mikhov arbitrarily and fictitiously, without receiving any actual time entry from him. *Id.* Aside from these specific examples, the application included other non-contemporaneous time records that were supplemented or entirely created by KLG's Fee Motion Department.

73. Later with respect to the *Fort* and *Bagwell* cases, Kirnos submitted a sworn declaration attaching "revised billing" to support a "revised . . . fee request" after Ford opposed the fee request, which included the same fraudulent entries for Morse and Mikhov to which Mikhov had previously sworn. Exhibit N at ¶ 2. Just as Mikhov did,

Kirnos swore that the time sheets were "true and correct." *Id*. Pursuant to a joint stipulation—agreed to by Ford and entered by the Court in reliance on Kirnos' and Mikhov's perjurious declarations and fraudulent fee statements—Ford paid KLG and associated firms a total of $146,978.48 between the two cases.

74. In *Medina v. Ford Motor Company*, Docket No. 2:29-cv-00078 (C.D. Cal.), Mikhov submitted a sworn declaration attaching timesheets and attesting that "[a]ll time billing entries were completed contemporaneously with each dated entry or near in time to the work performed" and that he "personally reviewed the billing entries to ensure that they appropriately reflect the time expended." Exhibit O at ¶ 49. However, in *Medina*, Defendants submitted numerous time entries for Amy Morse beginning in December 2018 reflecting "Communication with Client," "Draft Complaint" and "Draft NOD [Notice of Deposition]," notwithstanding her testimony that she did not perform those tasks during this period. *See id*. Moreover, the application included entries for Mikhov himself, including an entry reflecting one hour for "Initial communication with Clients and evaluation of Clients' claims"—exactly the amount of time Elin Howard testified she would input for Mikhov arbitrarily and fictitiously, without receiving any actual time entry from him. *Id*. Aside from these specific examples, the application included other non-contemporaneous time records that were supplemented or entirely created by KLG's Fee Motion Department. Pursuant to a joint stipulation—agreed to by Ford and entered by the Court in reliance on Mikhov's perjurious declaration and fraudulent billing records—Ford paid KLG and associated firms a total of $30,000.00.

75. In *O'Brien v. Ford Motor Company*, Docket No. 2:24-cv-04969 (C.D. Cal.), and *Daggett v. Ford Motor Company, et al.*, Docket No.: 2:24-cv-04970 (C.D. Cal.), which were part of the DPS6 Cases, Kirnos submitted a sworn declaration attaching timesheets and attesting that "[a]ll time billing entries were completed contemporaneously with each dated entry or near in time to the work performed" and

that he "personally reviewed the billing entries to ensure that they appropriately reflect the time expended."  Exhibit P at ¶ 66; Exhibit Q at ¶ 63.  The *O'Brien* and *Daggett* applications included not only attached time purportedly incurred for those plaintiffs alone, but also an attachment containing KLG time entries "performed globally for [KLG] clients' cases" in Judicial Council Coordinated Proceeding 4856 of the DP6S Cases.  Exhibit P at ¶ 3; Exhibit Q at ¶ 3.  These included numerous time entries for Amy Morse beginning in July 2016 reflecting numerous tasks including attending hearings, notwithstanding her testimony that she did not perform those tasks during this period.  Aside from these specific examples, the application included other non-contemporaneous time records that were supplemented or entirely created by KLG's Fee Motion Department.  Pursuant to a joint stipulation—agreed to by Ford and entered by the Court in reliance on Kirnos's perjurious declaration and fraudulent billing records —Ford paid KLG and associated firms a total of $73,600.58.

76.      The foregoing are but several illustrative examples.  Other, non-exhaustive examples are described in Exhibit C.  Mikhov and Kirnos submitted many such perjurious declarations in federal court in fee application proceedings, the outcomes of which hinged on their representations to the court about fees.  When a fee petition based on such perjurious declarations and fabricated evidence was successful, Mikhov and Kirnos often cited the result as "evidence" to recover fees in future matters, thus using their fraud as a foundation for further fraud.  Where, as in the foregoing examples, the declarations were filed in federal court and induced either Ford to stipulate to an amount of attorneys' fees or the Court to order attorneys' fees, Mikhov's and Kirnos' perjury caused an obstruction of and impediment to justice in violation of 18 U.S.C. § 1503.

### E.      <u>Defendants Used Interstate Wires And U.S. Mail To Demand And Receive False, Unearned, And Fraudulently Induced Fee Payments</u>

77.      Defendants used the U.S. mail and interstate wires to make fraudulent evidentiary submissions, to negotiate settlements, and to receive payments pursuant to

fraudulent billing records based on falsified time entries submitted in support of fee applications, all in furtherance of their scheme to defraud Ford of its money.  For example, by order dated July 19, 2018 and filed on July 31, 2018, in *Buck v. Ford Motor Company,* Stanislaus County Superior Court Case No. 2008745, the Court ordered Ford to pay attorneys' fees, costs, and expenses totaling $135,500.00 based on fraudulent billing records filed by KLG that included false billing entries by Morse for March 23, 2017 (on which date she billed at least 31.3 hours).  By letter dated July 24, 2018 addressed to Mikhov and sent by FedEx, Ford enclosed a check in the amount of $135,500.00 payable to KLG.  Similarly, by judgment entered on August 31, 2018 in *Duk v. Ford Motor Company*, San Diego County Superior Court Case No. 2016-00012779, the Court ordered Ford to pay attorneys' fees, costs, and expenses totaling $101,450.78 based on fraudulent billing records filed by KLG that included billing entries by Morse for November 30, 2016 (on which date she billed at least 57.5 hours).  By letter dated October 1, 2018 addressed to Mikhov and sent by FedEx, Ford enclosed a check in the amount of $101,450.78 payable to KLG.  In addition to the fee awards in the *Buck* and *Duk* cases, Morse's fraudulent billing records also were used to support fee awards in the following cases, among others: (a) fee award in the amount of $10,675.16 in *Burgess v. Ford Motor Company*, San Bernardino Superior Court Case No. CIVDS1620111, paid by check dated October 9, 2018 payable to KLG and sent by FedEx; (b) fee award in the amount of $12,405.20 in *Duenas v. Ford Motor Company*, Los Angeles County Superior Court Case No. BC638306, paid by check dated August 15, 2018 payable to KLG and the plaintiff and sent by FedEx; and (c) fee award in the amount of $15,005.00 in *Orosco v. Ford Motor Company*, Los Angeles Cnty. Sup. Ct. Case No. BC638222, paid by check dated October 12, 2018 payable to KLG and sent by FedEx.  Each of the *Buck*, *Duk*, *Burgess*, *Duenas*, and *Orosco* cases included time entries that were false and fraudulent because they were not contemporaneously

SECOND AMENDED COMPLAINT

recorded and were fabricated or supplemented after the fact by KLG's Fee Motion Department.[1]

78.    In *Berroteran v. Ford Motor Company*, Los Angeles County Superior Court Case No. BC542525, pursuant to fraudulent billing records submitted in support of a motion for attorneys' fees filed on May 20, 2022, KLG sought $1,226,868.45 in attorneys' fees, costs, and expenses on behalf of itself and other attorneys.  Kirnos submitted a false declaration that attached KLG's invoices, which included time entries from him, Mikhov, and Morse.  Those time entries, all of which Kirnos swore under oath "were completed contemporaneously with each dated entry or near in time to the work performed," *see* Exhibit F at ¶ 46, were in fact at least in large part false and fraudulent because they included entries that were not contemporaneously recorded and were fabricated or supplemented after the fact by KLG's Fee Motion Department, as well as because they included time entries for Morse for work that she has testified she never performed.  The court issued a minute order on July 14, 2022, awarding $807,127.50 in attorneys' fees only.  Ford mailed KLG a check in the amount of $851,493.51 on October 21, 2022 by FedEx.

79.    The fee application in *Coon v. Ford Motor Company*, Riverside County Superior Court Case No. MCC1300767, was filed on February 4, 2019, and was based on fraudulent billing records.  Mikhov submitted a false declaration in support of that application.  KLG requested $866,754.00 in attorney's fees (including a lodestar enhancement).  The time records attached to Mikhov's declaration, all of which Mikhov

---

[1] Morse's fraudulent billing records were also used to support successful efforts to extract fee payments in cases involving other auto manufacturers, including, among others: (a) fees in the amount of $106,560.55 in *Vargas v. FCA US LLC*, Orange County Superior Court Case No. 30-2016-00845431-CU-BC-CJC, paid by check dated July 26, 2018 and sent to KLG by FedEx; and (b) fees in the amount of $23,179.10 in *Beltran v. FCA US LLC*, Los Angeles County Superior Court Case No. BC617905, paid by check dated September 10, 2019 and sent by FedEx.

swore under oath "were completed contemporaneously with each dated entry or near in time to the work performed," *see* Exhibit G at ¶ 53, were in fact at least in large part false and fraudulent because they included entries that were not contemporaneously recorded and were fabricated or supplemented after the fact by KLG's Fee Motion Department, as well as because they included time entries from Morse for work that she has testified she never performed.  On May 19, 2019, the court awarded KLG $543,554.00 in attorneys' fees.  Ford mailed KLG a check in the amount of $709,004.12 on June 16, 2022 by FedEx.

80.    The fee application in *Brown v. Ford Motor Company*, Butte County Superior Court Case No. 160060, was filed on behalf of KLG and others on November 21, 2018, and was based on fraudulent billing records.  Mikhov submitted a false declaration in support of that application.  The time records attached to Mikhov's declaration, all of which Mikhov swore under oath "were completed contemporaneously with each dated entry or near in time to the work performed," *see* Exhibit H at ¶ 51, were in fact at least in large part false and fraudulent because they included entries that were not contemporaneously recorded and were fabricated or supplemented after the fact by KLG's Fee Motion Department, as well as because they included time entries from Morse for work that she has testified she never performed.  KLG sought $807,163.50 (including a lodestar enhancement).  On January 16, 2019, the court awarded $714,233.00 in total attorneys' fees.  Ford mailed KLG a check in the amount of $843,528.13 on July 25, 2022 by FedEx.

81.    *Margeson v. Ford Motor Company*, Los Angeles County Superior Court Case No. BC549430, is still another example.  Like with the *Coon* and *Brown* matters, the fee application—on behalf of KLG  and others—was submitted years prior, on December 15, 2017, and was based on fraudulent billing records.  Mikhov submitted a false declaration in support of that application.  KLG sought $523,494.00 in fees.  The time records attached to Mikhov's declaration, all of which Mikhov swore under oath

36

"were completed contemporaneously with each dated entry or near in time to the work performed," *see* Exhibit I at ¶ 49, were in fact at least in large part false and fraudulent because they included entries that were not contemporaneously recorded and were fabricated or supplemented after the fact by KLG's Fee Motion Department, as well as because they included time entries from Morse for work that she has testified she never performed.  On February 1, 2018, the court awarded $741,839.70 in total attorneys' fees, plus prejudgment interest to KLG and its associated counsel.  KLG had an opportunity to correct these misrepresentations in Mikhov's declaration when it filed a reply in support of its fee application on July 22, 2022, but failed to do so.  Ford's outside counsel mailed KLG two checks on behalf of Ford by FedEx: one for $136,744.53 on July 26, 2022, and another for $345,000.00 on September 22, 2022.

82.     As another example, the fee application in *Anderson v. Ford Motor Company*, San Joaquin County Superior Court Case No. 39-2013-00299512-CU-BC-STK, was submitted on May 28, 2019, on behalf of KLG and others.  Mikhov submitted a false declaration in support of that application.  The time records attached to Mikhov's declaration, all of which Mikhov swore under oath "were completed contemporaneously with each dated entry or near in time to the work performed," *see* Exhibit J at ¶ 64, were in fact at least in large part false and fraudulent because they included entries that were not contemporaneously recorded and were fabricated or supplemented after the fact by KLG's Fee Motion Department.  KLG sought $740,118.75 (including a lodestar enhancement).  On May 10, 2022, Ford mailed a check to KLG for $813,554.48 by FedEx.

83.     All of the above checks were sent in reliance on false and fraudulent fee applications or billing statements, and all were caused by Defendants to be mailed as an essential part of their fraudulent scheme.

**F.    Ford Has Suffered And Continues To Suffer Significant Harm From The Enterprise's Fraudulent Billing Scheme**

84.    As a direct and proximate result of Defendants' pervasive fraudulent criminal enterprise built on sham billing records, Ford has paid Defendants more than $100 million.  Defendants' misrepresentations to Ford have fraudulently induced Ford to settle fee disputes and have caused Ford to pay much larger amounts than it would have paid absent Defendants' fraudulent billing records and abuse of their trusted positions as attorneys.  Any uncertainty as to the amount of damages caused by Defendants' massive fraudulent billing scheme has been caused by Defendants' actions, and the true extent of the fraud and resulting damages will only be revealed as Ford assembles additional evidence and through discovery in this matter.

85.    In addition to the harm suffered from fraudulently induced payments based on false representations and falsified billing records, Ford has been further damaged by the legal fees and other costs it had to incur to detect and now attempt to stop the fraud perpetrated by this criminal enterprise.  The evidence presented in this Second Amended Complaint reflects extensive work by Ford.  New evidence continues to emerge as Defendants continue to file additional fraudulent fee billing records in support of fee demands against Ford and other car manufacturers in various jurisdictions.  Expensive expert services are needed to untangle the thousands of fraudulent billing entries that Defendants have filed in various jurisdictions.  The work to uncover Defendants' criminal enterprise is continuing and is expected to cost Ford many millions of dollars.  Such work is necessary only because of Defendants' calculated efforts to conceal their scheme by spreading their fraudulent billing entries across multiple cases, timekeepers, auto manufacturers, and jurisdictions.

86.    Ford has been further damaged by having to participate in a sham and tainted litigation process in connection with Defendants' submission of false and fraudulent billing records and perjured declarations in support of fee applications.

Defendants misrepresented the amount of time they actually worked, making those misrepresentations to—and thereby perpetrating a fraud on—Ford and the courts. Defendants intentionally and knowingly concealed the fictitious nature of the time entries for which they sought to recover fees, causing Ford to pay settlements, and successfully swaying courts to issue fee awards, for work that had not actually been performed on behalf of Defendants' client car owners. Ford did not know at the time—and could not have known—that Defendants' demands were premised on fabrications, lies, and systemic fraud. As Defendants well knew but concealed from Ford and the courts, its billing entries did not reflect actual and contemporaneously billed time, but rather were entirely fictional entries generated without regard to whether the billed tasks were ever performed at all and often years after cases had concluded.

87.    Ford has also suffered harm to its reputation and goodwill as a result of Defendants' conduct. In open court and through Facebook posts, blogs, and other forums for summoning negative publicity, Defendants have touted their fraudulently obtained fee payments to onboard new clients, harming Ford's reputation and goodwill.

## II.    THE RICO ENTERPRISE

88.    Defendants are a group of persons associated with Knight Law Group LLP, which constitutes an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (referred to hereinafter as the "Enterprise"), because, among other reasons: (a) those involved have the common purpose to unlawfully operate an ongoing criminal enterprise engaged in fraudulent billing; (b) the Enterprise has a governing structure that operates as a command hierarchy led by Defendants Mikhov, Morse, and Kirnos, different roles for members, and a governing set of rules and practices; (c) each of the Defendants participates in the operation or management of the Enterprise; (d) the Enterprise has enjoyed sufficient longevity and has been in continuous operation for over five years; and (e) the Enterprise has generally been structured to operate as a

continuing unit, with membership, rank, privileges, and access constantly maintained by the members, to accomplish the goals of the fraudulent billing scheme.

89.     Defendants and others have associated with one another and with the Enterprise for the common purposes of preparing and filing fraudulent billing records and perjured declarations in support of fee demands, fraudulently inflating the value of negotiated settlements, delaying and/or depriving clients of compensation due to them or increasing their clients' tax liability to advance their own financial interests, and funneling fraud proceeds into attorney distributions and extravagant purchases.

90.     Mikhov, Kirnos, and Morse oversaw the Enterprise's operations and expressly directed employees of the Enterprise to create fictitious fee statements and perjured declarations in order to allow the Enterprise to extract fraudulently induced payments from Ford and others.

91.     At all relevant times, Defendants were financially intertwined as partners of KLG.

92.     At all relevant times, the Enterprise was engaged in, and its activities affected, interstate commerce within the meaning of 18 U.S.C. § 1962(c).  The Enterprise conducts business involving clients in different states, auto manufacturers engaged in interstate commerce, and the federal courts' interstate e-filing system.  Many of the cases involved in the criminal scheme are related to multi-district litigation involving lawyers located in different states accessing the federal e-filing system.

93.     Each of the Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), namely, mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and obstruction and impediment of justice in violation of 18 U.S.C. § 1503.

## III.    THE PATTERN OF RACKETEERING ACTIVITY

94.    As described herein, Defendants engaged in an expansive criminal scheme to defraud Ford and obtain payment for fictitious fees in thousands of cases.

95.    Defendants conducted and participated in, directly and indirectly, the conduct of the Enterprise's affairs through a pattern of racketeering activity that included multiple instances of mail fraud, wire fraud, and obstruction and impediment of justice.

96.    The ultimate objective of Defendants' scheme or artifice to defraud and obstruction and impediment of justice was to deceive and coerce Ford into paying the Enterprise unearned and fraudulently obtained fee settlements and judgments totaling millions of dollars to directly benefit Defendants.

97.    In furtherance of their fraudulent scheme, and as described herein and in Exhibit C hereto, Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to, the following:

(a) electronic filing and service of court papers, served on lawyers located in various states, containing false and misleading statements intended to mislead the courts and relevant parties and to obtain Ford's money;

(b) mail service of court papers on lawyers containing false and misleading statements intended to mislead the relevant parties and to obtain Ford's money; and

(c) wires and/or mailings between and among Defendants, or between and among Defendants and Ford or its counsel, containing fraudulent billings and payments therefor.

41

98.     In addition to the acts identified in Exhibit C hereto, and as alleged herein, any document transmitted or caused to be transmitted by Defendants, whether by mail or wire, that contains, incorporates, references, and/or is based on purported post-2016 billing entries for Amy Morse for communicating with client, attending mediations, drafting case management statements, drafting or responding to meet-and-confer letters, and/or communicating with expert witnesses constitutes a predicate act of racketeering under 18 U.S.C. § 1341 (mail fraud) or 18 U.S.C. § 1343 (wire fraud) because Morse has testified that she did not ever perform any of those tasks.    The predicate racketeering acts falling into these two categories, which are believed to number in at least the hundreds, are too numerous to list in Exhibit C and will be further explored through discovery in this matter.  Ford reserves the right to seek leave to amend Exhibit C to include additional predicate acts as warranted by the evidence.

99.     In furthering this scheme, Defendants also engaged in multiple instances of perjury in federal court in violation of 18 U.S.C. § 1621, thereby "corruptly . . . influenc[ing], obstruct[ing], [and] imped[ing], or endeavor[ing] to influence, obstruct, or impede, the due administration of justice."  18 U.S.C. § 1503.  Several examples of perjurious declarations are included in Exhibits C.  The predicate racketeering acts falling into this category are too numerous to identify in Exhibit C, and will be further explored through discovery in this matter.  Ford reserves the right to seek leave to amend Exhibit C to include additional predicate acts as warranted by the evidence.

100.    Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud Ford into paying Defendants money to which Defendants knew they were not entitled.  Defendants knowingly and intentionally prepared false and fictitious billing records and perjured declarations and then, knowingly and with the intent to deceive Ford and the relevant courts for the purpose of obtaining Ford's money, caused those false and fictitious billing records and perjured declarations to be transmitted to Ford and publicly filed.  Defendants colluded with one

42

another to fabricate time records, after cases had been resolved and sometimes years after the purported work performed, and to use those fabricated records to extract fees and settlements, all with the intent that their false statements be believed. Indeed, when KLG submitted billing records in support of fee motions, KLG's attorneys (typically Mikhov or Kirnos) committed perjury when they falsely represented under oath to the courts and to Ford that KLG had billed its time contemporaneously. Mikhov and Kirnos also stated repeatedly under oath that the initials "ALM" in KLG's fraudulent billing statements reflected "Ms. [Amy] Morse's billing entries"—another patently perjurious statement given the content of those entries and Morse's own testimony that she only rarely billed any such time at all after 2016.

101. The attack on Ford was intended to, and did, result in Ford paying fabricated fees that benefited the Defendants, which in turn financed the criminal scheme.

102. In a concerted effort to thwart Ford's ability to uncover the truth about the fraudulent billing scheme, Defendants have filed or caused to be filed hundreds or thousands of false and misleading extra-judicial communications and hundreds or thousands of fraudulent documents in various matters against different auto manufacturers.

103. Defendants intended that automakers and courts in various jurisdictions rely on Defendants' false and misleading statements, trusting Defendants to comply with their ethical obligations as officers of the court. The effort has been successful. The acceptance of Defendants' fraudulent billings and perjured declarations has resulted in numerous inflated fee awards and settlements against Ford.

104. Accordingly, Defendants' submission of fraudulent billings and false and misleading representations in court have caused Ford to suffer substantial damages and reputational harm.

105.    The alleged pattern of predicate acts, consisting of scores of acts of mail fraud, wire fraud, and obstruction of justice, are related and continuous and were committed on behalf of an Enterprise that has existed for the purpose of carrying out the fraudulent billing scheme for more than a decade.

## FIRST CAUSE OF ACTION
### (RICO, 18 U.S.C. § 1962(c))
### (Against All Defendants)

106.    Ford realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint.

107.    At all relevant times, Ford was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

108.    At all relevant times, each Defendant was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

109.    As detailed above, Defendants and their co-conspirators are a group of persons associated with KLG for the common purpose of advancing an ongoing criminal enterprise by creating and submitting fraudulent billing records, including to Ford in settlement demands and to federal and state courts across California in fee petition proceedings, to obtain fraudulent payments for time never actually worked on behalf of clients.

110.    At all times alleged herein, the Enterprise was engaged in, and its activities affected, interstate commerce.

111.    The Enterprise is likely to continue to engage in racketeering activity in its efforts to collect and protect its ill-gotten gains.

112.    Each Defendant conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

SECOND AMENDED COMPLAINT

113.    Ford incorporates by reference the attached Exhibit C, which identifies numerous (but not all) specific uses of interstate wire and mail communications advancing the Enterprise's scheme in violation of 18 U.S.C §§ 1341 and 1443, and numerous (but not all) specific instances of Defendants' perjurious obstruction and impediment of justice in advancing the Enterprise's scheme in violation of 18 U.S.C § 1503.

114.    As a direct and proximate result of the Enterprise's pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), Ford has been damaged in its business and property in an amount to be determined at trial, including but not limited to by having to pay more than $100 million due to fraudulent billing statements submitted by Defendants.

115.    Pursuant to 18 U.S.C. § 1964(c), Ford is entitled to recover treble damages plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION

### Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)

### (Against All Defendants)

116.    Ford realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint.

117.    Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

118.    Defendants knew that they were engaged in a conspiracy to commit the predicate acts of mail fraud, wire fraud, and obstruction and impediment of justice, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.

119.   Each Defendant agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

120.   Each Defendant knew about and agreed to facilitate the Enterprise's scheme to submit fraudulent billing records to state and federal courts to obtain fraudulent fee payments for time never actually worked and to recover more than they were entitled to from Ford.  It was part of the conspiracy that Defendants would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including but not limited to the acts of racketeering set forth above and in Exhibit C.

121.   As a direct and proximate result of Defendants' conspiracy to violate 18 U.S.C. § 1962(d) and the overt acts taken in furtherance of that conspiracy, Ford has been damaged in its business and property in an amount to be determined at trial, including but not limited to by having to pay more than $100 million due to fraudulent billing statements submitted by Defendants.

122.   Pursuant to 18 U.S.C. § 1964(c), Ford is entitled to recover treble damages plus costs and attorneys' fees from Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks a judgment against Defendants awarding the following relief:

1.   An award of general damages in an amount to be determined at trial and estimated to be not less than $100 million, which damages are to be trebled according to the RICO statute, 18 U.S.C. § 1964(c);

2.   Pre-judgment interest according to statute;

3.   Ford's reasonable attorneys' fees and costs according to statute, 18 U.S.C. § 1964(c); and

4.   Any other relief that this Court deems just and proper.

SECOND AMENDED COMPLAINT

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial in this action.

Dated: January 5, 2025

KASOWITZ LLP

By: <u>/s/ *Daniel A. Saunders*</u>

Daniel A. Saunders
Matthew S. Manacek

Edward E. McNally
Daniel J. Fetterman
*Attorneys for Plaintiff Ford Motor Company*

47