1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KASOWITZ LLP**
Daniel A. Saunders (SBN 161051)
DSaunders@kasowitz.com
Matthew S. Manacek (SBN 312834)
MManacek@kasowitz.com
1801 Century Park East, Suite 2400
Los Angeles, California 90067
Telephone: (424) 288-7900
Facsimile: (424) 288-7901

Edward E. McNally (admitted *pro hac vice*)
EMcNally@kasowitz.com
Daniel J. Fetterman (admitted *pro hac vice*)
DFetterman@kasowitz.com
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1715
Facsimile: (212) 506-1800

*Attorneys for Plaintiff Ford Motor Company*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FORD MOTOR COMPANY, a Delaware Corporation, <br><br> Plaintiff, <br><br> v. <br><br> STEVE B. MIKHOV; ROGER KIRNOS; and AMY MORSE, <br><br> Defendants. | Case No: 2:25-cv-04550-MWC-PVC <br><br> **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT** <br><br> Date: March 6, 2026 <br> Time: 1:30 PM <br> Courtroom: 6A <br> Judge: Hon. Michelle Williams Court <br><br> Trial Date: None Set |

# **TABLE OF CONTENTS**

**Pages**

INTRODUCTION .................................................................................................. 9

FACTUAL BACKGROUND ................................................................................. 9

LEGAL STANDARD .......................................................................................... 12

ARGUMENT ....................................................................................................... 13

   I.     THE *NOERR-PENNINGTON* DOCTRINE DOES NOT APPLY TO DEFENDANTS' FRAUDULENT SCHEME ................................................ 13

       A    Ford's Lawsuit Targets Activity Not Protected By the First Amendment and Does Not Burden Defendants' Petitioning Rights .... 14

       B.   The Sham Exception Applies ............................................................. 19

       C.   The Statute Prohibiting Perjured Declarations Cannot Be Construed to Exclude the Allegedly Protected Petitioning Conduct ........................ 24

   II.    FORD SUFFICIENTLY STATES A RICO CLAIM ..................................... 24

       A.   Ford Has Adequately Alleged a RICO Enterprise with the Common Purpose of Defrauding Ford, Other Automakers, and the Courts ........ 25

       B.   Ford Adequately Has Alleged a Pattern of Racketeering Activity ...... 29

           1.   Ford identifies multiple predicate acts occurring within ten years ..................................................................................... 29

           2.   Ford's allegations satisfy Rule 9(b) ............................................ 30

           3.   Issue preclusion does not bar Ford's RICO claims ................... 31

       C.   Ford Adequately Alleges a RICO Claim Against Each Individual Defendant ........................................................................................... 33

  III.   FORD ADEQUATELY ALLEGES A RICO CONSPIRACY ....................... 38

CONCLUSION ................................................................................................... 38

---

2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Airs Aromatics, LLC v. Victoria's Secret Stores Brand Mgmt., Inc.*,
    744 F.3d 595 (9th Cir. 2014) .................................................................27, 28

*Am. Int'l Indus. v. Brenntag Specialties, Inc.*,
    2021 WL 5264239 (C.D. Cal. Aug. 30, 2021) ...........................................15, 24

*Amphastar Pharms. Inc. v. Aventis Pharma SA*,
    2012 WL 5512466 (C.D. Cal. Nov. 14, 2012) ...................................................16

*United States ex rel. Anita Silingo v. WellPoint, Inc.*,
    904 F.3d 667 (9th Cir. 2018) ................................................................33

*B&G Foods N. Am. v. Embry*,
    29 F.4th 527 (9th Cir. 2022) .................................................................14, 19, 24

*Baltimore Scrap Corp. v. David J. Joseph Co.*,
    237 F.3d 394 (4th Cir. 2001) ................................................................21

*Blake v. Dierdorff*,
    856 F.2d 1365 (9th Cir. 1988) ...............................................................33, 38

*Blantz v. Cal. Dep't of Corr. and Rehab.*,
    727 F.3d 917 (9th Cir. 2013) ................................................................34

*Blue Cross & Blue Shield Oklahoma v. S. Coast Behavioral Health LLC*,
    2025 WL 2004500 (C.D. Cal. June 20, 2025).................................................30, 38

*Borrego Cmty. Health Found. v. Hebets*,
    2025 WL 2780178 (S.D. Cal. Sept. 30, 2025) ...................................................29

*California Motor Transport Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972)..........................................................................18

*CBC Framing, Inc. v. Flores*,
    2008 WL 11337555 (C.D. Cal. Sept. 22, 2008)................................................38

*Carey v. J.A.K.'s Puppies, Inc.*
    763 F. Supp. 3d 952 (C.D. Cal. 2025)..........................................................37

3

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001)......................................................................27

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
    168 F.3d 119 (3d Cir. 1999) ..........................................................23

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*,
    690 F.2d 1240 (9th Cir. 1982) .......................................13, 14, 15, 16

*Confederated Tribes of Siletz Indians of Oregon v. Weyerhaeuser Co.*,
    2003 WL 24901381 (D. Or. July 5, 2003) ......................................22

*Cooter & Gell v. Hartmarx Corp.*,
    496 U.S. 384 (1990)......................................................................20

*Corley v. Rosewood Care Ctr.*,
    388 F.3d 990 (7th Cir. 2004) .........................................................29

*DKN Holdings LLC v. Faerber*,
    61 Cal. 4th 813 (2015) ..................................................................31

*Drummond Co., Inc. v. Collingsworth*,
    2024 WL 5056621 (N.D. Ala. Dec. 10, 2024) ................................26

*Evans v. Celotex Corp.*,
    194 Cal. App. 3d 741 (1987) .........................................................32

*Feld Entm't Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*,
    873 F. Supp. 2d 288 (D.D.C. 2012)...........................................26, 35

*Flores v. Emerich & Fike*,
    2008 WL 2489900 (E.D. Cal. June 18, 2008) ................................29

*Ford Motor Co. v. Knight Law Group*,
    2025 WL 3306280 (C.D. Cal. Nov. 24, 2025) ................17, 20, 23, 27

*Gomez v. Guthy-Renker, LLC*,
    2015 WL 4270042 (C.D. Cal. July 13, 2015) .................................27

*Goren v. New Vision Int'l, Inc.*,
    156 F.3d 721 (7th Cir. 1998) .........................................................37

*Grimmett v. Brown*,
    75 F.3d 506 (9th Cir. 1996) .....................................................29, 30

4

*H.J. Inc. v. N.W. Bell Tel. Co.*,
    492 U.S. 229 (1989)...................................................................25

*Hamilton v. Willms*,
    2005 WL 3797562 (E.D. Cal. Oct. 28, 2005).....................................37

*Handeen v. Lemaire*,
    112 F.3d 1339 (8th Cir. 1997) ..........................................13, 25, 28

*Hanna v. Mercedes-Benz USA, LLC*,
    36 Cal. App. 5th 493 (2019) ...................................................20

*Immobiliare, LLC v. Westcor Land Title Ins. Co.*,
    424 F. Supp. 3d 882 (E.D. Cal. 2019) .....................................33, 37

*Int'l Ass'n of Bridge, Structural, Ornamental, and Reinforcing
    Ironworkers' Loc. Union 75 v. Madison Indus., Inc.*,
    733 F.2d 656 (1984) ...........................................................20

*JSC Foreign Economic Ass'n Technostroyexport v. Weiss*,
    2007 WL 1159637 (S.D.N.Y. Apr. 8, 2007) .................................26

*In re JUUL Labs, Inc. Marketing, Sales Practices, and Prods. Liab.
    Litigation*,
    533 F. Supp. 3d 858 (N.D. Cal. 2021)........................................37

*Kanaan v. Yaqub*,
    2022 WL 3357834 (N.D. Cal. Aug. 15, 2022) ...............................28

*Kearney v. Foley & Lardner, LLP*,
    590 F.3d 638 (9th Cir. 2009) ...........................................14, 19, 23

*Kelly v. TransGlobe Travel Bureau, Inc.*,
    60 Cal. App. 3d 195 (1976) ...................................................31

*Kottle v. Northwest Kidney Ctrs.*,
    146 F.3d 1056 (9th Cir. 1998) ..........................................19, 21, 23

*Kruse v. Repp*,
    611 F. Supp. 3d 666 (S.D. Iowa 2020)....................................29, 35

*Lucido v. Superior Court*,
    51 Cal.3d 335 (1990) ...........................................................32

5

*Lumasense Techs., Inc. v. Advanced Eng'g Servs., LLC*,
  2021 WL 1197417 (N.D. Cal. Mar. 30, 2021) ....................................... 19

*McDonald v. Smith*,
  472 U.S. 479 (1985)......................................................................... 13, 15

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
  641 F.3d 834 (7th Cir. 2011) ................................................... 21, 24, 32

*MiCamp Sols., LLC v. Visa Inc.*,
  2025 WL 3548685 (N.D. Cal. Dec. 11, 2025) ..................................... 28

*Napoli v. United States*,
  32 F.3d 31 (2d Cir. 1994) ......................................................... 25, 27, 34, 36

*Natural-Immunogenics Corp. v. Newport Trial Grp.*,
  2020 WL 7263544 (C.D. Cal. Nov. 23, 2020) ..................................... 26

*Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*,
  298 F.3d 768 (9th Cir. 2002) ............................................................. 38

*In re Outlaw Lab'y, LP Litig.*,
  2020 WL 3469387 (S.D. Cal. June 25, 2020) ..................................... 25

*In re Outlaw Lab'y, LP Litig.*,
  2020 WL 5552558 (S.D. Cal. Sept. 16, 2020) ....................... 13, 26, 27, 35

*In re Outlaw Lab'y, LP Litig.*,
  2020 WL 1953584 (S.D. Cal. Apr. 23, 2020) ..................................... 35

*PAE Gov't Servs., Inc. v. MPRI, Inc.*,
  514 F.3d 856 (9th Cir. 2007) ......................................................... 27, 28

*Pepper v. Routh Crabtree, APC*,
  219 P.3d 1017 (Alaska 2019) ............................................................. 18

*Pyankovska v. Abid*,
  65 F.4th 1067 (9th Cir. 2023) .................................................... *passim*

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993)......................................................................... 33

*Rupert v. Bond*,
  68 F. Supp. 3d 1142 (N.D. Cal. 2014)................................................ 21

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC

*San Antonio Comm. Hosp. v. S. Cal. Dist. Council of Carpenters*,
    125 F.3d 1230 (9th Cir. 1997) ................................................................. 13

*Saniefar v. Moore*,
    2018 WL 1305710 (E.D. Cal. Mar. 13, 2018) ........................................ 22

*Sedima, S.P.R.L. v. Imrex Co., Inc.*,
    473 U.S. 479 (1985) ................................................................................ 25

*Sever v. Alaska Pulp Corp.*,
    978 F.2d 1529 (9th Cir. 1992) ................................................................ 27

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ....................................................... 13, 18, 23

*Swallow v. Torngren*,
    2018 WL 2197614 (N.D. Cal. May 14, 2018) ........................................ 21

*Tatung Co., Ltd. v. Hsu*,
    2015 WL 11072178 (C.D. Cal. Apr. 23, 2015) .................................. 34, 38

*Taverniti v. Astrue*,
    2008 WL 8448336 (N.D. Cal. Mar. 31, 2008) ........................................ 27

*The Cadle Co. v. Flanagan*,
    2006 WL 860063 (D. Conn. Mar. 31, 2006) ........................................... 27

*Theofel v. Farey-Jones*,
    359 F.3d 1066 (9th Cir. 2004) ................................................................ 20

*Tribune Co. v. Purcigliotti*,
    869 F. Supp. 1076 (S.D.N.Y. 1994) ....................................................... 26

*Union Pac. R.R. Co. v. Santa Fe Pac. Pipelines, Inc.*,
    231 Cal. App. 4th 134 (2014) ................................................................. 33

*United States v. Alvarez*,
    567 U.S. 709 (2012) ................................................................................ 15

*United States v. Executive Health Resources, Inc.*,
    196 F. Supp. 3d 477 (E.D. Pa. 2016) ...................................................... 16

*United States. v. Philip Morris USA Inc.*,
    566 F.3d 1095 (D.C. Cir. 2009) .............................................................. 15

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC

*United States v. Prime Healthcare Servs., Inc.*,
  2020 WL 11884833 (C.D. Cal. 2020) ..................................................... 36

*United States Golf Assn v. Arroyo Software Corp.*,
  69 Cal. App. 4th 607 (1999) ................................................................. 32

*United States ex rel. USN4U, LLC v. Wolf Creek Fed. Servs., Inc.*,
  34 F.4th 507 (6th Cir. 2022) ................................................................. 30

*Whelan v. Abell*,
  48 F.3d 1247 (D.C. Cir. 1995).............................................................. 15

*Williams v. Doctors Med. Ctr. of Modesto, Inc.*,
  100 Cal. App. 5th 1117 (2024) .............................................................. 31

*United States ex rel. Wilson v. Maxxam, Inc.*,
  2009 WL 322934 (N.D. Cal. Feb. 9, 2009)................................... 15, 16

*Woodall v. Walt Disney Co.*,
  2024 WL 5337348 (C.D. Cal. Nov. 2, 2024) .................................... 30

**Statutes**

18 U.S.C. § 1503.................................................................................. 17

18 U.S.C. § 1621........................................................................... 17, 24

18 U.S.C. § 1962(c) ...................................................................... 28, 38

Cal. Penal Code § 118.......................................................................... 17

**Other Authorities**

Cal. R. Pro. Conduct 3.3(a)(1), (3) .................................................... 18

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Lawyers are not—and should not be—above the law.

Plaintiff Ford Motor Company ("Ford") alleges in its Second Amended Complaint ("SAC") that Defendants Steve Mikhov, Roger Kirnos, and Amy Morse ("Defendants")—all lawyers affiliated with Knight Law Group LLP ("KLG"), which represents plaintiffs in Lemon Law cases—manipulated the Lemon Law's fee-shifting provisions and repeatedly lied under oath as part of a scheme to defraud Ford and other automakers by obtaining tens of millions of dollars in reimbursement for work never performed. Now caught red-handed, Defendants insist that they *cannot* be held civilly liable because (1) the First Amendment grants them a "get out of jail free" card as long as their lies are (partially) directed at courts, and (2) their rampant decade-long billing fraud is just "ordinary business conduct." Defendants are wrong on both counts.

*First*, Defendants are not immune under *Noerr-Pennington* because, *inter alia*: (i) fee requests resolved out of court do not implicate petitioning rights; (ii) being sued for lying to courts under oath does not implicate, let alone burden, petitioning rights; and (iii) the First Amendment does not protect fraud. *Second*, Ford states RICO claims because whether Defendants crossed the line from providing traditional legal services to racketeering—the essential issue in establishing an enterprise with a common purpose and their individual liability—is a factual one, and Defendants' other challenges misconstrue Ford's allegations, the law, and/or the applicable legal standards.

The Court should deny Defendants' motion and allow this case to proceed.

### FACTUAL BACKGROUND

The Court's prior order accurately summarized the factual allegations in Ford's First Amended Complaint. Ford therefore focuses this factual background on the allegations that its Second Amended Complaint has added or modified. The amended complaint highlights that the heart of the unlawful scheme was to defraud Ford of millions of dollars for services never rendered. The amended allegations also focus on

9

deposition admissions made by Defendants and non-lawyer KLG personnel regarding KLG's billing practices, perjurious declarations submitted by Mikhov and Kirnos, and the separateness of Lemon Law fee proceedings from the merits litigation.

The amended complaint describes an organized and pervasive scheme to defraud Ford and other auto manufacturers through the fabrication of billing records for work never performed. Some of Defendants' misrepresentations were included in court filings, while others were directed to Ford itself. Those direct-to-Ford misrepresentations underscore that the scheme was designed to defraud Ford directly (and the courts only incidentally) and that *Noerr-Pennington* cannot provide a complete defense in all events.

Defendants built their fraudulent scheme to create false billing records after the fact around KLG's fee motion department (the "Fee Motion Department"), which employed "drafters," "reviewers," and "finalizers" to defraud Ford and other auto manufacturers into paying tens of millions of dollars in legal fees for make-believe work. SAC ¶ 1. To further their scheme, Defendants Mikhov and Kirnos also lied under oath during fee proceedings in courts throughout California about the time sheets created by KLG's Fee Motion Department operated under Defendants' supervision, stating in sworn declarations that KLG's attorneys' time billing entries were completed contemporaneously with or near in time to the work performed. *Id.* ¶ 3. In actuality, however, most of the billing entries in a given case were created after the fact and under Defendants' direction by members of KLG's dedicated Fee Motion Department, who regularly would enter arbitrary time entries for particular attorney tasks before filing a fee application. *Id.* Based on Defendant Amy Morse's sworn deposition testimony, for example, Ford has already identified at least 8,963 specific fraudulent time entries in 1,152 separate cases totaling $865,301 in fees attributable to Defendant Morse alone for work she has admitted under oath she never performed. *Id.*

Defendants' material fraudulent misrepresentations were transmitted in the form of settlement demands for unearned fee amounts for services that were not truly

rendered. *Id.* ¶ 12. Many months—sometimes as much as a year or more—after the merits of Lemon Law cases were finalized and the plaintiffs' grievances redressed, KLG would demand fees from Ford and other manufacturers directly, threatening that unless Ford paid the claimed fees without KLG having to provide time records or any other proof of their claimed fees, KLG would file a motion to initiate a fee proceeding and seek more than its original demand using a substantial multiplier. *Id.* ¶ 15. In some cases, Ford settled the fee claims based on KLG's fraudulent demands, meaning there was no court action on those demands. *Id.* KLG's fraudulent demands were material to Ford's settlement decisions because if Ford refused to pay without receiving time records, then KLG would file a fee motion, starting a new proceeding before the court claiming statutory entitlement to fees. *Id.* Because discovery had long been closed, Ford would be unable to obtain discovery regarding the bases for the fee application. *Id.* KLG would then charge Ford for its time associated with the fee hearing—often spanning multiple days of (alleged) attorney labor to prepare and attend. *Id.* Ford had no ability at the time of KLG's fraudulent fee demands or at the judicial proceedings that sometimes followed those demands to discover the fraud in each of thousands of cases. *Id.* ¶ 16.

Defendants knew that most of their time entries submitted to Ford and the courts were fictitious. *Id.* ¶¶ 20-22. They oversaw a process by which the time entries included in KLG's fee motions were generated by non-lawyer members of a dedicated Fee Motion Department after the fact—often years after the purported work in question—to support fee demands against Ford and other auto manufacturers. *Id.* ¶ 31.

Testimony from Defendants and KLG employees confirms that KLG attorneys regularly did not record their time contemporaneously or ensure that the time entries attributed to them reflected time they actually worked. *Id.* ¶ 32; *see also id.* ¶¶ 33-35. A KLG employee named Elin Howard has explained that the Fee Motion Department was tasked with "prepar[ing] to file the motion for attorney's fees and costs after a case has settled," and to that end would "review attorney time billing." *Id.* ¶ 36. Howard testified that if information on time spent as stored in KLG's billing software was, in the

11

opinion of the Fee Motion Department, lacking, team members were authorized to "input an attorney task and identify a particular set of hours for that attorney." *Id.* "[O]n a regular basis" (and for "[m]ore than 50 percent" of case files she handled), Howard determined the amount of time she estimated an attorney might have spent on a particular task and would then input that imagined amount into a spreadsheet to be submitted in support of KLG's fee petitions. *Id.* Howard and the rest of her team initially relied on "guidelines" provided to them to determine the amounts to be added for specified "tasks," but Howard eventually began to "rely on [her] experience" and "history with the company" to "set a certain amount of time" for a particular task. *Id.* Similarly, Howard testified that when creating billing statements, she would "insert a set time period" for Mikhov's "client intake" tasks without ascertaining how much time Mikhov actually spent on that task or whether he performed that task at all. *Id.* ¶ 56. These practices were specifically authorized by Mikhov and Kirnos. *Id.* ¶ 37.

Defendant Morse has testified under oath that since becoming a "supervising attorney" at KLG in 2016, she has not "propounded written discovery," "drafted or prepared any motions," or had any "direct communications with clients." She also testified that she could not recall the "last time. . . [she] communicated with opposing counsel." *Id.* ¶ 46. Yet billing statements attached to declarations filed by KLG include hundreds of entries for Morse that purport to attribute to her time for performing these very tasks during this period, including frequent entries for communicating with clients and opposing counsel and hundreds of entries claiming to have drafted written discovery and complaints. *Id.*

Ford has identified numerous cases in which Mikhov and/or Kirnos submitted declarations attesting under oath to the accuracy and contemporaneous nature of time entries that were in fact made up long after the fact. *See id.* ¶¶ 71-75, 78-82.

## LEGAL STANDARD

The Court is familiar with the applicable legal standard from its Opinion and the parties' prior briefing. Ford adds that "[a]n attorney's license is not an invitation to

12

engage in racketeering," and courts regularly refuse to "shrink from finding an attorney liable when he crosses the line between traditional rendition of legal services and active participation in directing [an] enterprise." *Handeen v. Lemaire*, 112 F.3d 1339, 1349 (8th Cir. 1997). And "the answer" to "the question [of] whether the attorney crosses [that] line … is, at this stage, a factual one." *In re Outlaw Lab'y, LP Litig.*, 2020 WL 5552558, at *9 (S.D. Cal. Sept. 16, 2020) (discussing *Handeen* and denying summary judgment on fraudulent demand letter scheme).

## ARGUMENT[1]

## I.    THE *NOERR-PENNINGTON* DOCTRINE DOES NOT APPLY TO DEFENDANTS' FRAUDULENT SCHEME

The *Noerr-Pennington* doctrine is a "generic rule of statutory construction" that requires courts to "construe federal statutes so as to avoid burdening conduct that implicates the protections afforded by the Petition Clause unless the statute[s] clearly provide[] otherwise." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929, 931 (9th Cir. 2006) (citation modified). But the Petition Clause does not enjoy "special First Amendment status." *McDonald v. Smith*, 472 U.S. 479, 485 (1985). On the contrary, "petitions … that contain intentional and reckless falsehoods 'do not enjoy constitutional protection.'" *Id.* at 484 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964)). And as the Ninth Circuit has recognized, "[t]he first amendment has not been interpreted to preclude liability for false statements." *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1261 (9th Cir. 1982); *see San Antonio Comm. Hosp.*

---

[1] As an initial matter, the Court should decline to entertain Defendants' motion under L.R. 7-4 because—by their own admission—Defendants failed to comply with the meet-and-confer requirement of L.R. 7-3. *See* Laroche Decl. ¶¶ 4. Ford's SAC contains significant new factual allegations, a different alleged enterprise, and a different set of defendants, and Defendants' "belie[f]"—communicated for the first time the Saturday before their Monday filing deadline—that their "motion is covered by [] prior meet and confers" because they "intend[ed] to move on the same general grounds covered in our prior meet and confers" is as insufficient as their attempt to blame Ford for their noncompliance is improper. *See* Declaration of Daniel A. Saunders, ¶ 2 & Ex. 1.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC

*v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1239 (9th Cir. 1997) ("The First Amendment does not protect fraud."). Thus, "[t]here is no first amendment protection [under the Petition Clause] for furnishing with predatory intent false information to an administrative or adjudicatory body." *Clipper Exxpress*, 690 F.2d at 1261.

The Ninth Circuit employs "a three-step test to determine whether conduct that allegedly violates a statute is immunized from liability" under *Noerr-Pennington*. *Pyankovska v. Abid*, 65 F.4th 1067, 1077 (9th Cir. 2023). At step one, courts consider "whether the lawsuit imposes a burden on petitioning rights." *Id*. The step one analysis is structural, focusing not on "whether the conduct at issue is fraudulent or abusive, but instead whether the success of [the] lawsuit would constitute a burden on petitioning rights." *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 645 (9th Cir. 2009). At step two, courts consider "whether the alleged activities constitute protected petitioning activity" (which includes consideration of the sham exception). *Id.* at 644; *see B&G Foods N. Am. v. Embry*, 29 F.4th 527, 535-36 (9th Cir. 2022). At step three, courts consider "whether the statute at issue may be construed to avoid [the] burden" on petitioning rights. *Pyankovska*, 65 F.4th at 1077. Defendants' conduct is immunized under *Noerr-Pennington* only if the answer at each step is "yes." *Id.*

## A.    Ford's Lawsuit Targets Activity Not Protected By the First Amendment and Does Not Burden Defendants' Petitioning Rights

As a threshold matter, the lawsuit does not target petitioning activity, but instead alleges a scheme to defraud Ford of millions of dollars by making fraudulent settlement demands and submitting perjured declarations. This is not conduct covered or immunized by the *Noerr-Pennington* doctrine because the conduct alleged in the SAC does not enjoy First Amendment protection in the first instance.

The Supreme Court has held that perjury "lack[s] First Amendment protection," "not simply because perjured statements are false" but also because "[p]erjured testimony 'is at war with justice'" since "it can cause a court to render a 'judgment not resting on truth'" and thereby "undermines the function and province of the law and

threatens the integrity of judgments that are the basis of the legal system." *United States v. Alvarez*, 567 U.S. 709, 721 (2012) (plurality opinion); *see Clipper Exxpress*, 690 F.2d at 1261 ("Courts uniformly punish perjury."). Likewise, the Ninth Circuit has made clear that the First Amendment does not preclude liability for false statements, even if made to a court. *Id.*; *cf. McDonald*, 472 U.S. at 484 (petitions to the government "that contain intentional and reckless falsehoods do not enjoy constitutional protection") (citation omitted). That is true separate and apart from the sham exception; *Clipper Exxpress* "did not craft a new exception to *Noerr-Pennington* immunity. Rather, the court established that *Noerr-Pennington* does not protect the act of making false statements in the first place." *United States ex rel. Wilson v. Maxxam, Inc.*, 2009 WL 322934, at *7 (N.D. Cal. Feb. 9, 2009).

Here, Defendants made fraudulent statements not only to the courts, but also directly to Ford in the form of fraudulent settlement demands, which places this case far afield of expression that *Noerr-Pennington* was intended to protect.[2] As the D.C. Circuit explained in *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1123 (D.C. Cir. 2009): "Defendants' attempt to invoke *Noerr-Pennington* as protection fails because the doctrine does not protect deliberately false or misleading statements. Neither the *Noerr-Pennington* doctrine nor the First Amendment more generally protects petitions predicated on fraud or deliberate misrepresentation." (citation modified); *see Whelan v. Abell*, 48 F.3d 1247, 1255 (D.C. Cir. 1995) ("However broad the First Amendment right to petition may be, it cannot be stretched to cover petitions based on known

---

[2] Even if petitioning activity were implicated at all, Ford's lawsuit clearly imposes no plausible burden on such activity to the extent it involves fee requests that were not adjudicated in courts. *See* SAC ¶¶ 10, 12, 14-15, 27-28, 30, 41, 52, 55, 61-62, 65, 109. As a matter of law, Defendants have no *Noerr-Pennington* defense in that circumstance because their supposed "petitioning" only occurred when they filed false information in fee proceedings in court. That fact alone requires denial of Defendants' motion because "a defendant cannot use Rule 12(b)(6) to dismiss part of a claim." *Am. Int'l Indus. v. Brenntag Specialties, Inc.*, 2021 WL 5264239, at *3 (C.D. Cal. Aug. 30, 2021).

falsehoods."). This case therefore should not progress beyond the starting line of the *Noerr-Pennington* analysis.

*Maxxam*, a False Claims Act case, is instructive. There, the court drew the "critical distinction" that the plaintiff was "seek[ing] to impose liability, not for the act of 'petitioning' the government, but for specific acts committed in the course of 'petitioning' the government." 2009 WL 322934, at *6; *see also United States v. Executive Health Resources, Inc.*, 196 F. Supp. 3d 477, 505 (E.D. Pa. 2016) (quoting *Maxxam* for proposition that "[w]hile citizens have a First Amendment right to petition the government, they do not have a First Amendment right to lie while doing so"). In *Maxxam*, the court held that the defendants' submission of false statements to the government to defraud the United States of $250 million was "not protected by the *Noerr-Pennington* doctrine in the first place, as *Clipper Exxpress* makes clear." 2009 WL 322934, at *8; *see also Clipper Exxpress*, 690 F.2d at 1263 (no *Noerr-Pennington* immunity where "the petitioning activity is but a part of a larger overall scheme").

Here, as in *Maxxam*, the "critical distinction" is that Ford is not seeking to hold Defendants accountable for "the very *act of petitioning* the government," but rather "for specific acts committed in the course of 'petitioning' the government." 2009 WL 322934, at *6, 8 (emphasis original). That is, Ford does not allege liability based on the act of filing or litigating Lemon Law cases, but rather based on Defendants' fraudulent conduct in demanding fees from Ford based on fabricated evidence and perjurious declarations. Such conduct is not protected by the First Amendment in the first instance, so this Court does not even need to reach the sham exception to find that Defendants do not enjoy *Noerr-Pennington* immunity. *See id.* at *8 ("Plaintiffs do not need to demonstrate that Defendants' 'petitioning' activities were a sham because they do not seek to impose liability for engaging in those activities. The act for which Plaintiffs seek to impose liability—submitting … false statements [] approved … under false pretenses—is not protected by the *Noerr-Pennington* doctrine in the first place[.]"); *see also Amphastar Pharms. Inc. v. Aventis Pharma SA*, 2012 WL 5512466, at *9-10 (C.D.

16

Cal. Nov. 14, 2012) (citing *Maxxam* and holding that *Noerr-Pennington* did not apply to False Claims Act claim that defendant fraudulently inflated drug price by making false representations to U.S. Patent & Trademark Office because plaintiff was seeking to impose liability for defendant's fraud, not for the act of petitioning the government).

Even setting aside that Defendants' fraud was directed at Ford, their use of the courts in the course of that fraudulent scheme does not immunize their misconduct. That conclusion follows from *Pyankovska*. There, the Ninth Circuit reversed the district court's finding that *Noerr-Pennington* barred a lawsuit for violations of federal wiretap laws against an attorney who submitted intercepted communications to a state court in a custody case. 65 F.4th at 1077. As the court explained, the attorney was free to engage in petitioning activity, but once in court, he was "not at liberty to set [his] own rules" but was "obligated to play by the rules applicable to all litigants." *Id.* (attorney "was free to file and argue the custody motion—i.e., to petition—but he was not free to support that motion with illegal evidence"). The court thus held that "because [the attorney] had no petitioning 'right' to use the [illegally obtained evidence] in the first place, requiring him to face the consequences specified by Congress for those who violated the law is not a cognizable 'burden' on any conduct he was lawfully entitled to participate in. For these reasons, [the attorney] fails at step one and *Noerr-Pennington* cannot protect him from liability." *Id.* at 1078.

That rationale compels the same conclusion here.[3] Among the most basic "rules applicable to all litigants" are not to lie and not to submit false evidence. *See, e.g.,* 18 U.S.C. § 1503 (obstruction of justice); 18 U.S.C. § 1621 (perjury); Cal. Penal Code

---

[3] This Court previously suggested that *Pyankovska* was distinguishable because the plaintiff there alleged that the evidence was "illegal," while Ford "disputes the accuracy" of the evidence submitted with Defendants' fee petitions. *Ford Motor Co. v. Knight Law Group*, 2025 WL 3306280, at *8 (C.D. Cal. Nov. 24, 2025). However, Ford does not merely dispute the accuracy of Defendants' numbers; it alleges that Defendants perpetrated a fraud on Ford and the courts by creating and submitting false (and thus "illegal") evidence like perjurious declarations—which Defendants never had any petitioning "right" to use.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC

§ 118 (perjury); Cal. R. Pro. Conduct 3.3(a)(1), (3) (prohibiting lawyers from knowingly making false statements or offering false evidence). "[U]nethical conduct in the setting of the adjudicatory process often results in sanctions. Perjury of witnesses is one example." *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 512 (1972). While "[m]isrepresentations" may be "condoned in the political arena," they "are not immunized when used in the adjudicatory process." *Id.* at 513.

Because Defendants had no petitioning "right" to engage in fraud and perjury, holding them accountable under the law for that conduct—even when committed in connection with court proceedings—"is not a cognizable 'burden' on any conduct [they were] lawfully entitled to participate in," and Defendants "fail[] at step one." *Pyankovska*, 65 F.4th at 1078. Nothing in Ford's SAC prevents Defendants from filing Lemon Law suits or fee petitions and supporting them with lawful evidence; rather, Ford seeks to impose liability for Defendants' failure to "comply[] with laws and rules of general application to litigants in court," which "imposes no legally cognizable burden on [] conduct that is protected by the First Amendment's Petition Clause." *Id.* at 1078 n.5; *see Pepper v. Routh Crabtree, APC*, 219 P.3d 1017, 1022-23 (Alaska 2019) (applying *Sosa*, holding that unfair trade practices claim did not burden defendant's petitioning rights where "the manner in which it allegedly undertook [petitioning] activities was unfair, deceptive, and in violation of [law]."). By contrast, Defendants' expansive reading of *Noerr-Pennington* would, among other things, make it almost impossible to enforce the False Claims Act or police fraud against courts and agencies, allow litigants to use completely false evidence so long as there is some meritorious claim in the case, and drive attorney's fees artificially and fraudulently up based on fabricated billing records.

Finally, just as *Pyankovska* found no burden on petitioning activity because the illegally obtained evidence was reviewed by the court in the underlying custody proceeding and the defendant attorney prevailed, 65 F.4th at 1077, so too were Defendants' fraudulent fee applications reviewed by courts, and Defendants received

18

most, if not all, of the fees they requested. Accordingly, "it is hard for [Defendants] credibly to argue that the litigation of the [fee] motion[s] [is] 'burdened'" by a damages action based on their fraudulent statements. *Id.*

## B. The Sham Exception Applies

Because Defendants' *Noerr-Pennington* argument fails at the threshold, that alone is enough to defeat their argument. *See id.* at 1078 & n.5. In any event, for the same reasons that Defendants' argument should fail at the outset, it is also clear that the SAC does not impose a burden on petitioning rights or seek to impose liability for protected petitioning activity. But even if it did, Defendants still would not enjoy *Noerr-Pennington* immunity because "[s]ham petitioning is not protected." *Embry*, 29 F.4th at 535-36.

In cases involving the adjudicatory process, the Ninth Circuit recognizes three "circumstances in which a [] defendant's activities might fall into the sham exception," and this case concerns the third circumstance: when the at-issue conduct "consists of making intentional misrepresentations to the court, litigation can be deemed a sham if a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy." *Kottle v. Northwest Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998) (citation modified); *see id.* at 1061 (noting that sham exception based on intentional misrepresentations applies more broadly in an adjudicative context because "the political arena has a higher tolerance for outright lies than the judicial arena does") (citation omitted)); *Kearney*, 590 F.3d at 646 (stating that intentional misrepresentations to a court are "precisely the sort [of misconduct] the sham exception was created to address"); *Lumasense Techs., Inc. v. Advanced Eng'g Servs., LLC*, 2021 WL 1197417, at *1, 6 (N.D. Cal. Mar. 30, 2021) (allegations that defendant knowingly misled the court on substantive issues sufficient at pleading stage to trigger sham exception).

Defendants claim (at 19) that the sham analysis must focus on whether their "Lemon Law lawsuits as a whole were deprived of legitimacy." Not so. The relevant proceeding for purposes of analyzing the sham exception is the fee petition proceeding

19

and not the underlying merits litigation. California courts review Lemon Law fee awards under the collateral order doctrine, which applies to determinations that are "substantially the same as a final judgment in an independent proceeding." *Hanna v. Mercedes-Benz USA, LLC*, 36 Cal. App. 5th 493, 506 (2019) (citation modified). This is consistent with the Supreme Court's recognition that "motions for costs or attorney's fees are independent proceedings supplemental to the original proceeding and not a request for a modification of the original decree.'" *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990) (citation modified); *see also* SAC ¶¶ 11, 14. The Ninth Circuit similarly holds that "all attorney's fees requests are collateral to the main action" and "a judgment on the merits is final and appealable even though a request for attorney's fees is unresolved." *Int'l Ass'n of Bridge, Structural, Ornamental, and Reinforcing Ironworkers' Loc. Union 75 v. Madison Indus., Inc.*, 733 F.2d 656, 659 (1984).

No doubt, fee petitions bear the same case name and are filed under the same case number, but that does not mean that misrepresentations in a separate and distinct post-judgment fee petition proceeding are immunized as long as the preceding litigation was meritorious. In fact, the Ninth Circuit's decision in *Theofel v. Farey-Jones*, 359 F.3d 1066, 1079 (9th Cir. 2004), established otherwise. *Theofel* held that an action predicated on obtaining an overbroad subpoena in an underlying lawsuit could proceed regardless of the merits of that lawsuit. There, like here, the defendants asked the court "to look only at the merits of the underlying litigation, not the subpoena," when evaluating alleged discovery misconduct. *Id.* The court rejected that invitation because the defendants could "offer no authority for that implausible proposition." *Id.* In rejecting the defendants' logic, the court noted with disapproval that the defendants "apparently think a litigant should have immunity for any and all discovery abuses so long as his lawsuit has some merit." *Id*. Indeed, because statutory fee-shifting proceedings (in Lemon Law cases and many other contexts) only occur after the plaintiff has prevailed on the merits, Defendants' argument—adopted by the Court in its prior ruling, *see Ford Motor Co*., 2025 WL 3306280, at *11—would lead to the absurd result that attorneys

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC

are free to defraud their adversaries and the courts with impunity in such proceedings because the suit itself has already been found to be legitimate. Such a result is directly contrary to the purpose of the misrepresentation exception, which "is based on the Supreme Court's desire to protect the integrity of non-political governmental proceedings." *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 843-44 (7th Cir. 2011).

As for what is needed to deprive the fee petition process of its legitimacy, most courts—including other circuits interpreting *Kottle* and similar Ninth Circuit precedent—require no more than materiality, a standard already incorporated in the RICO fraud and perjury predicates alleged here.[4] The Seventh Circuit, citing *Kottle*, has held that "a misrepresentation renders an adjudicative proceeding a sham only if the misrepresentation (1) was intentionally made, with knowledge of its falsity; and (2) was material, in the sense that it actually altered the outcome of the proceeding." *Id.* at 843. The Fourth Circuit has similarly held that the sham exception does not apply to "alleged misstatements [that] were simply not material" in that "regardless of the alleged fraud, the outcome would have been the same." *Baltimore Scrap Corp. v. David J. Joseph Co.*, 237 F.3d 394, 401-03 (4th Cir. 2001) (citing *Liberty Lake Investments, Inc. v. Magnuson*, 12 F.3d 155, 157-59 (9th Cir. 1993)).

District courts in the Ninth Circuit are in accord. *See, e.g.*, *Rupert v. Bond*, 68 F. Supp. 3d 1142, 1158-59 (N.D. Cal. 2014) (declining to apply sham exception because the alleged misrepresentations "were clearly not relied upon by" the court in its underlying order); *Swallow v. Torngren*, 2018 WL 2197614, at *8-10 (N.D. Cal. May

---

[4] Counsel for Mikhov and Kirnos apparently agrees, citing *Kottle* multiple times to the Third Circuit to support the proposition that materiality is the correct standard to apply when evaluating whether misrepresentations to an adjudicatory body should enjoy immunity under *Noerr-Pennington*. *See In re Merck Mumps Vaccine Litig.*, 2024 WL 343108, at *32-34 (3d Cir. Jan. 24, 2024) (opening brief); 2024 WL 1656515, at *10-11 (3d Cir. Apr. 12, 2024) (reply brief).

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC

14, 2018) (declining to apply sham exception because plaintiff could not "show that any of the alleged irregularities in the proceeding had any influence on the underlying decision" and alleged misrepresentations "were clearly not relied upon by the decisionmakers") (quoting *Rupert*, 68 F. Supp. 3d at 1159); *Saniefar v. Moore*, 2018 WL 1305710, at *4 (E.D. Cal. Mar. 13, 2018) (applying sham exception based on finding that alleged fraudulent statements were "certainly material" to district court's determination of standing); *Confederated Tribes of Siletz Indians of Oregon v. Weyerhaeuser Co.*, 2003 WL 24901381, at *7 (D. Or. July 5, 2003) (despite finding waiver of *Noerr-Pennington* defense, analyzing sham exception under plain error doctrine and finding that it applied because "[t]here was evidence from which the jury could readily conclude that the misstatements were deliberate, the deviation from the truth was substantial, and the misstatements were intended to and did influence the outcome of [the] proceeding").[5]

Here, there is no denying—particularly at the pleading stage—that the SAC adequately alleges Defendants' intentional misrepresentations to hundreds of courts, which were material in that they impacted the outcome of the fee proceedings and

---

[5] In *Confederated Tribes*, the court explained that the defendant's false statements concerning the percentage of log consumption at its mills that was derived from state lands, made to obtain an exemption from log export regulations, were material because they were "the foundation for the exemption request," "[o]nly Defendant knew the true figures," "[t]he agency necessarily relied upon the information furnished by the Defendant," "it was unlikely that the falsity of that information would be revealed by 'public debate,'" and "a jury could find that this low risk of discovery was a principal reason why Defendant decided to risk submitting false data." *Id.* at *9. All of these factors are present in this case: Defendants' false declarations and fabricated time records were the "foundation" for their fee requests; only Defendants—not Ford, and not the hundreds of defrauded courts—"knew the true figures"; both Ford and the courts "necessarily relied on the information furnished" by Defendants in settling fee claims and issuing fee awards; "public debate" could not have revealed Defendants' fraud; and the "low risk of discovery" resulting from Defendants' scheme to spread their fraudulent billings across multiple cases, defendants, and jurisdictions "was a principal reason why [they] decided to risk submitting false data." *Id.*

caused Ford to pay attorney's fees for time that was never actually worked. *See* SAC ¶¶ 18, 20-22, 27-30, 38, 40, 44, 59-60, 62-65, 70–76, 88–90, 99–100, 103. Contrary to Defendants' argument (at 20), the fact that Defendants were entitled to *some* fees is of no moment, as the materiality inquiry in this context is not binary; it is sufficient that the alleged misconduct had a discernable and objective financial impact by increasing the amount of fees paid, even if it did not taint every dollar of that amount. *See Kearney*, 590 F.3d at 646-47 (fraudulent conduct falls within sham exception where it "led to [] property being valued lower than it should have been"); *Sosa*, 437 F.3d at 940 (fraudulent conduct falls within sham exception where it "induced the plaintiffs to settle the suit for a lower amount than they would have in the absence of the fraud"). Ford plainly and adequately alleges such a financial impact. *See* SAC ¶¶ 1, 3, 6, 10, 12, 25, 27-31, 38, 40-41, 44, 61-62, 65, 71-75, 77-86. Accordingly, Defendants' alleged misrepresentations were material and thus deprived the fee litigation process of its legitimacy, supporting application of the sham exception based on intentional misrepresentations.[6]

---

[6] The above-cited cases make clear that the objective merit (or lack thereof) of a defendant's claims in the prior proceeding is a separate inquiry from whether intentional misrepresentations deprived that proceeding of legitimacy. The misrepresentation exception is distinct from the objective baselessness exception under the doctrine, but this Court previously collapsed the two. *See Ford Motor Co.*, 2025 WL 3306280, at *11 (stating that "any misrepresentation exception to the doctrine should be limited to misrepresentations respecting the substance of the claim that show that the party's litigation position had no objective basis" (quoting *Thomas v. Hous. Auth. Of Cnty. of L.A.*, 2007 WL 5670938, at *9 n.49 (C.D. Cal. Feb. 28, 2006))); *see also Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 131 (3d Cir. 1999) (Sloviter, J., dissenting) (noting that Ninth Circuit in *Kottle* recognized misrepresentation as an independent prong of the sham exception and explaining that "by [] conflating the concepts of 'material' and 'objectively baseless,' the majority ignores the risk that a party will intentionally use fraud and misrepresentation to transform a claim that is otherwise weak and unlikely to prevail, although not 'objectively baseless,' into one that succeeds"). If this distinction is collapsed, it would reopen the "sizeable loophole in the Supreme Court's definition of sham litigation"—a loophole closed by *Kottle*'s clarification that "although successful petitioning activity may not, as a general matter,

### C.    The Statute Prohibiting Perjured Declarations Cannot Be Construed to Exclude the Allegedly Protected Petitioning Conduct

At minimum, Defendants' attempt to invoke *Noerr-Pennington* fails at step three—a step they fail to address. Even assuming the conduct at issue burdens protected petitioning rights and falls outside the sham exception (none of which is the case here), the doctrine is nonetheless inapplicable if the statute at issue "unambiguously applies to [defendants'] conduct." *Pyankovksa*, 65 F.4th at 1078; *see Embry*, 29 F.4th at 539-40.

The SAC alleges that Defendants filed perjurious declarations in violation of 18 U.S.C. § 1621, thereby obstructing and impeding the administration of justice. *See, e.g.*, SAC ¶¶ 18, 20, 22, 28, 38, 40, 44, 65, 70–76, 88–90, 99–100, 103. That statute's plain text unambiguously provides that a person is "guilty of perjury" where, "in any declaration ... under penalty of perjury," the person "willfully subscribes as true any material matter in which he does not believe to be true." 18 U.S.C. § 1621(2). Section 1621's clear and all-encompassing mandate cannot be construed to exclude any perjured declarations filed in court. Since the statute's prohibition is "pellucid, not ambiguous," the *Noerr-Pennington* doctrine cannot bar the claims based on the perjured declarations. *See Pyankovska*, 65 F.4th at 1078.[7]

## II.    FORD SUFFICIENTLY STATES A RICO CLAIM

Ford's SAC alleges new facts, new predicate acts, and a modified RICO enterprise to address the deficiencies the Court identified in its prior order. As pleaded, and for purposes of a motion to dismiss, Ford plausibly alleges the existence of an enterprise and that each Defendant associated with the enterprise and conducted or

---

be deemed a sham, the fraud exception can remove that immunity if success is achieved by means of intentional falsehoods." *Mercatus Grp.*, 641 F.3d at 843.

[7] Again, that the claims are also based in part on Defendants' fraudulent billing records is irrelevant on this motion, as "a defendant cannot use Rule 12(b)(6) to dismiss part of a claim." *Am. Int'l Indus.*, 2021 WL 5264239, at *3.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC

participated in its affairs through a pattern of racketeering activity—and therefore plausibly states a RICO claim.[8]

### A.    Ford Has Adequately Alleged a RICO Enterprise with the Common Purpose of Defrauding Ford, Other Automakers, and the Courts

Lawyers are not above the law, including RICO. *See Handeen*, 112 F.3d at 1349 ("An attorney's license is not an invitation to engage in racketeering, and a lawyer no less than anyone else is bound by generally applicable legislative enactments."). Accordingly, courts do "not shrink from finding an attorney liable when he crosses the line between traditional rendition of legal services and active participation in directing the enterprise." *Id.* Courts routinely refuse to dismiss RICO claims (even on summary judgment) involving law firms, lawyers, and other professionals in schemes that pale in comparison to Defendants' scheme alleged here.[9]

---

[8] At the outset, the Court should reject Defendants' suggestion (at 10 and repeatedly in the prior oral argument) that claims not involving "the infiltration of legitimate business organizations by organized crime" are outside of RICO's intended purview. *See H.J. Inc. v. N.W. Bell Tel. Co.*, 492 U.S. 229, 243-44 (1989) ("[T]he argument for reading an organized crime limitation into RICO's pattern concept, whatever the merits and demerits of such a limitation as an initial legislative matter, finds no support in the Act's text, and is at odds with the tenor of its legislative history."); *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 499 (1985) ("Congress wanted to reach both 'legitimate' and 'illegitimate' enterprises. The former enjoy neither an inherent incapacity for criminal activity nor immunity from its consequences. The fact that § 1964(c) is used against respected businesses allegedly engaged in a pattern of specifically identified criminal conduct is hardly a sufficient reason for assuming that the provision is being misconstrued.") (citation omitted); *id.* at 497 ("RICO is to be read broadly.").

[9] *See, e.g., Handeen*, 112 F.3d at 1350 (reversing summary judgment granted in law firm's favor in RICO scheme to "manipulat[e] [] the bankruptcy process to obtain a discharge" for client); *Napoli v. United States*, 32 F.3d 31, 33, 36 (2d Cir. 1994) (upholding criminal RICO jury verdict against lawyers in scheme of "pursuing counterfeit claims and using false witnesses in personal injury trials" due to evidence that lawyers "had participated in the core activities that constituted the affairs of the [] firm, namely, trying cases and obtaining settlements"); *In re Outlaw Lab'y, LP Litig.*, 2020 WL 3469387, at *3 (S.D. Cal. June 25, 2020) (refusing to reconsider order denying law firm's motion to dismiss in mail-fraud-based scheme involving "demand

*In re Outlaw*, 2020 WL 5552558, at *15, warrants special emphasis. As here, the defendants claimed that the alleged enterprise simply provided routine legal services. But the court rejected that, explaining on summary judgment that "the Enterprise's conduct of sending fraudulent demand letters to further its scheme, if true, amounts to mail fraud, which in turn forms the basis of the Enterprise's pattern of racketeering conduct." *Id*. Noting evidence showing that the firm "pursued litigation, obtained settlements, and won default judgments that resulted from the letters," the court concluded that "it does not appear that the Enterprise members … engaged in 'ordinary business conduct' pursuant to 'an ordinary business purpose.'" *Id.* (quoting *Shaw v. Nissan N. Am., Inc.*, 220 F. Supp. 3d 1046, 1054 (C.D. Cal. 2016)). The court further explained that "to the extent that any of these facts are disputed, they must be put to a

---

letters [] threatening RICO liability without a genuine intent to pursue such litigation"); *In re Outlaw*, 2020 WL 5552558, at *8-10 (denying summary judgment motion in same case and explaining that "the question is whether the attorney crosses the line between traditional rendition of legal services and active participation in directing the enterprise, and the answer to that question is, at this stage, a factual one") (citation modified); *Natural-Immunogenics Corp. v. Newport Trial Grp.*, 2020 WL 7263544, at *6 (C.D. Cal. Nov. 23, 2020) (denying motion for partial judgment on the pleadings because law firm's "fraudulent conduct of allegedly recruiting individuals to commence lawsuits" against plaintiff was predicate racketeering act such that legal fees constituted RICO injury); *Tribune Co. v. Purcigliotti*, 869 F. Supp. 1076, 1082, 1089, 1096-99 (S.D.N.Y. 1994) (denying law firm's and attorney's motion to dismiss in workers compensation scheme involving "the filing and prosecution of fraudulent hearing loss claims"); *Feld Entm't Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 316 & n.16 (D.D.C. 2012) (denying motion to dismiss because law firms and lawyers were "alleged to have gone far beyond providing traditional legal services" in allegedly paying plaintiff in underlying lawsuit "to fabricate his standing as a plaintiff and conceal[ing] nature of payments" through false discovery responses and deposition testimony); *Drummond Co., Inc. v. Collingsworth*, 2024 WL 5056621, at *9 (N.D. Ala. Dec. 10, 2024) (denying motion for summary judgment in scheme "to pay money to multiple witnesses and obtain their testimony … for use in litigation" against plaintiff); *JSC Foreign Economic Ass'n Technostroyexport v. Weiss*, 2007 WL 1159637, at *8 (S.D.N.Y. Apr. 8, 2007) (collecting cases for proposition that "where professionals are alleged to have exceeded the mere rendering of legitimate professional services, the 'operation or management' requirement will be pleaded adequately").

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC

trier of fact." *Id.* The court distinguished many of the cases cited by Defendants, such as *Gomez v. Guthy-Renker, LLC*, 2015 WL 4270042 (C.D. Cal. July 13, 2015) and the cases *Gomez* cites (most of which the Court addressed in its prior order as well).

Here, as in *In re Outlaw*, "the subject allegations … provide a basis from which to find that the RICO members [did] more than perform routine commercial activity." 2020 WL 5552558, at *15. Like the fraudulent demand letters in that case, the scheme here stems from fraudulent billing and perjurious declarations that resulted in settlements and judgments. *See* SAC ¶¶ 3, 5, 12, 18, 20-22, 27-30, 38, 40, 44, 59-60, 62-65, 70–76, 88–90, 99–100, 103; *see also The Cadle Co. v. Flanagan*, 2006 WL 860063, at *11 (D. Conn. Mar. 31, 2006) (noting that "filing of false claim exemptions and compliance statements is conduct reaching beyond the furnishing of advice, and constitutes decision making for the enterprise").

Notably, Defendants do not attack the viability of Ford's new enterprise theory *as alleged*[10], instead challenging the SAC (at 21-22) as "false and a sham" for changing its enterprise theory from KLG as a RICO person to the RICO enterprise. This argument lacks merit. "Rather obviously, one of the purposes of amending a pleading is to *cure a defect in a prior pleading*." *Taverniti v. Astrue*, 2008 WL 8448336, at 14 n.32 (N.D. Cal. Mar. 31, 2008) (emphasis original); *see Ford Motor Co.*, 2025 WL 3306280, at *17 (Ford should have the "benefit of any guidance from the Court as to what the Court viewed as deficiencies [] in its pleading"). Amended allegations are not defective merely because they differ from an earlier complaint. *See PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856, 860 (9th Cir. 2007) ("[T]here is nothing in the Federal Rules of Civil Procedure to prevent a party from filing successive pleadings that make inconsistent or even contradictory allegations."). *Airs Aromatics, LLC v. Victoria's*

---

[10] For good reason—both the Supreme Court and Ninth Circuit recognize Ford's enterprise theory as valid. *See, e.g., Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 163 (2001); *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1534 (9th Cir. 1992)*; see also Napoli*, 32 F.3d at 36 (affirming criminal convictions of attorneys who controlled or managed law firm that was "the charged enterprise").

*Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 600 (9th Cir. 2014) is not to the contrary; there, unlike here, the plaintiff sought to plead an entirely new cause of action, the elements of which directly contradicted claims previously made about the plaintiff's own conduct.[11] And while Defendants (at 22-23 n.3) cite *MiCamp Sols., LLC v. Visa Inc.*, 2025 WL 3548685, at *3 (N.D. Cal. Dec. 11, 2025) to argue that courts need not "ignore the prior allegations in determining the plausibility of the current pleadings," they do not identify any allegation in the FAC rendering the SAC implausible.

Recognizing that they cannot prevail on a distinctiveness argument against the SAC as pleaded, Defendants (at 23) argue that the SAC's description of Defendants as "a group of persons associated with [KLG]" means that KLG remains a RICO person and part of an alleged association-in-fact enterprise. Not so. *See* 18 U.S.C. § 1962(c) ("It shall be unlawful for any person employed by *or associated with any enterprise* ….") (emphasis added). Ford plainly alleges that Defendants used a legal entity, KLG, as an enterprise through which they violated RICO. *See, e.g.,* SAC ¶¶ 1, 3, 23.

Finally, the SAC sufficiently alleges a common purpose to engage in activity that goes far beyond "representing consumers pursuing Lemon Law claims" (at 23). Defendants have not just "crosse[d] the line between traditional rendition of legal services and active participation in directing the enterprise," *Handeen*, 112 F.3d at 1349, they have erased it. Sworn testimony from KLG employees confirms a consistent pattern of fraud—including that KLG's Fee Motion Department would compile new and separate invoices for fee petitions and "on a regular basis" and "for 'more than 50 percent' of cases" would invent imagined time spent on tasks, all with the knowledge and under the direction of the Defendants, SAC ¶¶ 36-39—and that Mikhov and Kirnos routinely submitted perjurious declarations affirming the truth and contemporaneous

---

[11] *See also Kanaan v. Yaqub*, 2022 WL 3357834, at *4 (N.D. Cal. Aug. 15, 2022) (noting that Ninth Circuit has held "both before and after *Airs Aromatics* that a party *can* amend a pleading to directly contradict an earlier iteration" and that "the *PAE* line of cases [] is more consistent with the Ninth Circuit's liberal policy favoring amendment") (emphasis original).

nature of the fraudulent billing records. *Id.* ¶¶ 3, 32-40, 70-83. This alleged ***criminal conduct by members of the Bar*** is worlds apart from the "regular business" cases Defendants cite (at 23-24). "[T]o conclude [Ford] ha[s] failed to state a claim would sanction fraud by the Bar and shut tight the courthouse doors to any person who alleges to be injured by it." *Kruse v. Repp*, 611 F. Supp. 3d 666, 711 (S.D. Iowa 2020).

### B.     Ford Adequately Has Alleged a Pattern of Racketeering Activity

####        1.     Ford identifies multiple predicate acts occurring within ten years

Defendants suggest (at 25-26) that because claims based on certain examples of Defendants' scheme are time-barred, Ford cannot adequately allege a pattern of racketeering activity. As a threshold matter, Defendants wrongly conflate two distinct concepts: a *pattern* of racketeering activity (which can be established by events occurring outside of the four-year limitations period) and a RICO *injury* (which cannot). *See, e.g., Flores v. Emerich & Fike*, 2008 WL 2489900, at *24 (E.D. Cal. June 18, 2008) (finding that "the fact a predicate act did not occur within four years from the accrual date does not bar the use of the act as a predicate act to show a pattern of racketeering because a pattern the [sic] racketeering requires two or more predicate acts within ten years, not four years"); *Corley v. Rosewood Care Ctr.*, 388 F.3d 990, 1004 (7th Cir. 2004) ("[A] plaintiff need not demonstrate injury to himself from each and every predicate act making up the RICO claim."). At minimum, therefore, the examples Defendants cite (at 25-26) are valid predicate acts.

In any event, Ford also can establish RICO injury from these examples because a "statute of limitations looks to the discovery of injury, not the date of predicate acts." *Flores*, 2008 WL 2489900, at *26. And because Defendants "actively misled" Ford and the courts, *Grimmett v. Brown*, 75 F.3d 506, 514 (9th Cir. 1996), including by using their stature as officers of the court to falsely assure automaker defendants and the courts ***under oath*** that the time reflected in fee petitions was accurate, SAC ¶¶ 27-30, 43-44, 59-65, 70-76, Ford properly invokes the "fraudulent concealment" doctrine. *See Borrego Cmty. Health Found. v. Hebets*, 2025 WL 2780178, at *17 (S.D. Cal. Sept. 30,

29

2025) (finding that plaintiff sufficiently alleged fraudulent concealment and that statute of limitations for RICO claim did not begin to accrue until government investigation unveiled the fraudulent conduct alleged). Moreover, even if injuries resulting from some of the predicate acts are time-barred, the separate accrual rule provides that a new cause of action accrues for each new and independent injury. *Grimmett*, 75 F.3d at 510-11.[12]

### 2.    Ford's allegations satisfy Rule 9(b)

Rule 9(b) "does not require absolute particularity or a recital of the evidence and ... need not allege a precise time frame, describe in detail a single specific transaction, identify the precise method used to carry out the fraud, or identify representative examples of false claims to support every allegation." *Blue Cross & Blue Shield Oklahoma v. S. Coast Behavioral Health LLC*, 2025 WL 2004500, at *6 (C.D. Cal. June 20, 2025) (citation modified). The SAC's allegations suffice. *See United States ex rel. USN4U, LLC v. Wolf Creek Fed. Servs., Inc.*, 34 F.4th 507, 514 (6th Cir. 2022) (finding Rule 9(b)'s particularity requirement met where plaintiff identified four examples "of specific fraudulent conduct that [we]re representative samples of the scheme").

Here, Ford alleges with particularity numerous examples of predicate acts. In Paragraphs 71 through 76, Ford describes declarations submitted with attached timesheets that constitute predicate acts of Mikhov's and Kirnos' perjury and false entries. In Paragraphs 77 through 82, Ford provides examples of mailed payments based on such fraudulent time sheets. Though not every example provides the same degree of specificity, they are sufficient to satisfy the Rule 9(b) standard with respect to the overall scheme, particularly when viewed alongside sworn deposition testimony

---

[12] Defendants claim (at 26 n.5) that a news article contradicts Ford's assertions that it recently became aware of the extent of Defendants' fraud. Even if this Court takes judicial notice of that article, it may not be considered for the truth of its contents on this motion. *See Woodall v. Walt Disney Co.*, 2024 WL 5337348, at *3 (C.D. Cal. Nov. 2, 2024). In any event, the article does not say that Ford was aware that KLG was fraudulently creating time sheets from scratch and thus does not "contradict" Ford's recent discovery of the scheme alleged in the SAC.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC

confirming Morse's tasks and pervasive fabrication by the Fee Motion Department that alone raises the reasonable inference that all of KLG's fee petitions, including the ones cited as representative examples, were fraudulent. *See, e.g.*, SAC ¶¶ 36-40, 44, 50, 52.

### 3.    Issue preclusion does not bar Ford's RICO claims

Defendants are wrong (at 27-30) that issue preclusion bars Ford from relying on **certain fee petitions** identified in the SAC as RICO predicate acts. Issue preclusion applies only "(1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party." *DKN Holdings LLC v. Faerber*, 61 Cal. 4th 813, 825 (2015). Issue preclusion, however, "is not an inflexible, universally applicable principle. Rather, policy considerations may limit its use where the limitation on relitigation underpinnings of the doctrine are outweighed by other factors." *Kelly v. TransGlobe Travel Bureau, Inc.*, 60 Cal. App. 3d 195, 202 (1976).

To start, there is no identical issue. That requirement "addresses whether identical factual allegations are at stake in the two proceedings, not whether the ultimate issues or dispositions are the same." *Williams v. Doctors Med. Ctr. of Modesto, Inc.,* 100 Cal. App. 5th 1117, 1132 (2024). Thus, the issue preclusion analysis "is specific to the particular allegations made in a complaint." *Id.* at 1137. Ford's allegations that Defendants created a Fee Motion Department to populate fee applications with fake time entries for work never performed, *see* SAC ¶¶ 1, 3, 12, 20, 23, 31-39, 52-53, 56, 58, 71-72, 74-75, 77-82, are not identical to the factual allegations Ford raised in opposition to the fee petitions, which focused on the lodestar method of determining a reasonable fee. While both issues relate generally to Defendants' fee recovery, Ford never alleged then what it alleges now: a systematic, sweeping fraudulent scheme. Nor did any of KLG's fee petitions—or Ford's oppositions to them—involve any of the RICO-related factual allegations (enterprise, pattern, etc.).

These new allegations, moreover, provide a second basis to reject a preclusion finding. "[C]ollateral estoppel was never intended to operate so as to prevent a re-

examination of the same question between the same parties where, in the interval between the first and second actions, the facts have materially changed or new facts have occurred which may have altered the legal rights or relations of the litigants." *Evans v. Celotex Corp.*, 194 Cal. App. 3d 741, 748 (1987) (applying collateral estoppel where "no new facts or issues came to light since the prior litigation"). Here, the SAC alleges substantial new facts—including facts first disclosed through discovery in this case—that were not available to Ford at the time it challenged the reasonableness of fees sought in individual fee petitions. *See* SAC ¶¶ 1, 3, 12, 20, 23, 31-32, 35-39, 52-53, 56, 58, 71-72, 74-75, 77-82.

Nor does issue preclusion apply where, as here, "the proceeding in which issue preclusion is currently sought involves different substantive law than the previous proceeding." *United States Golf Assn v. Arroyo Software Corp.*, 69 Cal. App. 4th 607, 617-18 (1999). This case—a federal RICO action based on fraud and perjury—rests on a different legal foundation and is controlled by different substantive law than the fee petitions, which were focused on the reasonableness of fees using the lodestar method.

Finally, even were all elements of issue preclusion satisfied (they are not), the Court should decline to apply the doctrine here because doing so would not advance the doctrine's underlying policies of "preserving the integrity of the judicial system, promoting judicial economy, and protecting litigants from harassment by vexatious litigation." *Lucido v. Superior Court*, 51 Cal.3d 335, 343 (1990). Indeed, "preserving the integrity of the judicial system" by holding officers of the court liable for lying and cheating in hundreds or thousands of legal cases is at the heart of Ford's lawsuit, and insulating such conduct from consequence would gravely ***harm*** the system's integrity. *See Mercatus Grp.*, 641 F.3d at 843-44 (explaining that "fraudulent statements in the adjudicative context threaten the fair and impartial functioning of these agencies and do not deserve immunity") (citation modified). Nor would applying issue preclusion here promote judicial economy; fee petition proceedings are truncated, with limited or no discovery, and defendants like Ford do not have the ability to uncover and challenge

32

fraudulent activity that Ford has here. Finally, applying issue preclusion would not protect litigants from harassment by vexatious litigation. Not only are Ford's claims credible, but they are not even raised against the consumer plaintiffs—the actual litigants—in the underlying cases. *See Union Pac. R.R. Co. v. Santa Fe Pac. Pipelines, Inc.*, 231 Cal. App. 4th 134, 186 (2014) ("Where there is doubt about the application of issue preclusion, it should not apply.").

### C. Ford Adequately Alleges a RICO Claim Against Each Individual Defendant

Ford also adequately alleges that each individual Defendant participated in the enterprise's conduct through a pattern of racketeering activity. To start, Ford need only allege that each Defendant played "*some* part in directing the enterprise's affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (emphasis original). And while Defendants resort (at 31) to counting words to advance their complaint that the SAC improperly groups allegations, "[t]here is no flaw in a pleading where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct." *United States ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 677 (9th Cir. 2018). Moreover, the Rule 9(b) standard is relaxed as to "matters within the opposing party's knowledge," where "plaintiffs cannot be expected to have personal knowledge of the relevant facts." *Immobiliare, LLC v. Westcor Land Title Ins. Co.,* 424 F. Supp. 3d 882, 890 (E.D. Cal. 2019) (citation omitted). And at the motion to dismiss stage, where every inference must be drawn in Ford's favor, all that is required is that the allegations be "sufficiently particular to show [Defendants] *may have* conducted or participated, either directly or indirectly," in the enterprise's racketeering conduct. *Blake v. Dierdorff*, 856 F.2d 1365, 1371-72 (9th Cir. 1988) (emphasis added) (upholding RICO allegations against lawyer and law firm).

Defendants' challenge (at 31) to Ford's allegations that they "oversaw," "supervised," or "directed" the enterprise is equally misplaced, as Ford provides factual assertions supporting those allegations. *See* SAC ¶¶ 23, 32-33, 35-39; *see also, e.g.,*

33

*Tatung Co., Ltd. v. Hsu*, 2015 WL 11072178, at *20 (C.D. Cal. Apr. 23, 2015) (finding adequate allegations that each defendant gave or took directions, occupied a position in the chain of command, knowingly implemented decisions of upper management, and was indispensable to achievement of enterprise's goal). Unlike *Blantz v. Cal. Dep't of Corr. and Rehab.*, 727 F.3d 917, 920, 926-27 (9th Cir. 2013), where the court found the plaintiff's allegations of a defendant's role to be implausible on their face, the enterprise alleged here is a law firm that Defendants themselves owned and managed. In *Napoli*, which involved a scheme of "pursuing counterfeit claims and using false witnesses in personal injury trials," *id.* at 33, the Second Circuit found an incorrect jury instruction on the "conduct or participate" element did not support collateral attack under 28 U.S.C. § 2255 due to "overwhelming evidence" that the attorneys "played some part in directing the affairs of the charged enterprise," including "participat[ing] in the core activities that constituted the affairs of the [] firm" and "discharg[ing] their responsibility through a pattern of illegal acts." *Id.* at 36. Here, the issue is not even evidence, but allegations—and Ford plausibly alleges a decade-plus-long scheme that operated out of a law firm that Mikhov *formed* during the pendency of the scheme and that Defendants carried out through hundreds of false declarations signed by Mikhov and Kirnos that included thousands of hours fraudulently billed by Morse and others. SAC ¶¶ 3, 5, 12, 18, 20-22, 27-30, 38, 40, 44, 59-60, 62-65, 70–76, 88–90, 99–100, 103. No more is required at the pleading stage.

**Mikhov.** Defendants' contention (at 32) that Ford does not "plausibly allege" that Mikhov was involved in directing the enterprise's affairs or that he participated in its operation and management is wrong.[13] Mikhov was the founder and managing partner of KLG, and in that role "was responsible for creating KLG's Fee Motion Department"

---

[13] Nor are Ford's allegations "inflammatory, irrelevant, [or] inaccurate." (Mot. at 32.) Ford's allegations regarding Mikhov's relocation to Puerto Rico are relevant to establish that Mikhov is still involved in KLG despite his nominal relocation, which was for reasons other than abandoning the criminal enterprise. *See* SAC ¶ 20.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC

and the scheme generally. SAC ¶¶ 2, 20. Mikhov, when he was not "recreat[ing]" "what time he could remember," gave authority to the Fee Motion Department to arbitrarily "enter [his] time for various tasks" without even providing the department with any estimate of time spent, just as he authorized them to do with respect to other attorneys' time. SAC ¶¶ 35, 37, 39. These are specific factual allegations sufficient to survive summary judgment, and which readily survive a motion to dismiss. *See In re Outlaw*, 2020 WL 5552558, at *9 (finding that whether law firm "originated the scheme," "was the architect of the demand letters," and "directed the Enterprise's settlements" were "facts in dispute that may establish [the law firm] had *some* part in directing the enterprise's affairs") (emphasis original, citation modified).

Ford also sufficiently alleges Mikhov's pattern of racketeering. Mikhov, in addition to admittedly fabricating his own time when it was not being invented by the Fee Motion Department, SAC ¶ 35, submitted perjurious declarations in which he falsely represented that the time sworn to was true, correct, and contemporaneously recorded—all while knowing this was false. SAC ¶¶ 38, 40, 65, 70-72, 74, 76. Mikhov "used U.S. mail and interstate wires to make fraudulent submissions, to negotiate settlements, and to receive payments pursuant to [the] fraudulent billing records" on numerous occasions. *Id.* ¶¶ 77-83. Mikhov wrongly contends (at 33) that there "are no plausible allegations that [he] even knew that any allegedly false billing entries were included" or "acted with an intent to defraud" by submitting false declarations. Putting aside the absurdity of this position—Mikhov is alleged to have created the Fee Motion Department and authorized it to fabricate time—this is not something to decide at the Rule 12 stage. *See, e.g., In re Outlaw Lab'y, LP Litig.*, 2020 WL 1953584, at *11 (S.D. Cal. Apr. 23, 2020); *Kruse*, 611 F. Supp. 3d at 711; *Feld*, 873 F. Supp. 2d at 316 & n.16; *Handeen*, 112 F.3d at 1349.

***Kirnos.*** The allegations against Kirnos are similarly sufficient. Kirnos is currently the managing partner of KLG and testified that even before assuming that role his duties included "supervising and addressing matters involving settlement of cases and fee

motions." SAC ¶¶ 2, 33. Kirnos attempts (at 34-35) to downplay his involvement, characterizing himself as just "a partner in a law firm," but he is wrong on the facts, *see* SAC ¶¶ 31-39, and on the law, *see, e.g., Napoli*, 32 F.3d at 35-36.

Defendants argue (at 35) that Kirnos is not alleged to have engaged in a pattern of racketeering activity—including through his routine submission of perjurious and false declarations in support of attorney's fees—because Ford fails to allege that Kirnos knew the truth or acted with intend to defraud. But, as with Mikhov, Ford adequately alleges that Kirnos, who oversaw the Fee Motion Department (and later acted as managing partner of the firm), "knowingly used the fabricated records ... in sworn, perjurious declarations" declaring that "all time billing entries were completed contemporaneously with or near in time to the work performed." SAC ¶¶ 35, 37-39. Ford need not establish that Kirnos was aware of all of the Fee Motion Department's activities; even if he did not know which of the time records he attached to his declarations were false, it would still be false and perjurious to swear that he had "personally reviewed" those timesheets "to ensure that they appropriately reflect the time expended," and that they were "true and correct" and "completed contemporaneously." SAC ¶¶ 73, 75-76; *compare id. with* SAC ¶ 33 ("I can't speak for what other attorneys do. My understanding is that we have a billing program, and they're supposed to, and I have seen results. So I know that they do on a general level."). If Kirnos is unable to "speak" about it in a sworn deposition, he cannot truthfully do so in a sworn declaration.[14]

*Morse.* Ford's allegations against Morse include that she "personally and knowingly participated" in the scheme, including by "knowingly making and/or allowing the creation of fraudulent entries," SAC ¶ 21; that she "knew that the great majority of time entries submitted to Ford and to courts under her name were fictitious,"

---

[14] Defendants' reliance (at 36) on *United States v. Prime Healthcare Servs., Inc.*, 2020 WL 11884833, at *6 (C.D. Cal. 2020) is misplaced. There, allegations against the "CEO of a large hospital network" suggested only that he "had the opportunity to discover the alleged scheme," *id.*; here, Kirnos' repeated swearing to his personal knowledge of the petitions' truth "impl[ies] either active participation or even willful ignorance." *Id.*

36

*id.*; that she was a "supervising attorney" at KLG, *id.* ¶¶ 21, 44; that she routinely billed more than 24 (or even 20) hours per day, reflecting clearly impossible and per se fraudulent billing entries, *id.* ¶¶ 7, 46-48; and that her time records contained thousands of entries for work she has admitted she never performed, as well as large numbers of duplicate tasks. *Id.* ¶¶ 21, 44, 50, 53-54, 71-75. And this fraud does not fall only on the Fee Motion Department, as Howard testified that she reviewed—before inputting the arbitrary time values—attorney billing statements reflecting that Morse performed tasks that she has admitted she did not. *Id.* ¶¶ 45.

Ford also sufficiently pleads Morse's knowing participation. "[I]ntent, knowledge, and other conditions of a person's mind may be averred generally" and can be inferred from "the existence of a scheme which was reasonably calculated to deceive persons of ordinary prudence and comprehension." *Carey v. J.A.K.'s Puppies, Inc.*, 763 F. Supp. 3d 952, 982-83 (C.D. Cal. 2025) (citation modified). This is particularly true when "plaintiffs cannot be expected to have personal knowledge of the relevant facts." *Immobiliare*, 424 F. Supp. 3d at 890. While Defendants claim (at 37) that Ford's "bare, information-and-belief assertion" of Morse's "knowing participation is not plausible," what is truly not plausible is that Morse was unaware that thousands of fake hours under her name were being submitted by her partners in fee petitions.[15] *See In re JUUL Labs, Inc. Marketing, Sales Practices, and Prods. Liab. Litigation*, 533 F. Supp. 3d 858, 871-72 (N.D. Cal. 2021) ("[I]t is only necessary that plaintiffs allege that each defendant knowingly participated in the scheme to defraud, with the requisite intent, and that some member or members of the Enterprise commit at least two acts of mail or wire fraud.").

---

[15] *Hamilton v. Willms*, 2005 WL 3797562, at *8 (E.D. Cal. Oct. 28, 2005), found on summary judgment that the only evidence against a RICO defendant was that she might have provided secretarial services and "knew very little about the details." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 728 (7th Cir. 1998) states that "simply performing services for an enterprise" is insufficient, but that case involved allegations against a doctor who was not alleged to have "participate[] in the operation and management of the enterprise itself." Neither case helps Morse given Ford's allegations.

Finally, Ford adequately alleges that Morse engaged in enterprise conduct. Morse was a supervising partner who is alleged to have submitted false time herself, SAC ¶¶ 44-45, 53, to have allowed others to submit false time entries under her name, *id.* ¶¶ 21, 71-81, and to have benefited financially as a result. *Id.* ¶ 39. This is more than sufficient at the pleading stage "to show that [Morse] may have conducted or participated, either directly or indirectly," in the creation and issuance of fraudulent time and billing records. *Blake*, 856 F.2d at 1372; *see CBC Framing, Inc. v. Flores*, 2008 WL 11337555, at *11 (C.D. Cal. Sept. 22, 2008) ("Though the alleged predicate acts of mail and/or wire fraud do not involve each of the Defendants in each instance, the Court finds that the allegations plausibly allege that each Defendant would have or should have known, and indeed should have expected, that the alleged acts of mail or wire fraud would occur, and thus each Defendant could plausibly be liable for each predicate act alleged.") (citation omitted).

## III.    FORD ADEQUATELY ALLEGES A RICO CONSPIRACY

For purposes of a RICO conspiracy claim, the "illegal agreement need not be express as long as its existence can be inferred from the words, actions, or interdependence of activities and persons involved." *Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 775 (9th Cir. 2002). Moreover, each defendant "need not have personally committed a predicate act, or even an overt act in furtherance of the RICO conspiracy"; rather, they must only be "aware of the essential nature and scope of the enterprise and intend[] to participate in it." *Tatung*, 2015 WL 11072178, at *25. Ford's allegations easily satisfy that standard at the pleading stage. SAC ¶¶ 116-122. And as Ford adequately alleges a substantive RICO claim under 18 U.S.C. § 1962(c), Defendants also fail in their challenge to the conspiracy claim based on the alleged failure to plead the underlying claim. *See Blue Cross,* 2025 WL 2004500, at *9.

### CONCLUSION

For the foregoing reasons, Defendants' motion should be denied.

Dated: February 9, 2026

KASOWITZ LLP

By: /s/ *Daniel A. Saunders*

Daniel A. Saunders
Matthew S. Manacek

Edward E. McNally
Daniel J. Fetterman

*Attorneys for Plaintiff*
*Ford Motor Company*

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SAC